**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**GENESIS HILL,**

        **Petitioner,**

   **v.**                            **Case No.  1:98-cv-452**
                                              **JUDGE SARGUS**

**BETTY J. MITCHELL, Warden,**               **Magistrate Judge Kemp**

        **Respondent.**

<u>**OPINION AND ORDER**</u>

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action under 28 U.S.C. §2254.  This matter is before the Court upon petitioner's motion for leave to conduct discovery (Doc. # 155), respondent's brief in opposition (Doc. # 156), and petitioner's reply (Doc. # 157).

I.  Overview

Petitioner seeks leave to conduct discovery in furtherance of his claims that prosecutors sought the death penalty against him, in violation of his rights under the Eighth and Fourteenth Amendments, arbitrarily and/or because of his race; that his rights to due process were violated because he was incompetent during his direct appeals of right, because he was incompetent to consent to a search of his residence, and because he was incompetent to waive his *Miranda* rights; and that his death sentence is in violation of his right under the Eighth Amendment to be free from cruel and unusual punishment because Ohio's lethal injection process raises "serious Eighth Amendment concerns," (Doc. # 155, at 16).  Specifically, petitioner seeks:

- Responses to all discovery requests in Mr. Hill's First Requests for admission, First Set of Interrogatories, and First Requests for Production of Documents to Respondent (attached to petitioner's motion as Exhibit A);

- To depose Hamilton County prosecutors Steven M. Tolbert, Esq. and Jerome A. Kunkel, Esq., seeking their office's policies, procedures, or guidelines regarding who should be charged with capital murder, both before and at the time of Mr. Hill's prosecution, and the decision to charge Mr. Hill with capital murder;

- To depose any other person who worked in the Hamilton County prosecutor's office at the time of Genesis Hill's prosecution who had or could have had knowledge of that office's policies, procedures, or guidelines, in place at that time, regarding who should be charged with capital murder, or prosecutors' reasons for seeking the death penalty against Genesis Hill;

- To depose present or former Cincinnati Police Department employees Charles Beaver, Robert Hennekes, Linda Petrovsky, and Robert Steinher, regarding Mr. Hill's putative consent to a search of his house and his putative waiver of his *Miranda* rights;

- To depose any other individuals present on any occasion when police officers putatively received Genesis Hill's consent to conduct any searches at 18 Mulberry Street in Cincinnati, or any other place at which Genesis Hill was present, or any place of which Genesis Hill was or appeared to be an owner, lessor, resident, occupant, or guest, in the investigation giving rise to his death-penalty conviction; and

- To depose any other individuals present on any occasion when police officers putatively received Mr. Hill's consent to waive his *Miranda* rights in the investigation giving rise to his death-penalty conviction.

(Doc. # 155, at 2.)

Respondent opposes petitioner's discovery requests, arguing not only that 28 U.S.C. § 2254(e)(2) precludes petitioner from developing in habeas corpus evidence that he failed to develop in the state courts, but also that petitioner cannot demonstrate good cause pursuant to Rule 6 of the Rules Governing Section 2254 Cases for any of his discovery requests.

II.  Discussion

2

The discovery processes contained in the Federal Rules of Civil Procedure do not automatically apply in habeas corpus actions. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In *Harris v. Nelson*, 394 U.S. 286, 295 (1969), the United States Supreme Court held that the "broad discovery provisions" of the Federal Rules of Civil Procedure did not apply in habeas corpus proceedings. As a result of the holding in *Harris*, the Rules Governing Section 2254 Cases In United States District Courts were promulgated in 1976.

Specifically, Rule 6(a) provides--

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Under this "good cause" standard, a district court should grant leave to conduct discovery in habeas corpus proceedings only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is ... entitled to relief....'" *Bracy*, 520 U.S. at 908-909 (quoting *Harris*, 394 U.S. at 300). *See also Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004); *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). In keeping with the well settled principle that habeas petitioners are not entitled to go on a fishing expedition in search of damaging evidence, Rule 6's "good cause" standard requires petitioner to at least attempt to identify what he expects to uncover through his discovery requests. *See Williams v. Bagley, supra*, 380 F.3d at 976.

Regarding respondent's assertion that petitioner should not be able to develop and present in habeas corpus evidence that he failed to develop or present during his state court postconviction proceedings and that petitioner is precluded by the restrictions set forth in 28

U.S.C. § 2254(e)(2) from conducting this discovery, this Court is of the view that respondent's arguments in this regard are premature and do not provide a basis for denying petitioner discovery at this point.  Section 2254(e)(2) provides in relevant part that if a habeas corpus applicant fails to develop the factual basis of a claim in state court proceedings, the district court is precluded from holding an evidentiary hearing on the claim unless the applicant shows that:

> (A) the claim relies on–
> (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

In *Holland v. Jackson*, 542 U.S. 649, 653 (2004), the Supreme Court held that the restrictions on factual development set forth in 28 U.S.C. § 2254(e)(2) apply when a petitioner seeks to present new evidence not considered by the state courts, whether he seeks to present that new evidence through an evidentiary hearing or expansion of the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases.  This Court is aware of at least one case in which *Holland*'s holding was extended to prohibit a discovery request that appeared to be fashioned as "an end run around the restrictions of Rule 7 as interpreted by *Holland v. Jackson*, 542 U.S. 649 (2004)." *Stallings v. Bagley*, Case No. 505-CV-722, 2007 WL 437888, at * 2 (N.D. Ohio Feb. 6, 2007).  That said, this Court is of the view that it is premature to address respondent's argument because, at this point, petitioner has not sought (and may never seek) to present new evidence in support of his claims.  At this point, he has asked only for leave to conduct discovery that may

4

lead to new evidence.  The Court will address any arguments regarding whether § 2254(e)(2) precludes petitioner from introducing new evidence in support of his claims when and if he seeks to present that new evidence.  It also bears mentioning that, to the extent that petitioner may seek to present new evidence for purposes other than demonstrating that he is entitled to relief on his constitutional claims, such as attempting to satisfy the cause-and-prejudice exception to procedural default, then presumably the restrictions set forth in §2254(e)(2) would not apply. *See Cristin v. Brennan*, 281 F.3d 404, 417 n.14 (3rd Cir. 2002) (suggesting that the standard adopted in § 2254(e)(2) does not apply to evidentiary hearings on whether a petitioner can establish an excuse for an earlier procedural default); *see also Boyko v. Parke*, 259 F.3d 781, 790 (7th Cir. 2001) (finding that § 2254(e)(2) should not be applied when expansion of the record is sought for purposes other than introducing new evidence on the merits of a claim).

With these principles in mind, the Court will now consider of petitioner's discovery requests.

A.  <u>Ground Twenty-One – Arbitrary and/or Discriminatory Imposition of Death Penalty</u>

In his twenty-first ground for relief, petitioner argues that the prosecutors sought the death penalty against him arbitrarily in violation of his due process rights.  (Second Amended Petition, Doc. # 137-2, at ¶¶ 135-138.)  Specifically, petitioner argues that prosecutors sought the death penalty against him because of his race, in violation of his rights under the Equal Protection Clause of the Fourteenth Amendment.  Citing *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987), petitioner asserts that although prosecutors have broad discretion in deciding whether the seek the death penalty, that discretion is not unlimited and may not be exercised with discriminatory intent.  Petitioner asserts that various facts give rise to an inference that Hamilton

5

County prosecutors relied on inappropriate factors, *i.e.*, race, in pursuing a death sentence for petitioner.  Petitioner explains that of the one-hundred and ninety-three death sentences that have been imposed since Ohio reinstated the death penalty, forty-eight have been imposed on individuals from Hamilton County.  Of those forty-eight death sentences, petitioner continues, sixty per cent have been imposed on African-Americans, even though African-Americans comprise only twenty-one per cent of the Hamilton County population, according to the 1990 census.  Petitioner argues that "[t]he Hamilton County prosecutor's office can offer no rational, race-neutral explanation of why African-Americans are sentenced to death in Hamilton County at a rate of three times their presence in the population."  (Doc. # 137-2, at ¶ 138.)

Petitioner seeks discovery to develop additional factual support for his claim, acknowledging "that the Sixth Circuit has examined these or similar statistics regarding Hamilton County racial disparities in capital sentencing and found them insufficient, in themselves, to support relief under *McCleskey*."  (Doc. # 155, at 8, citing *Coleman v. Mitchell*, 268 F.3d 417, 441-442 (6th Cir. 2001).)  Petitioner states that he intends to present both direct evidence of racial discrimination in his own case and statistical evidence showing that racial discrimination so pervades prosecutions for capital crimes in Hamilton County and Ohio that his Equal Protection rights were violated.  To that end, petitioner seeks to depose the prosecutors from his case, Mr. Steven Tolbert and Mr. Jerome Kunkel, along with any other individuals who were in the prosecutor's office at the time of petitioner's prosecution, who may be aware not only of any policies, procedures, or guidelines that existed regarding the decision of whether to seek a death sentence, but also of the reasons that prosecutors decided to seek a death sentence for petitioner.  Reiterating that prosecutors may not act with discriminatory intent, petitioner

reasons that his only likely means of substantiating his claim that prosecutors in his case did so is to examine them and others privy to their decision-making process. Petitioner further asserts that the deposition testimony he seeks is narrowly focused on one issue, about which the prosecutors and others in the office are certain to have knowledge, that will likely be determinative of his claim.

Petitioner also seeks a broad array of documents to support his claim. Specifically, he requests:

- All documents reflecting or referencing procedures, policies, or guidelines regarding who should be charged with capital murder in Hamilton County before or at the time of Mr. Hill's prosecution, including but not limited to any forms upon which prosecutors could record [or] memorialize the factors it considered in determining whether to seek a capital indictment.

- All documents pertaining to the Hamilton County prosecutor's office's decision to seek the death penalty in its prosecution of Genesis Hill.

- All documents addressing death penalty imposition in Ohio's various counties, including but not limited to statistics, analyses, strategies, comparisons, policies, procedures, and guidelines, including any document that addresses death-penalty imposition in more than one Ohio county, and any document that addresses death-penalty imposition in one county that is part of a larger collection of documents addressing death penalty imposition in multiple counties.

(Doc. # 155, at 9-11.) Petitioner asserts that the first set of documents will allow him to better understand the process that Hamilton County prosecutors used in making the decision to capitally indict him and to determine at what points racial prejudice may have entered the decision-making process. Petitioner asserts that the relevance of the second set of documents is obvious, as they might evidence any discriminatory purpose the prosecutors had. Finally,

7

petitioner asserts that the final set of documents may assist him in demonstrating that African-Americans are disproportionately charged with capital crimes in Hamilton County. Petitioner insists that although such statistical evidence alone is unlikely to warrant relief, it is relevant as a source of proof of intentional discrimination.

Finally, as the Court noted earlier, petitioner also seeks responses to his First Request for Admissions, First Set of Interrogatories, and First Requests for Production of Documents, attached to petitioner's discovery motion as Exhibit A. (See Doc. # 155-2, Admissions 1 through 7 at pp. 4-6; Interrogatories 1 through 2 at p. 14; Document Requests 1 through 3 at pp. 15- 16.)

Respondent opposes petitioner's discovery requests, arguing that they are based on broad and unsupported allegations. Asserting that a presumption of regularity supports prosecutorial decisions, absent clear evidence to the contrary, respondent argues that a petitioner making an Equal Protection challenge must show that similarly situated individuals of a different race were not prosecuted. (Doc. # 156, at 7-8.) Respondent further argues that a number of courts, including the Sixth Circuit, have considered and rejected the precise claim that petitioner raises herein. (Doc. # 156, at 8-9, citing *Smith v. Mitchell*, 348 F.3d 177, 211-212 (6th Cir. 2003), and *Henderson v. Collins*, 101 F. Supp. 2d 866, 925 (S.D. Ohio 1999).) Respondent also takes petitioner to task for his failure to properly and timely request similar information in the state courts, asserting that "[a]ll the information Hill currently seeks was, could have been, or should have been requested prior to this federal habeas action." (Doc. # 156, at 10.) Finally, respondent opposes petitioner's discovery requests on the ground that he has failed to offer some evidence, as opposed to only his vague speculation, that discovery is necessary to substantiate his Equal

Protection claim.  (Doc. # 156, at 10.)

In order to determine whether petitioner is entitled to conduct discovery on this claim, the Court initially must identify the essential elements of his claims.  *See Bracy*, 520 U.S. at 904.  It is true that equal protection and due process prohibit prosecutors from basing their decision to prosecute on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962).  To prevail on a claim of (discriminatory) selective prosecution, the petitioner must demonstrate that similarly situated defendants of a different race were not prosecuted on the sole basis of their race.  *See United States v. Armstrong*, 517 U.S. 456, 465 (1996).  "[A] defendant who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination."  *McClesky v. Kemp*, 481 U.S. 279, 292 (1987) (citations omitted).  More particularly, "'to prevail under the Equal Protection Clause, [a defendant] must prove that decisionmakers in *his* case acted with discriminatory purpose.'" *Smith v. Mitchell*, 348 F.3d 177, 211 (6th Cir. 2003) (quoting *McCleskey*, 481 U.S. at 292). Further, "[b]ecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *McCleskey*, 481 U.S. at 297.  To be clear, petitioner need not prove these elements in order to justify discovery; rather, he must show that, if the facts are developed through the discovery he seeks, he could prove a constitutional violation and would be entitled to relief. *See Harris, supra*, 394 U.S. at 299.

The Court is of the view that there are more factors militating in favor of granting petitioner's discovery request than there are in favor of denying it.  The law is clear, and petitioner concedes, that a claimant must offer specific evidence of discriminatory intent above

and beyond statistics giving rise to an inference of discriminatory intent. *See Wayte v. United States*, 470 U.S. 598, 608 (1985). That being the case, petitioner argues, and the Court is inclined to agree, that it is precisely because the burden of proof for succeeding on the merits of an equal protection claim is so high that the threshold for warranting additional factual development must be relatively low. *McCleskey* requires "exceptionally clear proof" of discriminatory intent and, as petitioner asserts, habeas corpus discovery may be his only means for obtaining such evidence, assuming it exists. In that regard, this Court notes that, although the Sixth Circuit in *Smith v. Mitchell* rejected the precise claim that petitioner raises herein, it did so in part based on facts that were developed in discovery that the district court had permitted, including deposition testimony of one of the petitioner's trial prosecutor and a sworn statement by that trial prosecutor's former first assistant. *Smith v. Mitchell*, 348 F.3d at 211-212; *see also Jefferson v. Terry*, 490 F. Supp. 2d 1261, 1339-1342 (N.D. Ga. 2007) (rejecting an equal protection claim brought under *McCleskey* only after considering, in addition to statistical evidence demonstrating racial disparity in death sentences, deposition testimony of the former district attorney in charge of making capital indictment decisions from 1977 through 1998).

A related factor supporting this Court's inclination to grant discovery on this claim is the fact that it does not appear that petitioner could obtain the information he seeks through any other means. *See Jeffries v. Blodgett*, 771 F.Supp. 1520, 1529 (W.D. Washington 1991), *aff'd* 974 F.2d 1179 (9th Cir. 1992); *Cf. Gibbs v. Johnson*, 134 F.3d 253, 258-59 (5th Cir. 1998) (denying motion for discovery of materials that were "not nonpublic"). Demonstrating discriminatory intent on the part of the prosecutors in his case requires inquiry into evidence uniquely in the possession of the prosecutors. *See Batson v. Kentucky*, 476 U.S. 79, 94 (1986);

10

*United States v. Hazel*, 696 F.2d 473, 475 (6th Cir. 1983). The Court is mindful that the Supreme Court in *McCleskey* recognized the "impropriety of our requiring prosecutors to defend their decisions to seek death penalties often years after they were made," *McCleskey*, 481 U.S. at 296 (internal quotation marks and citations omitted). Still, as noted above, the information that petitioner seeks is uniquely in possession of the prosecutors who made the decision to indict him capitally and, as petitioner notes, courts have permitted requests to depose prosecutors for this very purpose. *See, e.g., Smith v. Mitchell*, 384 F.3d at 211-212 (noting that district court had permitted discovery that included deposition testimony of the petitioner's former trial prosecutor).

Respondent suggests in opposing this discovery request that all of the information that petitioner seeks "was, could have been, or should have been requested prior this federal habeas action." (Doc. # 156, at 10.) Without expressing any opinion as to whether or to what extent petitioner might be precluded by the restrictions set forth in 28 U.S.C. § 2254(e)(2) from introducing whatever evidence he might find through the discovery this Court is inclined to permit, the Court would note that it seems highly doubtful that petitioner could have obtained during any of his state court proceedings the information he now seeks. Such information does not appear to fall within the scope of that which is discoverable prior to trial under Ohio R. Crim. P. 16. And it is even less likely that petitioner would have been able to develop such evidence through the voluntary cooperation of the prosecutors or others who were in the prosecutor's office at the time of petitioner's prosecution. Thus, this Court finds more persuasive petitioner's argument that his only likely means of substantiating his claim is to examine the prosecutors in his case and others privy to their decision-making process than it does respondent's argument

11

that the information petitioner seeks was or could have been obtained during state court proceedings.

In granting petitioner's request to conduct discovery on his Equal Protection claim, this Court is mindful of the uphill battle he faces in proving that he is entitled to relief on this claim. The Court could speculate as to any number of race-neutral explanations that may have led law enforcement officers to charge Petitioner Hill with capital aggravated murder and to forego charging petitioner with a lesser offense -- not the least of which is the fact that petitioner committed "an act for which the United States Constitution and [Ohio] laws permit imposition of the death penalty." *McCleskey*, 481 U.S. at 296-297. But such an endeavor would be just that -- largely speculative. Because the issue before the Court is not whether petitioner has demonstrated or can demonstrate enough evidence to ultimately succeed on the merits of this claim, but whether petitioner has demonstrated "sufficient facts to take the question past the frivolous state," *United States v. Hazel, supra*, 696 F.2d at 475, the Court is inclined to err on the side of gathering too much information, rather than too little. The statistical evidence that petitioner has offered may be insufficient, standing alone, to warrant relief on his Equal Protection claim; but it is enough to constitute good cause for discovery of further facts supporting his Equal Protection claim. Petitioner's motion for leave to conduct discovery on his twenty-first ground for relief is well taken, but not as to every one of his requests.

As noted above, petitioner states that he "intends to present both direct evidence of racial discrimination in his own case and statistical evidence showing that racial discrimination so pervades prosecutions for capital crimes in Ohio and Hamilton County that his Equal Protection rights were violated." (Doc. # 155, at 8.) This Court is not persuaded that petitioner has

12

demonstrated good cause for the latter category of evidence that he seeks to present because

proving anything but the former would not entitle petitioner to relief.  That is, even assuming

petitioner could find, develop, and present evidence showing that racial discrimination so

pervades prosecutions for capital crimes in Ohio and Hamilton County, that would not entitle

*him* to relief on a claim that *his* Equal Protection rights were violated.   As the Court noted

earlier, *McCleskey* and *Smith v. Mitchell* make clear that "'to prevail under the Equal Protection

Clause, [a defendant] must prove that the decisionmakers in *his* case acted with discriminatory

purpose.'" *Smith v. Mitchell*, 348 F.3d at 211 (quoting *McCleskey*, 481 U.S. at 292 (emphasis in

original)).  That being so, petitioner has not demonstrated good cause for his request for the

production of all documents addressing death penalty imposition in Ohio's various counties,

including but not limited to statistics, analyses, strategies, comparisons, policies, procedures, or

guidelines, including any document that addresses death-penalty imposition in more than one

Ohio county, and any document that addresses death-penalty imposition in one county that is

part of a larger collection of documents addressing death penalty imposition in multiple counties.

(Doc. # 155, at 10-11; Doc. # 155-2, at 16.)

Petitioner has, on the other hand, demonstrated good cause for the following discovery

requests:

- From petitioner's First Requests for Admission, attached as
  Exhibit A to his motion for leave to conduct discovery, responses
  to questions 1 through 7 (Doc. # 155-2, at pp. 4-6);

- From petitioner's First Set of Interrogatories, attached as Exhibit A
  to his motion for leave to conduct discovery, responses to
  questions 1 and 2 (Doc. # 155-2, at p. 14);

- From petitioner's First Requests for Production of Documents,
  attached as Exhibit A to his motion for leave to conduct discovery,

13

production of requests in numbers 1 and 3 (Doc. # 155-2, at pp. 15-16);

- Depositions of Steven M. Tolbert, Esq. and Jerome A. Kunkel, Esq. on the Hamilton County, Ohio prosecutor's office's policies, procedures, and guidelines regarding who should be charged with capital murder before and at the time of Genesis Hill's prosecution, and the decision to charge Genesis Hill with capital murder (Doc. # 155-3, at p. 1;

- Deposition of any other person, (within reason and as identified in response to interrogatory questions 1 and 2), who worked in the Hamilton County prosecutor's office at the time of Genesis Hill's prosecution who had or could have had knowledge of that office's policies, procedures, or guidelines, in place before or at that time, regarding who should be charged with capital murder, or who had or could have had knowledge of the reasons for charging Genesis Hill with capital murder (Doc. # 155-3, at pp. 1-2).

B. Grounds Seventeen, Eighteen, and Nineteen – Incompetence on Direct Appeal

In his seventeenth ground for relief, petitioner alleges that he was deprived of due process because he was incompetent during his direct appeals in the state courts. (Doc.# 137-2 at ¶ 221.) Petitioner also argues in his eighteenth and nineteenth grounds for relief that his incompetence contributed to rendering his appellate counsel ineffective during petitioner's direct appeals to the Ohio Court of Appeals for the First Appellate District and the Supreme Court of Ohio, respectively. (Doc. # 137-2, at ¶ 73.) Arguing that trying a criminal defendant who is incompetent violates that defendant's right to due process under the Fourteenth Amendment, petitioner asserts that, in spite of the trial court's finding that he was competent to stand trial, new evidence demonstrates that petitioner actually was incompetent prior to and during his trial and that petitioner's incompetence continued through his direct appeals.

Petitioner explains in paragraphs of his second amended petition relating to his claim that he was incompetent prior to and during his trial that, following a suggestion of insanity and

14

motion for appointment of psychiatrists that his trial attorneys filed, the trial court appointed

three psychiatrists to examine petitioner and file reports in advance of a competency hearing.

The experts filed their reports on October 28, 1991, all concluding that petitioner was competent.

At petitioner's competency hearing, the parties stipulated to the findings in the three reports and

defense counsel presented no other evidence demonstrating or suggesting that petitioner was

incompetent. Accordingly, the trial court found on the record that petitioner was competent.

     Recognizing that 28 U.S.C. § 2254(e)(1) requires this Court to presume as correct the

state court's factual finding that petitioner was competent, absent clear and convincing evidence

to the contrary, petitioner argues that he can rebut the trial court's finding of competence with

clear and convincing evidence, to wit: the affidavit of Dr. Robert L. Smith, a Clinical

Psychologist who examined petitioner in connection with his state postconviction proceedings.

Petitioner points out that Dr. Smith, following a two-day evaluation of petitioner that included

extensive testing and a review of relevant documents, diagnosed petitioner with Major

Depressive Disorder with mood congruent psychotic features, Paranoid Personality Disorder,

and Substance Dependence at the time of the offense. (Doc. # 137-2, at ¶ 216.) These

conditions, according to Dr. Smith, would have impaired petitioner's ability to trust his counsel,

work cooperatively with them, or adequately understand or contribute to his defense. (*Id.*)

Petitioner points out specifically that Dr. Smith considered, among other things, severe traumas

in petitioner's childhood and adolescence – *i.e.*, pervasive poverty, drug and alcohol abuse,

mental illness, physical abuse, sexual abuse, and neglect – that resulted in thought disorder,

including hallucinations, delusions, and suicidal thoughts, as well as symptoms of paranoia. (*Id.*,

at ¶ 215.) Petitioner asserts that his conduct during his trial (and presumably his direct appeals)

supports Dr. Smith's conclusions, as evidenced by petitioner's refusal to tell his trial attorneys his version of the events surrounding his daughter's death and his refusal to permit counsel to engage in plea negotiations. (*Id.*, at ¶ 219.)

Petitioner argues herein that, although he has strong, specific evidence to support his claim that he was incompetent during his direct appeals – *i.e.*, the affidavits of Dr. Robert L. Smith and neuropsychologist Dr. Michael Gelbort establishing that petitioner was at the time of his direct appeals, (and remains), suffering from a mental disease or defect rendering him mentally incompetent to the extent that he was unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense – he requires discovery to uncover additional facts to support his claim. (Doc. # 155, at 12.) Specifically, petitioner seeks any psychological and medical records in possession of the State verifying that petitioner is or was incompetent. Petitioner points out that this Court, in *Cowans v. Bagley*, 1:00-cv-618 (S.D. Ohio Sept. 30, 2002), permitted discovery of medical or psychological records in the possession of the State regarding petitioner's allegation that he was incompetent to be tried. Petitioner also suggests that he may, at some point, seek leave to obtain affidavits or deposition testimony from his appellate attorneys.[1] The specific discovery that petitioner seeks at this time consists of a single request for the production of copies of all documents referencing or otherwise relating to Genesis Hill's mental or physical health at any time. (Doc. # 155-2, at 17.)

Respondent opposes this request, arguing first that petitioner's broad request for all psychological or medical records in the possession of the State and/or Hamilton County fails to

---

[1] Petitioner states in his motion that such discovery would be beyond the scope of the present motion, "because this Court's scheduling order appears only to have contemplated that this motion would address discovery Mr. Hill seeks from Respondents, not from third parties." (Doc. # 155, at 12.) This Court intended no such limitation.

satisfy the good cause requirement for habeas corpus discovery.  Respondent emphasizes that Dr.

Nancy Schmidtgoessling evaluated petitioner prior to his trial and concluded that he was rational

and intelligent, had no mental disease or defect, and was not suffering from major depression.

(Doc. # 156, at 11.)  Dismissing the affidavits of Drs. Smith and Gelbort because they were

based on evaluations that took place well after petitioner's trial in 1991 and completion of his

direct appeals in 1996, respondent argues that petitioner has offered no evidence that Dr.

Schmidtgoessling was incorrect in her conclusions as to petitioner's competence during trial and

on his direct appeals.  Respondent also argues that petitioner's reliance on *Cowans* is misplaced,

insofar as Petitioner Cowans had sought records to demonstrate that he had been incompetent to

waive his right to present mitigation evidence and Petitioner Cowans had never been

psychologically examined in connection with his trial or the trial court's determination that he

was competent.  (*Id*., at 12.)  Respondent goes on to argue that petitioner has failed to

demonstrate good cause to present affidavits or deposition testimony from his appellate attorneys

because petitioner has failed to explain why he has never even attempted to speak with them

informally.  (*Id*., at 13.)  Moreover, according to respondent, the record demonstrates that

petitioner's appellate counsel performed effectively in using their professional judgment to

determine which issues to assign as error and in raising, ultimately, twenty-nine issues on direct

appeal to the intermediate appellate court and twenty-six issues on direct appeal to the Supreme

Court of Ohio.  (*Id*., at 13-14.)

   In order to determine whether petitioner is entitled to conduct discovery on this claim, the

Court initially must identify the essential elements of his claims.  *See Bracy*, 520 U.S. at 904.

The Due Process Clause is violated when a mentally incompetent defendant is tried and

convicted.  *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Dusky v. United States*, 362 U.S. 402, 402 (1960).  A defendant is competent to stand trial if he has sufficient present ability to consult with counsel with a reasonable degree of rational understanding, as well as rational and factual understanding of the proceedings against him.  *Dusky*, 362 U.S. at 402; *see also Gall v. Parker*, 231 F.3d 265, 284 (6th Cir. 2000).[2]

With respect to the essential elements of petitioner's claims of ineffective assistance of appellate counsel, establishing a claim of ineffective assistance of counsel requires the petitioner to show both deficient performance on the part of his attorneys and prejudice from the deficient performance:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  With respect to the first prong of the *Strickland* test, the Court notes that, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*. at 689.  To establish the second prong of the *Strickland* test, *i.e.*, prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.

---

[2]     The Court will assume, for purposes of this discussion, that the rights and standards advanced by *Duskey*, *Drope*, and *Pate* extend to direct appeals proceedings.

18

The *Strickland* test applies to appellate counsel.  *Burger v. Kemp*, 483 U.S. 776 (1987).

Counsel must provide reasonable professional judgment in presenting the appeal.  *Evitts v.

Lucey*, 469 U.S. 387, 396-97 (1985).  "'[W]innowing out weaker arguments on appeal and

focusing on' those more likely to prevail, far from being evidence of incompetence, is the

hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting

*Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  *But see Smith v. Anderson*, 104 F. Supp. 2d 773,

839 (S.D. Ohio 2000) ("This Court believes that, in capital cases, appellate counsel should

approach the traditional process of winnowing out claims with extreme caution."); *Jamison v.

Collins*, 100 F. Supp. 2d 647, 740-41 (S.D. Ohio 2000) ("[W]e believe that any 'winnowing' or

narrowing of issues must be done very cautiously when a person's life is at stake.").  Of course,

not every decision made by appellate counsel can be insulated from review merely by

categorizing it as strategic.

The Court is satisfied that petitioner has demonstrated "good cause" for the discovery he

requests as to his seventeenth, eighteenth, and nineteenth grounds for relief.  Those claims are

properly before the Court and petitioner's allegations are neither patently frivolous nor palpably

incredible.  The discovery he requests is specific, limited, and reasonably calculated to lead to

evidence in support of his claims that he was incompetent during his direct appeals in violation

of his right to due process and that his incompetence was a contributing factor to the ineffective

assistance allegedly rendered by his appellate counsel.  The Court is persuaded that good cause

exists for the records that petitioner seeks precisely for a reason that respondent advances in

opposing this particular discovery request.

Respondent argues that the affidavits of Drs. Robert Smith and Michael Gelbort do not

provide sufficient evidence to call into question petitioner's competency at the time of his trial or direct appeals because their evaluations of petitioner "occurred well after Hill's conviction in 1991 and the completion of his direct appeal on March 5, 1996."  (Doc. # 156, at 12 n.1.) Initially, the Court notes that there is no blanket prohibition against post hoc competency determinations.  *See, e.g., Conner v. Wingo*, 429 F.2d 630, 640 (6th Cir. 1970) (holding that a retrospective determination of competency may satisfy the due process requirement so long as a meaningful hearing is possible).   This Court is of the view that the affidavits of Drs. Smith and Gelbort provide good cause sufficient to believe that the records sought by petitioner could yield facts in support of his claims that he was incompetent during his direct appeals and that his incompetency contributed to alleged ineffective assistance rendered by his appellate attorneys. Both experts expressed opinions that the mental deficiencies and brain impairment that the diagnosed were in effect at the time of the offense, would have continued prior to and during petitioner's trial since he had received no treatment, and likely continued to the present.  (Doc. # 155-6, at 8-9; Doc. # 155-7, at 7-8.)  This Court is of the view, however, that petitioner's request for psychological and medical records in possession of the State must be limited to the time of his trial through the completion of his direct appeals.

For the foregoing reasons, the Court finds good cause for the following request for production of documents:

- Copies of documents in possession of the State or Hamilton County referencing or otherwise relating to Genesis Hill's mental or physical health from 1991 through 1996.

   C.  Ground One – Incompetence to Consent to Search or Waive *Miranda* Rights

In his first ground for relief, petitioner alleges that the State's unlawful gathering and use

of evidence violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

(Doc. # 137-2, at ¶¶ 272-283.)  Relevant to the instant motion are petitioner's allegations that,

due to mental deficiencies that included a full scale IQ of 77, as well as his suffering from major

depressive disorder and paranoid personality disorder, he was unable knowingly, intelligently, or

voluntarily to consent to the warrantless search of his residence (Doc. # 137-2, at ¶ 275) or to

waive his *Miranda* rights (Doc. # 137-2, at ¶ 279).

Petitioner appears to challenge the validity of a waiver of *Miranda* rights form that he

signed on June 1, 1991, a consent to search form that he and his uncle, Elmer Hill, signed on

June 2, 1991, and a waiver of *Miranda* rights form that he signed on June 4, 1991.  Petitioner

explains as to the consent to search form that, during the course of its investigation into the

disappearance of Domika Dudley, police recovered from petitioner's apartment several plastic

garbage bags and a fragment of a plastic garbage bag that, through "quasi-expert testimony," the

State claimed at trial were of the same type as the plastic garbage bag in which the victim's body

was found.  (Doc. # 137-2, at ¶ 274.)  Petitioner further explains, as to the waiver of *Miranda*

rights forms, that police interrogated him several times during the course of its investigation into

the disappearance of Domika Dudley.  According to petitioner, the State adduced testimony

during trial concerning the statements that petitioner made to police during those interrogations

which never contained an admission of guilt, but which contained internal inconsistencies and

inconsistencies with petitioner's own trial testimony.  (Doc. # 137-2, at ¶ 278.)

On November 4, 1991, the trial court conducted a hearing on defense counsel's motion to

suppress all of petitioner's statements and all physical evidence recovered from petitioner's

residence at 18 Mulberry Street.  Petitioner testified that he had not read any of the forms before

he signed them, that no one had read them to him, and that he signed them because officers told him to sign them.  (Tr.Vol. VI, at 634-37.)  He further testified that he had not understood what he was signing and that he had trouble understanding such things.  (*Id.*, at 637-38.)

As to the waiver of *Miranda* rights form that petitioner signed at the police station during the early morning hours of June 1, 1991, Specialist Joe Hoffman testified during the hearing that he had read aloud the rights form to petitioner and asked petitioner if he understood.  (*Id.*, at 657-59.)  Specialist Hoffman testified that petitioner said that he understood and was willing to talk.  (*Id.*, at 659.)  It appeared to Specialist Hoffman that petitioner did understand and that petitioner was capable of intelligently and coherently responding.  (*Id.*)  Petitioner did not appear to Specialist Hoffman to be slow in picking up things as Hoffman read the rights form to him.  (*Id.*, at 662.)  Specialist Hoffman further testified that petitioner did not seem intoxicated.  (*Id.*, at 662-61.)

Presumably as to the same waiver of *Miranda* rights form that petitioner signed on June 1, 1991, Specialist Linda Petrosky testified that she had advised petitioner of his rights before speaking to him at the police station in the early morning hours on that date.  (*Id.*, at 664-65.)  She testified that she had read aloud to him his rights and then asked him whether he understood and would be willing to waive them.  (*Id.*, at 666.)  She testified that he seemed capable of understanding, and that she had questioned him as to his education, and reading and writing ability.  (*Id.*, at 667)  Petitioner told her that he was not under the influence of any drugs or alcohol and it did not appear to Specialist Petrosky that petitioner was having any trouble communicating with her.  (*Id.*, 667-68.)  She confirmed that petitioner was then questioned by someone else and that she did not recall detecting any signs of intoxication.  (*Id.*, at 668, 670.)

Officer Robert Steinher then took the stand to testify as to not only the consent to search form that petitioner and his uncle signed on June 2, 1991, but also the waiver of *Miranda* rights form that petitioner signed on June 4, 1991 at the police station.  Regarding the former, Officer Steinher testified that he had read aloud and explained thoroughly the consent to search form, including the right of the occupants to refuse consent, to petitioner and his uncle, Elmer Hill, before obtaining their signatures on the form.  (Tr.Vol. VI, at 674-75.)  Police retrieved as a result of the search plastic garbage bags, a Nike shoe flap, and a black torn fragment from a garbage bag.  (*Id*., at 683.)

As to the waiver of *Miranda* rights form that petitioner signed on June 4, 1991, Officer Steinher testified that Specialist Hennekes read the form aloud to petitioner before obtaining petitioner's signature and that he (Steinher) witnessed it.  (*Id*., at 677.)  Officer Steinher further testified that petitioner was asked if he could read and write, that petitioner did not appear to have any trouble communicating, and that petitioner understood what was being said to him.  (*Id*., at 677-78.)  Officer Steinher also testified that petitioner was not impaired in any way by drugs or alcohol, and that petitioner freely, voluntarily, and intelligently signed the waiver of *Miranda* rights form, after which Specialist Hennekes proceeded to question him.  (*Id*., at 678-79.)  Officer Steinher confirmed that petitioner was placed under arrest at the conclusion of that questioning.  (*Id*., at 681.)

The gravamen of petitioner's claim is that his mental deficiencies prevented him from knowingly, voluntarily, or intelligently consenting to the search of his residence or waiving his *Miranda* rights.  As with his claim that he was incompetent during his direct appeals, petitioner asserts herein that, although he already has specific evidence demonstrating his incompetence, he

requires discovery to adduce additional facts to demonstrate that his putative waivers of his constitutional rights were invalid.  (Doc. # 155, at 13.)  Asserting that the testimony of Officer Robert Steinher concerning petitioner's June 2, 1991 consent to search his house and June 4, 1991 waiver of his *Miranda* rights was cursory, contradicted by petitioner's own testimony that no one had read or explained to him the various waiver forms that he had signed, and insufficient to create a complete picture of the totality of the circumstances surrounding, petitioner argues that evidence regarding his mental infirmities which had not been before the trial court gives strong reason to doubt that his consent was knowing and voluntary.  (*Id*., at 14-16.)  Thus, petitioner seeks at least an opportunity to depose the officers involved in the search of his apartment and the interrogations of him.  He also seeks documents regarding disciplinary proceedings or grievances of any kind filed against those officers, as well as records of the training that they received pertaining to obtaining a consent to search or a waiver of *Miranda* rights because such documents may indicate that, even if those officers sincerely believed that petitioner was competent, their perception of his subjective understanding was not informed by adequate training or was otherwise influenced by bias evident in their records.  (*Id*., at 14-15.)

Respondent opposes the instant discovery requests, arguing, as she did in connection with petitioner's claim that he was incompetent during his direct appeals, that petitioner has produced no evidence sufficient to undermine the testimony of Dr. Nancy Schmidtgoessling that petitioner was rational and intelligent, had no mental disease or defects, and was not suffering from major depression.  (Doc. # 156, at 11, 15.)  Dismissing the affidavits of Drs. Smith and Gelbort because they were based on evaluations that took place well after petitioner's trial in 1991 and completion of his direct appeals in 1996, respondent argues that petitioner has offered no

evidence that Dr. Schmidtgoessling was incorrect in her conclusions as to petitioner's competence during trial and on his direct appeals. (*Id.*, at 12.) As to petitioner's requests to depose the police officers involved in the search of his apartment and the interrogations of him, respondent argues simply that petitioner has failed to demonstrate why the record, as presently constituted, is insufficient to permit consideration of his claims. (*Id.*, at 14.) Summarizing the testimony of Officer Steinher concerning petitioner's consent to search and waiver of his *Miranda* rights, as well as the findings by the Ohio Supreme Court in rejecting petitioner's claims on direct appeal, respondent argues that the presumption of correctness that attaches to the state courts' factual findings defeats any determination that petitioner is entitled to conduct discovery on these claims. (*Id.*, at 15-16.)

Turning first to the essential elements of petitioner's claim, *i.e.*, that he did not knowingly, voluntarily, or intelligently consent to the search of his apartment or consent to waive his *Miranda* rights, it is well established that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970); *see also Colorado v. Spring*, 479 U.S. 564, 573 (1987); *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In *Moran v. Burbine*, the Supreme Court clarified that:

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran*, 475 U.S. at 421. The Supreme Court has further clarified that, "[a] court must examine

the 'totality of the circumstances' to determine whether a suspect's waiver was knowing and intelligent, including inquiries into the suspect's 'age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'" *Garner v. Mitchell*, No. 02-3552, – F.3d –, 2007 WL 2593514, at * 11 (6th Cir. Sept. 11, 2007) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).  In examining petitioner's discovery requests in the context of these essential elements, the Sixth Circuit's recent decision of *Garner v. Mitchell* is highly instructive, if not dispositive.[3]

In *Garner*, the Sixth Circuit held that the petitioner's waiver of his *Miranda* rights was not knowing and intelligent in view of an expert's essentially unrebutted conclusion that the petitioner had lacked a full comprehension of the warnings or consequences of waiver.  In stating that "Garner's low IQ scores and other mental disabilities indicate that we must carefully consider whether Garner knowingly and intelligently waived his *Miranda* rights," the Sixth Circuit emphasized that it was "reject[ing] calls to establish a categorical rule that a low IQ or other significant limitations in intellectual functioning are dispositive and make a suspect with such characteristics categorically unable to give a valid waiver of *Miranda* rights."  *Id*., at * 15 (citations omitted).  Ultimately, however, the court concluded that the petitioner's young age, indeterminate prior experience with the legal system, poor education, significant limitations in intellectual functioning, and the unrebutted expert evidence all tended to show that the petitioner's *Miranda* waiver was not made knowingly and intelligently.  *Id*., at * 18.  In so holding, the Sixth Circuit was careful to note that the only evidence to the contrary, *i.e.*, the fact

---

[3]     The Court is mindful that neither party had the benefit of the *Garner* decision when they filed their pleadings.

that the petitioner had told police that he understood his rights and the waiver, should not be given great weight, due to unrebutted expert evidence indicating both that the petitioner's appearance did not accurately reflect his actual level of intelligence and understanding and that his cognitive and linguistic limitations increased the likelihood of suggestibility to input from others, *i.e.*, a proclivity to go along with the perceived wishes of authority figures.  It is that observation on the part of the Sixth Circuit that constrains this Court to conclude that petitioner has not demonstrated good cause for the discovery he seeks in support of his claims that neither his consent to search nor his waiver of *Miranda* rights was knowingly, intelligently, or voluntarily given.

Even indulging petitioner every benefit of the doubt, especially in light of *Garner*, this Court does not have before it specific allegations showing that the facts, if more fully developed through the discovery that petitioner seeks, would entitle petitioner to relief.  The expert evidence concerning Petitioner Garner's mental deficiencies and the manner in which they indicated that Garner did not have full comprehension of the *Miranda* warnings that had been given to him or the consequences of waiving them was far more extensive than the evidence before this Court.  Petitioner does not seek to develop evidence of that nature.  Further, the particular type of evidence that petitioner *does* seek to develop – *i.e.*, evidence of and concerning the observations, beliefs, and possible biases of the officers who obtained Petitioner Hill's putative consent to search and waiver of *Miranda* rights – is the very type of evidence that the Sixth Circuit in *Garner* deemed the least probative on the issue of whether the petitioner's waiver had been knowing and intelligent.  In short, the Court is not persuaded that the discovery that petitioner seeks is likely to yield or provide leads to facts supporting his claim that his

mental deficiencies prevented him from knowingly, intelligently, or voluntarily consenting to a search of his apartment and waiving his *Miranda* rights.

D.  Ground Twenty-Three – Whether Lethal Injection Procedures Violate Eighth Amendment

Petitioner argues in his twenty-third ground for relief that Ohio's death penalty violates the Eighth Amendment.  (Doc. # 137-2, at ¶ 258.)  He elaborates in his motion for leave to conduct discovery that his claim purported to focus on the cruelty of the electric chair.  (Doc. # 155, at 16.)  He goes on to reason that, because Ohio has now abolished death by electrocution and has implemented as the sole means of killing prisoners death by lethal injection, he seeks and is entitled to discovery which previously he had no reason to seek regarding the cruelty of lethal injection.  (Doc. # 155, at 16.)

In support of his request for discovery on this ever-morphing claim, petitioner argues that lethal injection and the methods used to carry it out raise serious Eighth Amendment concerns. Petitioner points out that "[t]he United States District Court for the Northern District of California very recently ruled that California's implementation of its lethal-injection protocols violates the Eighth Amendment."  (Doc. # 155, at 16, citing *Morales v. Tilton*, Nos. C 06 219 JF RS, C 06 926 JF RS, slip op. (N.D. Cal. Dec. 15, 2006).)   Reasoning that it is important to look at both the lethal injection method prescribed by statute and the manner in which prison personnel carry out executions, petitioner asserts that he can only acquire such detailed information through discovery from the State.  To that end, petitioner seeks:

- All documents relating to Ohio's imposition of the death penalty by lethal injection, including but not limited to methods, how those methods were chosen, alternative methods that were used or considered in the past, procedures, policies, guidelines, details of previous lethal injections in Ohio, problems with previous lethal injections, and anticipated or possible problems with future lethal

28

injections.

(Doc. # 155-2, at 17.)  Petitioner also cautions "that he may require more discovery, should the documents produced suggest further avenues for it."  (Doc. # 155, at 18.)

Respondent opposes the instant discovery request on several grounds.  First, respondent argues that petitioner's reliance on *Morales v. Tilton* is misplaced because the district court in *Morales* did not hold that lethal injection itself was unconstitutional, that *Morales* was a case brought pursuant to 42 U.S.C. § 1983 as opposed to a habeas case, and that *Morales* does not stand for the proposition "that a petitioner is required to obtain discovery in a federal habeas case."  (Doc. # 156, at 16.)  Respondent also takes petitioner to task for never having raised, or sought discovery on, this claim until now, despite the fact that lethal injection became the sole method of execution in Ohio in 2001 and had been, prior to that time, an option for execution along with electrocution.  (*Id.*)  Finally, respondent argues that the United States Supreme Court has never held that execution by lethal injection resulted in cruel and unusual punishment, and that numerous federal and state courts have rejected such claims.

Because this Court's determination of whether petitioner is entitled to discovery must begin with identifying the essential elements of petitioner's claim, *see Bracy*, 520 U.S. at 904, it follows that whether or not petitioner is entitled to conduct the discovery he seeks inevitably turns on whether, or to what extent, his claim is properly brought in this habeas corpus action.  In *Hill v. McDonough*, 126 S.Ct. 2096 (2006), the Supreme Court held that the plaintiff's claim challenging the constitutionality of a three-drug sequence by which the State of Florida was likely to execute him could proceed as an action for relief under 42 U.S.C. § 1983.  In so holding, the Supreme Court explained that challenges to the lawfulness of confinement or to

29

particulars affecting its duration are properly raised in habeas corpus, while challenges to the circumstances of confinement could be brought under § 1983. *Hill*, 126 S.Ct., at 2101. The Court acknowledged that "in a State where the legislature has established lethal injection as the method of execution, 'a constitutional challenge seeking to permanently enjoin the use of lethal injection may amount to a challenge to the fact of the sentence itself.'" *Id.*, (quoting *Nelson v. Campbell*, 541 U.S. 637, 644 (2004)). Ultimately, the Supreme Court concluded that the plaintiff's challenge was properly brought in a § 1983 action because "[h]ere, as in *Nelson*, [the plaintiff]'s action if successful would not necessarily prevent the State from executing him by lethal injection. The complaint does not challenge the lethal injection sentence as a general matter but seeks instead only to enjoin the respondents from executing [the plaintiff] in the manner they currently intend." *Hill*, 126 S.Ct., at 2102 (internal quotation marks omitted).

Petitioner insists that his instant challenge is properly brought in habeas because it is not a challenge to the *method* of Ohio's lethal injection procedure, but rather, a challenge to the constitutionality of Ohio's death penalty as a whole based on the fact that the sole method of execution in Ohio, lethal injection, is cruel and unusual. (Doc. # 155, at 17 n.4.) The discovery that petitioner seeks, however, as well as the cases and anecdotal evidence that he cites in support of the discovery request, undeniably support only a method-of-execution challenge, not a categorical challenge to the constitutionality of lethal injection itself. That being so, without expressing any opinion as to the merits of petitioner's claim, the Court cannot find that petitioner has presented specific allegations giving reason to believe that the facts, if more fully developed through the discovery that he seeks, would entitle him to relief, *i.e.*, the invalidation of his death sentence. Petitioner's request to conduct discovery on his twenty-third ground for relief must be

denied.

III.  Conclusion

Petitioner's motion for leave to conduct discovery is GRANTED to the extent described above.  In finding that petitioner has demonstrated good cause for the limited discovery that this Court is granted, the Court is mindful of the deference it owes to state court decisions and findings of fact in determining whether petitioner is entitled to habeas corpus relief, 28 U.S.C. §2245(d), and that petitioner must present clear and convincing evidence in order to rebut a finding of fact made by the state courts, 28 U.S.C. §2254(e)(1).  But it is precisely because of the deferential standard of review set forth in §2254(d) and the presumption of correctness established in §2254(e)(1) that this Court is inclined to grant discovery.

Although the Court finds that discovery is warranted as described above, the Court will not permit prolonged, unlimited discovery.  Since the discovery requests granted by this Court will consist only of responses to certain requests for admission, interrogatories, and requests for production of documents, and at least two depositions, petitioner will have three (3) months from the date of this Order to complete the discovery allowed by this order.

For the foregoing reasons, petitioner's motion to conduct discovery (Doc. # 155) is **GRANTED** in part and **DENIED** in part.


**IT IS SO ORDERED.**


*/s/ Edmund A. Sargus, Jr.*
**EDMUND A. SARGUS, JR.**
**United States District Judge**

31