## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **GENESIS HILL,** | ) | **Case No.  1:98-cv-452** |
| | ) | |
| **Petitioner,** | ) | **District Judge Edmund A. Sargus, Jr.** |
| | ) | |
| **v.** | ) | **Magistrate Judge Terence P. Kemp** |
| | ) | |
| **BETTY MITCHELL, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | **DEATH PENALTY CASE** |

---

### PETITIONER GENESIS HILL'S AMENDED MOTION FOR RECONSIDERATION OF HIS CLAIMS UNDER *BRADY V. MARYLAND*, 373 U.S. 83 (1963)

---

Now comes Petitioner Genesis Hill, by and through the undersigned counsel, and moves this Court to reconsider its previous decision, entered September 27, 2006, finding Petitioner's *Brady* claims to be procedurally defaulted.  This request, as set forth more fully in the attached Memorandum in Support, is made in light of new information that Petitioner learned only recently.  If the Court grant's this Motion, Petitioner's Traverse, which has been fully briefed and filed with the Court, may require supplementation to address the merits of Petitioner's *Brady* claims.

Respectfully submitted,

*/s/ Justin C. Thompson*

**Justin C. Thompson (0078817)**
Assistant Federal Public Defender
**Carol A. Wright (0029782)**
Assistant Federal Public Defender
Lead Counsel for Petitioner

Federal Public Defender's Office
for the Southern District of Ohio
Capital Habeas Unit
10 W. Broad St., Suite 1020
Columbus, OH 43215
Phone: (614) 469-2999
carol_wright@fd.org
justin_thompson@fd.org

and

**David S. Bloomfield, Jr (0068158)**
**James B. Hadden (0059315)**
**Lawrence Bradfield Hughes (0070997)**
**Justin L. Root (0083459)**
Porter Wright Morris & Arthur LLP
41 S. High Street, Suite 3000
Columbus, OH 43215-6194
Phone: (614) 227-2000
Fax: (614) 227-2100

dbloomfield@porterwright.com
jhadden@porterwright.com
bhughes@porterwright.com
jroot@porterwright.com

## **TABLE OF CONTENTS**

**Summary Of The Argument: Evidence Favorable To Genesis Hill's Defense Was Concealed During His Capital Trial In 1991.  This Court Should Reconsider Its Procedural Default Ruling On Sub-Claim C Of Hill's Fourth Ground For Relief.  (Opinion and Order, Doc. No. 151.)** .......... 1

I.  The Facts Of Hill's Habeas Proceedings Relevant To This Motion ..................................... 2

    A.  This Court found Hill's *Brady* claim to be procedurally defaulted ......................... 3

    B.  Hill asked for and was granted discovery on his Twenty-First Ground for Relief, which included discovery from the Warden regarding materials in the prosecutor's trial file. ............................................................................................. 4

    C.  The Warden failed to respond to this Court's Discovery Order. ............................ 7

    D.  This Court ordered the Warden to Respond - Allowing Hill (and the Court) to Finally have a More Complete Picture of the Record in this Matter ................... 10

II.  Sub-Claim C Of Hill's Fourth Ground For Relief Presents A Meritorious *Brady* Claim ...... 12

    A.  The Undisclosed Preliminary Report is Exculpatory .............................................. 13

    B.  The Exculpatory Preliminary Report Was Not Disclosed To Hill's Trial Counsel. . 15

    C.  The Suppressed Preliminary Report Is Material. ................................................... 17

    D.  Hamilton County Prosecutors have repeatedly violated *Brady*'s constitutional requirements. ......................................................................................................... 21

III.  Any Procedural Default Is Excused By Cause And Prejudice. ........................................... 23

    A.  Cause. ..................................................................................................................... 24

    B.  Prejudice. ............................................................................................................... 25

    C.  Hill is not required to return to state court to exhaust his *Brady* claim ............... 26

    D.  In the event that this Court holds that Hill must return to state court exhaust his claim, this Court should stay and hold in abeyance his federal habeas corpus proceedings. ............................................................................................... 28

IV.  Conclusion – Prayer for Relief ............................................................................................. 29

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GENESIS HILL,** | ) | **Case No.  1:98-cv-452** |
| | ) | |
| **Petitioner,** | ) | **District Judge Edmund A. Sargus, Jr.** |
| | ) | |
| **v.** | ) | **Magistrate Judge Terence P. Kemp** |
| | ) | |
| **BETTY MITCHELL, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | **DEATH PENALTY CASE** |

---

**MEMORANDUM IN SUPPORT OF PETITIONER GENESIS HILL'S AMENDED MOTION FOR RECONSIDERATION OF HIS CLAIMS UNDER *BRADY V. MARYLAND*, 373 U.S. 83 (1963)**

---

**Summary Of The Argument: Evidence Favorable To Genesis Hill's Defense Was Concealed During His Capital Trial In 1991.  This Court Should Reconsider Its Procedural Default Ruling On Sub-Claim C Of Hill's Fourth Ground For Relief.  (Opinion and Order, Doc. No. 151.)[1]**

In 1991, State prosecutors concealed evidence favorable to Genesis Hill's defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  As explained in Section III of this Motion, the excluded Preliminary Investigation Report, which was completed by a Cincinnati Police officer investigating Hill's case, was exculpatory and favorable to Hill's defense.  The suppressed evidence supports sub-claim C of Hill's Fourth Ground for Relief in Hill's Second Amended Petition for Habeas Corpus (Doc No. 137.)  As a result, this Court's Opinion and Order (Doc. No.

---

[1] Hill originally filed his motion for reconsideration on February 15, 2011.  In responding to the motion, the Warden alleged that some of the allegations in the motion lacked an adequate legal and factual basis, and questioned whether the motion violated Rule 11 of the Federal Rules of Civil Procedure.  While counsel for Hill submit that no violation took place, counsel do not wish to distract this Court from the merits of Hill's *Brady* claim by engaging in tangential litigation involving Rule 11.  Accordingly, counsel for Hill are submitting this amended motion as a gesture of good faith.

151), which found sub-claim C to be procedurally defaulted, was rendered incomplete, inaccurate, and unfair.  Hill is entitled to this Court's reconsideration.

This Memorandum will set out: (1) the facts of Hill's habeas proceedings relevant to this ground for relief; (2) the evidence withheld by the Warden's counsel and its materiality; and (3) the reasons why cause and prejudice exist that would excuse any finding of procedural default. This Court should reconsider its finding of procedural default on Sub-claim C of Hill's Fourth Ground for Relief in order to permit a full, fair, and accurate adjudication of its merits.

**I.      The Facts Of Hill's Habeas Proceedings Relevant To This Motion.**

Hill initiated his postconviction proceedings in this Court on June 19, 1998, when he filed a Notice of Intention to File a Petition for Writ of Habeas Corpus.  (Doc. No. 1.)  On June 26, 1998, Hill filed his original Petition for Writ of Habeas Corpus.  (Doc. No. 6.)  On October 24, 2005, Hill filed a Motion for Leave to File a Second Amended Petition. (Doc. No. 136.)  This Court granted Hill's motion on December 30, 2005.  (Opinion and Order, Doc. No. 140.)

In Hill's Fourth Ground for Relief in the Second Amended Petition, he raised a *Brady* claim alleging that the Prosecutor's "failure to provide exculpatory evidence during pretrial discovery denied Genesis Hill a fair trial."  (Second Amended Petition, Doc. No. 137, P. 111.)[2] The *Brady* claim in Hill's Second Amended Petition was comprised of three sub-claims:

> A.  Withholding Linda Phillips's exculpatory evidence violated Mr. Hill's due process rights.
>
> B.  The State withheld mitigating polygraph evidence.
>
> C.  The files of the prosecutor and investigating officer contain *Brady* material.

---

[2] Page references to the filings in this case are being made to the docket PageID number, rather than to the pagination of the individual pleadings.

Of importance to this motion, sub-claim C argued that the State likely had more *Brady* material in its possession that it was refusing to produce.  (Doc. No. 137, P.115-16.)  Given that habeas relief had already been granted to at least one death-row inmate due to the Cincinnati Police Department's past practice of excluding exculpatory material from the Homicide Book, *see Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002), Hill's counsel believed that it was crucial to have an opportunity to confirm beyond all doubt that they had indeed received any and all exculpatory evidence during discovery.

### A.    This Court found Hill's *Brady* claim to be procedurally defaulted.

On January 27, 2006, the Warden filed a "Second Motion to Dismiss Procedurally Defaulted Claims" in which she claimed that Hill had procedurally defaulted the *Brady* claim in its entirety.  (Doc. No. 142.)  This Court issued an Opinion and Order on procedural default on September 27, 2006.  The Court found all three *Brady* sub-claims to be procedurally defaulted. (*Id*. at 102.)  With respect to sub-claim C, this Court held:

> Regarding petitioner's blanket assertion in sub-part ( c ) that there must be more *Brady* information in the files of the prosecution and the investigating officer, given the history of the Hamilton County Prosecutor's Office of committing *Brady* violations, the Court is not persuaded that there was sufficient evidence on the trial record from which petitioner could have raised that argument on direct appeal.  But the utter lack of substance to the claim makes any procedural default analysis not only impossible, but also unnecessary.

(*Id.* at 96.)

Now, as shown below, after pursuing and investigating the discovery that this Court ordered on Hill's surviving claims, Hill has discovered real and compelling substance to his *Brady* claim, which supports this Court's reconsideration of its procedural default ruling with respect to sub-claim C.

3

**B.** **Hill asked for and was granted discovery on his Twenty-First Ground for Relief, which included discovery from the Warden regarding materials in the prosecutor's trial file.**

On December 22, 2006 Hill filed a Motion for Discovery regarding his claims which survived this Court's Order on procedural default. (Doc. No. 155.) One of those surviving claims was Hill's Twenty-First Ground for Relief. Of particular relevance to this Motion for Reconsideration, Hill's Twenty-First Ground alleged that the prosecution improperly sought the death penalty in this case as a result of Hill's race. In its September 27, 2007 Opinion and Order on Hill's discovery motion, this Court determined that Hill had demonstrated good cause to depose certain individuals involved in Petitioner's prosecution in Hamilton County, and the Court also required the Warden to respond to certain specific Interrogatories, Requests for Admission, and Requests for Production of Documents that had been served by Petitioner. (Discovery Order, Doc. No. 158, pp. 890–91.)[3] The following requests for production of documents were granted:

- Produce all copies of all documents reflecting or referencing procedures, policies, or guidelines regarding who should be charged with capital murder in Hamilton County before or at the time of Mr. Hill's prosecution, including but not limited to any forms upon which prosecutors could record or memorialize the factors it considered in determining whether to seek a capital indictment.
- Produce copies of all documents pertaining to the Hamilton County prosecutor's office's decision to seek the death penalty in its prosecution of Genesis Hill.

(Petitioner's First Request for Discovery, Doc. No. 155, pp. 783-84.)

In preparation for the depositions granted by the Court, attorney James B. Hadden contacted Mike Flores (counsel for the Hamilton County deponents) on or about November 12,

---

[3] Hill's discovery requests were first served upon the Warden on December 5, 2006. The Warden originally refused to respond to any of Hill's requests, necessitating the briefing that led to the Court's Discovery Order.

4

2007, to ask about the documents that the County would be producing at or before the depositions of Hamilton County Prosecutors Stephen Tolbert and Jerome Kunkle in response to Hill's subpoenas.[4]  Mr. Flores was specifically asked about the Homicide Book[5] the Cincinnati Police Department prepared as a part of their investigation of Hill's case and brought to an indictment meeting with the Hamilton County Prosecutor.[6]  In response to the inquiries, Mr. Flores stated that there was no Homicide Book and that all the County had in its possession regarding Genesis Hill were medical records.[7]

Attorney Bradfield Hughes similarly contacted Daniel Ranke, former counsel for the Warden, on or about November 19, 2007 to discuss the scheduling of former Hamilton County Prosecutor Art Ney's deposition.[8]  During this conversation, Mr. Ranke informed counsel that any attempt to subpoena the Homicide Book would be met with a motion to quash because, in his view, it was outside the scope of the discovery order.[9]

In light of these responses, counsel for Hill retained Jim Silvania, a private investigator, to obtain a copy of the Homicide Book regarding Hill's case via a public records request to Hamilton County.  Mr. Silvania obtained a copy of the Homicide Book on December 18, 2007

---

[4] *See* Attached Exhibit A (April 23, 2010 Declaration of James B. Hadden, Esq.).

[5] As explained in *Jamison*, "Prior to trial, the prosecution responded to a defense discovery request by indicating that the prosecution was aware of no exculpatory evidence. This was, however, due to the CPD's practice of "homicide booking," in which the CPD would gather inculpatory material into a homicide book that was then sent to the prosecutors; exculpatory material was excluded from the homicide book. As a result, the prosecutor never became aware of exculpatory evidence, and did not disclose it as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This practice has been discontinued." *Jamison,* 291 F.3d at 383.

[6] Exhibit A at ¶5.

[7] *Id.* at ¶6.

[8] *See* Attached Exhibit B (April 23, 2010 Declaration of Bradfield Hughes, Esq.).

[9] *Id.*

and provided a copy to Hill's counsel in Columbus.[10]  Included in the Homicide Book was a "Cincinnati Police Preliminary Investigation Report" (hereinafter "Preliminary Report") completed by Cincinnati Police Officer James Givens.[11]  In the Preliminary Report, Officer Givens indicated that Teresa Dudley ran from the police when they initially approached her, and that she also appeared to possess information relating to the whereabouts of her missing baby prior to the discovery of the child's body.[12]  Indeed, the reporting officer suggested that investigators follow-up on Teresa Dudley's strange behavior and inexplicable knowledge of the incident.[13]  This information, however, which could easily have affected the trajectory of Hill's defense, was never given to Hill's defense team, thus depriving Mr. Hill of the opportunity to explore other theories or challenge the quality of the police investigation.  That is, Hill lost his ability to fully defend himself at trial because the prosecutor's office failed to give him evidence in its possession that could help to exculpate him.

Although the Preliminary Report contains *Brady* material directly relevant to sub-claim C of Hill's Fourth Ground for Relief, Mr. Hill's habeas counsel were not in a proper position to revisit this Court's procedural default ruling until the Warden had complied with all outstanding discovery orders and until counsel had an opportunity to review the substantial amount of documentation served by the Warden in response to those orders.  When analyzing the merits of Hill's *Brady* issue, after all, this Court would be required to consider "the cumulative effect of all such evidence suppressed by the government."  *Kyles v. Whitley*, 514 U.S. 419, 421 (2005). Without access to the full discovery ordered by this Court, Hill was unable to fully investigate

---

[10] *See* Attached Exhibit C (April 23, 2010 Declaration of Investigator Jim Silvania).
[11] *See* Attached Exhibit D (June 1, 1991 Cincinnati Police Preliminary Investigation Report).
[12] Preliminary Report, Exhibit D.
[13] Id.

and properly present, as required by *Brady*, the cumulative effect of all favorable evidence suppressed at trial.

### C. The Warden failed to respond to this Court's Discovery Order.

After the depositions of Stephen Tolbert, Jerome Kunkle and Art Ney were completed, new counsel appeared for both the Warden and Hill. After the undersigned counsel from the Federal Public Defender's office joined Hill's legal team, a review of Hill's file revealed that the Warden had never served responses to the written discovery requests to which the Court, in its Discovery Order, had previously ordered the Warden to respond.

Accordingly, in October 2009, counsel for Hill contacted counsel for the Warden to confer about the outstanding discovery requests.[14] Counsel for the Warden also checked the Warden's case file and found nothing therein to suggest that the Warden had ever responded to the written discovery requests. Counsel for the Warden and Hill then attempted to determine (1) why the Warden never responded to the discovery requests and (2) how to address this deficiency. Counsel for the Warden and Hill began pursuing extrajudicial remedies to resolve the discovery dispute.

On January 21, 2010, counsel for the Warden provided an affidavit from the Warden purporting to respond to Hill's discovery requests.[15] Counsel for Hill, however, did not find this affidavit to be responsive or procedurally sufficient under the Federal Rules of Civil Procedure.[16] On February 5, 2010, counsel for the Warden submitted amended responses in which she

---

[14] Attached as Exhibit E (January 20, 2010 Letter from Justin Root to Holly LeClair and Sarah Leatherman).

[15] Attached as Exhibit F (January 4, 2010 Affidavit of Keith Smith, Warden of Mansfield Correctional Institution).

[16] Attached as Exhibit G (February 2, 2010 Letter from Carol Wright to Holly LeClair and Sarah Leatherman, Counsel for the Warden).

indicated that the Warden "has insufficient information to answer the matters set forth in the request for production of documents…."[17]  Counsel for the Warden also stated, however, that she was in possession of "certain documents pertaining to the prosecution of Genesis Hill for the offenses that are the subject of Mr. Hill's petition for a writ of habeas corpus."

Although counsel for the Warden believed these documents to be unresponsive to Hill's discovery requests, she also provided in her February 5, 2010 letter what she described as a "privilege log" in which she listed the materials in her possession.[18]  Some of the vague and incomplete descriptions provided within this privilege log, however, suggested that the documents may indeed be responsive to Hill's requests, and the entries in the log offered no support for any form of "privilege" that would have protected the documents from disclosure to Hill.  Even though Hill asked the Warden to simply provide these items to Hill to allow both parties to move beyond this discovery dispute,[19] and even though counsel for the Warden herself had previously offered to submit these documents to the Court voluntarily for an *in camera* review,[20] counsel for the Warden later demanded that counsel for Hill seek this Court's assistance to obtain these documents.[21]

Ultimately, the parties reached an impasse and were unable to resolve the lingering discovery dispute extra-judicially.  On March 22, 2010, then, Hill requested this Court to

---

[17] Attached as Exhibit H (January 4, 2010 Addendum To Warden's Affidavit In Response To Discovery From R. 155-2, pp. 7–8).

[18] Attached as Exhibit I (January 4, 2010 Privilege Log: Exhibit 4 to Addendum).

[19] Attached as Exhibit J (February 19, 2010 Letter from Carol Wright to Holly LeClair).

[20] *See* Exhibit H (January 4, 2010 Addendum to Warden's Affidavit In Response To Discovery From R. 155-2, pp. 2-8.  "If requested, counsel for the Warden will provide such documents to the district court, under seal, for the district court's en camera [*sic*] inspection.").

[21] Attached as Exhibit K (February 24, 2010 Letter from Holly LeClair to Carol Wright.  "If at this point you are seeking discovery of the documents listed in the privilege log, you will need to proceed with briefing in the district court.").

conduct an *in camera* inspection of the disputed materials in light of the discovery requests that the Court had previously granted in the Discovery Order.  (Motion For *In Camera* Inspection of Documents and to Compel Discovery, Doc. No. 202.)  Despite previously offering to submit the documents in question for *in camera* review in a letter dated February 5, 2010, the Warden made a 180-degree turn in a memorandum in opposition filed on April 12, 2010.  After previously offering to submit the disputed documents to this Court on eleven separate occasions, the Warden asked this Court to deny the discovery request and to dismiss Hill's Twenty-First Ground for Relief for lack of merit.  (Warden's Response in Opposition to Motion For *In Camera* Inspection of Documents, Doc. No. 204.)  The Warden specifically addressed the Homicide Book in this response, arguing that the "so called 'book'" was "not kept intact."  (*Id.* at 1922.)  The Warden also claimed that there is "no indication that Hamilton County or the Cincinnati Police would remember what was in an alleged 'book.'" (*Id.* at 1923.)

Hill filed a reply in further support of the motion for *in camera* review on April 26, 2010. (Doc. No. 206.)  In that reply, Hill presented several arguments as to why this Court, not the Warden, should review the documents and make a determination of whether the disputed documents were responsive to the Court's discovery order.  One of the arguments in support for *in camera* inspection specifically addressed the Warden's puzzling discussion of the "so-called" Homicide Book.  This Court was reminded that counsel for Hill had previously been led to believe that the book did not exist.  Counsel for Hill acknowledged in this reply that a private investigator had obtained the Homicide Book in December of 2007.  On May 20, 2010, counsel for the Warden finally acknowledged possessing the "same documents" that they previously

claimed did not exist.  (Compare Warden's Response in Opposition to Hill's Motion for *In Camera* Inspection, Doc. No. 204, pp. 1922-23 with Warden's Reply, Doc. No. 210, p. 2086.)

> **D.** **This Court ordered the Warden to Respond - Allowing Hill (and the Court) to Finally have a More Complete Picture of the Record in this Matter.**

On September 30, 2010, this Court issued an Opinion and Order granting Hill's Motion for *In Camera* Inspection and to Compel Discovery.  (Doc. No. 212.)  In compliance with the Court's Order, counsel for the Warden scanned the discovery documents into an electronic file and emailed them to Hill's counsel on October 8, 2010.  The discovery documents provided to Hill's counsel consisted of 449 pages of reports, notes, records, exhibits and pleadings related to the investigation and prosecution of Hill in Hamilton County.  Counsel for Hill reviewed and catalogued the 449 pages of discovery and learned that Officer Givens' Preliminary Report, obtained by Hill's investigator in December 2007, was <u>not</u> included in the Warden's October 2010 production provided to counsel.

The absence of the Preliminary Report in the Warden's October 2010 discovery production lends further support to the conclusion that it was withheld at trial.  The Preliminary Report cannot be found in the state court record, or in any of the documents that have been filed in this Court since Hill initiated his habeas proceedings.  If the Preliminary Report was never provided to counsel for the Warden, it is reasonable to conclude that it was also hidden from defense counsel at trial.  The fact that the Warden may not have been in possession of the Preliminary Report would not excuse her failure to obtain and disclose the report.  *See United States v. Ash,* 413 U.S. 300, 320, fn16 (1973) ("Throughout a criminal prosecution the prosecutor's ethical responsibility extends, of course, to supervision of any continuing investigation of the case.")  And the fact that Hill's Investigator was so easily able to obtain the

document after becoming aware of its existence demonstrates the Warden's ongoing failure to properly supervise this case and respond, in full, to the Court's discovery orders.

Having reviewed the Warden's belated document production and not found the Homicide Book included within it, counsel for Hill spoke to Mark Krumbein, Hill's trial counsel, on November 24, 2010. Mr. Krumbein reviewed the materials provided to him and executed an affidavit on December 1, 2010.[22]  In relation to the Preliminary Report, Krumbein noted the following:

> To the best of my knowledge, this report was never turned over to me prior to trial. If it had been provided to me, I would have conducted further investigation into why Teresa ran from the police, and why she told them to look for Domika's body in the alley. I also would have questioned the prosecution's witnesses about these matters during cross-examination. If I had the report, I could have much more effectively defended Genesis.

(*Id*. at ¶ 11.)

Hill cannot be faulted for failing to uncover all the facts surrounding the withheld Preliminary Report. "Ordinarily, we presume that public officials have properly discharged their official duties." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997). Counsel for Hill, for the first time, are now able to fully review the record in conjunction with the Homicide Book obtained by Hill's investigation in 2007, the discovery provided by the Warden in October 2010, and trial counsel's December 2010 Affidavit. It has now become clear that evidence favorable to Hill existed prior to trial, was suppressed by the government, has never been disclosed to Hill in these postconviction proceedings, and that Hill was prejudiced as a result of the suppression. As noted above, this Court's earlier procedural default decision regarding Hill's Fourth Ground for Relief stated that "the utter lack of substance to the claim makes any procedural default

---

[22] Attached as Exhibit L (December 1, 2010 Affidavit of Mark Krumbein).

analysis not only impossible, but also unnecessary." (Opinion and Order, Doc. No. 151, p. 590.) Given the recent developments in this matter, however, this Court should reconsider its earlier finding of procedural default and give fresh review to the merits of sub-claim C of Hill's Fourth Ground for Relief.

**II.     Sub-Claim C Of Hill's Fourth Ground For Relief Presents A Meritorious *Brady* Claim.**

A *Brady* violation has three essential elements: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004). The "prejudice" element is satisfied "when the suppressed evidence is material for *Brady* purposes." *Id.* Favorable evidence "is material . . . if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). The Supreme Court has noted, however, that there is not a requirement that the evidence be sufficiently strong to *ensure* an acquittal had it been presented at trial, saying:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id*. at 434.

In order to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in this case, <u>including the police</u>." *Id.* at 437 (emphasis added). "[T]he *Brady* duty extends to impeachment evidence

as well as exculpatory evidence, and *Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006).  The duty to disclose *Brady* material continues throughout the judicial process.  *See United States v. Ash*, 413 U.S. 300, 320, n.16 (1973) ("Throughout a criminal prosecution the prosecutor's ethical responsibility extends, of course, to supervision of any continuing investigation of the case.").

> A.    **The Undisclosed Preliminary Report is Exculpatory**

In November 1990, a teenage Genesis Hill and his girlfriend, Teresa Dudley, had a daughter, Domika Dudley. (Tr. Vol. VIII at 997.)  Domika was reported missing on the evening of Friday, May 31, 1991.  On June 1, 1991, Officer James Givens completed the Preliminary Report.[23]  In response to a question on the form which asks about the necessity for "additional investigative time," Givens wrote that investigation was needed to determine "why the mother ran from police and asked for the police to check the alley behind the house (several times)."  One day later, on June 2, 1991, police found Domika Dudley's dead body, with a fractured skull, behind Hill's home, wrapped in a garbage bag.  (*Id.* at 1052-54, Tr. Vol. IX at 1186.)

This Preliminary Report was exculpatory and favorable to Hill's defense for several reasons.  Teresa Dudley's actions around the time of the baby's disappearance, and continuing during the search for her, raised significant questions.  (Why did she run from the police when they arrived?  After the police finally spoke with her, why was she insistent that the police search the area near where Domika's body was ultimately found?  What did she do between

---

[23] Attached as Exhibit D (Preliminary Report).

the time when she ran from the police and the time when she insisted to them that they search the specific area in the alley where Domika was later found?)

Due to the prosecution's failure to disclose the Preliminary Report, however, trial counsel were unable to address these questions and impeach Officer Givens and Teresa Dudley at trial. Trial counsel could have cross-examined these witnesses and presented evidence to the jury that Teresa ran from the police on the night her baby went missing. She also appeared to have knowledge of the baby's whereabouts. This information becomes even stronger when paired with the additional fact, also unknown to Hill's jury, that Teresa was asked to submit to a lie detection examination – a fact that this Court previously noted was "significant." (Opinion and Order, Doc. No. 151, p. 592.) After reviewing the concealed Preliminary Report for the first time in December 2010, Hill's trial counsel testified under oath that he "would have questioned the prosecution's witnesses about these matters during cross-examination" and could have "much more effectively defended Genesis."[24]

The State's failure to disclose this Preliminary Report also precluded trial counsel's investigation into other matters that would have proven beneficial to Hill at trial. As noted by trial counsel, if the report had been provided, he "would have conducted further investigation into why Teresa ran from the police, and why she told them to look for Domika's body in the alley."[25] Such an investigation could have led to information surrounding the circumstances of Alexis Davenport's claim that state witness Barbara Jansen, who lived close in proximity to Teresa Dudley, was somehow aware that the baby was dead in a box one day before she was found. (Tr. Vol. X at 1290-1295.) Ms. Davenport lived in the same neighborhood as Dudley and

---

[24] *See* Exhibit L (December 1, 2010 Affidavit of Mark Krumbein) at ¶ 11.
[25] *Id.*

Jansen.  The State would have been hard pressed to explain how its own witness was able to relay critical facts to Davenport prior to the baby's discovery.

The Supreme Court has acknowledged the compounding effect that favorable evidence, or the failure to posses it, has on a trial.  Failure to disclose exculpatory information "not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist" causing defense counsel to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise might have pursued."  *United States v. Bagley*, 473 U.S. 667, 682-83 (1985).  Here, Hill was denied the opportunity to explore "lines of independent investigation, defense, or trial strategies" because of the prosecution's failure to produce exculpatory evidence.

Whether considered individually or in conjunction with other evidence concealed during trial (*see* sub-claims A and B of Hill' Fourth Ground for Relief), the Preliminary Report qualifies as exculpatory evidence and the Hamilton County Prosecutor's Office's failure to provide it to Hill and his defense team constitutes an inexcusable *Brady* violation.

**B.    The Exculpatory Preliminary Report Was Not Disclosed To Hill's Trial Counsel.**

On June 7, 1991, a Hamilton County grand jury indicted Mr. Hill on two counts of aggravated murder, each containing two death-penalty specifications: (1) committing murder while committing, attempting to commit, or fleeing immediately after committing aggravated burglary; and (2) committing murder while committing, attempting to commit, or fleeing immediately after committing kidnapping. The grand jury also indicted him on separate counts of aggravated burglary and kidnapping arising out of the same events.

Trial counsel filed a Demand For Disclosure of Favorable Evidence on June 20, 1991.[26] On August 16, 1991, the State filed Plaintiff's Response to Defendant's Demand for Discovery, Demand for Disclosure of favorable Evidence, and Request For Notice of Intention to Use Evidence.[27]  In this response, the State asserted it knew of no evidence favorable to Hill.  (*Id*.) On October 30, 1991, the State filed a Supplemental Response to Defendant's Demand for Discovery.[28]  Although the State produced additional evidence and disclosed more witnesses, it produced nothing exculpatory in conjunction with this Supplemental Response.  (*Id*.)  The State filed no additional discovery responses between the filing of the supplemental response and Hill's conviction on November 13, 1991.  Nor did the State ever disclose the Preliminary Report to Hill at any time between Hill's 1991 conviction and the Warden's October 2010 court-ordered discovery responses in this *habeas* case.  On the contrary, as explained above, Hill's investigator uncovered the document for the first time via a public-records request to the Cincinnati Police Department after counsel for the Warden first denied the existence of the Homicide Book.[29]

After reviewing the previously undisclosed Preliminary Report, Hill's trial counsel executed an affidavit stating, "to the best of my knowledge, this report was never turned over

---

[26] Attached as Exhibit M (June 20, 1991 Defendant's Demand for Discovery, Row Apx. Vol. I at 23).

[27] Attached as Exhibit N  (August 16, 1991 State's Response to Defendant's Demand for Discovery, Demand for Disclosure of favorable Evidence, and Request For Notice of Intention to Use Evidence, ROW Apx. Vol. I at 30).

[28] Attached as Exhibit O  (October 30, 1991 State's Supplemental Response to Defendant's Demand for Discovery, Demand for Disclosure of favorable Evidence, and Request For Notice of Intention to Use Evidence, ROW Apx. Vol. I at 322).

[29] *See* Exhibit C (April 23, 2010 declaration of Jim Sylvania) at ¶4-6.

to me prior to trial."[30]  Trial counsel never had this exculpatory information.  If he had, he certainly would have used it in Hill's defense.

### C.    The Suppressed Preliminary Report Is Material.

The prosecution suppressed a police report that strikes at the heart of trial counsel's defense strategy.  At trial, the prosecution's theory of the case was that Genesis had purposefully murdered Domika Dudley because he did not wish to pay child support. (Tr. Vol. VII at 949.)  In opening statements, the prosecution promised the jury that they would hear cold-hearted threats that supported this theory.  Genesis had allegedly stated to Teresa Dudley, the baby's mother, that he would "kill that little bitch before he paid" child support.  (Tr. Vol. VIII at 976.)  However, Dudley flatly denied that Genesis had ever made any kind of physical threat against her or Domika. (*Id.* at 998.)

Defense counsel's strategy at trial was to attack the credibility of the investigation and shift suspicion toward Teresa Dudley, the victim's mother.  The Cincinnati Police Department's homicide investigators[31] were cross-examined about oddities in their investigation.  Specifically, Hill's counsel asked, why was the baby found in an area on June 2, 1991, that had already been thoroughly searched by the investigators the day before on June 1, 1991?  (*Id.* at 1052-54, 1071, 1091-92.)  One of the victim's barrettes was allegedly found in the garage of the Hill residence by Teresa Dudley, but no one could confirm Dudley's claim that the barrette was found in that garage.  (*Id.* at 1105.)  The barrette that Dudley claimed to have found at the Hill residence was turned over to the police at her own home.  (*Id.* at 1105-07.)

---

[30] Attached as Exhibit L (December 1, 2010 Affidavit of Mark Krumbein).

[31] *See* Trial Testimony of Charles Beaver (Tr. Vol. VIII at 1088 et. seq.), Robert Steinher (Tr. Vol. VIII at 1076 et. seq.), James Givens (Tr. Vol. VIII at 1037 et. seq.) and Robert Hennekes (Tr. Vol. VIII at 1050 et. seq.).

After the State rested its case, defense counsel called Robert Nastold, manager of the Curve Café, to prove that Teresa Dudley had, in fact, lied when she denied being inside his bar on the night the baby went missing.  (Tr. Vol X at 1284-87.)  Defense counsel also called Mark Davenport as a witness.  Davenport testified that he saw the victim in this case passed around between Teresa's friends and family and treated improperly; for example, Teresa would roughhouse with others while she was holding the baby, and she would fail to dress the baby appropriately for cold weather.  (*Id.* at 1387-88.)  Teresa's care of the baby was so deficient that Davenport wanted to call Children's Services around one week before the crime.  (*Id.* at 1387-88.)  Davenport also testified he had been inside the Dudley home.  According to Davenport, the conditions were so horrible inside the home that he would not have let his dog live there.  (*Id.* at 1389.)  And Hill's defense counsel sought unsuccessfully to introduce the testimony of Alexis Davenport, who overheard state witness Barbara Janson claim that the baby was "dead and inside a box" on Saturday, June 1, o*ne day before the baby was found*.  (*Id.* at 1290-91.)

Defense counsel's clear intention at trial was to suggest to the jury that Teresa Dudley was not only a deficient mother, but also a mother who could have planted evidence and could well have been involved in—if not responsible for—the disappearance and death of her child. And although there were inconsistencies and irregularities in both the investigation and the discovery of Domika's body, Hill's defense counsel were limited in their ability to call the thoroughness of the investigation into question. The prosecution suppressed a Preliminary Report that was not only exculpatory and material, but also directly in concert with defense counsel's trial strategy of arguing reasonable doubt through the actions of Teresa Dudley.  That is, Hill's counsel could only illuminate a small portion of the path of his defense for the jury; he

could not explore its full breadth and depth because of the prosecution's failure to provide relevant, exculpatory evidence.

A claim by the Warden that there is overwhelming evidence of Hill's guilt in the record is misplaced.[32]  As for the State's circumstantial evidence, enough reasonable alternative explanations existed here to prevent any rational trier of fact from finding beyond a reasonable doubt that Mr. Hill intentionally caused the victim's death. For example, although witnesses saw Mr. Hill in the yard in front of Ms. Dudley's apartment, no witnesses actually saw him enter or leave the apartment around the time in question.  (Tr. Vol VIII at 979, 992.)  As to the shirt in which the victim's body was wrapped, the only evidence that the State produced linking the shirt to Mr. Hill was the testimony of Ms. Dudley and one of her friends.  (*Id.* at 974–75, 999.) But the friend could only testify that the shirt "appeared similar" to one that Mr. Hill had worn – and she could not even describe the color of the shirt's stripes.  Ms. Dudley could not specifically describe the shirt either. (*Id.* at 981–82, 1019–20.)

Regarding the trash bags in which the victim's body was wrapped, the State's expert testified that they probably came from Mr. Hill's apartment – but many people had access to that apartment, and the prosecution offered no fingerprints or other evidence directly linking Mr. Hill to the bags.  (Tr. Vol. IX at 1166.)  As for Ms. Janson's testimony that she overheard Mr. Hill threatening to kill the victim, she later testified that she did not know whether the mother or the daughter was the object of these threats. (*Id.* at 983.)  Further, Domika's mother herself testified that *Mr. Hill never threatened to hurt the victim*.  (*Id.* at 998.)  Finally, the bus driver

---

[32] For a more detailed analysis of the insufficient evidence to support a conviction for Aggravated Murder, *see* Hill's Ninth Ground for Relief in his Second Amended Petition (Doc. 137 at 142-50).

who allegedly overheard Mr. Hill confess could not identify Mr. Hill in court.  (Tr. Vol. IX at 1135–36.)  Moreover, the driver admitted that his earlier identification of Mr. Hill's photo was based on nothing more than *general size and build*.  (*Id.* at 1135.)  Further, Mr. Hill denied even taking a bus at the time.  (Tr. Vol. X at 1412.)

Even if the State offered sufficient evidence that Mr. Hill caused the victim's death, no rational trier of fact could have found beyond a reasonable doubt that Mr. Hill *purposely* did so. Here, the victim died of head trauma that, according to the coroner, a fall actually may have caused.  (*Id.* at 1195, 1197–1201, 1203.) The coroner herself testified that, based purely on the physical evidence of the victim's injuries, she could not tell whether the child had been killed intentionally. (*Id.* IX at 1193.)  A second doctor reviewed the autopsy and concluded, "to a reasonable degree of medical and scientific certainty, the manner of Domika Dudley's injuries is consistent with an accidental fall."[33]

"Because the State withheld evidence, its case was much stronger, and the defense case much weaker, than the full facts would have suggested." *Kyles v. Whitley*, 514 U.S. 419, 429 (1995).  And further, a unanimous Supreme Court has stressed the importance of a defendant's constitutional right to argue reasonable doubt through alternative suspects.  "Just because the prosecution's evidence, *if credited,* would provide strong support for a guilty verdict, it does not follow that evidence of third-party guilt has only a weak logical connection to the central issues in the case." *Holmes v. South Carolina* 547 U.S. 319, 330 (2006).  Indeed, it is easy to see how a record could appear to "overwhelmingly" show guilt when the State controls not only the

---

[33] Attached Exhibit P (November 18, 1999 Affidavit of Dirk G. Wood, M.D., J.D., F.A.C.S.).

investigation and prosecution of a defendant, but also when those prosecutors get to decide which bits of exculpatory evidence in their possession they will give to the defense.

The possibility that there may have existed even one juror with any reasonable doubt about Hill's guilt or the nature of his participation in the crime should lead this Court to question the reliability of the verdict and to conclude that the Preliminary Report was material. "There is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1984).  And a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

> **D.    Hamilton County Prosecutors have repeatedly violated *Brady*'s constitutional requirements.**

The Hamilton County Prosecutor's Office has repeatedly failed to abide by its constitutionally imposed duty to provide exculpatory evidence in a timely manner to defense counsel.  In a case similar to this one, the federal courts granted relief in a capital case because members of the Hamilton County Prosecutor's Office failed to provide exculpatory evidence from a Homicide Book to trial counsel.  *Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002).  In other cases, federal courts again recognized that the Hamilton County Prosecutor's Office had failed to disclose certain exculpatory evidence.  *See Fautenberry v. Mitchell*, 515 F.3d 614, 632 (6th Cir. 2008) (state did not dispute "cause" element relating to five categories of exculpatory evidence not disclosed by Hamilton County at trial; the Sixth Circuit deemed the evidence not material); *O'Hara v. Brigano*, 499 F.3d 492, 502-03 (6th Cir. Ohio 2007) (written statement made by rape victim to township police not disclosed by Hamilton County prosecutors until mid-trial, during victim's testimony; the Sixth Circuit deemed the evidence not material); *Zuern*

*v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003) (memorandum by prison employee regarding defendant's desire to kill another inmate not disclosed by Hamilton County prosecutors in trial relating to defendant's murder of corrections officer; the Sixth Circuit reversed the district court's grant of habeas corpus on basis of *Brady* violation).

In *State v. Kalejs*, 782 N.E.2d 112, 116 (Ohio Ct. App. 2002), the First District Court of Appeals granted the defendant a new trial because of the Hamilton County Prosecutor's *Brady* violations regarding the failure to disclose a witness's taped statement.  Another defendant, James Mills, was recently granted a new trial based on violations of *Brady* by a Hamilton County Prosecutor. *State v. Mills*, Case No. B8802581 (Hamilton Ct. C.P. Sept. 26, 2007).  And in other cases, the Hamilton County Court of Appeals acknowledged that the Prosecutor's Office withheld evidence from the defense that should have been disclosed. *State v. Gumm*, 864 N.E.2d 133, 142 (Ohio Ct. App. 2006); *State v. Wogenstahl*, 2004 Ohio App. LEXIS 5427, 13-14 (Ohio Ct. App., Nov. 12 2004) (inmate discovered during federal habeas corpus discovery that Hamilton County had withheld arrest records of key witnesses that would have impeached witness's testimony); *State v. Carroll*, 2003 Ohio App.LEXIS 4759, 12-13 (Ohio Ct. App., Oct. 3, 2003); *State v. Hout*, 2003 Ohio App. LEXIS 4590, 22- 23 (Ohio Ct. App., Sept. 26, 2003). *See also State v. Campa*, 2002 Ohio App. LEXIS 1445 (Ohio Ct. App., March 29, 2002) (where the state conceded on appeal that the [Hamilton County] assistant prosecutor committed error in failing to disclose evidence favorable to the defendant).[34]

---

[34] Although some of these documented *Brady* violations committed by Hamilton County Prosecutors did not result in relief being granted due to overwhelming evidence of guilt, such overwhelming evidence is lacking here.  *See* Hill's Ninth Ground for Relief in his Amended Petition.  (Doc. 137 at 142-50).

A capital case pending before this Court highlights this ongoing problem of the Hamilton County Prosecutor's Office to provide defense counsel with exculpatory evidence.  In *Cook v. Anderson*, 2007 U.S. Dist. LEXIS 71400, No. 96-cv-424 (S.D. Ohio Sep. 26, 2007), the petitioner was granted an evidentiary hearing based on his claim that the prosecutors failed to disclose a number of police reports that impeached the credibility of four eyewitnesses, who had placed Petitioner near the scene of the abduction or with the victim near where the body was found. *Cook,* 2007 U.S. Dist. LEXIS 71400 at *10, 36.  The State also failed to produce a police officer's report that contradicted the officer's own testimony that he had spoken with someone identified as Petitioner, who said he was in possession of the murder weapon.  *Id.* at *10. Contrary to the officer's testimony, the withheld report noted that the caller did not have the weapon. *Id.*

Given Hamilton County's long and troubling history of *Brady* violations, Hill's habeas counsel asked to review independently the prosecutor's and investigating officers' files to identify any potential *Brady* material.  Due to the State's concealment of the Preliminary Report at trial, as well as the Warden's failure to comply with this Court's discovery order, Hill has been limited in his ability to fully and properly litigate this claim.  Because Hill has now obtained and reviewed the Homicide Book and the documents in the Warden's possession, the record now confirms what Hill long suspected – *Brady* material does exist, and favorable evidence was concealed at trial.

### III.    Any Procedural Default Is Excused By Cause And Prejudice.

Hill anticipates that the Warden will allege that his *Brady* claim regarding the undisclosed Preliminary Report has been procedurally defaulted because it has never been

presented to the state courts.  However, even if this claim has been defaulted, the default is clearly excused by cause and prejudice.  Furthermore, because the *Brady* claim in question did not surface until after federal habeas corpus proceedings had commenced, exhaustion of state court remedies is not at issue.

### A. Cause.

The suppression of favorable evidence by the prosecution in violation of *Brady* constitutes cause for the purpose of excusing a procedural default.  *Strickler v. Greene,* 527 U.S. 263, 289 (1999).  As in *Strickler* and *Banks v. Dretke,* 540 U.S. 668 (2004), the prosecution in Hill's case not only suppressed favorable evidence, but also led Hill's attorneys to believe that it had complied with *Brady*.  In *Strickler*, defense counsel were advised that the prosecution maintained an open file policy, and this amounted to an "implicit representation that [favorable] materials would be included in the open files tendered to defense counsel for their examination[.]"  *Strickler*, 527 U.S. at 283-84.  However, the prosecution in *Strickler* suppressed impeachment evidence relating to the State's key witness.  *Id.* at 273-75, 278.

Similarly, in its response to Hill's demand for discovery prior to trial, the prosecution asserted that "[t]he State of Ohio knows of no evidence favorable to the defendant."  (ROW Apx. Vol. I at 31.)  Hill's defense attorneys at trial were entitled to rely upon the prosecution's assurances that the government had not suppressed any exculpatory evidence.  *Strickler,* 527 U.S. at 284.  As *Strickler* and *Banks* make clear, Hill's trial lawyers "cannot be faulted" for relying upon the assurances of the prosecution that no exculpatory evidence had been suppressed.[35]

---

[35] As the Sixth Circuit noted in *Jamison*, "Ohio…affirmatively represented to the defense that no favorable evidence existed.  Ohio cannot now argue that it was unreasonable for defense counsel not to have caught it suppressing evidence."  291 F.3d at 388.

*Banks,* 540 U.S. at 693, citing *Strickler*, 527 U.S. at 283-84.  As already discussed at length, the prosecution withheld evidence relating to Teresa Dudley which was favorable to Hill's defense. Accordingly, Hill has demonstrated cause for any procedural default.

> **B.     Prejudice.**

A petitioner who demonstrates materiality under *Brady* satisfies the required showing of prejudice necessary to overcome a procedural default.  *Banks,* 540 U.S. at 698, citing *Strickler,* 527 U.S. at 282.  If there is a *reasonable probability* that the suppressed evidence would have resulted in a more favorable outcome at trial, then the procedural default is excused, and the court may grant relief on the underlying *Brady* violation.  *Id.* at 698-99.  A petitioner need not demonstrate prejudice by a preponderance of the evidence, or show that it is more likely than not that the result of the trial would have been different.  *Kyles,* 514 U.S. at 434 (citations omitted).  Instead, a petitioner need only demonstrate that the undisclosed evidence "undermines confidence in the outcome of the trial."  *Id*. at 434, quoting *United States v. Bagley,* 473 U.S. 667, 678 (1985).

As already explained at length, there is a reasonable probability that the disclosure of the Preliminary Report would have resulted in a different verdict, and the State's failure to disclose Officer Givens' Preliminary Report undermines confidence in the outcome of Hill's trial. Had the jury known that Teresa Dudley first ran from the police and suggested a location for where the body might be (and was, ultimately) found, the jury might have harbored reasonable doubt about Hill's involvement in the offense.  At a minimum, the jury might have concluded that Teresa Dudley played some role in her daughter's death, which could have militated against a death sentence for Hill.  If the jury determined that Hill was not solely responsible for

Domika Dudley's death, they might have concluded that the imposition of the death penalty was not appropriate in his case.

Accordingly, Hill has demonstrated both cause and prejudice to overcome the procedural default, and this Court may therefore grant habeas corpus relief on his underlying *Brady* claim. *Banks,* 540 U.S. at 702-03; *Akrawi v. Booker,* 572 F.3d 252, 261-62 (6th Cir. 2009).[36]

**C.    Hill is not required to return to state court to exhaust his *Brady* claim.**

Hill's *Brady* claim relating to the Preliminary Report has never been presented in state court.[37]  Nevertheless, Hill is not required to return to state court to exhaust his state court remedies.  First, where *Brady* material surfaces for the first time in the course of federal proceedings, the federal courts may consider the merits of the *Brady* claim without the petitioner first returning to state court to litigate the claim.  *See Webb v. Mitchell,* 586 F.3d 383, 389 (6th Cir. 2009).[38]  *Strickler* also supports this conclusion; for in that case, the Supreme Court considered the petitioner's *Brady* claims even though the factual predicate for the claims had

---

[36] As explained in *Akrawi,* a petitioner who "succeeds in showing suppression of favorable evidence material to guilt or innocence, will have necessarily shown cause and prejudice excusing his procedural default."  *Akrawi,* 572 F.3d at 261-62.

[37] The reason for this, of course, is that the State continued to withhold this evidence throughout state post-conviction proceedings, and continued to suppress the evidence even after federal habeas corpus proceedings commenced and discovery had been granted.  Hill was only able to obtain this evidence and assess the *Brady* claim by utilizing his own investigator, and then by confirming that the Report was not included in the Warden's October 2010 court-ordered document production.

[38] As explained in *Webb,* "[The petitioner] did not raise his *Brady* claim in the state proceedings, but the district court excused his procedural default and reviewed the claim on the merits because Webb did not learn of the police report until federal habeas discovery.  Because this claim was not 'adjudicated on the merits in State court proceedings,' we give fresh review to the merits of this claim[.]"  *Webb,* 586 F.3d at 389. *Webb* thus indicates that the requirement of exhaustion of state remedies is not applicable to cases where the factual predicate for a *Brady* claim is discovered for the first time in federal habeas corpus proceedings.

not been discovered until after the petitioner sought relief in federal court, and there was no return to state court to exhaust the claims. *Strickler,* 527 U.S. at 278.

Second, the exhaustion requirement is inapplicable in this case because circumstances exist which render Ohio's alleged corrective process ineffective to protect Hill's rights. *See* 28 U.S.C. § 2254(b)(1)(B)(ii). If Hill returned to state court to present his *Brady* claim in a successive post-conviction petition, his claim would be subject to O.R.C. § 2953.23, which requires a petitioner to demonstrate "by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted." *State v. Broom,* 914 N.E.2d 392, 396 (Ohio 2009) (quoting O.R.C. § 2953.23). Obviously, this is a far more stringent evidentiary showing than that which is required under *Brady*. *Compare id. with Kyles,* 514 U.S. at 434.[39] As previously noted, *Brady* does not even require a petitioner to demonstrate prejudice by a preponderance of the evidence. *Kyles,* 514 U.S. at 434 (citations omitted). In contrast, O.R.C. § 2953.23 requires a petitioner to demonstrate actual innocence by clear and convincing evidence before relief can be granted.

It follows that, even if a petitioner presents a clearly meritorious *Brady* claim in a successive post-conviction petition, he will not be granted relief unless he also satisfies the more rigorous requirements set out in O.R.C. § 2953.23. Because Ohio's successive post-conviction framework would not permit the state courts to reach the merits of Hill's *Brady* claim unless he first satisfies the requirements of O.R.C. § 2953.23, it is clear that circumstances exist which render Ohio's corrective process ineffective to protect Hill's rights. As a result,

---

[39] The evidentiary burden under § 2953.23 is virtually identical to the standard for claims of "actual innocence of the death penalty" set out in *Sawyer v. Whitley,* 505 U.S. 333, 336 (1992).

there is no requirement that Hill return to state court to exhaust this claim.  *See* 28 U.S.C. § 2254(b)(1)(B)(ii); *see also Quezada v. Scribner,* 611 F.3d 1165, 1168 (9th Cir. 2010).[40]

In *Quezada*, the Ninth Circuit indicated that an unexhausted *Brady* claim which is procedurally barred in state court may be considered on the merits in federal habeas corpus proceedings if the petitioner can demonstrate cause and prejudice.  *Quezada,* 611 F.3d at 1168, citing *Strickler*.  As already explained, Hill has demonstrated cause and prejudice for his *Brady* claim.  Because Hill's claim would be procedurally barred in state court, he is not required to return to state court to exhaust it, and this Court may reach the merits of the claim. *Id.*

> **D.     In the event that this Court holds that Hill must return to state court exhaust his claim, this Court should stay and hold in abeyance his federal habeas corpus proceedings.**

As already explained, Hill is not required to return to state court to exhaust his *Brady* claim.  However, if the court determines that Hill has an adequate corrective process available to him under Ohio law through which he could present his *Brady* claim, the instant federal habeas corpus proceedings should be stayed and held in abeyance while the matter is litigated in state court.  *Quezada,* 611 F.3d at 1168, citing *Rhines v. Weber,* 544 U.S. 269, 275-76 (2005).  That is the very process this Court employed in *Wogenstahl v. Mitchell*, S.D. Ohio No. 1:99-cv-00843, Doc.98 (Aug. 12, 2003) (habeas case held in abeyance pending state-court adjudication of a *Brady* claim regarding undisclosed arrest records of a key state witness).  Accordingly, Hill respectfully requests that the Court stay this case and hold it in abeyance if it concludes that no exception to the exhaustion requirement exists with respect to his *Brady* claim.

---

[40] Furthermore, there is no requirement that a petitioner return to state court to exhaust a claim where doing so would be futile.  *Williams v. Taylor,* 529 U.S. 420, 444 (2000).  Given the very stringent evidentiary showing that a petitioner must make under O.R.C. 2953.23, it would be futile for Hill to present his *Brady* claim to the state courts.

IV.     **Conclusion – Prayer for Relief.**

*Brady* material was suppressed at trial that was material to Hill's defense.  A reasonable probability exists that the disclosure of the Preliminary Report would have resulted in a more favorable verdict.  And cause and prejudice exist that will defeat any allegation of procedural default.  For all of the reasons presented in this motion, this Court should reconsider its earlier finding of default on Sub-claim C of Hill's Fourth Ground for Relief in order to permit a full, fair and accurate adjudication of its merits.  In the alternative, this Court should stay this case and hold it in abeyance while Hill returns to state court to exhaust this claim.  Should the Court grant this motion, supplementation of Mr. Hill's pending traverse will be required.

Respectfully submitted,

*/s/ Justin C. Thompson*
**Justin C. Thompson (0078817)**
Assistant Federal Public Defender
**Carol A. Wright (0029782)**
Assistant Federal Public Defender
Lead Counsel for Petitioner

Federal Public Defender's Office
for the Southern District of Ohio
Capital Habeas Unit
10 W. Broad St., Suite 1020
Columbus, OH 43215
Phone: (614) 469-2999
carol_wright@fd.org
justin_thompson@fd.org

and

**David S. Bloomfield, Jr (0068158)**
**James B. Hadden (0059315)**
**Lawrence Bradfield Hughes (0070997)**
**Justin L. Root (0083459)**
Porter Wright Morris & Arthur LLP
41 S. High Street, Suite 3000
Columbus, OH 43215-6194
Phone: (614) 227-2000
Fax: (614) 227-2100

dbloomfield@porterwright.com
jhadden@porterwright.com
bhughes@porterwright.com
jroot@porterwright.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this **Petitioner's Amended Motion for Reconsideration of His Claims Under *Brady v. Maryland*, 373 U.S. 83 (1963)** was filed electronically this 18th day of March, 2011. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*s/ Justin C. Thompson*
Justin C. Thompson
Assistant Federal Public Defender

COLUMBUS/1574609v.1