IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GENESIS HILL,

      Petitioner,

    v.

BETTY MITCHELL, Warden,

      Respondent.

Case No. 1:98-cv-452
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action pursuant to 28 U.S.C. § 2254. This matter is before the Court upon Petitioner's amended motion for reconsideration of his claims under *Brady v. Maryland*, 373 U.S. 83 (1963) (ECF No. 219), Respondent's memorandum in opposition (ECF No. 217), and Petitioner's reply (ECF No. 220). Also before the Court is Respondent's notice of supplemental authority, to wit: *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011) (ECF No. 221).

### I. Overview

Petitioner is asking this Court to reconsider its September 27, 2006 decision finding that Petitioner had procedurally defaulted the *Brady* violations alleged in his fourth ground for relief. (ECF No. 151-2, at 21-31.) Specifically, Petitioner seeks to revive sub-part (c) of that ground, alleging that the state withheld material exculpatory evidence. The Court based its procedural default conclusion in large part on the "utter lack of substance" to the claim. (*Id.* at 25.) Petitioner premises the instant request on newly discovered evidence–namely, a June 1, 1991 police report in which the officer documented questions about why the child-victim's mother, Teresa Dudley, ran when approached by police about her missing baby and why Dudley asked police several times to search in an alley behind the house for her baby's body. (ECF No. 219, at 16.) Petitioner obtained that report in December, 2007, through the use of a private investigator. (*Id.* at 8-9.) Petitioner filed the instant motion on March 18, 2011.

Respondent urges this Court to deny the motion, arguing that it is legally time-barred and

equitably inappropriate. (ECF No. 217, at 3.) First, Respondent argues that Petitioner's new allegation is barred by the statute of limitations provision requiring claims to be filed within one year of the date on which the factual predicate supporting the claim was discovered or could have been discovered through the exercise of due diligence. (*Id.* at 3-4 (citing 28 U.S.C. § 2244(d)(1)(D)).) To this point, Respondent asserts that "[a]lthough ostensibly asking the court to 'reconsider' its previous order, Hill essentially requests to once again amend his application for habeas corpus relief, to present a specific factual allegation not presented in his previous applications, namely, the alleged suppression of a preliminary police report." (ECF No. 217. at 4.) Noting that Petitioner admits that his investigator obtained a copy of that report on December 18, 2007, Respondent argues that Petitioner's waiting more than three years after that date to file the instant motion places the new allegation well outside the one-year deadline for filing the allegation. Respondent asserts that because "[t]he subject of the report – the behavior of Teresa Dudley when the police initially approached her – is not related to the allegedly suppressed information provided to the juvenile probation officer or to the allegedly suppressed evidence of the polygraph examinations," the new allegation does not "relate back" to the original *Brady* violations alleged in the fourth ground for relief, sufficient to evade the statute of limitation (*Id.* at 5.)

Petitioner insists that his new allegation is not barred by the statute of limitations because, contrary to Respondent's assertion, Petitioner is not asking to amend his petition to add a new claim. Rather, according to Petitioner, he "is simply asking the Court to reconsider its procedural default ruling on the *Brady* claim that he *already alleged* within the Fourth Ground for Relief of his second amended petition – an amended petition that this Court already granted him leave to file." (ECF No. 220, at 4 (emphasis in original).) Petitioner proceeds to argue that even assuming he were required to meet a "relation back" standard, he could. Petitioner asserts that both the *Brady* claim set forth in his second amended petition–consisting of a generalized allegation of suppressing favorable evidence based on Hamilton County's extensive history of

2

*Brady* violations (specifically relating to the Cincinnati Police Department's practice of not turning over the entire "homicide book" generated during murder investigations)–and the *Brady* allegations set forth in the instant motion for reconsideration–consisting of a particularized allegation of the suppression of a favorable police report–"go to the same legal issue; that of the State withholding exculpatory evidence in violation of Hill's Sixth, Eighth, and Fourteenth Amendment Rights under *Brady v. Maryland*, 373 U.S. 83 (1963)." (*Id.* at 6.) Petitioner maintains that the allegations in the instant motion for reconsideration do not constitute a new claim " 'supported by facts that differ in both time and type from those in the original pleading.' " (*Id.* at 7 (quoting *Mayle v. Felix*, 545 U.S. 644, 650 (2005)).)

In the event the Court concludes that Petitioner's new allegation is not time-barred, Respondent argues in the alternative that equitable principles weigh against granting Petitioner's motion for reconsideration. Respondent argues that Petitioner "offers no credible explanation for waiting over three years to present the allegedly suppressed police report as a ground for habeas corpus relief." (*Id.* at 5-6.) Respondent dismisses any attempt by Petitioner to equate Respondent's failure to discover and provide the report to Petitioner with misconduct by Respondent. Respondent likewise takes issue with any argument by Petitioner that the need to complete the discovery in this case contributed to Petitioner's delay in filing the instant motion because "the discovery permitted by the Court concerned Hill's claim that the prosecution improperly sought the death penalty [to] be imposed on Hill based on Hill's race," while the new allegation at issue in the instant motion concerns a claimed *Brady* violation. (*Id.* at 7.)

Petitioner offers several arguments demonstrating that he has been diligent in presenting the new facts set forth in the instant motion. First, Petitioner points out that during the three-year period between Petitioner's discovery of the police report and his filing of the instant motion, not only did Respondent fail to provide complete discovery but also the instant proceedings were stayed for a period of time pending the Supreme Court's *certiorari* decision in *Garner v. Mitchell*, 502 F.3d 394 (6th Cir. 2007). (ECF No. 220, at 9-11.) Second, Petitioner notes that

3

during the period of time when the instant proceedings were stayed, new lead counsel took over the case and required extensive time to familiarize themselves with the case. (*Id.* at 11-13.) Finally, Petitioner asserts that the primary fault for Petitioner's delay in presenting the instant allegations lies with Respondent, not Petitioner, due to the persistent failure of the State and counsel for Respondent to produce the police report at issue. (*Id.* at 1316.)

With respect to the substance of Petitioner's motion, which Respondent did not address in any detail, Petitioner asserts that sub-part (C) of his fourth ground for relief presents a meritorious *Brady* claim, in view of the newly discovered police report, and that the State's suppression of the report meets the cause and prejudice standard sufficient to excuse any default of the claim because the police report is exculpatory and material. (ECF No. 219; ECF No. 220, at 2-4.)

## II. Motion for Reconsideration

To the extent that the instant motion is what Petitioner says it is–a motion to reconsider this Court's enforcement of procedural default against the *Brady* claim set forth in sub-part (C) of Petitioner's fourth ground for relief rather than a motion to amend his petition–the Court's procedural default decision is best characterized as an interlocutory order and district courts have the inherent power to reconsider interlocutory orders. *See McWhorter v. Elsea, Inc.*, No. 2:00-cv-473, 2006 WL 3483964, at *1 (S.D. Ohio Nov. 30, 2006). Motions for reconsideration are properly used to correct manifest injustice, although interests of finality dictate that they should be used sparingly. *Id.* at *2.

The issue before the Court is determining whether Petitioner can demonstrate cause and prejudice sufficient to excuse the default that this Court previously found. In the instant case, of course, Petitioner offers as "cause" for the default of his *Brady* claim the alleged *Brady* violation itself. That is, Petitioner argues that the prosecution's failure to disclose the material, exculpatory evidence allegedly encompassed in his fourth ground for relief prevented him from discovering, developing, or presenting that precise allegation until now. The Supreme Court

4

addressed the same scenario in *Strickler v. Greene*, 527 U.S. 263 (1999). The petitioner in *Strickler* raised his *Brady* claim for the first time in his amended habeas corpus petition, after learning of the allegedly favorable, undisclosed evidence for the first time during habeas corpus discovery. *Strickler*, 527 U.S. at 278. The exculpatory evidence at issue in *Strickler* consisted of documents prepared by an eyewitness who testified at trial, as well as notes of police interviews with that eyewitness, which impeached significant portions of her trial testimony as to the abduction of the victim. *Id.* at 266. The Supreme Court began its analysis by revisiting the three components of a *Brady* claim -- namely, (1) the existence of evidence favorable to the petitioner; (2) which was suppressed by state officials; and (3) which resulted in prejudice to the petitioner. *Id.* at 281-82 (citing *Brady v. Maryland*, 373 U.S. 83 (1963). The Court then explained:

> Because petitioner acknowledges that his *Brady* claim is procedurally defaulted, we must first decide whether that default is excused by an adequate showing of cause and prejudice. In this case, cause and prejudice parallel two of the three components of the alleged *Brady* violation itself. The suppression of the [eyewitness] documents constitutes one of the causes for the failure to assert a *Brady* claim in the state courts, and unless those documents were "material" for *Brady* purposes, their suppression did not give rise to sufficient prejudice to overcome the procedural default.

*Strickler*, 527 U.S. at 282. Thus, to determine whether petitioner can demonstrate cause and prejudice to excuse his failure to present his second claim for relief to the state courts, this Court must determine whether, (1) favorable evidence exists, (2) that was suppressed by the prosecution, (3) that was so material as to either guilt or punishment that petitioner was prejudiced by its omission.

With respect to undisclosed evidence, the inquiry of whether evidence was suppressed, (and whether Petitioner can establish cause), turns in part on whether Petitioner's trial counsel knew or reasonably could have known about the undisclosed evidence. *Strickler*, 527 U.S. at 286. The Sixth Circuit has held that the prosecution's failure to disclose evidence to the petitioner's defense counsel is adequate cause for the petitioner's failure to present his *Brady* claim to the state courts in accordance with state procedural rules. *Jamison v. Collins*, 291 F.3d 380, 386 (6th Cir. 2002). In the instant case, Petitioner offers the affidavit of trial counsel Mark

Krumbein, in which Krumbein states that he did not receive the Jun 1, 1991 preliminary police report. (ECF No. 219, at 19-20.) Respondent does not appear to dispute that Petitioner's trial counsel never received the police report. That being so, the Court is satisfied that the evidence was suppressed.

If the Court determines that this piece of evidence is favorable, the Court would then have to determine whether that evidence was so material that its suppression prejudiced Petitioner. If the evidence was not material, then Petitioner cannot establish the prejudice prong of the cause-and-prejudice test to excuse the default of his *Brady* claim. *Strickler, supra*, 527 U.S. at 282. The Court agrees with Petitioner that the evidence is favorable. Evidence that the child victim's mother ran when police first approached her and appeared to have knowledge about the location of her baby's body is favorable because at a minimum, it raises a suspicion that the victim's mother had knowledge about the victim's death that she did not share with police.

Evidence is material within the meaning of *Brady* if it cannot be said that Petitioner received a fair trial, "understood as a trial resulting in a verdict worthy of confidence," in the absence of that evidence. *Strickler*, 527 U.S. at 289-90 (quoting *Kyles, supra*, 514 U.S. at 434).

> As we made clear in *Kyles*, the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusion. (citation omitted). Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Strickler*, 527 U.S. at 290 (quoting *Kyles, supra*, 514 U.S. at 435). Petitioner must demonstrate more than a *possibility* that the suppressed evidence might have produced a different outcome of his trial; he must establish a reasonable *probability* that the result would have been different. *Strickler*, 527 U.S. at 289-291. As the Sixth Circuit pointed out in *Jamison*, "[p]rejudice (or materiality) in the *Brady* context is a difficult test to meet...; if the defendant would still have been convicted based on evidence not affected by the suppressed material, the conviction must stand." *Jamison*, 291 F.3d at 388.

*Brady* material encompasses impeachment evidence pertinent to the credibility of

6

prosecution witnesses. *Sutton v. Bell*, No. 3:07-cv-30, 2011 WL 4595801, at \*55 (E.D. Tenn. Sep. 29, 2011); *Bragan v. Morgan*, 791 F. Supp. 704, 715 (M.D. Tenn. 1992) ("Included among the favorable evidence the State is required to disclose is information relating to the reliability of prosecution witnesses.") Nondisclosure of evidence undermining the credibility of the prosecution's key witness requires a new trial irrespective of the good faith or bad faith of the prosecutor. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Suppressed impeachment evidence is material if the witness whose credibility is attacked provides the only evidence linking the defendant to the crime or where the impact of the evidence on the witness's credibility would have undermined a critical element of the prosecution's case. *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996). The Sixth Circuit has not been reluctant to grant habeas corpus relief where material evidence impeaching key prosecution witnesses was suppressed. *Robinson v. Mills*, 592 F.3d 730, 736-37 (6th Cir. 2010) ("the suppressed evidence of Sims' status as a [confidential informant] is material under *Brady* because Sims was the State's star witness and only her testimony contradicted or undermined Robinson's assertion that he killed Irwin in self-defense."); *Jamison v. Collins*, 291 F.3d 380, 391 (6th Cir. 2002) (affirming grant of habeas corpus relief upon concluding that the suppressed impeachment evidence "presented a significant challenge to the prosecution's theory of the case").

Petitioner argues that the suppressed report was material because it went to "the heart of trial counsel's defense strategy." (ECF No. 219, at 20.) That strategy, Petitioner explains, "was to attack the credibility of the investigation and shift suspicion toward Teresa Dudley, the victim's mother." (*Id.*) Petitioner proceeds to list a host of "oddities" in the Cincinnati Police Department's investigation, as follows:

> Specifically, Hill's counsel asked, why was the baby found in an area on June 2, 1991, that had already been thoroughly searched by the investigators the day before on June 1, 1991? (*Id.* at 1052-54, 1071, 1091-92.) One of the victim's barrettes was allegedly found in the garage of the Hill residence by Teresa Dudley, but no one could confirm Dudley's claim that the barrette was found in that garage. The barrette that Dudley claimed to have found at the Hill residence was turned over to the police at her own home.

7

(ECF No. 219, at 20.)  Petitioner also lists numerous factors calling Teresa Dudley's credibility and character into question.  Specifically, according to Petitioner:

> After the State rested its case, defense counsel called Robert Nastold, manager of the Curve Café, to prove that Teresa Dudley had, in fact, lied when she denied being inside his bar on the night the baby went missing.  (Tr. Vol X at 1284-87.)  Defense counsel also called Mark Davenport as a witness.  Davenport testified that he saw the victim in this case passed around between Teresa's friends and family and treated improperly; for example, Teresa would roughhouse with others while she was holding the baby, and she would fail to dress the baby appropriately for cold weather.  (*Id.* at 1387-88.)  Teresa's care of the baby was so deficient that Davenport wanted to call Children's Services around one week before the crime.  (*Id.* at 1387-88.)  Davenport also testified that he had been inside the Dudley home.  According to Davenport, the conditions were so horrible inside the home that he would not have let his dog live there.  (*Id.* at 1389.)  And Hill's defense counsel sought unsuccessfully to introduce the testimony of Alexis Davenport, who overheard state witness Barbara Janson claim that the baby was "dead and inside a box" on Saturday, June 1, *one day before the baby was found.* (*Id.* at 1290-91.)

(ECF No. 210, at 21.)  Thus, concludes Petitioner, "[d]efense counsel's clear intention at trial was to suggest to the jury that Teresa Dudley was not only deficient mother, but also a mother who could have planted evidence and could well have been involved in–if not responsible for–the disappearance and death of her child."  (*Id.*)  Petitioner maintains that the suppressed report "was not only exculpatory and material, but also directly in concert with defense counsel's trial strategy of arguing reasonable doubt through the actions of Teresa Dudley."  (*Id.*)

Continuing with his case for materiality, Petitioner dismisses as "misplaced" any reliance by Respondent that there was overwhelming evidence of Petitioner's guilt.  According to Petitioner:

- "For example, although witnesses saw Mr. Hill in the yard in front of Ms. Dudley's apartment, no witnesses actually saw him enter or leave the apartment around the time in question."

- "As to the shirt in which the victim's body was wrapped, the only evidence that the State produced linking the shirt to Mr. Hill was the testimony of Ms. Dudley and one of her friends."

- "Regarding the trash bags in which the victim's body was wrapped, the State's expert testified that they probably came from Mr. Hill's apartment – but many people had access to that apartment, and the prosecution offered no fingerprints or other evidence directly linking Mr. Hill to the bags."

- "As for Ms. Janson's testimony that she overheard Mr. Hill threatening to kill the victim, she later testified that she did not know whether Dudley or her daughter was the object of these threats. (Citation omitted.) Dudley herself denied being physically threatened by Petitioner. Further, Domika's mother herself testified that *Mr. Hill never threatened to hurt the victim*."

- "Finally, the bus driver who allegedly overheard Mr. Hill confess could not identify Mr. Hill in court. (Citation omitted.) Moreover, the driver admitted that his earlier identification of Mr. Hill's photo was based on nothing more than *general size and build*."

(ECF No. 219, at 22-23.) Finally, Petitioner asserts that, "[e]ven if the State offered sufficient evidence that Mr. Hill caused the victim's death, no rational trier of fact could have found beyond a reasonable doubt that Mr. Hill *purposely* did so." (*Id.* at 23.)

The issue before the Court is determining whether the suppressed police report is material, as defined by the Supreme Court and Sixth Circuit. The one-and-a-half page report at issue, dated June 1, 1991 and authored by Cincinnati Police Officer James Givens, provides in relevant part the following. On a line following the question, "Do you believe that this case could be solved with some additional investigative time[,]" Officer Givens circled "yes" and handwrote the following: "Investigate why the mother ran from police and asked for the police to check the alley behind the house. (several times)" (ECF No. 219-4, at 1.) Although the unaffected evidence establishing Petitioner's guilt was more substantial than characterized by Petitioner, this Court cannot reach any other conclusion than that the suppressed report is material. And here is why.

The report casts far more suspicion on Teresa Dudley than any evidence at trial did. If it was defense counsel's strategy to shift blame for the baby's death to Dudley or otherwise call her credibility into question, the trial transcript contains very little evidence to that end. The most that defense counsel established was that Dudley's friend Barbara Janson did not get along with Petitioner (Tr. Vol. VIII, at 982-83); that Dudley was at her home when she handed to police a barrette similar to one her daughter was wearing at the time of her disappearance that Dudley claimed to have found on the floor of Petitioner's garage (Tr. Vol. VIII, at 1105-06); that several neighbors were of the view that Dudley did not properly care for her baby daughter (Tr. Vol. X,

9

at 1298-99; 1385-95); and that when Dudley discovered that her baby was missing and told her mother, her mother was crying and shouting but Dudley was not (Tr. Vol. X, at 1394-95).

At a minimum, the suppressed report gives rise to a reasonable suspicion that Dudley had knowledge not only that her missing baby was dead but also where the baby's body was–before the body was found and at a time when Dudley was purporting to search for her missing daughter. The suppressed report also gives rise to a reasonable suspicion that Dudley actively undertook to place the blame for the baby's death on Petitioner. Finally, the suppressed report gives rise to at least an inference that Dudley was responsible for the baby's death. In short, the suppressed impeachment evidence was material because it would have told Petitioner's defense counsel more than they already knew and because it related to more than mere collateral matters. *Jamison v. Collins*, 100 F. Supp. 2d 647, 695-96 (S.D. Ohio 2000).

According to the suppressed report, Teresa Dudley fled from police when they first approached her, despite the fact that it was Dudley and her mother who called police when Teresa could not find her baby. (Tr. Vol. VIII, at 1005.)   The credibility of Teresa Dudley's testimony was essential to the prosecution's case against Petitioner. In the instant case, information that a young mother who frantically called police when her baby went missing actually fled from police when they first approached her constitutes vital, powerful evidence as to her credibility. Petitioner's jury never heard any of these matters.

Also damning is the notation in the report documenting that Dudley several times on June 1, 1991 had asked the police to check the alley behind the house. Trial testimony established that on June 1, 1991, the large box that had contained cans of baby formula and inside of which the baby's body was eventually found was in the alley next to garbage cans behind Petitioner's house. Officer Hennekes testified that one of Petitioner's aunts, Ruby Hill, stated that she had deposited such a box there on June 1, 1991. (Tr. Vol. VIII, at 1059-60.) Officer Beaver testified that when police searched the area near Petitioner's house on June 1, 1991, there was a formula box in the alley next to Petitioner's garage. (Tr. Vol. VIII, at 1092, 1093-94.) Ruby Hill

10

subsequently testified that she had observed Dudley around the alley near Petitioner's garage on the morning of June 1, 1991. (Tr. Vol. X, at 1332, 1353.) The trial court disallowed as hearsay proffered testimony by Alexis Davenport that she had overheard Barbara Janson state that the baby was in a box in the alley. (Tr. Vol. X, at 1290-92.) Information that Teresa Dudley had a concrete idea about where police should search for her baby's body that ended up being very close to where the body was later found constitutes important evidence impacting her credibility.

Teresa Dudley was a vital witness to the prosecution's case against Petitioner. The prosecution's theory of the case, as set forth in opening statements, was that Petitioner kidnapped his 6-month-old daughter Domika Dudley from her mother Teresa Dudley's apartment because he did not want to pay child support that Teresa Dudley had announced an intent to seek. (Tr. Vol. VII, at 947-966.) Much of the essential information supporting that theory came from Teresa Dudley's testimony. Defense counsel's ability to undermine her credibility on cross-examination with evidence that she initially fled from police and seemed insistent that police search an alley near Petitioner's residence would have presented a significant challenge to the prosecution's theory of the case.

Testimony by neighbor (and friend of Teresa Dudley's) Barbara Janson established that Petitioner was in the yard approaching Teresa Dudley's apartment close to midnight, shortly after which Dudley ran outside yelling that her baby was gone, that the shirt in which the baby's body was wrapped resembled a shirt Janson had seen Petitioner wear, and that a day or two earlier Janson had heard Petitioner and Teresa arguing, as well as Petitioner announcing that he would kill Teresa and/or Domika before he would pay any child support. (Tr. Vol. VII, at 970-985.) But Janson eventually wavered on whether the shirt wrapped around the baby resembled one she had seen Petitioner wear, admitted that she did not get along with Petitioner and certain members of his family, and conceded that she never took seriously Petitioner's threats to cause Teresa or Domika harm.

11

Another neighbor, Pamela Lewis, also testified that she saw Petitioner approach the entranceway of Teresa Dudley's apartment between 10:00 and 11:00 p.m., some fifteen minutes before Dudley ran out yelling that her baby was gone. (*Id.* at 988-989.) But Petitioner admitted to being there at the time to try to see Teresa Dudley. (Tr. Vol. X, at 1399, 1406.)

The transcript also reveals that during various interviews with police, Petitioner made numerous statements that were inconsistent internally and with his testimony at trial. That said, he did not confess or make any inculpatory statements. Testimony by a police criminalist established that Petitioner's thumb print was found on the light bulb in the hallway outside Teresa Dudley's room that was unscrewed. (Tr. Vol. IX, at 1124-1126.) But Petitioner admitted to being there the night Domika went missing and to unscrewing that bulb to "play with" Teresa. (Tr. Vol. X, at 1400.)

City bus driver Patrick Ormand testified to a conversation he overheard on his bus on the evening of Sunday, June 2, 1991. According to Ormand, a man said during a conversation that he could not believe what he had done to that baby and that he knew he would get the electric chair for it. (Tr. Vol. IX, at 1132.) Ormand reported that conversation to police after hearing about the disappearance of Domika Dudley on the news. When police showed Ormand a photo array, Ormand identified Petitioner's photograph. (*Id.* at 1134-1135.) But when Ormand testified at trial, he could not identify Petitioner in court. Further, Ormand testified that he had chosen Petitioner's photograph based only on general size and appearance and insisted that he had told police as much when he selected the photograph of Petitioner. (*Id.* at 1136, 1139-1140.) Further, Petitioner denied having been on any bus that night. (Tr. Vol. X, at 1412.)

Criminalist William Dean testified that on the basis of perforation analysis, it was his opinion that the plastic trash bags that were wrapped around the baby's body were detached from the same roll of plastic trash bags that police removed from Petitioner's residence. (Tr. Vol. IX, at 1151-1166.) But the soundness of the perforation analysis upon which Dean relied was called into question on cross examination, with Dean unable to explain certain inconsistencies in the

12

perforation marks that he examined. (*Id.* at 1168-1170, 1172-1173.)

Coroner Dr. Amy Martin, who performed the autopsy on the baby, testified that several blunt force trauma impacts to the head caused the baby's death. (Tr. Vol. IX, at 1190.) Dr. Martin could not, however, testify whether those wounds were deliberately inflicted or could have been the result of an accident. (*Id.* at 1192-1193.)

Although the foregoing constitutes persuasive evidence supporting the prosecution's case against Petitioner, Teresa Dudley proved to be a vital witness for the prosecution because much of the essential information supporting the prosecution's theory and connecting the evidence set forth above came from Teresa Dudley's testimony. It was Teresa Dudley who testified that Petitioner had fathered Domika. (Tr. Vol. VIII, at 996-997.) It was Teresa Dudley who testified that when she had told Petitioner of her intention to take him to court for child support, Petitioner replied, "I bet I don't pay." (*Id.* at 997-998.) It was Teresa Dudley who most definitively identified the men's shirt in which the baby's body was wrapped as having belonged to Petitioner, never wavering on saying that she had seen him wear that exact shirt. (*Id.* at 999, 1019.)

It was Teresa Dudley who described her activities, as well as the activities, appearance, and whereabouts of Domika, in the hours and minutes leading up to Domika's disappearance. She testified that Domika was wearing only a diaper when Teresa took her upstairs with a bottle, laid her on a pillow next to the bed where she fell asleep, before she (Teresa), too, went to sleep at the bottom of the pillows near a fan. (Tr. Vol. VIII, at 1001-1002.) She testified that her door was slightly ajar and that there was a light on the hallway outside the room. (*Id.*) She testified that when she woke up some time later, she discovered that Domika was gone, saw that Domika's bottle was sitting by the door, and noticed that the light that had been on in the hallway was off. (*Id.* at 1002.) She testified that she screwed the light bulb back in when she had trouble turning the light on with the switch. (*Id.*) She testified that she then ran downstairs and asked her brother whether he had Domika, after which they both ran back upstairs to search for the

13

baby. (*Id*. at 1003.) She testified that she then ran downstairs and outside, yelling that Domika was gone. (*Id*.)

It was Teresa Dudley who testified that when she proceeded to Petitioner's residence and he appeared from around back, he did not appear worried about the news that Domika was missing and did not help in the search for the baby. (*Id*. at 1005.) It was Teresa Dudley who testified that later that morning, she found on the floor of Petitioner's garage one of the three barrettes that Domika was wearing in her hair when she went to sleep shortly before disappearing. (*Id*. at 1006-1007.) It was Teresa Dudley who testified that a few weeks earlier, Petitioner had broken one of her windows. (*Id*. at 1033-1034.) And it was Teresa Dudley who testified that Petitioner did not have permission to come to her residence and take the baby that night (May 31, 1991-June 1, 1991). (*Id*. at 1033-1035.)

It is doubtful from the foregoing that the prosecution could have made its case without Teresa Dudley. Undermining her credibility with a powerful cross-examination was critical to Petitioner's defense. Indeed, it was his only defense. Early in the investigation of Domika Dudley's disappearance, police viewed Petitioner and Teresa Dudley as suspects. (Tr. Vol. VI, at 658.) Because of the nondisclosure of the police report at the heart of this motion, Petitioner's jury never heard on cross-examination that Teresa Dudley, who summoned police when she could not find her baby, not only ran from police when they first approached her but also had a concrete idea about where police should search for the baby. The impact of that information on Teresa Dudley's credibility no doubt would have crippled the prosecution's case against Petitioner. That is, the suppressed report would have given counsel invaluable ammunition not only to undermine the credibility of both Teresa Dudley and Barbara Janson, but also to shift the blame away from Petitioner, sufficient to establish reasonable doubt about his guilt for the murder of the baby. At a minimum, the suppressed report creates doubt about whether Petitioner would "still have been convicted based on evidence not affected by the suppressed material." *Jamison*, 291 F.3d at 388.

14

### III. Motion to Amend the Petition

This Court is of the view that Petitioner's motion for reconsideration is properly brought under Fed. R. Civ. P. 60(b)(2). Even assuming, however, that this Court were to accept Respondent's argument that the instant motion is a motion to amend the petition barred by the one-year statute of limitations, the Court would conclude that the amendment sought relates back to the claim that was originally pleaded and is by virtue of that relation-back timely.

The Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA"), established time limits for commencing attacks on state convictions through habeas corpus proceedings under 28 U.S.C. § 2254. Under the AEDPA, a state prisoner must commence the collateral attack within one year from the latest of:

> (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Petitioner's initial habeas corpus petition was timely filed and Respondent has never argued otherwise.

Amendments to habeas corpus petitions were contemplated by the habeas corpus statute, and are governed by Rule 15 of the Federal Rules of Civil Procedure. Section 2242, Title 28 U.S.C., addressing the habeas corpus application itself, states that the application "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." Similarly, Rule 11 of the Rules Governing Section 2254 Cases states that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent with these rules, may be applied, when appropriate, to petitions filed under these rules." Rule 15(a)(2) of the Federal Rules of

15

Civil Procedures provides that a party may amend its pleading only with the opposing party's

consent or by leave of court and that "[t]he court should freely give leave when justice so

requires." Rule 15(c)(1) then provides:

> (1) ***When an Amendment Relates Back.*** An amendment to a pleading relates
> back to the date of the original pleading when:
>
> > **(A)** the law that provides the applicable statute of limitations
> > allows relation back;
> >
> > **(B)** the amendment asserts a claim or defense that arose out of the
> > conduct, transaction, or occurrence set out–or attempted to be set
> > out–in the original pleading; or
> >
> > **(C)** the amendment changes the party or the naming of the party
> > against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied
> > and if, within the period provided by Rule 4(m) for serving the
> > summons and complaint, the party to be brought in by amendment:
> >
> > > **(i)** received such notice of the action that it will not
> > > be prejudiced in defending on the merits; and
> > >
> > > **(ii)** knew or should have known that the action
> > > would have been brought against it, but for a
> > > mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1).

With respect to habeas corpus petitions, the decision of whether to grant a motion for

leave to amend rests within the discretion of the district court; traditionally, district courts

liberally grant requested amendments. The Court of Appeals for the Sixth Circuit has held:

> Under Rule 15(a), leave to amend a pleading shall be freely given when justice so
> requires. This court has explained the factors that a district court should consider
> when deciding whether to grant leave to amend. Several elements may be
> considered in determining whether to permit an amendment. Undue delay in
> filing, lack of notice to the opposing party, bad faith by the moving party, repeated
> failure to cure deficiencies by previous amendments, undue prejudice to the
> opposing party, and futility of amendment are all factors which may affect the
> decision. Delay by itself is not sufficient reason to deny a motion to amend.
> Notice and substantial prejudice to the opposing party are critical factors in
> determining whether an amendment should be granted.

*Coe v. Bell*, 161 F.3d 320, 341-42 (6th Cir. 1998) (quoting *Brooks v. Celeste*, 39 F.3d 125, 130

(6th Cir. 1994)). A district court's decision whether to grant a motion to amend the petition

pursuant to Fed. R. Civ. P. 15(a) generally is reviewed for an abuse of discretion. *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 305 (6th Cir. 2001).

On June 23, 2005, the United States Supreme Court reversed a decision of the United States Court of Appeals for the Ninth Circuit permitting a petitioner in a habeas corpus proceeding to amend his petition after the statute of limitations had already expired to include a new claim not presented in the initial habeas corpus petition. *Mayle v. Felix*, 545 U.S. 644 (2005). The Supreme Court stated that "[a]n amended habeas petition, we hold, does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650. The Supreme Court noted that former Fed. R. Civ. P. 15(c) provides that amendments to a pleading relate back to the date of the original pleading when the amended claim " 'arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.' " *Id.* at 656-57 (quoting former Fed. R. Civ. P. 15(c)(2)). The Supreme Court later explained that "relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claim." *Id.* at 659 (citing *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1259 n. 29; and 6A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1497, p. 85 (2d ed. 1990)). Under that narrow definition, an amended claim does not arise from the same core facts as the timely filed claims simply by virtue of stemming from the habeas petitioner's trial, conviction, or sentence. *Id.* at 664.

Even prior to *Mayle*, the Sixth Circuit had held that a motion to amend a habeas corpus petition to include "entirely new arguments" filed after the expiration of the statute of limitations was futile and such claims did not relate back to the date that the initial petition was filed. *See, e.g., Oleson v. United States*, 27 F. App'x 566, 570 (6th Cir. 2001). Following the Sixth Circuit, the district court for the Western District of Tennessee explained in *Taylor v. Myers*, 345 F. Supp. 2d 855 (W.D. Tenn. 2003):

17

> [O]nce the statute of limitations has expired, allowing amendment of a petition
> with additional grounds for relief would defeat the purpose of the Antiterrorism
> and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214
> (Apr. 24, 1996)(codified, inter alia, at 28 U.S.C. § 2244 *et seq.*)(AEDPA).
> *Oleson*, 2001 WL 1631828 at *3 (citing *United States v. Thomas*, 221 F.3d 430,
> 436 (3d Cir. 2000) ("[A] party cannot amend a § 2255 petition to add a
> completely new claim after the statute of limitations has expired."). *See also
> United States v. Pittman*, 209 F.3d 314, 317-18 (4th Cir. 2000) ("The fact that
> amended claims arise from the same trial and sentencing proceeding as the
> original motion does not mean that the amended claims relate back for purposes
> of Rule 15(c).... Such a broad view of 'relation back' would undermine the
> limitations period set by Congress in the AEDPA) (citing *United States v. Duffus*,
> 174 F.3d 333, 337 (3d Cir. 1999)).

*Id.* at 860.

The issue before the Court is whether Petitioner's proposed amendment consists of

entirely new arguments or arguments arising from the same core facts already alleged in his

petition. If the amendment consists of the former, then under Fed. R. Civ. P. 15(c), the

arguments set forth in the amendment do not relate back to the date of that the petition was

originally filed and are time-barred. If, however, the amendment consists of arguments that stem

from the same core facts, then the amendment does relate back to the original petition and

Petitioner's new argument are not time-barred. Resolving this issue requires the Court to

determine whether the proposed amendment asserts new grounds for relief supported by facts

that differ in both time and type from those that the original petition set forth. *Mayle*, 545 U.S. at

650. An amendment relates back to the date of the original pleading when the amended claim

arises out of the conduct or occurrence set forth in the original petition or when the amended

claim arises from the same core facts as the timely filed claims, but not when the amended claim

depends upon events separate in both time and type from the originally raised claims.

Under that standard, the Court is satisfied that the newly discovered evidence that

Petitioner seeks to add to sub-part (c) of his fourth ground for relief is not an entirely new

argument, but rather, involves the same core facts already alleged in that ground. The

prosecutorial misconduct claimed in sub-part (c) of ground four alleges that the files of the

prosecutors and/or investigating officers contained material, exculpatory *Brady* material. (ECF

No. 137-1, at ¶¶ 93-97.) Petitioner explains that he asked for but was denied permission to review those files and that he was thereafter without any remedy for obtaining them. Petitioner also asserts that Hamilton County in general has an extensive history of *Brady* violations and that Hamilton County prosecutors and Cincinnati police officers in his case had a history of *Brady* violations, to wit: failing to disclosed favorable evidence concerning Linda Phillips exculpatory information and polygraph evidence. Through the use of a private investigator, Petitioner finally obtained what he had insisted all along in sub-part (c) of his fourth ground for relief existed-- favorable *Brady* material in the files of the prosecutors and/or investigating officers. That is, what Petitioner surmised existed–namely a favorable report in the police department's "homicide book"–does in fact exist. In view of the foregoing, the Court concludes the newly discovered evidence that Petitioner seeks to add to sub-part (c) of his fourth ground for relief arises out of the same core of operative facts already pled in that ground.

What remains to be determined in deciding whether Petitioner's proposed amendment relates back to the original petition sufficient that the amendment is not time-barred is whether newly discovered evidence forming the basis of Petitioner's proposed amendment could have been discovered earlier through the exercise of due diligence. That inquiry is easily answered in the negative. For the reasons discussed more fully in Part II above, the failure of the State to turn over the police report at issue establishes that Petitioner could not have discovered the report earlier than he did. That being so, the Court is satisfied that even assuming it were to accept Respondent's argument that the instant motion is properly construed as a motion to amend the petition, the newly discovered evidence that Petitioner seeks to add relates back to the *Brady* violation that he originally alleged in sub-part (c) of his fourth ground for relief.

All that remains to be addressed is Respondent's assertion that principles of equity dictate that his Court deny Petitioner's motion. Pointing to the three-year delay between when Petitioner initially obtained the police report and when Petitioner finally filed the instant motion, Respondent argues that Petitioner "offers no credible explanation for waiting over three years to

19

present the allegedly suppressed police report as a ground for habeas corpus relief." (ECF No. 217, at 5-6.) The Court agrees with that characterization but cannot find that it dictates denying the instant motion. To be clear, the Court is displeased by Petitioner's waiting three years to file the instant motion and finds his reasons explaining the delay wholly wanting. Under most circumstances, that delay would present an insurmountable (and self-imposed) hurdle to a request for reconsideration–even one that is entirely within the province of the Court to consider. That said, the Court cannot find that equitable principles require or justify a refusal to consider Petitioner's request because the new evidence at issue strikes at the heart of a case that landed Petitioner on death row. Further, it does not appear that Respondent was prejudiced by the three-year delay. Finally, the delay caused by Petitioner in presenting this new evidence is balanced out by what can only be characterized as a serious failure on the part of Hamilton County to disclose the evidence in the first place. That being so, although this Court in no way minimizes or condones the Petitioner's delay, Respondent is hardly in a position to invoke equitable principles.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Petitioner's motion for reconsideration (ECF No. 219). The Court concludes the *Brady* claim set forth in sub-part (C) of Petitioner's fourth ground for relief is not barred by procedural default. The Court will give it a full review on the merits when it issues its final decision. In view of the instant decision, the Court sees no need for any additional briefing on the revived claim.

**IT IS SO ORDERED.**

3-23-2012
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**