# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**GENESIS HILL,**

      **Petitioner,**

v.

      **Case No. 1:98-cv-452**
      **JUDGE EDMUND A. SARGUS, JR.**

**BETTY MITCHELL, Warden,**       **Magistrate Judge Terence P. Kemp**

      **Respondent.**

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action pursuant to 28 U.S.C. § 2254. This matter is before the Court upon Petitioner's Second Amended Petition (ECF No. 137), Respondent's Return of Writ/Answer (ECF No. 154), Petitioner's Traverse/Reply (ECF No. 194), Respondent's Sur-Reply (ECF No. 213), and Petitioner's Reply (ECF No. 214). Also before the Court are Petitioner's third amended petition (ECF No. 231)—adding grounds twenty-five and twenty-six—, Respondent's Supplemental Return of Writ (ECF No. 238), and Petitioner's Supplemental Reply/Traverse (ECF No. 239).

For the reasons that follow, this Court concludes that the Petitioner is entitled to a Writ of Habeas Corpus as to the Fourth Ground for Relief, sub-part (c).

## I. Overview

This case began with the brutal murder of a defenseless six month old baby. Genesis Hill, the father of the infant, was convicted of capital murder and sentenced to death.

No matter how heinous the crime, our system of justice requires that a defendant be

1

accorded the rights guaranteed by the United States Constitution. The Constitution requires that exculpatory evidence, that is material evidence favorable to the defense, be turned over to the defense. *Brady v. Maryland*, 373 U.S. 83 (1963).

In this case, the prosecution's case was based almost exclusively upon the testimony of the victim's mother, Teresa Dudley. There were no eyewitnesses, no DNA results, no fingerprint comparisons, or other corroborating evidence. While this fact alone in no way discredits a conviction, it does indicate that evidence discrediting the primary accuser of the defendant is critical to a defense against a charge of murder.

Here, Dudley testified that Hill threatened to kill the baby if she sought child support. A witness initially corroborated her statement, but at trial testified that the threat may have been to Dudley, not the baby. Dudley's mother testified that Hill never threatened the baby.

The only physical evidence linking Hill to the murder was a shirt in which the victim's body had been found. Dudley and one other witness described the shirt as similar to one Hill wore. Police also found in Hill's residence a garbage bag similar to the one in which the victim's body had been placed.

Dudley also testified that she found the child's barrette in the garage adjoining Hill's residence, although police searched the premises the day before and made no such discovery. Finally, a bus driver told police that he overheard a man on a bus tell his acquaintance that he had killed a baby. The bus driver picked Hill from a lineup, but could not identify him at trial.

This Court does not question the sufficiency of the evidence in this Opinion. What the nature of the evidence discloses is that this case turned in large part on the jury's assessment of Dudley's credibility. Within this context, evidence compiled by the police, but not turned over

to the defense, was material and calls into question whether the same jury would have convicted

the Defendant, had this evidence been considered.

The first officer to respond to the missing child was James Givens.  He wrote a preliminary

investigation report, Appendix A, which included the following question and answer:

> 10.   DO YOU BELIEVE THAT THIS CASE COULD BE SOLVED
>        WITH SOME ADDITIONAL INVESTIGATIVE TIME?
>        IF YES, WHY?
>
>        Investigate why the mother ran from police and asked for the police
>        to check the alley behind the house (several times).

Givens questioned why Dudley ran from police, a fact not known to the jury.  Further, Givens

questioned why Dudley asked police to check the alley behind the house, a day before the

victim's body was found in that location.

Hill's trial lawyer has sworn that he did not receive Officer Givens' report.  (ECF No.

219, at 19-20.)  Givens testified at trial and was extensively cross-examined.  His entire

testimony is annexed at Appendix B.  Tellingly, no mention was made to the preliminary

investigation report.  No questions were asked as to why Dudley fled from police or why she

insisted they search Hill's garage.

In the course of the lengthy Opinion to follow, this Court finds that the failure to disclose

Givens' report deprived Hill of his constitutional right to receive exculpatory evidence, in

violation of *Brady*, *supra*.  The undisclosed evidence is material; the prejudice to him is

compelling.  This Court makes no finding that the evidence presented was insufficient to convict

him.  It does find, however, that the evidence was incomplete to a sufficient degree warranting

the issuance of a writ of habeas corpus.

3

## II.

In a September 27, 2006 *Opinion and Order*, the Court dismissed as procedurally defaulted the following grounds for relief: seven, twelve (paragraphs 64-66), four, ten (sub-part a), five, eight, fourteen, three, eleven, two, and twenty-two. (ECF No. 151.) The Court also dismissed as "premature" Petitioner's twenty-fifth ground for relief, where he sought to preserve a claim that he was or would be incompetent to be executed due to mental illness.

The Court permitted certain factual development in this case. Petitioner filed his original habeas corpus petition on June 26, 1998. (ECF No. 6.) In September, 1998, Petitioner conducted depositions of attorneys Mark Krumbein and Myron Davis, as well as a deposition of the records custodian for the Hamilton County Coroner's Office. (ECF Nos. 18, 19, and 20.) Petitioner conducted a deposition of the records custodian for the Hamilton County Jury commission in October, 1998. (ECF No. 24.) In March, 1999, the state court record and transcript were filed. Petitioner filed his first amended petition on April 12, 1999. (ECF No. 71.) On March 22, 1999, the Court permitted Petitioner to expand the record with the affidavit of Dr. Michael Gelbort. (ECF No. 119.) The docket reflects that between 1998 and 2004, Petitioner litigated a second or successive postconviction action in the state courts, upon completion of which Respondent filed additional appendix volumes from those proceedings. (ECF No. 141.) On July 20, 2006, the Court issued an order (ECF No. 149) expanding the record with seven affidavits that Petitioner had offered on March 31, 2006 (ECF No. 146). In a September 27, 2007 *Opinion and Order*, the Court granted leave for Petitioner to conduct limited discovery on his claim of arbitrary or discriminatory imposition of the death penalty, allowing Petitioner to depose prosecutors Steven Tolbert and Jerome Kunkel, and to serve on Respondent

4

requests for admissions, interrogatories, and requests for the production of documents. (ECF No. 158.) The Court also allowed Petitioner, in connection with his claim that he was incompetent during his direct appeals of right, to collect any records in possession of Hamilton County documenting Petitioner's mental or physical health between 1991 and 1996. Toward the end of 2009, Petitioner initiated "*Atkins*" proceedings in the state court alleging that he was mentally retarded and ineligible for the death penalty, although the Court issued an order on January 29, 2010 declining to stay and hold in abeyance the instant habeas corpus proceedings. (ECF No. 196.) Following a series of disputes concerning Respondent's compliance with the Court's order allowing discovery, the Court issued an *Opinion and Order* on September 30, 2010 allowing an *in camera* review of certain documents from the prosecutor's file concerning the decision to capitally charge Petitioner. (ECF No. 212.) Factual development of this case is now completed.

This case is now ripe for review of the grounds for relief that are properly before the Court.

### III.  Factual and Procedural History

The details of this capital murder and aggravated robbery are set forth in numerous state court opinions, including the Ohio Supreme Court's published opinion in *State v. Hill*, 75 Ohio St. 3d 195 (1996):

> On May 31, 1991, defendant-appellant, Genesis Hill, crept into his girlfriend's apartment in Cincinnati and surreptitiously removed their six-month-old daughter, Domika Dudley. On June 2, police found Domika's body, wrapped in trash bags, in a vacant lot behind Hill's house.
>
> Hill, age nineteen, and Teresa Dudley, age eighteen, lived near each other and had an on-going relationship. Their daughter, Domika Dudley, was born in November 1990. Around May 29, 1991, Barbara Janson, a neighbor, heard Teresa "making silly little comments" to Hill that she was going to take him to court for child support. Hill replied that "he'd kill that little bitch before he paid

5

anything." Teresa recalled Hill saying, "I bet I don't pay," when she asked him about child support.

On May 31, in the late afternoon, Hill and Teresa were together in Hill's yard. Teresa became upset, they argued, and Teresa went home. That evening, Teresa went to sleep in her mother's second-floor apartment in the same room as Domika. Between 11:00 p.m. and midnight, Janson and another neighbor saw Hill enter the front yard of Teresa's apartment building, but they did not see Hill leave. That front entrance was the only entry way to her apartment except for the back yard, which was enclosed by a high wall. Ten to fifteen minutes after the neighbors saw Hill, Teresa came out and said Domika was missing.

Teresa went to Hill's home, but was told that Hill was not there and did not have the baby. Hill lived in the same building as did his uncle and two aunts. Just then, Hill appeared, but he denied knowing where his daughter was. A neighborhood search for Domika by police proved unsuccessful. Hill appeared unconcerned, did not participate in the search, and was "snickering" and "grinning" as Teresa talked to police about their missing baby.

Around 5:45 a.m., June 1, Teresa and one of Hill's aunts found a distinctive blue and pink barrette on the floor of Hill's garage. That barrette was identical to one used in Domika's hair before she went to sleep.

On the afternoon of June 2, police found a suspicious SMA(R) BABY FORMULA CARTON in an overgrown vacant lot behind Hill's garage. That box was not there on the day before when police searched the lot. Domika's body was inside the carton. A plastic shopping bag and three plastic trash bags had been successively wrapped around her body. Black electrical tape was wrapped around the outer trash bag.

A man's blue shirt, with white and red stripes, was tied around Domika's head. Teresa and Janson identified this shirt as one that "looks like" a shirt Hill owned.

Domika died as a result of three skull fractures, and she had been dead for more than twelve hours. Either a strong, blunt force had struck her head, or her head had been crushed. She might have been injured in a fall, but it seems only if another force had hit her during or after the fall. She was wearing only a diaper and two barrettes.

The baby formula box, in which Domika was found, was similar to one that Hill's aunt had placed in the trash pile next to Hill's garage. The box was in the trash on June 1, but not on June 2. Batch numbers on an SMA(R) can from the aunt's pantry matched batch numbers on the box in which Domika was found.

6

Hill's uncle was unable to find the black electrical tape that he kept in a tool box.

A forensic expert testified that the last trash bag wrapped around Domika had once been directly attached to a trash bag found in Hill's kitchen. Microscopic grain, crease, and other distinctive marks made in the manufacturing process matched exactly on the two trash bags.

At Teresa's apartment, police found Hill's right thumb print on a hallway light bulb near where Teresa and Domika had slept. When Teresa went to sleep that night, the hallway door had been partly open and the light had been on. When she awoke and discovered Domika missing, the light bulb was unscrewed.

On the evening of June 2, the day Domika's body was found, a Cincinnati bus driver overheard a conversation on his bus. One young man, crying and upset, told another, "he could not believe what he had done to a little baby." The man further said, "he thought he might get the chair for it." After the bus driver heard the news about a dead baby, police were called. The bus driver picked Hill out of a photo array as the young man crying on the bus.

A grand jury indicted Hill on two felony-murder counts in violation of R.C. 2903.01: murder during an aggravated burglary (Count I) and during a kidnapping (Count II). Each aggravated murder count contained two death-penalty specifications under R.C. 2929.04(A)(7)(murder during an aggravated burglary and murder during a kidnapping). Count III charged aggravated burglary in violation of R.C. 2911.11, and Count IV charged kidnapping in violation of R.C. 2905.01. Hill pled not guilty.

At trial, numerous friends and relatives testified for Hill and described his activities on the evening of May 31. Defense witnesses suggested that only two trash bags had been in the kitchen; that Teresa was not a good mother; that she had been aggressive towards Hill on May 31; that she had access to the trash bags in Hill's kitchen; and that she may have "planted" the barrette on the garage floor.

Hill testified as to his activities on May 31. He admitted he had been in the hallway, outside Teresa's door, around 11:00 p.m., and had unscrewed the light bulb. He claimed he only "whistled" to Teresa. When she did not answer, he left and went out the front, the same way he came in. He said he then "[w]ent on about [his] business" (drinking with friends). In his narrative testimony, Hill implicitly denied taking Domika, but he did not explicitly do so. Cross-examination revealed discrepancies between his testimony and his statements to police and two mental health professionals.

The jury found him guilty as charged.

7

Penalty Phase Evidence

Numerous relatives testified regarding Hill's character.  One aunt described him as "kind," "sweet," and "gentle."  Another aunt said he was a "loving, caring" person who was always helpful.  Others described him as a "good person," a "very nice person," "very outgoing," and one who "treats people very well."  His grandparents and other relatives described the difficult environment in which Hill was raised and expressed their love and understanding for him.  His juvenile case worker described him as "likable" and "respectable," although easily "intimidated."

According to the record, Hill was born on June 7, 1971, and his mother suffered from serious depression and chronic emotional problems.  Hill grew up in an extremely poor and drug-infested neighborhood, with a lot of "negative influences" and "temptations."  His family was very poor.  Hill's father, an ex-convict, had only a distant relationship with him and contributed little to his support or upbringing.  Hill left school after the eighth grade.

In his opening statement, trial counsel conceded Hill had a juvenile record for arson, burglary, resisting arrest, and tampering with a coin machine.  Family members also disclosed that Hill had become involved with drugs and gangs as a youngster, and had "sold drugs to have things *** to survive" and to support himself.

Dr. Nancy Schmidtgoessling found Hill to be of average intelligence with the capacity to develop job skills and educate himself.  However, Hill had always struggled academically.  At fourteen, Hill started using drugs and alcohol.  At sixteen, Hill had "problems with serious depression, and wrote suicide notes."  At seventeen, a psychiatric evaluation found that he suffered from "major depression with psychotic features" and he reportedly experienced auditory hallucinations.  But, in June 1991, Schmidtgoessling found that Hill was rational and intelligent, had no mental diseases or defect, and was not suffering from major depression.

In an unsworn statement, Hill said, "I feel hurt.  Growing up was hard.  A lot of things wasn't right for me," and he "struggled to survive."  He was "sorry that you all have to be here ," "sorry that the baby [was] gone," and "sorry for the family."  He neither admitted nor denied killing Domika.  After hearing the evidence, the jury recommended the death penalty.

After the jury recommended death, Hill appeared before the judge for sentencing.  At that hearing, Hill told the court that he was "sorry you have to judge me. *** [I] just hope and pray that you can spare my life."  His probation officer asserted that Hill told him that he "did not brutally nor intentionally kill that baby.  He told me it was an accident."  After explaining its reasons, the trial

8

court then imposed the death penalty.

*Hill*, 75 Ohio St. 3d at 195-98.

Represented by two new attorneys, H. Fred Hoefle and Chuck R. Stidham, Petitioner

pursued his first appeal of right to the Ohio Court of Appeals for the First Appellate District.

Counsel filed their appellate brief on December 28, 1992 raising twenty-nine assignments of

error. On December 21, 1994, the appellate court issued a decision rejecting Petitioner's

assignments of error, and making an independent determination that Petitioner's death sentence

was appropriate and not disproportionate.[1]

Represented by the same two attorneys who had represented him before the court of

appeals below, Petitioner perfected a timely appeal to the Supreme Court of Ohio on January 30,

1995. Counsel raised twenty-six propositions of law. On March 5, 1996, the Supreme Court of

Ohio issued a decision rejecting Petitioner's propositions of law and concluding that Petitioner's

death sentence was appropriate and proportionate. (*State v. Hill, supra*, 75 Ohio St. 3d 195; J.A.

Vol. VI, at 1853.) On April 24, 1996, the Ohio Supreme Court denied without opinion

Petitioner's motion for reconsideration. (*State v. Hill*, 75 Ohio St. 3d 1453 (1996); J.A. Vol. VI,

at 1891.)

The United States Supreme Court denied *certiorari* on October 7, 1996. (J.A. Vol. VII,

at 2014.)

While pursuing his *certiorari* petition to the United States Supreme Court, Petitioner,

---

[1] The decision issued by the court of appeals addressed two causes that had been
consolidated for appeal. Petitioner's appeal of his convictions and death sentence were docketed
as C-910916. Petitioner was also granted leave to pursue a delayed appeal from the judgment
entered by the trial court on April 22, 1994 correcting and supplementing the record, which
appeal was docketed as C-940487. Both cases were consolidated for appeal.

represented by new counsel, filed a postconviction action in the state trial court on September 20, 1996 raising eight claims for relief. On October 31, 1996, the trial court issued findings of fact and conclusions of law denying Petitioner's postconviction action on the pleadings; no discovery was conducted and no evidentiary hearing was held. (J.A. Vol. IX, at 2636.) Represented by the same counsel, Petitioner appealed to the Ohio Court of Appeals for the First Appellate District. On November 21, 1997, the appellate court issued a decision rejecting Petitioner's assignments of error and affirming the trial court's judgment denying Petitioner's postconviction action. (J.A. Vol. X, at 2798.) Petitioner appealed to the Supreme Court of Ohio, filing a memorandum in support of jurisdiction on January 5, 1998. (J.A. Vol. XI, 2803.) On March 11, 1998, the Supreme Court of Ohio issued a summary order declining to accept jurisdiction over Petitioner's appeal. (*State v. Hill*, 81 Ohio St. 3d 1468 (1998); J.A. Vol. XI, at 2828.)

Petitioner commenced this habeas corpus proceeding on June 19, 1998 and filed his initial habeas corpus petition on June 26, 1998. On November 12, 1998, Petitioner filed a motion asking the Court to hold these proceedings in abeyance while he returned to state court to exhaust claims that he had included in his habeas corpus petition but had never presented to the state courts. In an *Opinion and Order* dated December 21, 1998, the Court denied Petitioner's motion without prejudice, but advised him that he was free to pursue additional state court remedies during the pendency of this habeas corpus proceeding. Subsequently, Petitioner filed a second postconviction action in the state trial court, as well as an application for delayed reconsideration of his direct appeal in the state court of appeals.

Represented by the Ohio Public Defender's Office and attorneys James B. Hadden and David Bloomfield, Jr., Petitioner filed a second postconviction action pursuant to O.R.C.

10

§2953.23(A)(2) on February 18, 2000. (J.A.Vol. XIV, at 135.) In addition to attacking the

constitutionality of O.R.C. §2953.23(A)(2) due to the restrictions it applies on the state courts'

ability to entertain second or successive postconviction actions, Petitioner also raised nine

additional claims for relief. (J.A. Vol. XIV, at 135-166.) On March 6, 2000, the trial court

issued an entry denying Petitioner's earlier motion requesting the trial court to recuse itself.

(J.A. Vol. XIV, at 377.) Some three years later, on April 18, 2003, the trial court issued a

decision declining to entertain Petitioner's second postconviction action, finding that the petition

did not meet or even address the criteria under R.C. §2953.23 for a second or successive petition.

(J.A. Vol. XIV, at 459.) Petitioner appealed to the Ohio Court of Appeals for the First Appellate

District and filed his merit brief on September 3, 2003. On December 24, 2003, the appellate

court issued a judgment entry affirming the trial court's decision not to entertain Petitioner's

second postconviction action. (J.A. Vol. XV, at 74.) Petitioner appealed to the Supreme Court

of Ohio, filing a memorandum in support of jurisdiction February 5, 2004. On May 12, 2004,

the Supreme Court of Ohio issued a one-line entry summarily declining to accept jurisdiction

over Petitioner's appeal, thereby affirming the judgment of the appellate court below. (J.A. Vol.

XVI, at 45.)

On October 1, 1999, pursuant to Ohio R. App. P. 26(B), Petitioner filed an application for

delayed reopening of his direct appeal in the court of appeals, the procedure in Ohio for raising

claims of ineffective assistance of appellate counsel. According to the application, Petitioner's

appellate attorneys had performed unreasonably and to his prejudice in failing to raise twelve

assignments of error that Petitioner detailed in the application. (J.A. Vol. XVII, at 8.) On April

14, 2000, the appellate court issued an entry overruling a motion that Petitioner had filed

11

requesting all of the judges of the First District Court of Appeals to recuse themselves. (J.A. Vol. XIX, at 73.) On June 8, 2000, the appellate court issued an entry denying Petitioner's Rule 26(B) application for reopening on the ground that Petitioner had failed to show good cause for filing an untimely application. (J.A. Vol. XIX, at 75.) In so ruling, the appellate court expressly held that, "[t]he fact that appellant was represented by the same counsel in the direct appeals of his case to this Court and to the Ohio Supreme Court does not establish good cause for filing this application more than three and one-half years after the Ohio Supreme Court decided the direct appeal." *Id.* (citations omitted). Petitioner appealed to the Supreme Court of Ohio and filed his merit brief on September 15, 2000. On January 17, 2001, the Supreme Court of Ohio issued an opinion affirming the judgment of the appellate court below, "albeit, for different reasons." (*State v. Hill*, 90 Ohio St. 3d 571, 572 (2001); J.A. Vol. XX, at 150.) Specifically, the Supreme Court of Ohio concluded that, under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), Petitioner had not demonstrated a genuine issue that he received ineffective assistance of counsel. *Hill*, 90 Ohio St. 3d at 572-73. In other words, the Supreme Court of Ohio rejected Petitioner's application on the merits.

Represented by attorneys Randall L. Porter of the Ohio Public Defender's Office and Steven M. Brown, Petitioner filed a "shell" habeas corpus petition on June 26, 1998. (ECF No. 6.). On that same day, this Court issued an order staying Petitioner's execution. (ECF No. 10.)

On November 2, 1998, Petitioner filed a motion for an order to hold his habeas corpus proceedings in abeyance to permit him to complete his factual investigation and exhaust certain claims. (ECF No. 27.) Counsel for Petitioner explained that the appointment of the Ohio Public Defender's Office to Petitioner's case afforded him his first meaningful opportunity to conduct a

12

proper, thorough factual investigation. On December 21, 1998, this Court issued an order

denying Petitioner's motion without prejudice. (ECF No. 30.) The Court advised Petitioner that,

although it was not willing to issue an order staying the habeas corpus proceedings, Petitioner

was free to pursue whatever state court remedies he wished in an effort to exhaust new claims

and to file, when and if necessary, a motion to amend his petition to add any newly exhausted

claims or newly exhausted facts. This Court issued another order on December 21, 1998 which

required, among other things, the parties to file a joint status report every sixty days advising the

Court about the status of any new state court proceedings that Petitioner might initiate. (ECF

No. 31.)

On April 12, 1999, Petitioner, represented by attorneys James B. Hadden of Porter

Wright Morris & Arthur and Randall L. Porter of the Ohio Public Defender's Office, filed an

amended habeas corpus petition raising twenty-five claims for relief. (ECF No. 71.) On June

11, 1999, Respondent filed a return of writ setting forth the procedural history of Petitioner's

case and cursory responses to each of Petitioner's twenty-five claims for relief. (ECF No. 78.)

On August 16, 1999, the parties filed their second Joint Status Report. (ECF No. 79.)

Petitioner indicated that, although he had not yet initiated any new state court proceedings, he

anticipated filing a *Murnahan* motion in the state court of appeals to reopen his direct appeal no

later than September 17, 1999, and a state postconviction action in the trial court shortly after

that.

On March 22, 2000, Respondent filed a motion to dismiss procedurally defaulted claims.

(ECF No. 91.) Following several extensions of time, Petitioner filed a memorandum in response

on May 25, 2000, in which he indicated, among other things, that he had filed a *Murnahan*

13

motion in the court of appeals to reopen his direct appeal on October 1, 1999, and a successor postconviction action in the trial court on February 18, 2000. (ECF No. 100.) On June 19, 2000, Respondent filed a reply in support of her motion to dismiss procedurally defaulted claims.

On May 6, 2002, Petitioner filed a "Notice of Exhaustion" urging the Court to find that he had constructively exhausted the facts and claims set forth in his successor postconviction action. (ECF No. 121.) Petitioner argued that, since the state trial court had taken no action on the successor postconviction action that Petitioner had filed nearly two years earlier, it was futile to require Petitioner to continue to pursue or wait out his successor postconviction proceedings. Respondent filed a memorandum in opposition on May 30, 2002, (ECF No. 122), and Petitioner filed a reply on June 12, 2002 (ECF No. 123).

On April 28, 2003, Respondent filed a notice indicating that the state trial court had ruled on Petitioner's successor postconviction action. (ECF No. 126.) A year later, on April 15, 2004, the parties filed a Joint Status Report in which Petitioner indicated that he had filed an appeal in his successor postconviction proceedings to the Supreme Court of Ohio on February 5, 2004 and that the matter was pending. (ECF No. 128.) On August 10, 2004, the Court issued an order requiring Petitioner, within thirty days of the date of any decision by the Ohio Supreme Court in Petitioner's successor postconviction appeal, to file a motion for leave to file an amended habeas corpus petition in this Court. (ECF No. 130.)

A little over a year later, on August 26, 2005, Respondent filed a notice indicating that, apparently unbeknownst to Petitioner and Respondent alike, the Supreme Court of Ohio had issued an order back on May 12, 2004 declining to accept jurisdiction over Petitioner's appeal, thereby ending Petitioner's successor postconviction proceedings. (ECF No. 131.) Accordingly,

14

the Court conducted a status conference on September 22, 2005 and established a briefing schedule concerning Petitioner's motion for leave to file a second amended petition. (ECF No. 135.)

The Court issued an *Opinion and Order* on December 30, 2005, granting Petitioner leave to file a second amended petition. (ECF No. 140.) In the most recent version of the petition before the Court, Petitioner raises essentially the same twenty-five claims that he previously raised, but re-organized the order in which he presents them, all while maintaining the original numbers assigned to the claims. For example, Petitioner's seventh ground for relief, in which he argues that trial counsel provided ineffective assistance before and during the culpability phase of his trial, is presented first in the most recent version of the petition, but it is still designated as the "seventh ground for relief."

### IV. Standards for Habeas Review

The provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective prior to the filing of the instant petition, apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under the AEDPA, a federal court shall not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's review of claimed factual errors.

15

Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent "when the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent[]" or "when the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases." *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406-07 (2000)). A state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of the Petitioner's case. *Williams v. Coyle*, 260 F.3d at 699. A federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Id.* Rather, a state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In this regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that a petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.

16

### V. Petitioner's Claims

This case is ripe for review of the merits of the grounds properly before the Court. The Court begins out of order, turning first to a claim that the Court originally found was procedurally defaulted but recently concluded was not procedurally defaulted by virtue of presenting a meritorious *Brady* claim.

A.     <u>Fourth Ground for Relief</u>: **Prosecutors' failure to provide exculpatory evidence during pretrial discovery denied Genesis Hill a fair trial.**

         c.     **The files of the prosecutor and investigating officer contain *Brady* material.**

(Second Amended Petition, ECF No. 137-2, at ¶¶ 93-97.) After setting forth more specific allegations about exculpatory evidence that the prosecutors had allegedly suppressed, Petitioner argued in his second amended petition that "[t]he State likely still has more *Brady* material that it is refusing or unable to produce. Petitioner explained that the prosecutors' office had never had formal training in identifying and producing *Brady* material and had had a history of documented *Brady* violations. (*Id.* at ¶¶ 93-94.) In its September 27, 2006 *Opinion and Order*, the Court denied the allegation as procedurally defaulted, specifically noting that "the utter lack of substance to the claim makes any procedural default analysis not only impossible, but also unnecessary." (ECF No. 151-2, at 25.)

More than five years later, Petitioner supplied that substance–namely, a June 1, 1991 police report, which Petitioner did not find until December, 2007, in which a police officer raised questions about why the child-victim's mother, Teresa Dudley, had fled when approached by police about her missing baby and why Dudley repeatedly asked police to search a certain alley for her baby. Setting aside why Petitioner waited nearly three years to reveal the report, this

17

Court proceeded to conclude, for *Brady* purposes, that the suppressed report was favorable and material. (ECF No. 226.) The Court reasoned that the report cast far more suspicion on Teresa Dudley than any evidence at trial had, which was defense counsel's sole strategy. The Court noted that Dudley's credibility was essential to the prosecution's case against Petitioner. The fact that Dudley had voiced a concrete idea about where her baby's body might be, which was close to where the body was eventually discovered, critically undermined Dudley's credibility. And Petitioner's jury never heard it. The fact that Dudley fled when first approached by police, even though it was Dudley and her mother who had summoned the police when Dudley's baby went missing, also critically undermined Dudley's credibility. And Petitioner's jury never heard it. The Court concluded that although there was evidence produced at trial implicating Petitioner in the kidnapping and murder of the baby, Teresa Dudley by far provided the most damning evidence, leaving the Court with grave doubts whether the prosecution could have made a case without Teresa Dudley.

After careful consideration of the evidence and the parties' arguments, the Court concluded that the June 1, 1991 report was suppressed, favorable, and material. Such a finding constitutes not only cause and prejudice sufficient to excuse the procedural default of a *Brady* claim, but also a meritorious *Brady* claim. *Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("Thus, if Banks succeeds in demonstrating 'cause and prejudice,' he will at the same time succeed in establishing the elements of his Farr *Brady* death penalty due process claim."); *Brooks v. Tennessee*, 626 F.3d 878, 891 (6th Cir. 2010) ("Thus, a petitioner who proves a *Brady* violation demonstrates cause and prejudice to excuse procedural default of the *Brady* claim.").

That being so, for the reasons summarized above and set forth more fully in its March 23,

18

2012 *Opinion and Order* (ECF No. 226), the Court sustains sub-part (c) of Petitioner's fourth ground for relief. The Court concludes that the State suppressed material, exculpatory evidence in violation of Petitioner's rights to due process, a fair trial, and to be free from cruel and unusual punishment as guaranteed by the Sixth, Eighth, and Fourteenth Amendments. The violation invalidates not just Petitioner's death sentence, but in fact the entire criminal judgment against Petitioner.

After the Court reached these conclusions, Petitioner on September 18, 2012 filed a motion to expand the record (ECF No. 237) with yet additional (previously undisclosed) evidence that impugned Teresa Dudley's credibility and thereby undermined the State's case— Teresa Dudley's grand jury testimony. (ECF No. 237-1.) According to Petitioner, portions of Dudley's testimony before the grand jury were inconsistent with the testimony that Dudley gave at trial. Critical to the prosecution's case linking Petitioner to the kidnapping and killing of the child-victim was the discovery of the victim's barrette in Petitioner's garage the morning after the victim went missing. Petitioner asserts that although Dudley testified before the grand jury that she was accompanied by her cousins Denise and Ranisha when Dudley discovered the victim's barrette in Petitioner's garage, Dudley testified at trial that she was accompanied by Barbie and Pam. (ECF No. 237, at 9.) Moreover, Petitioner continues, although Dudley testified before the grand jury that she had found the victim's barrette *outside* the garage of Petitioner's home, Dudley testified at trial that she had found the barrette *inside* the garage. Concerning the importance of the discovery of the barrette to the State's case, Petitioner points out that the prosecution repeatedly emphasized that evidence in its rebuttal closing arguments. (*Id.* at 11.)

Respondent filed no response to Petitioner's motion.

19

Rule 7 of the Rules Governing Section 2254 Cases permits federal habeas corpus courts to direct the parties to supplement the state court record with materials relevant to the Court's resolution of the petition. The decision of whether to order Rule 7 expansion is within the sound discretion of the district judge. *Ford v. Seabold*, 841 F.2d 677, 691 (6th Cir. 1988) (holding that record expansion is left to discretion of the district court). Expansion pursuant to Rule 7, under the language of that Rule, therefore contains only a relevancy limitation. That is, the materials a petitioner seeks to include need only be relevant to the determination of the merits of the constitutional claims in order to be added to the record.

Section 2254(e)(2) of the habeas corpus statute places more significant limitations on the ability of a federal court to permit factual development. That section provides:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> > (A) the claim relies on--
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

The United States Supreme Court has explained, however, that "[b]y the terms of its opening clause the statute applies only to prisoners who have 'failed to develop the factual basis of a claim in State court proceedings.'" *Williams v. Taylor*, 529 U.S. 420, 430 (2000) (quoting §

20

2254(e)(2)). The Supreme Court further clarified that "[i]f the prisoner failed to develop the facts, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2)." *Id.* Thus, when a petitioner seeks to develop facts in an evidentiary hearing that the state courts did not consider and to have a federal court consider his constitutional claims in light of those new facts, the petitioner must demonstrate that he was not at fault for the failure to develop the facts underlying his claims. A petitioner is at fault for the failure to develop the facts if he failed, based on the evidence that was available to him, to exercise due diligence in developing and presenting that evidence. *Id.* at 432. Generally, a petitioner exercises due diligence if he requests an evidentiary hearing in the state courts in accordance with state law. *Id.* at 437; *see also Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (holding that the petitioner satisfied the diligence requirement by raising his claim in the appropriate forum and requesting a hearing that was never afforded by the state courts); *Jackson v. Anderson*, 141 F. Supp. 2d 811, 828 (N.D. Ohio 2001) ("The Petitioner sought an evidentiary hearing in state court, which was denied, and thereby satisfied the diligence requirement of §2254(e)(2).")

More recently, the United States Supreme Court issued another restriction on the materials that federal courts may consider in habeas corpus: *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011). In *Cullen*, the Supreme Court held "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S.Ct. at 1398. Noting that "[o]ur cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did," the Supreme Court remarked that, "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably

21

applied federal law to facts not before the state court." *Id.* at 1399.

The Court is satisfied that the expansion of the record sought by Petitioner is warranted. Under the strictures of Rule 7, the materials that Petitioner seeks to add are relevant to the very *Brady* claim set forth in sub-part (c) of Petitioner's fourth ground for relief. The undisclosed grand jury testimony by Teresa Dudley casts yet additional suspicion on Dudley's credibility. As noted above, Dudley's credibility was essential to the prosecution's case against Petitioner. The fact that Dudley had testified differently before the grand jury than she had at trial about whom she was accompanied by when the victim's barrette was discovered in Petitioner's garage and about whether that barrette was discovered inside or outside Petitioner's garage calls her credibility into question. Petitioner's jury never heard any cross-examination by defense counsel exposing those inconsistencies. As the Court also noted, although there was evidence produced at trial implicating Petitioner in the kidnapping and murder of the baby, Teresa Dudley by far provided the most damning evidence, leaving the Court with grave doubts whether the prosecution could have made a case without Teresa Dudley. The grand jury testimony that Petitioner seeks to add serves to bolster the Court's conclusion that the prosecution failed to disclose favorable, material evidence—evidence undermining the credibility of the prosecution's key witness, undercutting the prosecution's case, and potentially bolstering defense counsel's trial strategy of innocence.

Further, for the same reasons that the Court found cause and prejudice to excuse the default of sub-part (c) of Petitioner's fourth ground for relief—namely the prosecution's suppression of favorable and material impeachment evidence—the Court is satisfied that Petitioner exercised due diligence in attempting to develop these facts during state court

proceedings sufficient that § 2254(e)(2) does not limit this Court's consideration of the materials.

Moreover, having found that the state courts failed to address Petitioner's claim on the merits,

denying it instead on procedural grounds, the Court concludes that *Pinholster* does not constrain

this Court's consideration to only the facts and evidence that the state courts considered. *See,*

*e.g., Toliver v. Pollard*, 688 F.3d 853, 859 (7th Cir. 2012) ("*Pinholster* does not apply to Mr.

Tolliver's case because the Wisconsin courts never addressed whether Mr. Tolliver's counsel

performed deficiently."). Finally, the Court is satisfied that grand jury testimony at issue would

have been subject to the *Brady* rule under these circumstances. *See United States v. Tincher*, 907

F.2d 600, 602 (6th Cir. 1990) (reversing convictions where prosecution had failed to disclose

impeachment grand jury testimony under either Jencks Act or *Brady*).

For the foregoing reasons, the Court **GRANTS** Petitioner's motion to expand the record

(ECF No. 237). The record is **HEREBY EXPANDED** to include the grand jury testimony of

Teresa Dudley (ECF No. 237-1.)

> B.  <u>First Ground for Relief</u>: The State's unlawful gathering and use of evidence violated Mr. Hill's Fourth, Fifth, Sixth, and Fourteenth Amendment rights.
>
>> a.  The use at trial of evidence obtained without a warrant violated Mr. Hill's Fourth and Fourteenth Amendment rights.
>>
>> b.  The use at trial of statements obtained from Mr. Hill without a knowing and voluntary waiver violated of *Miranda* rights violated Mr. Hill's due process rights. [sic]

(Second Amended Petition, ECF No. 137-2, at ¶¶ 272-283 (argued nineteenth in the second

amended petition).) Petitioner argues in his first ground for relief that neither his consent to

search his apartment nor his waiver of his *Miranda* rights were knowing, intelligent, and

voluntary. He asserts that the very poor comprehension skills and tenuous grasp on reality that he had by virtue of low intellectual functioning and various mental disorders undermined the validity of the consent to search that he gave to police. As a result of the search, police obtained plastic trash bags that the prosecution introduced at trial and that, through "quasi-expert testimony," were matched to the plastic trash bag in which the infant-victim's body was wrapped. (*Id.* at ¶ 274.) Petitioner argues that he suffered prejudice because the prosecution's case consisted entirely of circumstantial evidence and because the unlawfully obtained trash bags contributed significantly to that circumstantial case.

Petitioner argues in sub-part (b) that any waiver of his *Miranda* rights was not knowing and intelligent because he executed it only after he made statements to police–statements that were prejudicial because they revealed inconsistencies. Petitioner further argues that he did not read the waiver form before signing it, that no one read the form to him, and that he signed  the waiver forms because police told him to sign them. And, as with his consent to search, Petitioner argues that his mental incapacities prevented him from executing a voluntary waiver of his *Miranda* rights. In that regard, Petitioner points out that although case law permits the state to introduce statements made in violation of *Miranda* for the limited purpose of impeachment, the trial court in his case never instructed the jury that it could consider the unlawfully obtained statements only for impeachment purposes. Petitioner also argues that compounding or contributing to the trial court's failure to give such an instruction was the failure of Petitioner's trial counsel to obtain the mental health experts necessary to identify Petitioner's mental deficiencies.

Respondent argues that Petitioner's claim does not warrant habeas corpus relief because

the Ohio Supreme Court's decision rejecting the claim did not contravene or unreasonably apply

clearly established law. (ECF No. 154, at 85.) Further undermining Petitioner's claim,

according to Respondent, is the fact that as a threshold matter, the Supreme Court has held that

Fourth Amendment claims do not sound in habeas corpus where, as here, the petitioner had a full

and fair opportunity to challenge the alleged Fourth Amendment violation in the state courts.

(*Id.* (citing *Stone v. Powell*, 428 U.S. 465 (1976)).) Turning to the substance of Petitioner's

claimed violations, Respondent argues that Petitioner failed to establish that his consent to search

was not voluntary. According to Respondent, Police Officer Robert Steiner testified that he had

thoroughly explained the consent form both to Petitioner and Petitioner's uncle, who was

present, that Petitioner had had no difficulty communicating with officers that day, and that

Petitioner had shown no signs that he did not understand what officers said to him. (*Id.* at 85.)

Respondent argues that Petitioner's claimed *Miranda* waiver violation is equally unpersuasive.

*Colorado v. Connelly*, 479 U.S. 157, 164-67 (1986), according to Respondent, establishes that an

individual's mental deficiencies are not dispositive of the inquiry into voluntariness and that

absent coercive police activity, mental incapacity alone does not undermine a voluntary waiver

of *Miranda* rights. Respondent asserts that Petitioner has failed to overcome record evidence

establishing that police officers fully advised Petitioner of his *Miranda* rights and that Petitioner

spoke freely and willingly. (*Id.* at 86-88.)

Petitioner expands upon his arguments in his Traverse. (ECF No. 194, at 46-55.)

Petitioner begins by noting that this Court permitted expansion of the record to include the

affidavits of Drs. Michael Gelbort and Robert Smith–both of whom conducted mental health

evaluations of Petitioner. (ECF Nos. 149 and 167.) Petitioner proceeds to set forth the record

25

evidence upon which the trial court based its decision overruling Petitioner's motion to suppress his *Miranda* waiver of June 1, 1991; the consent to search that Petitioner and his uncle signed on June 2, 1991; and Petitioner's *Miranda* waiver dated June 4, 1991. Petitioner emphasizes that "[w]ithout making any findings of credibility or referencing any facts to support its decision, the trial court simply 'overruled' defense counsel" and that "[t]he trial court made no dispositive findings on the issue of Hill's ability to knowingly and intelligently waive his Constitutional rights." (*Id.* at 49.) Petitioner goes on to assail the Ohio Supreme Court for concluding after a "cursory review" that there existed " 'no basis to reverse the trial court.' " (*Id.* (quoting *State v. Hill*, 75 Ohio St. 3d at 208).) Petitioner notes that the Ohio Supreme Court relied on testimony by police officers and failed to address Petitioner's testimony or competence. Petitioner takes the state courts to task for failing to reconcile numerous inconsistencies in testimony by Petitioner and police officers, to wit: as to whether Petitioner had been advised of his *Miranda* rights; as to whether any forms were read or explained to Petitioner; as to whether Petitioner signed the June 4, 1991 waiver before or after he had already made statements to police; and as to whether Petitioner simply signed the forms because police told him to sign them. Petitioner also questions the veracity of testimony that police believed that Petitioner was competent when he consented to the search of his apartment, in view of the fact that after signing the consent, Petitioner resumed watching basketball on television and paid no attention to the officers searching his home.

Beyond the record evidence discussed above, Petitioner argues that new evidence–the affidavits of Drs. Gelbort and Smith–further establish that Petitioner did not voluntarily, knowingly, and intelligently waive his constitutional rights. (*Id.* at 49-52.) Specifically,

26

Petitioner notes that Drs. Gelbort and Smith found Petitioner's developmental years to be marked by privation, neglect, physical and sexual abuse, substance abuse, and mental illness. They found that Petitioner's parents were a poor influence on him, that he struggled mightily in school, that he received psychiatric treatment at age seventeen, and that all of the above compromised his ability to comprehend and communicate. Dr. Gelbort, according to Petitioner, additionally found evidence of organic brain impairment in Petitioner. Finally, Petitioner notes that he is actively litigating in state courts his claim that he is mentally retarded and accordingly ineligible for the death penalty. (*Id*. at 51-52 (citing *Atkins v. Virginia*, 536 U.S. 304 (2002)).) Petitioner concludes that on the basis of the facts and clearly established federal law concerning the validity of a waiver of fundamental constitutional rights, the state court decisions rejecting his claims challenging his waivers were unreasonable, thereby warranting habeas corpus relief pursuant to 28 U.S.C. § 2254(d)(1).

Respondent asserts in response that "Hill is not entitled to relief on his first ground for relief because the claim is procedurally defaulted and meritless." (ECF No. 213, at 7.) This is the first time Respondent has raised the issue of procedural default in connection with Petitioner's first ground for relief. Respondent argues that Petitioner has shifted the factual basis underlying his challenge to the voluntariness of his waivers. (*Id*. at 7-8.) Specifically, Respondent asserts that in the state courts, Petitioner argued that his *Miranda* waivers and consent to search were not knowing and intelligent by virtue of the fact that he had not read the forms or had them explained to him. Now, according to Respondent, Petitioner argues for the first time that the reason his waivers were not knowing and intelligent was because of his mental incapacity. Respondent argues that that claim was never fairly presented in the state courts and

27

is procedurally defaulted.

Respondent argues in the alternative that Petitioner's claim also fails on the merits. (*Id.* at 8-13.) First, Respondent argues that Petitioner's claim fails on the merits because it relies heavily on new affidavits that this Court cannot consider, due to their being irrelevant and to Petitioner's failure to diligently develop and present them to the state courts. Respondent next reiterates his argument that pursuant to *Stone v. Powell*, claimed Fourth Amendment violations are not cognizable in habeas corpus where, as here, the petitioner enjoyed an opportunity to fully and fairly litigate the claim in the state court. Third, Respondent argues that Petitioner failed to demonstrate that the state court decisions rejecting his claim unreasonably applied clearly established federal law sufficient to allow habeas corpus relief under 28 U.S.C. § 2254(d)(1). Respondent proceeds to assert that although Petitioner's consent to search was knowing, intelligent, and voluntary, in the end, it was not necessary because police also obtained valid consent to search from the other occupant of Petitioner's home–Petitioner's uncle Elmer Hill. Beyond that, Respondent continues, Petitioner failed to overcome the suppression hearing testimony of Officer Robert Steiner establishing that he (Steiner) had thoroughly explained the consent forms to both Petitioner and his uncle, that both of them signed the forms, and that Steiner believed that Petitioner had understood the form and had had no difficulty communicating with officers. Regarding Petitioner's *Miranda* waivers, Respondent argues that Petitioner failed to persuasively refute testimony by Officer Hoffman that Petitioner told police he understood his rights and was willing to talk and that Petitioner seemed to understand what was being said to him and provided intelligent, coherent responses. Additionally, according to Respondent, Officer Petrosky testified that Petitioner related to her that his reading and writing

28

ability were "okay" and that she never had any reason to doubt his ability to communicate or understand. Respondent dismisses Petitioner's reliance on *Garner v. Mitchell*, 557 F.3d 257 (6th Cir. 2009), because any evidence that Petitioner has presented suggesting he was mentally incapable of making a voluntary waiver of his rights was even less substantial than that presented and rejected in *Garner*. Finally, Respondent argues that the fact that Petitioner might be litigating an *Atkins* claim in the state courts is not relevant to the instant query–namely determining whether Petitioner knowingly, intelligently, and voluntarily waived his rights.

Initially, the Court rejects Respondent's argument that Petitioner's claim is procedurally defaulted by virtue of Petitioner's shifting the factual basis of his claim from whether he read the waiver forms or had them explained to him to whether he was mentally capable of waiving his rights. As the facts set forth below demonstrate, Petitioner did raise or sufficiently touch upon his possible mental deficiencies during his suppression hearing. (Tr. Vol. VI, at 638, 659, 662-63, 667, 667-68, 678.)

Turning now to consideration of Petitioner's claim, it bears reminding that the precise issue for this Court to decide is not whether the State collected evidence and/or statements in violation of Petitioner's rights, but whether the state courts' decisions denying Petitioner's claim contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts in light of the evidence presented. In making that determination, this Court must confine its consideration to the same evidence upon which the state courts relied in rejecting Petitioner's claim.

As the Court touched upon earlier, in *Cullen v. Pinholster*, 131 S.Ct. at 1398, the Supreme Court granted certiorari to resolve two questions, the first of which was: "whether

29

review under § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court."[2] The Supreme Court had before it a case in which first the district court and then the United States Court of Appeals for the Ninth Circuit, sitting *en banc*, had held on the basis of evidence developed during a federal evidentiary hearing that the California state courts' decision rejecting Pinholster's ineffective assistance claim was contrary to or involved an unreasonable application of clearly established federal law and warranted habeas corpus relief. The Supreme Court reversed, holding "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* Noting that "[o]ur cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did," the Supreme Court remarked that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id.* at 1399. "[H]old[ing] that evidence introduced in federal court has no bearing on § 2254(d)(1) review," the Supreme Court made clear that, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 1400.

In the instant case, the state courts considered and rejected on the merits Petitioner's claim challenging the admissibility of statements and evidence that police obtained pursuant to his *Miranda* waivers and consent to search, respectively. *Pinholster* thus dictates that this Court, in determining whether those decisions contravened or unreasonably applied clearly established federal law, confine its consideration to the same evidence that the state courts considered. In

---

[2] The Supreme Court issued *Pinholster* on April 4, 2011, well after the parties filed

other words, *Pinholster* precludes this Court from considering the affidavits of Drs. Gelbort or Smith in making the threshold § 2254(d)(1) determination. Review of the record evidence upon which the state courts relied in rejecting Petitioner's claim leads this Court to conclude that the state court decisions rejecting Petitioner's claim did not contravene or unreasonably apply clearly established federal law. Petitioner's claim thus does not support habeas corpus relief.

Petitioner's defense counsel filed motions to suppress statements obtained as a result of *Miranda* waivers that Petitioner signed on June 1, 1991 and June 4, 1991, as well as evidence obtained as a result of a consent-to-search form that both Petitioner and his uncle, Elmer Hill, signed on June 2, 1991. The trial court heard testimony during a November 4, 1991 hearing on the motions. Defense counsel called Petitioner as their only witness. On direct examination, Petitioner testified that police questioned him several times concerning the disappearance of Domika Dudley and confirmed that he signed two different notification of rights forms. (Tr. Vol. VI, at 633-34.) He testified that he had not read either form before he signed and that no one had read or explained those forms to him before he signed. (*Id.* at 634-35.) He further testified that "[t]hey told me just put my signature on[]" and that police had mentioned those rights only after they had had discussions with him. (*Id.* at 635-36.) Petitioner also testified on direct examination that he had not read the consent-to-search form before he and his uncle signed it and that no one had read it to him either. According to Petitioner's recollection, Petitioner testified: "[s]aid for me and my uncle to sign it." (*Id.* at 637.) Petitioner testified that he did not understand what he was consenting to. (On cross-examination, Petitioner testified that he did not know to that day what items police collected from his apartment. (*Id.* at 648, 652-55.)) Finally,

---

their merits briefing.

Petitioner confirmed that he could read and write, that he had completed school to the tenth grade before dropping out, that he had repeated the third and eighth grades, and that he had had trouble understanding things. (*Id.* at 637-38.)

The prosecution called as its first witness Specialist Joseph Hoffman. Hoffman testified on direct examination that he participated in questioning of Petitioner at the police station between 2:15 and 2:30 a.m. on June 1, 1991. Hoffman testified that police at that time viewed both Petitioner and the missing baby's mother, Teresa Dudley, as suspects. (*Id.* at 658.) Hoffman proceeded to testify that he read the *Miranda* rights form to Petitioner out loud and asked Petitioner if he understood them. (*Id.* at 658-59.) According to Hoffman, Petitioner said that he understood the rights, stated that he was willing to talk, and signed the waiver. Hoffman testified that Petitioner appeared to understand what Hoffman was saying to him. (*Id.* at 659.) On cross-examination, Hoffman testified that he began his questioning of Petitioner by collecting general personal information before asking Petitioner generally about his whereabouts and activities the day and night that the baby went missing. (*Id.* at 659-60.) Hoffman confirmed that he read the rights form to Petitioner, that Petitioner did not appear to Hoffman to be "slow," and that Petitioner showed no signs of being under the influence of alcohol or drugs. (*Id.* at 661-63.)

The prosecution next called Specialist Linda Petrosky. Petrosky testified that she first met Petitioner at his Mulberry Street residence on the morning of June 1, 1991. (*Id.* at 664-65.) She testified that police then transported Petitioner to the police station, after which she advised Petitioner of his *Miranda* rights. (*Id.* at 665.) She testified that before any discussions occurred, she read the rights form to Petitioner, read the waiver form to Petitioner, and asked him if he understood everything she had just said and, if so, whether he would sign the waiver. (*Id.* at

666.) To Petrosky, Petitioner appeared capable of understanding. (*Id*. at 667.) Petrosky testified that she proceeded to ask Petitioner about his schooling and ability to read and write. (*Id*.) According to Petrosky, Petitioner said that he could read and write "okay" and that he went to school through the tenth grade. (*Id*.) Petrosky testified that she asked whether Petitioner was under the influence of any alcohol or drugs at that time, which he denied. (*Id*.) She testified that Petitioner did not appear to her to have any trouble understanding or communicating. (*Id*. at 667-68.)

The prosecution called as its final witness Officer Robert Steinher. Steinher responded to Petitioner's residence on Sunday, June 2, 1991 around 6:00 p.m. There, Steinher testified, he obtained signed consent-to-search forms from both Petitioner and Elmer Hill, an uncle who lived with Petitioner. (*Id*. at 673-74.) Steinher testified that he explained the form "thoroughly" to both Petitioner and his uncle. (*Id*. at 675.) Steinher confirmed that police collected several items from the apartment. On cross-examination, Steinher testified that in addition to a t-shirt and a pair of shorts, policed collected black garbage bags, a Nike shoe flap, and a black torn fragment from a garbage bag. (*Id*. at 683.) Steinher also testified on cross-examination that officers explained to Petitioner and his uncle what the consent-to-search form meant and what was involved and that Petitioner and his uncle said they understood. (*Id*. at 682-83.)

Steinher testified on direct examination that he was also present when police questioned Petitioner at the police station on the morning of June 4, 1991. (*Id*. at 676.) Steinher testified that he witnessed Officer Hennekes read to Petitioner the standard Advice of Rights form, ask Petitioner whether he could read and write, and ask whether Petitioner understood what Hennekes was saying to him. (*Id*. at 677-78.) Steinher also testified that Petitioner had no

33

trouble communicating, did not appear to be under the influence of alcohol or drugs, and
demonstrated no impairments of any kind. (*Id*. at 678.) When asked whether, in his opinion,
Petitioner had freely, voluntarily, and intelligently signed the waiver of rights form, Steinher
answered, "Yes, he did." (*Id*. at 678-79.) On cross-examination, Steinher testified that after
Hennekes questioned Petitioner about his education and ability to read and write, Hennekes read
Petitioner his rights and Petitioner stated that he understood. (*Id*. at 680-81.) Steinher confirmed
that they then asked Petitioner to sign the waiver, which he voluntarily did. (*Id*. at 681.)
Steinher also testified that immediately following the conversation, police placed Petitioner
under arrest. (*Id*.)

At the conclusion of closing arguments, the trial court stated without elaboration,
"Overruled." (*Id*. at 688.) The trial court also issued a one-page entry on November 4, 1991,
stating that the motion to suppress was not well taken and was overruled, over Petitioner's
objection. (J.A. Vol. I, at 399.)

On direct appeal, Petitioner challenged the trial court's decision overruling his motion to
suppress and admitting the statements Petitioner provided and the evidence police collected from
his residence in his twenty-second and twenty-third propositions of law. The Ohio Supreme
Court rejected his claim on the merits, explaining as follows:

> In proposition of law twenty-two, Hill argues his pretrial statements to
> police were inadmissible. In his June 1 and June 4 statements, Hill denied
> responsibility and described his activities on May 31 and June 1. As Hill points
> out, these statements were inconsistent with each other and with his trial
> testimony. At a suppression hearing, Hill testified police never advised him of his
> rights and that he signed *Miranda* forms without reading them. Police officers
> testified that they informed Hill of his rights, that he read and signed the *Miranda*
> forms, and that he talked freely and willingly.
>
> "[T]he weight of the evidence and credibility of witnesses are primarily

34

for the trier of the facts. * * * This principle is applicable to suppression hearings as well as trials." *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584. The trial court chose not to believe Hill and rejected his motion to suppress. The police testimony supports admissibility, and we find no basis to reverse the trial court. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982; *State v. Smith* (1991), 61 Ohio St.3d 284, 287-288, 574 N.E.2d 510, 514-515.

In proposition twenty-three, Hill challenges the admission of evidence, principally the trash bags, seized from his residence on June 2. Hill testified that police never explained the search-consent form which he and his uncle signed but did not read. But police officer Robert Steinher testified that he thoroughly explained the consent form, and Hill and his uncle both signed it.

The trial court resolved the conflicting testimony and rejected Hill's motion to suppress. The totality of the circumstances supports the voluntariness of Hill's consent. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.E.2d 854; *State v. Barnes* (1986), 25 Ohio St.3d 203, 208-209, 25 OBR 266, 271, 495 N.E.2d 922, 926. We reject propositions seventeen, twenty-two, and twenty-three as lacking merit.

*Hill*, 75 Ohio St. 3d at 208.

In determining whether the Ohio Supreme Court's decision contravened or unreasonably applied clearly established federal law, the Court looks first to the clearly established federal law. It is well settled pursuant to *Miranda v. Arizona* that a " 'defendant may waive effectuation' of the rights conveyed in the [*Miranda*] warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' " *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Miranda*, 384 U.S. at 444, 475). Likewise, an accused's consent to search, which absolves officers' obligation to obtain a search warrant, must be "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). The Court determines voluntariness by viewing the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). In *Murphy v. Ohio*, the Sixth Circuit reaffirmed:

The totality of the circumstances can include such factors as "age, education, and

35

> intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep."

551 F.3d 485, 511 (6th Cir. 2009) (quoting *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006)); *see, generally, Schneckloth*, 412 U.S. at 226; *Arizona v. Fulminante*, 499 U.S. 279, 286 (1991).

Petitioner falls short of demonstrating that the state court decisions rejecting his motion to suppress and admitting the challenged statements and evidence were unreasonable. The lack of detailed discussion, however, does not render a decision unreasonable. In the instant case, this Court's review of the suppression hearing transcript substantiates the Ohio Supreme Court's decision, however cursory, that police testimony supported the admissibility of statements obtained pursuant to Petitioner's *Miranda* waivers and that the totality of the circumstances demonstrated the voluntariness of Petitioner's consent to search. *Hill*, 75 Ohio St. 3d at 208.

The totality of the circumstances belies the assertion that Petitioner did not–and could not–knowingly, intelligently, and voluntarily waive his *Miranda* rights and consent to a search of his residence. First, the record contains absolutely no evidence of police coercion or trickery and Petitioner does not argue otherwise. Every officer who testified at the suppression hearing was asked about their impression of Petitioner's mental capacity, awareness, or ability to understand and communicate. Every one of them testified that they saw no indication that Petitioner had any difficulty understanding what was said to him or communicating coherently and rationally. Petitioner himself reported that he could read and write. Petitioner answered questions and documented his whereabouts on May 31 and June 1. All of the above reflect a mental capacity to execute a valid waiver of constitutional rights. To the extent that the trial court failed to

reconcile Petitioner's testimony that he did not read the *Miranda* waivers or consent-to-search

before signing them and that police never read the forms to him with police testimony that they

<u>did</u> read the forms to him, the Ohio Supreme Court correctly observed that the credibility of

witnesses is the province of the trier of fact and the trial court in this instance chose not to

believe Petitioner. *Hill*, 75 Ohio St. 3d at 208. The Ohio Supreme Court's perfunctory decision

finding that police testimony supported the admissibility of Petitioner's statements and that

Petitioner's consent to search was voluntary did not miss the mark; the totality of the

circumstances, which includes Petitioner's low intellect, demonstrates that Petitioner's *Miranda*

waivers and consent to search were voluntary, knowing, and intelligent.

For the foregoing reasons, the Court cannot agree with Petitioner's claims and finds that

the state court decisions did not contravene or unreasonably apply clearly established federal

law. Accordingly, the Court **DENIES** Petitioner's first ground for relief.

C.    <u>Sixth Ground for Relief</u>: **The trial court admitted testimony
        that violated Mr. Hill's right to a fair trial.**

(Second Amended Petition, ECF No. 137-2, at ¶¶ 224-232 (argued fourteenth in the second

amended petition).) Petitioner here challenges the trial court's decision to allow the prosecution

to evoke an uncontrolled and unduly prejudicial emotional response from Teresa Dudley after

showing her a photograph of her dead daughter—the first time she had seen a photograph of her

dead baby. Upon seeing that photograph, Petitioner explains, Teresa Dudley "immediately,

naturally, and predictably began crying loudly and became hysterical." (*Id.* at ¶ 226.) Petitioner

continues that when defense counsel sought to stipulate to the decedent's identity and the

prosecution demanded that defense counsel stipulate also to the authenticity of the photograph

depicting the two barrettes in the victim's hair and the shirt in which the baby's body was

37

wrapped, Teresa Dudley again became hysterical and could not continue with her testimony. When the trial court then called a recess, according to Petitioner, Teresa Dudley could be heard in the hallway outside the courtroom crying and yelling. Petitioner argues that because no one disputed the identity of the baby, showing the photograph to the baby's mother was not necessary, logical, or relevant. Petitioner further argues that the prosecution's stated reason for showing the photograph to Teresa Dudley–that she was the only witness who could identify a photograph of the baby with those barrettes in her hair–was specious. According to Petitioner, Officer Robert Steinher, who was present when the baby's body was unwrapped at the coroner's, identified the barrettes that were in the baby's hair and the shirt in which her body was wrapped. And showing the photograph to Officer Steinher was not likely to generate the emotional outburst that resulted when the prosecution instead showed the photograph to the baby's mother. Finally, Petitioner argues that there is little doubt that the extreme nature of the outburst affected the jury, to Petitioner's prejudice.

In the return of writ, Respondent begins by asserting that § 2254(d)(1) governs this Court's review of Petitioner's claim because the state courts adjudicated it on the merits and because it presents a mixed question of law and fact. (ECF No. 154, at 75-76.) Respondent proceeds to argue that, under that standard, Petitioner's claim fails because he cannot show that the Ohio Supreme Court's decision rejecting the claim contravened or unreasonably applied clearly established federal law. "Simply put," Respondent asserts, "there is no constitutional prohibition against showing the jury exactly what Hill did to his daughter." (*Id.* at 77.) Respondent further argues that Petitioner's claim is not even cognizable in habeas corpus because it concerns a state law evidentiary ruling that does not raise the specter of fundamental

fairness. Finally, Respondent argues that the prosecutor's showing the photograph to Teresa Dudley was relevant and necessary to demonstrate not only that the barrettes belonged to the baby and that the baby in the photograph was the baby that Petitioner removed from Teresa Dudley's room, but also that the baby was killed via a purposeful act.

Responding to Respondent's arguments, Petitioner begins in his traverse by asserting that the claimed error does sound in habeas corpus because the challenged actions denied him his fundamental right to a fair trial. (ECF No. 194, at 61.) Specifically, Petitioner argues that habeas corpus review extends to state law evidentiary rulings that " 'so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.' " (*Id.* (quoting *Kelly v. Winthrow*, 25 F.3d 363, 370 (6th Cir. 1994)).) Petitioner proceeds to argue that the Ohio Supreme Court's decision rejecting his claim not only contravened or unreasonably applied clearly established federal law in violation of § 2254(d)(1), but also involved an unreasonable determination of the facts based on the evidence presented in violation of § 2254(d)(2). Petitioner asserts that a denial of fundamental fairness results from improperly introduced evidence that is material to a crucial, critical, highly significant factor. (*Id.* at 63 (citing *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000)).) Petitioner argues that the evidence in question meets that standard because it was not relevant to any fact of consequence for the jury in determining beyond a reasonable doubt whether Petitioner had committed the crimes, because Officer Steinher could have viewed the photograph and identified the relevant evidence without becoming emotional, and because the prosecution's showing the photograph to Teresa Dudley during her testimony was an intentional act offered purely to inflame the jury to Petitioner's prejudice. (*Id.* at 63-64.) Turning to the Ohio Supreme Court's decision, Petitioner

argues that in finding that Teresa Dudley " 'was an essential witness relating relevant, crucial

testimony,' " the Ohio Supreme Court "nowhere referenced what relevant, crucial evidence came

from her identification of the photo of her dead baby.' " (*Id.* at 64 (quoting *Hill*, 75 Ohio St. 3d at

204).) Petitioner also assails the Ohio Supreme Court's reliance on the fact that defense counsel

managed to elicit favorable testimony from Dudley during cross-examination, arguing that that

fact in no way erases the prejudicial effect that Dudley's outburst had on the jury. In conclusion,

Petitioner argues that:

> The State court's finding is not reasonable because it fails to identify what
> the critical evidence established by this identification was. It is also a decision
> based on an unreasonable determination of the facts to permit such inflammatory
> evidence to be elicited without some need for the evidence. It is an unreasonable
> determination of clearly established federal law because the emotional
> inflammatory outburst deprived Hill of a fair trial.

(ECF No. 194, at 65.)

In his response to Petitioner's traverse, Respondent simply relies on his previous

arguments asserting that Petitioner's claim is without merit. Respondent states that Petitioner's

traverse "has not cited any applicable U.S. Supreme Court case law that conflicts with the

decision of the Ohio Supreme Court, nor does Hill show the factual determinations by the state

court were clearly erroneous.' " (ECF No. 213, at 13.)

Petitioner claims that the trial court erred in allowing the prosecution to introduce during

Teresa Dudley's testimony a photograph depicting her baby's corpse because it resulted in an

emotional outburst that inflamed the jury to Petitioner's prejudice. The issue before the Court, of

course, is whether the Ohio Supreme Court's decision rejecting Petitioner's claim contravened or

unreasonably applied clearly established federal law or involved an unreasonable determination

of the facts based on the evidence presented. Only by answering either question in the

40

affirmative may this Court consider granting habeas corpus relief.

The prosecution called Teresa Dudley as its third witness. (Tr. Vol. VIII, at 994-1036.) After asking preliminary questions about her whereabouts and activities the night that her baby went missing, the prosecution introduced state's exhibit number 16 and asked Dudley whether she had ever seen Petitioner wear that shirt. She responded that she had. (*Id.* at 999.) She proceeded to testify that on the morning of June 1, 1991, she had found one of the three barrettes that had been in Domika's hair when she went to sleep the night she disappeared. (*Id.* at 1006-1007.) Dudley then identified state's exhibit 13 as a blue barrette with a pink teddy bear as having been one of the three barrettes Domika was wearing that night. (*Id.* at 1007.) After the state introduced a series of photographs depicting the scenes of and around both Petitioner's residence and Dudley's residence, the prosecution introduced state's exhibits 14 and 15 and asked whether those were the other two barrettes that were in Domika's hair when she went to sleep the night she disappeared. Dudley responded that they were. (*Id.* at 1010.)

Following a pause, the prosecution then asked of Dudley, "Ma'am, I need you to take a look at something else, we have to identify this for the Court, State's Exhibit Number 12; is this your baby?" (*Id.*) The transcript then reflects that the witness was crying. Dudley offered no answer when the trial court asked her whether she could continue. The trial court proceeded to ask the prosecution whether it could use another witness, to which the prosecutor responded that it needed Dudley to identify one more exhibit. As defense counsel were offering a stipulation, the prosecution interrupted and stated, "We have two barrettes, if he will stipulate to the authenticity of the picture with the barrettes and shirt marked around it, I won't show it to this young lady." (*Id.* at 1011.) The trial court proceeded to inquire of Dudley whether she could

41

continue, at which point the transcript contains a notation indicating a "[d]isruption in the courtroom." (*Id.*) The trial court then dismissed the jury and recessed court for ten minutes.

The trial proceedings resumed ten minutes later without the jury, at which point defense counsel moved for a mistrial. (*Id.* at 1011-1012.) After recounting what had happened preceding the recess, defense counsel then stated that during the recess, counsel could hear Teresa Dudley screaming and yelling out from somewhere that defense counsel could not see. (*Id.* at 1012.) Defense counsel acknowledged that jurors were still in the jury room, but the transcript does not reflect where the jury room was in proximity to where defense counsel were able to hear Dudley screaming. In response to the defense motion, the prosecution responded that "[n]o other witness who could have identified the picture of the baby with the barrettes in her hair that were found here, Your Honor. I have no choice, she is the mother of the baby, she is an essential witness." (*Id.* at 1013.) The trial court responded as follows:

> THE COURT: Mother of the deceased child broke down, natural reaction. I don't think it was anything particularly out of the ordinary. Not conducive to an orderly presentation of the case, but it's not sufficient for a mistrial.

(*Id.*) Still out of the presence of the jury, discussions between counsel did not result in a stipulation by defense counsel to the identity of the baby, the barrettes in her hair, or the shirt in which her body was wrapped. When the trial court voir-dired Dudley as to whether she could continue, even if it meant that she might have to identify the body of her deceased child, she repeatedly stated that she did not want to see that again. (*Id.* at 1017-1018.) At that point, the prosecution agreed not to show her any more photographs and stated that it was finished with direct examination of her. The jury was brought back in, at which point the trial court instructed the gallery that it would tolerate no further outbursts of support, disappointment, sympathy, or

anything else.  Defense counsel then commenced its cross examination of Dudley.  (*Id.* at 1019.)

The record also confirms that after police found the box containing the baby's body, they processed the scene and then transported the box, undisturbed, to the coroner's office.  (Tr. Vol. VIII, at 1093-1094.)  Present when the baby's body was removed from the box and unwrapped were Officer Charles Beaver, the coroner (Dr. Amy Martin), Detective Steinher, Detective Hennekes, and criminalist Caesar.  (*Id.* at 1094.)  Officer Beaver in his testimony identified not only the man's shirt that was wrapped around the body, but also the pink and yellow barrettes that were still in her hair.  (*Id.* at 1096, 1099, 1099-1100.)  It is reasonable to presume that any of the individuals set forth above who were present could have identified the same.

Finally, the record reflects that during its trial-phase charge to the jury, the trial court gave the following instructions: "You must not be influenced in your deliberations by any concerns of sympathy or prejudice[,]" and "[c]onsider all the evidence, and make your finding with intelligence and impartiality, without bias, sympathy, or prejudice, so the State of Ohio and this defendant will feel that their case is fairly and impartially tried."  (Tr. Vol. XI, at 1573-1574.)

Petitioner raised this issue on direct appeal.  The Ohio Supreme Court rejected it as follows:

> In proposition eighteen, Hill argues the prosecutor improperly showed a photo of Domika's body to witness Teresa Dudley, and asked her to identify it. Teresa reacted emotionally, started sobbing, and left the stand. Hill's counsel moved for a mistrial and asserted she was still "screaming and yelling" in the hall six to ten minutes later. However, Teresa resumed testifying without further incident or reference to the photograph.
>
> The impact of emotional outbursts at trial by witnesses or spectators cannot be judged by an appellate court on a cold record. "Was the jury disturbed, alarmed, shocked or deeply moved? * * * These questions necessarily depend on

43

facts which no record can reflect." *State v. Bradley* (1965), 3 Ohio St.2d 38, 40, 32 O.O.2d 21, 22, 209 N.E.2d 215, 216. Normally, only the trial judge can make the necessary factual determinations on these questions. "[H]is findings thereon will not be disturbed on review in the absence of evidence on the face of the record clearly and affirmatively showing that the jury was improperly affected * * * ." *Bradley* at 41, 32 O.O.2d at 22, 209 N.E.2d at 217. Accord *State v. Morales* (1987), 32 Ohio St.3d 252, 255, 513 N.E.2d 267, 271.

The prosecutor did not err by placing Teresa on the stand, nor by showing her the child's photo. She was an essential witness relating relevant, crucial testimony. She testified about Hill's refusal to support Domika and his breaking their window, with a brick, causing her mother to banish Hill. Teresa identified the shirt wrapped around Domika's body as identical to one Hill owned. Teresa placed three barrettes in Domika's hair that night; she later found one on the floor in Hill's garage. Showing her the photo of Domika's body was a natural part of her testimony. Domika was taken away from her presence. Only Teresa could readily confirm Hill's identity as the father or testify that he lacked her permission to enter the apartment or take Domika.

In fact, Hill cross-examined Teresa extensively and elicited favorable testimony. Teresa confirmed she had no custody order and that Hill treated children kindly and had once taken Domika with permission. Teresa also agreed she permitted Hill to visit her, and that she and Hill were involved in an ongoing sexual relationship.

Nothing suggests that the prosecutor called Teresa to evoke sympathy or an emotional outburst. Compare *State v. Tyler* (1990), 50 Ohio St.3d 24, 35, 553 N.E.2d 576, 591; *State v. Williams* (1988), 38 Ohio St.3d 346, 354, 528 N.E.2d 910, 919. The trial court instructed the jury not to be influenced by sympathy or prejudice. Under all the circumstances, no "clear, affirmative evidence" exists that Teresa's earlier outburst deprived Hill of a fair trial. *State v. Morales*, 32 Ohio St.3d at 255, 513 N.E.2d at 271. Thus, we reject proposition eighteen.

*Hill*, 75 Ohio St.3d at 204-05.

To determine whether Petitioner has shown that the Ohio Supreme Court's decision contravened or unreasonably applied clearly established law, the Court must first identify what constitutes clearly established federal law. As a general rule, claims alleging errors by a state court involving the admission of evidence are not cognizable in federal habeas corpus, which exists to correct errors of a federal constitutional dimension. *See Estelle v. McGuire*, 502 U.S.

44

62, 68 (1991); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Where, however, the claimed error " 'is so egregious that it results in a denial of fundamental fairness [does] it ... violate due process and thus warrant habeas corpus relief.' " *Fleming v. Metrish*, 556 F.3d 520, 534 (6th Cir. 2009) (quoting *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004)); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Estelle*, 502 U.S. at 72; *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994) ("Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.").

Viewed through this standard, Petitioner's claim fails. The Court is not persuaded that the Ohio Supreme Court's decision rejecting his claim contravened or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts. Far from unreasonable, the Ohio Supreme Court was correct in recognizing, that under controlling law, it was in no position to question the trial court's evident determination that Teresa Dudley's emotional outburst did not alarm, shock, or unduly move the jury sufficient to require a mistrial. Far from unreasonable, the Ohio Supreme Court was correct in concluding under controlling law that the prosecution was within its rights to call Teresa Dudley and to show her that photograph. It was not unreasonable for the Ohio Supreme Court to characterize Teresa Dudley as an essential witness; in view of the many details she provided that no one else could have provided, it is difficult to believe that the State could have made its case without her. The Court cannot disagree with, much less find unreasonable, the Ohio Supreme Court's determination that the record contained no affirmative evidence demonstrating that the prosecution called Teresa Dudley deliberately to evoke sympathy. Further, the Court finds nothing improper, much less

unreasonable, with the fact that the Ohio Supreme Court, in rejecting Petitioner's claim, placed

some reliance on the trial court's having instructed the jury not to base its decision on sympathy

or emotion. *See Coleman v. Giles*, 140 F. App'x 895, 900 (11th Cir. 2005). In view of the

foregoing, whether it was proper for the Ohio Supreme Court to have also placed reliance on the

fact that defense counsel elicited favorable testimony from Teresa Dudley on cross-examination

is irrelevant. With or without that reliance, the record supported the Ohio Supreme Court's

decision rejecting Petitioner's claim.

      This Court has found at least one decision reaching the same result on similar facts. In

*Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001), the petitioner claimed among other things

that the prosecution engineered an emotional outburst from the murder victim's daughter-in-law.

The Court of Appeals for the Fifth Circuit rejected the claim as follows:

>       Kutzner argues next that the state engineered an emotional outburst from
> Cynthia Ann Harrison, the daughter-in-law of Kathryn Harrison, during her
> testimony. Kutzner argues that the prosecutor shocked Cynthia Ann Harrison by
> showing her a picture of her mother-in-law from the crime scene without any
> prior warning, that this caused Cynthia Ann Harrison to become hysterically
> emotional, and that the jury was accordingly prejudiced against him. The state
> habeas court considered Kutzner's claim and found that Cynthia Ann Harrison's
> reaction had no effect on the jury's verdict.
>
>       For Kutzner to establish that his right to the due process of law has been
> violated he must show that the actions of the prosecutor so infected the trial with
> unfairness as to make the resulting conviction a denial of due process. *Darden v.
> Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.E.2d 144 (1986) (quoting
> *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431
> (1974)); *Guidroz v. Lynaugh*, 852 F.2d 832, 834-35 (5th Cir. 1988). The trial
> record does show that after being shown the picture of her mother-in-law, Cynthia
> Ann Harrison became extremely upset. However, it also shows that the jury was
> removed from the courtroom shortly afterwards and remained outside the
> courtroom until Cynthia Ann Harrison regained her composure. The trial record
> also shows that the judge instructed the jury not to be influenced by Cynthia Ann
> Harrison's reaction to the photograph. Furthermore, affidavits from various
> courtroom personnel submitted to the state habeas court show that while Cynthia

46

Ann Harrison did begin to cry, she never became hysterical. These affidavits also show that the jury was unable to hear anything after it was removed from the courtroom. As with the first issue raised by Kutzner, the state habeas court's finding that these events had no effect on the jury was eminently reasonable.

*Kutzner*, 242 F.3d at 609-610.

Although the claimed error in *Kutzner* was styled as prosecutorial misconduct, the standard of review is the same as that for a claim challenging a trial court's evidentiary ruling– review for a denial of fundamental fairness. As with *Kutzner*, the trial court called a recess and the jury exited shortly after Teresa Dudley became emotionally distraught. Although the trial court in *Kutzner* specifically instructed the jury not to be influenced by the witness's outburst, it is sufficient in this case that the trial court instructed the jury at the conclusion of the evidence not to base its decision on sympathy or prejudice. Although the record in this case does not contain affidavits establishing that jurors were unable to hear anything from the jury room as was the case in *Kutzner*, it is reasonable, if not prudent, to note that the record is devoid of any affirmative evidence that jurors heard Teresa yelling or crying or that the jury was unduly moved by Teresa's outburst.

For the foregoing reasons, the Court cannot find that the Ohio Supreme Court's decision rejecting Petitioner's claim contravened or unreasonably applied clearly established federal law or involved an unreasonable factual determination. That being so, habeas corpus relief is not warranted. The Court **DENIES** Petitioner's sixth ground for relief.

### D. Ninth Ground for Relief: Insufficient evidence supported Mr. Hill's conviction, violating his due process rights.

(Second Amended Petition, ECF No. 137-2, at ¶¶ 177-206 (argued fourteenth in the second amended petition).) In his ninth ground for relief, Petitioner argues that the prosecution provided

47

insufficient evidence that Petitioner purposely caused the victim's death, insufficient evidence of kidnapping, insufficient evidence of aggravated burglary, and insufficient evidence that the aggravating factors outweighed the mitigating factors.

In his amended return of writ, Respondent begins by conceding that Petitioner's claim is properly before the Court for review on the merits and setting forth the standard of review governing sufficiency of the evidence claims. Respondent then asserts that "[t]he Ohio Supreme Court evaluated Hill's sufficiency of the evidence claim and determined that it was wholly without merit." (ECF No. 154, at 66.) After setting forth verbatim the Ohio Supreme Court's decision rejecting Petitioner's claim, Respondent argues that there was more than sufficient evidence of Petitioner's guilt on all of the indicted offenses to support his convictions. Specifically, Respondent sets forth that:

> The most compelling evidence against Hill was the fact that he was seen entering Teresa's yard within fifteen minutes of Domika's abduction, Hill admitted he was in fact at the residence and his thumbprint was found on an unlit hallway bulb outside Teresa's apartment. Moreover, Domika's body was found in a vacant lot behind Hill's garage wrapped in Hill's shirt and trash bags from Hill's apartment. Domika's body was stuffed inside a carton which had been discarded near Hill's garage and Domika's barrette was found on the floor of Hill's garage. In addition, Hill was overheard making threats to Domika prior to the murder ("kill the little bitch" before paying child support) and after the murder was overheard by a disinterested bus driver saying that he would "get the chair" for what he had done to the baby.

(*Id.* at 69.)

Respondent disputes Petitioner's assertion that the prosecution presented insufficient evidence to prove aggravated murder by virtue of failing to prove beyond a reasonable doubt that Domika's fatal injuries were deliberately inflicted. Specifically, Respondent asserts that the nature of the baby's injuries–multiple blunt force head injuries causing three separate skull

48

fractures–provides sufficient evidence that the killing was intentional rather than an accident.

Respondent also disputes Petitioner's assertion that the prosecution provided insufficient evidence to sustain a conviction for kidnapping because if Domika was murdered in the room, which the prosecution did not disprove, then removing her would not be kidnapping. Respondent counters that the fact that Domika was removed while Teresa Dudley was sleeping and that Teresa Dudley never woke up belies any argument that Domika was killed in the room because of the substantial unlikelihood that blows causing three separate skull fractures could have been inflicted without waking a sleeping woman. Respondent also asserts that sufficient evidence supports the kidnapping conviction because the act of removing Domika from Teresa's room was completed prior to the act of killing her.

Returning to Petitioner's claim, Petitioner also contends that the prosecution failed to provide sufficient evidence to support the aggravated burglary conviction because it failed to prove that he entered the apartment with the intent to cause serious physical harm to Domika and because the prosecution failed to prove the necessary element of trespass in view of the fact that Petitioner had permission to enter Teresa Dudley's apartment. Respondent counters the first argument by asserting that the threats that Petitioner had made in order to avoid paying child support, combined with the steps he took in entering the apartment, provide sufficient evidence of aggravated burglary. As for the trespass argument, Respondent reiterates the Ohio Supreme Court's determination that even though Petitioner had been permitted to visit the apartment in the past, the record established that on the night Domika went missing, he did not have permission to visit the apartment or to remove Domika.

Finally, with respect to Petitioner's position that the prosecution produced insufficient

49

evidence to prove that the aggravating factors outweighed the mitigating circumstances, Respondent asserts that the Ohio Supreme Court's independent sentence review defeats any such argument.

Noting in his traverse that he was charged with two counts of aggravated murder, each with two death penalty specifications, one count of aggravated burglary, and one count of kidnapping, Petitioner asserts that "[t]he State failed to present sufficient evidence to support a conviction on any of these charges." (ECF No. 194, at 65.) Petitioner proceeds to argue first that the prosecution failed to present sufficient evidence to support an aggravated murder conviction because they failed to present sufficient evidence either that he killed or harmed Domika Dudley or that, if he did so, he killed Domika deliberately. (*Id*. at 66-70.) Regarding the first argument, Petitioner details how the State offered no direct evidence linking Petitioner to Domika's death and only circumstantial evidence linking him to Domika's death, each piece of which had flaws. Petitioner then attacks the sufficiency what evidence the prosecution presented in an effort to establish that the killing was purposeful, to wit: the coroner testified that the blunt force trauma to the head could have resulted from a fall, the coroner could not determine whether the injuries were inflicted deliberately, and the coroner ignored the baby's underdevelopment and malnourishment as factors that may have contributed to her death from the trauma. Petitioner also insists that juvenile probation officer Linda Phillips, whom Petitioner trusted, stated that Petitioner told her the killing was an accident.

Petitioner also argues that the prosecution presented insufficient evidence to support a kidnapping conviction. (*Id*. at 70-71.) Petitioner asserts that "[i]n addition to how the victim died, there is an absence of evidence establishing whether Domika Dudley died after, rather than

50

before, she was removed from Teresa Dudley's apartment." (*Id.* at 70.) "If," Petitioner explains, "her death occurred as she was taken from the bed, the removal of her dead body from the apartment would not have constituted kidnapping because any asportation that does not substantially increase the risk of harm to the victim, separate from the risk involved in the underlying crime, is not kidnapping." (*Id.*) Petitioner accordingly concludes that the record contained insufficient evidence to support either his kidnapping conviction or the kidnapping death penalty specification.

Petitioner next argues that the prosecution presented insufficient evidence to support an aggravated burglary conviction in two respects. (*Id.* at 71-72.) First, according to Petitioner, "[t]he State presented no evidence proving the aggravating element of inflicting or attempting to inflict physical harm to another." (*Id.* at 71.) Petitioner argues that the prosecution also failed to provide sufficient evidence to support the trespass element of the aggravated burglary charge. Specifically, Petitioner asserts that "Teresa Dudley testified that Hill *had permission* to enter her apartment ('to come and go as he pleased'), and that he frequently did so, sometimes to spend the night." (*Id.* at 72 (emphasis in original).) To that point, Petitioner also asserts that "[t]here was no evidence that he inflicted any harm on his daughter while he was in the apartment, *i.e.*, that he committed a criminal offense on the premises." (*Id.*)

Petitioner proceeds to argue that the Ohio Supreme Court's decision rejecting his sufficiency of the evidence challenges contravened or unreasonably applied clearly established Supreme Court precedent and involved an unreasonable determination of the facts. (*Id.* at 72-76.) According to Petitioner, the Ohio Supreme Court ignored the facts supporting Petitioner's arguments and relied on evidence that is contradicted by the record. Petitioner argues that two

51

witnesses–Barbara Janson and Pamela Lewis–placing him near an apartment that he had permission to enter near the time Domika Dudley went missing–does not support a finding of a purposeful killing.  Petitioner also argues that neither witness who identified the shirt that was wrapped around the baby's body as having belonged to Petitioner could definitively say that the shirt belonged to Petitioner, only that it resembled one he had worn.  Petitioner faults the Ohio Supreme Court's finding that the plastic trash bag in which the baby's body was found definitely matched a roll of trash bags that police took from Petitioner's residence.  Petitioner reasons that the expert who made the comparison could not explain certain discrepancies in the perforation comparisons.  Petitioner also takes the Ohio Supreme Court to task for finding that a disinterested bus driver identified Petitioner as the rider expressing disbelief about something he had done to a baby when that bus driver could <u>not</u> identify Petitioner in court and testified that he selected Petitioner's picture from a photo array only on the basis of general appearance.  Petitioner characterizes as unreasonable the Ohio Supreme Court's reliance on threats Petitioner made toward Teresa and Domika Dudley as evidence supporting a purposeful killing because the recipient of those alleged threats, Teresa Dudley, testified that Petitioner never uttered those threats to her.  Petitioner also asserts as unreasonable the Ohio Supreme Court's reliance on the baby's skull fractures as evidence of purposeful killing, arguing that the Ohio Supreme Court ignored evidence that the baby's lower bone density demonstrated that those injuries could have been the result of an accidental fall.

In his response to Petitioner's traverse, Respondent continues to insist that Petitioner "does not meet his burden of overcoming the two layers of deference which are mandated for claims of evidence sufficiency." (ECF No. 213, at 14 (citing *Brown v. Konteh*, 567 F.3d 191,

204-05 (6th Cir. 2009)).) Specifically, Respondent argues that to prevail on his claim, Petitioner would first have to demonstrate that no rational trier of fact would have found him guilty when viewing the evidence in a light most favorable to the prosecution, and would then have to demonstrate that the Ohio Supreme Court's decision finding otherwise was unreasonable under 28 U.S.C. § 2254(d). Respondent asserts that the Ohio Supreme Court's findings about the evidence supporting Petitioner's convictions were reasonable and that Petitioner ignores the vast majority of this evidence. Specifically, Respondent argues that:

> [Petitioner] does not attack the fact he admitted to being at the residence, his thumb-print was found on the hallway bulb, the victim's body was stuffed in a carton and dumped in a vacant lot behind Hill's garage, or Domika's barrette being found on the floor of his garage. *Id.* Instead, Hill presents the Court with nothing more than a subjective interpretation of other trial testimony. Under the *Jackson* standard, which requires the evidence be construed in a light most favorable to the prosecution, a petitioner arguing an alternative interpretation of the evidence cannot obtain relief. The arguments further fail to show how the Ohio Supreme Court was unreasonable as well.

(*Id.* at 15.)

Respondent proceeds to characterize as misguided Petitioner's arguments questioning the credibility of certain witnesses, noting that federal courts in habeas corpus do not weigh credibility. In the alternative, Respondent dismisses Petitioner's argument that the fact that he had permission to visit Teresa Dudley's apartment undermines the import of testimony that he was seen near the apartment shortly before the baby went missing. Respondent reasons that because Teresa Dudley's apartment was a crime scene, whether Petitioner had permission to be there was irrelevant. Respondent also argues that testimony linking the shirt and trash bag in which the baby's body was wrapped to Petitioner was sound enough to allow a rational fact finder to rely on that evidence. Finally, with respect to findings by Dr. Wood purporting to

contradict the coroner's testimony that the baby's injuries could not have resulted from an accidental fall, Respondent argues first that Petitioner is not permitted to offer that evidence because he did not exercise diligence in presenting the evidence to the state courts. Respondent argues in the alternative that Dr. Wood's opinion that the baby's injuries could have been caused by an accidental fall was a theory offered and rejected at trial.

On direct appeal, Petitioner raised sufficiency of the evidence challenges in his thirteenth, fourteenth, fifteenth, and twenty-fourth propositions of law. The Ohio Supreme Court addressed and rejected them as follows:

> In propositions of law thirteen through sixteen, Hill argues the evidence was insufficient to sustain his convictions. In a review for sufficiency following a conviction, we must consider the evidence in light most favorable to the prosecution. *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. Moreover, evaluations of the weight of the evidence and credibility of witnesses are jury issues. *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819, 825; *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. We find the evidence adequately proved Hill's guilt of aggravated murder, kidnapping, and aggravated burglary.
>
> The evidence supported the jury's finding that Hill was Domika's killer. Two witnesses identified Hill as entering Teresa's yard within fifteen minutes of Domika's disappearance. They did not see him leave. Hill admitted he was there, and his thumbprint on the unlit hall light bulb confirmed this. Domika's body was found in a vacant lot behind his garage. Hill's shirt and trash bags from his apartment were wrapped around her body. She had been stuffed in a carton, which had been earlier discarded near Hill's garage floor. Finally, a disinterested bus driver reported that, on the day Domika was found dead, Hill said that he would "get the chair" for what he had done to a baby.
>
> Hill argues that no proof exists that he purposefully killed Domika. However, Domika died as a result of multiple blunt force or blunt impacts to her head. Her three skull fractures could not have been caused by a simple fall. Violent shaking, in addition to blunt trauma, may have contributed to her death, but the coroner concluded Domika died as a result of homicide, not accident. Hill had vowed never to pay child support and to "kill that little bitch" first. In view of Domika's injuries and Hill's declared intentions, the jury could reasonably find

54

that Hill purposefully killed Domika.

In proposition of law fourteen, Hill argues that as Domika's natural father, he has equal rights to her custody under Ohio law and cannot be convicted of kidnapping her. Admittedly, R.C. 3109.03 specifies that when a husband and wife are divorced or living separate and apart, "they shall stand upon an equality as to the parental rights and responsibilities * * *." *Pasqualone v. Pasqualone* (1980), 63 Ohio St.2d 96, 100, 17 O.O.3d 58, 61, 406 N.E.2d 1121, 1124, recognized that "[i]n the absence of an agreement or binding court order, parents have equal rights to a custody * * *." Accord *In re Corey* (1945), 145 Ohio St. 413, 31 O.O. 35, 61 N.E.2d 892. However, R.C. 3109.03 deals with a husband and wife, not the rights of a putative father who has neither acknowledged paternity nor supported the child. See, also, R.C. 3109.12; 3111.03.

Moreover, R.C. 2905.01(A), in defining the crime of kidnapping, specifies that, "No person * * * in the case of a victim under the age of thirteen * * * , by any means, shall remove another from the place where he is found or restrain him of his liberty, for any of the following purposes: * * * (3) To terrorize, or to inflict serious physical harm on the victim * * *." No exception is made for either a father or mother. Other deprivation-of-liberty crimes, with different elements, specifically exclude parents by use of the term, "without privilege to do so." See R.C. 2905.02; 2905.03; 2905.05. See, also, R.C. 2905.04(C). We find that the absence of any reference to privilege in R.C. 2905.01 evinces a clear legislative intent to forbid kidnapping by any person regardless of parental rights.

Hill took Domika from her mother's presence, without waking the mother, and therefore clearly did not kill her at the scene. Approximately thirty minutes later, Hill reappeared without Domika. The jury could find that the injuries inflicted closely followed the kidnapping in time, but they were distinct and separate offenses. *State v. Simko* (1994), 71 Ohio St.3d 483, 488, 644 N.E.2d 345, 351; see *State v. Morales*, 32 Ohio St.3d at 255-256, 513 N.E.2d at 272. The jury could also reasonably find Hill intended to inflict serious harm at the time he took Domika. Thus, the evidence supports the jury's verdict of guilt of the crime of kidnapping.

Hill further argues he had permission to enter the Dudley residence at any time; hence, he could not be guilty of burglary. At trial, Teresa acknowledged that Hill was allowed to visit the hallway. He also regularly visited her apartment and spent the night there.

However, Teresa denied Hill had permission "that night" to visit her apartment. Also, Hill admitted to police and testified that he had broken a Dudley apartment window some three months before. As a result, Teresa's mother refused to allow Hill to come back, and Teresa confirmed this. In sum, the jury

55

could reasonably find Hill lacked consent for entry. Moreover, his unauthorized taking of Domika would have revoked any prior consent. See *State v. Bonnell* (1991), 61 Ohio St.3d 179, 183, 573 N.E.2d 1082, 1086; *State v. Steffen* (1987), 31 Ohio St.3d 111, 115, 31 OBR 273, 276, 509 N.E.2d 383, 388-389.

Hill further argues that the jury's consideration of two unproved capital specifications skewed the weighing process. However, the evidence proved Hill's guilt, as the principal offender, of both the kidnapping and aggravated burglary death-penalty specifications. Thus we rejected propositions of law thirteen through sixteen.

\* \* \*

In his twenty-fourth proposition, Hill argues the prosecution failed to prove beyond a reasonable doubt that the aggravating circumstances outweighed relevant mitigating factors; hence, he argues the death penalty is inappropriate. Our independent sentence reassessment resolves that issue.

After independent assessment, we find the evidence clearly proves the aggravating circumstances for which Hill was convicted, *i.e.*, murder during a kidnapping and aggravated burglary. As to possible mitigating factors, we find nothing in the nature and circumstances of the offense to be mitigating. Hill secretly kidnapped his daughter from her mother, while both slept. Then he brutally killed her, denied knowing where she was while neighbors searched, and later disposed of her body as though it were trash.

Hill's history and background provide mitigating features. Admittedly, Hill had a difficult life growing up in an urban slum. His mother was depressed and poor, and he lacked a strong, supportive father. Relatives also described him as sweet, kind and gentle, and several family members clearly loved and cared for him. Yet, even his relatives, in effect, conceded that Hill never outgrew or overcame the difficult challenges present in his youth. No evidence exists of a favorable work record; instead, Hill appears to have chosen to use and sell drugs to support himself. Although of average intelligence, he quit school after the eighth grade. He fathered a daughter, but evaded suggestions he support the child. In sum, we accord his history and background only modest weight. We find nothing in his character to be mitigating.

As to the statutory mitigating factors, R.C. 2929.04(B)(1) through (6), only (B)(4), his youth, is applicable. Hill was born on June 7, 1971, and thus was fully nineteen on May 31, 1991, the date of the offense. Yet, at trial, the possibility was raised that he was born on June 7, 1972, making him not quite nineteen on May 31, 1991. However, even if only eighteen, Hill, with average intelligence, had been out of school for years, had been involved in gangs, and

had fathered a child. Thus, he was mature enough to be fully accountable for his acts. Cf. *State v. Lorraine*, 66 Ohio St.3d at 429, 613 N.E.2d at 224; *State v. Slagle*, 65 Ohio St.3d at 613, 605 N.E.2d at 931.

As to "other factors" as contemplated by R.C. 2929.04(B)(7), none appears to possess significant weight. Hill's vague expressions of remorse are not determinative. Rehabilitation does not appear likely. Cf. *State v. Fox*, 69 Ohio St.3d 183, 195-195, 631 N.E.2d 124, 133. Dr. Schmidtgoessling's testimony fails to establish any significant mental state entitled to mitigating weight. Admittedly, Hill underwent a psychiatric evaluation a few years previously and was then thought to suffer from mental problems. However, no evidence established that he suffered from any mental problems at the time of the offense. Similarly, in view of the evidence, we accord no weight to residual doubt.

We find that the aggravating circumstances outweigh Hill's youth and the modest mitigating features of his history and background. Thus, we find the death penalty is appropriate. His victim was young, innocent, and helpless. As her father, he had a responsibility to nurture and protect her. Instead, by stealth and burglary, he kidnapped her from her mother, purposefully murdered her, and then callously disposed of her body. Although Hill came from a deprived background, he has demonstrated neither the desire nor effort to rise above the unfortunate circumstances of his birth despite family members who loved and assisted him.

*Hill*, 75 Ohio St. 3d, at 205-207, 213-214.

The issue before the Court is whether the Ohio Supreme Court's decision rejecting Petitioner's sufficiency of the evidence challenges contravened or unreasonably applied clearly established federal law or relied on an unreasonable factual determination. It is clearly established federal law that as a matter of fundamental due process, a criminal conviction cannot stand unless each essential element is proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979). The Supreme Court explained that when reviewing a challenge to the constitutional sufficiency of the evidence supporting a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Id.* at 319. The Supreme Court cautioned, with respect to the role of a reviewing court, that "[t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Thus, after reviewing the evidence in a light most favorable to the prosecution and respecting the trier of fact's role in determining witnesses' credibility and weighing the evidence, a federal court must grant habeas corpus relief "if it is found that upon the record evidence at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324.

As the Sixth Circuit has explained, "[i]n a habeas proceeding, however, we cannot simply conduct de novo review of the state court's application of [the *Jackson v. Virginia*] rule, but must review its sufficiency-of-the-evidence decision under the highly deferential standard of the AEDPA." *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). In *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008), the Sixth Circuit explained in more detail:

> Accordingly, the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by the AEDPA.

*Tucker*, 541 F.3d at 656. *See also Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007); *Nash v. Eberlin*, 258 F.App'x 761, 765 (6th Cir. 2007). This Court recognizes, however, that "even after AEDPA, [the Court] must 'distinguish reasonable speculation from sufficient evidence' when reviewing a state court's application of *Jackson*." *Smith v. Romanowski*, No. 07-1578, 2009 WL 1884451, at *6 (6th Cir. Jul. 1, 2009) (Moore, J., dissenting) (quoting *Brown v. Palmer*, 441 F.3d 367, 352 (6th Cir. 2006).)

Thus, the inquiry before this Court is whether the Ohio Supreme Court's application of

*Jackson v. Virginia* in rejecting Petitioner's sufficiency of the evidence claim contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court. As noted in more detail above, the Ohio Supreme Court relied on the following evidence established at trial as constituting sufficient evidence to support Petitioner's convictions as a matter of due process: In support of a finding that it was Petitioner who had killed Domika, the Supreme Court noted that two witnesses had placed him near Teresa Dudley's apartment right around the time that baby Domika went missing; that Petitioner had admitted being in the apartment and unscrewing a light bulb outside of the door to Teresa's room; and that police found the baby's body in a vacant lot near Petitioner's residence in a carton that had been discarded right next to Petitioner's garage and wrapped in a shirt and plastic garbage bags that testimony linked to Petitioner. The Ohio Supreme Court also relied on testimony by a disinterested bus driver who purported to have heard Petitioner lament about what he had done to a baby. In support of a finding that Petitioner had killed Domika purposefully, the Ohio Supreme Court concluded that the severity and number of blunt impacts and skull fractures that caused the baby's death demonstrated that the injuries were inflicted purposefully as opposed to accidentally. The Supreme Court also noted that the coroner dismissed the possibility that those injuries could have resulted from an accidental fall and that Petitioner had been heard making threats to harm the baby.

Petitioner attacks the legal sufficiency of each piece of evidence upon which the Ohio Supreme Court relied in support of a finding that it was Petitioner who had killed baby Domika and that he had done so purposely. Petitioner points out that the state offered no direct evidence linking him to the murder–such as an eyewitness, a murder weapon, or a confession–and that the

circumstantial evidence that the state offered was legally incapable of supporting a finding that

Petitioner purposely killed Domika. Petitioner argues that only two witnesses placed him near

Teresa's home shortly before Domika went missing and that neither saw him actually enter or

exit the home. Petitioner argues that neither witness who identified the shirt in which the baby's

body was wrapped as having belonged to Petitioner could state definitely that <u>that</u> shirt was

<u>Petitioner's</u>. Petitioner assails the evidence linking the trash bags in which the baby's body was

found to trash bags found in Petitioner's home not only because of weaknesses in the expert's

testimony providing the link but also because many people had access to Petitioner's home and

accordingly the trash bags in his home. Petitioner also assails the legitimacy of evidence

suggesting that he made threats to harm Domika, pointing out both that the only person who

purported to have heard those threats–Barbara Janson–could not be sure whether the threats had

been directed toward the baby or her mother Teresa and that Teresa herself denied that Petitioner

had ever threatened her or baby Domika with physical harm. Petitioner attacks the legal

competence of the "disinterested bus driver's" identification of him as a rider that the driver had

overheard expressing disbelief at what he had done to a baby and lamenting that he was certain

to get the electric chair. That bus driver could not identify Petitioner in court and admitted to

having selected Petitioner's photo only on the basis of general appearance. Finally, Petitioner

argues that the state produced no evidence that the baby was killed purposely.

     Petitioner's arguments challenging the sufficiency of this evidence invite this Court to

weigh the veracity of witnesses who placed him near the scene of the baby's disappearance near

the time of the disappearance, witnesses who linked material evidence to Petitioner, a witness

who heard Petitioner make threats against Teresa and/or Domika, and a coroner who opined that

it was highly unlikely that the baby's injuries were the result of an accident. The Court declines to do so. It bears reminding that courts reviewing a sufficiency of the evidence challenge cannot substitute their own determinations of guilt for those of the fact finder or weigh credibility. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993); *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). It is true that bus driver Patrick Ormand could not identify Petitioner in court and admitted that he had selected Petitioner's photo only on the basis of general appearance. Even without that testimony, however, evidence in the record establishing that it was Petitioner who killed baby Domika and that he had done so purposely was competent and credible, and not just speculation.

The Ohio Supreme Court relied on the following evidence established at trial as constituting sufficient evidence to support Petitioner's kidnapping conviction. First, the Ohio Supreme Court rejected Petitioner's argument that any parental rights he may have enjoyed as the baby's biological father made it impossible for him to kidnap her. The Ohio Supreme Court cited as evidence of a kidnapping that Petitioner, already placed just outside of Teresa's room at the time that Domika went missing, removed Domika without waking Teresa–evidence that he spirited her away with deliberation. That he did not wake Teresa demonstrated to the Ohio Supreme Court that Petitioner did not kill Domika in the room. That fact, combined with the fact that Petitioner appeared at his home thirty minutes later without Domika, provided sufficient evidence in the view of the Ohio Supreme Court that kidnapping Domika was a separate offense from the act of killing Domika.

Challenging the sufficiency of the evidence supporting his kidnapping conviction, Petitioner argues that the record is devoid of any evidence establishing that baby Domika was

61

killed after, rather than before, she was removed from Teresa Dudley's home. If, as Petitioner posits, the baby was killed during the act of removing her, then the record cannot support both a kidnapping conviction and an aggravated murder conviction, as the death resulted from a singular action. Petitioner's argument falls short. The record evidence established that the baby died from multiple blunt impacts to the head and that Teresa Dudley did not awaken when the baby was removed from the room in which Teresa and the baby slept. A rational fact finder could reasonably conclude from this evidence that it was highly unlikely that the baby was killed while being removed because it is unlikely that such blows could be inflicted without waking an adult sleeping in the same room. That is, the evidence supporting that conclusion is competent and credible, not just reasonably speculative.

The Ohio Supreme Court relied on the following trial evidence as sufficient to support Petitioner's burglary conviction. The Ohio Supreme Court pointed to testimony by Teresa Dudley establishing that notwithstanding Petitioner's permission in the past to visit her home, to spend the night, and to come and go as he pleased, he did not have Teresa's permission to be at her residence on the night of Domika's disappearance. The Ohio Supreme Court also noted Teresa's testimony that her mother had months earlier forbidden Petitioner to visit the residence after he had broken one of their windows with a brick. Finally, the Ohio Supreme Court found that any prior consent that Petitioner might have had to be at the residence was revoked by his unauthorized removal of baby Domika.

Petitioner assails the sufficiency of this evidence in two respects. First, Petitioner argues that the evidence set forth above was insufficient to support a finding of the aggravating element because there was no evidence that, while Petitioner was in Teresa's home, he inflicted or

62

attempted to inflict physical harm against an occupant. Next, according to Petitioner, the record contained insufficient evidence to support the trespass element of an aggravated burglary challenge. Petitioner points not only to Teresa Dudley's testimony that he had had permission to visit her home, to come and go as he pleased, and to spend the night, but also to the fact that the state produced no evidence that Petitioner inflicted any harm–*i.e.*, committed a criminal offense– against his daughter while in the residence. Petitioner's arguments are unpersuasive. Evidence that Petitioner had made threats to harm either Teresa or Domika–however dismissively the person who heard the threats, Barbara Janson, viewed them–constitutes competent, credible evidence, rather than reasonable speculation, to support a finding that Petitioner inflicted or attempted to inflict harm to Domika when he entered Teresa's home. Further, evidence in the form of Teresa's own testimony that Petitioner did not have permission to visit her residence on the night Domika was kidnapped and did not have permission to take Domika without Teresa's knowledge constitutes competent, credible evidence that Petitioner trespassed and committed a criminal offense, kidnapping, when he entered Teresa Dudley's home.

The Ohio Supreme Court also relied on the following to support a determination that the aggravating circumstances outweighed the mitigating factors. The court found nothing mitigating in the nature and circumstances of the offense, noting that Petitioner had secreted Domika away while her mother Teresa slept, brutally killed the baby, denied any knowledge of the baby's whereabouts while neighbors searched for her, and disposed of the baby's body as if it were trash. Although recognizing that Petitioner had a difficult life growing up with the presence of a mother who was depressed and poor and the absence of a strong, supportive father, the Ohio Supreme Court also noted that Petitioner was described as sweet, kind, and gentle; that

63

several relatives clearly loved and cared for Petitioner; that Petitioner never overcame the obstacles that his upbringing raised; that no evidence existed that Petitioner had a favorable work record; that Petitioner instead chose to use and sell drugs to support himself; that although of average intelligence Petitioner dropped out of school before completing his high school degree; and that Petitioner had fathered a daughter but evaded suggestions that he support her. In short, the Ohio Supreme Court concluded that Petitioner's history and background were entitled to "modest weight."

The Ohio Supreme Court relied on several factors in giving Petitioner's youth little weight. The Ohio Supreme Court acknowledged that Petitioner was nineteen at the time he committed his offenses. The Ohio Supreme Court went on to note that because Petitioner had been out of school for years, had been involved in gangs, and had fathered a child, Petitioner was mature enough to be fully accountable for his actions.

The Ohio Supreme Court also relied on several factors in giving the "catch-all" mitigating factor category little significant weight. The Court noted that Petitioner had made only vague expressions of remorse, that rehabilitation did not appear likely, that Petitioner's mental state deserved no mitigation weight, that no evidence existed that Petitioner suffered any mental health problems at the time of the offenses, and that the evidence did not support giving any weight to residual doubt.

Against that scant mitigation case, the Ohio Supreme Court relied on the following in support of a determination that the aggravating circumstances outweighed the mitigating factors: the victim was young, innocent, and helpless; Petitioner, as the victim's father, should have nurtured and protected her; Petitioner instead, by stealth and burglary, kidnapped her,

64

purposefully murdered her, and callously disposed of her body. The court again acknowledged Petitioner's deprived background, but also noted that he evinced no desire or effort to rise above that background, despite the presence of family members who loved and assisted him.

Petitioner attacks the sufficiency of this evidence in his second amended petition but nowhere else. Specifically, Petitioner asserts that the evidence supporting a finding that the aggravating circumstance outweighed the mitigating factors was insufficient because three professionals testified about Petitioner's potential for reform; because any one of four mitigating factors–Petitioner's psychological problems, Petitioner's youth, Petitioner's traumatic upbringing, and Petitioner's capacity for rehabilitation–was sufficient alone to outweigh the sole aggravating circumstance: that Petitioner committed felony murder; and because it is not evident from the trial court's sentencing opinion whether it even considered any mitigating factor other than Petitioner's youth. Petitioner's arguments miss the mark because they call upon this Court to adopt Petitioner's interpretation of the evidence or to substitute the Court's determination of the weight to afford the mitigating evidence for that of the factfinder, which established law forbids. The record contains competent, credible evidence, supporting the Ohio Supreme Court's decision that the aggravating circumstance outweighed the mitigating factors, rather than evidence yielding only reasonable speculation to support that finding. Accordingly, sufficient evidence supports a finding that the aggravating circumstance outweighed the mitigating factors.

Based on its own review of the state court record, this Court cannot find that the determinations made by the Ohio Supreme Court were unreasonable. The Court is satisfied that there was sufficient evidence to support Petitioner's convictions and death sentence, and that the Ohio Supreme Court's application of *Jackson v. Virginia* in rejecting Petitioner's challenges to

the sufficiency of the evidence did not contravene or unreasonably apply clearly established Supreme Court precedent or rely on any unreasonable factual determinations.  Accordingly, Petitioner's ninth ground for relief is **DENIED**.

      E.     <u>Tenth Ground for Relief</u>: **Prosecutorial misconduct at trial denied Mr. Hill [] his due process rights.**

(Second Amended Petition, ECF No. 137-2, at ¶¶ 98-124 (argued fifth in the second amended petition).)  Petitioner raises several allegations of prosecutorial misconduct; sub-part (a), alleging prosecutorial misconduct during *voir dire*.  The allegation, however, is barred by procedural default.  (*Id.* at ¶¶ 98-101.)  In sub-part (b), Petitioner argues that the prosecutors committed misconduct during the culpability-phase closing arguments.  Petitioner complains that the prosecutors made improper statements of opinion, "repeatedly invit[ing] the jury to convict Mr. Hill on the basis of the prosecutors' own personal beliefs." (*Id.* at 103.)  Petitioner contends that the prosecutors disparaged Petitioner's attorneys personally and defense attorneys in general, questioned Petitioner's credibility and lack of emotion in reaction to autopsy slides depicting his daughter, bolstered the veracity of their own witnesses, and stated that Petitioner was the only person in the courtroom who did not believe he should pay for what he had done.  Also under sub-part (b), Petitioner argues that prosecutors committed misconduct when they tossed at Petitioner the shirt that had been wrapped around the baby's body.  Petitioner insists that these instances of misconduct were so egregious as to render his trial fundamentally unfair.

      In sub-part (c), Petitioner argues that the prosecutors committed misconduct during the mitigation phase.  First, according to Petitioner, the prosecutors rebutted arguments that Petitioner never made–*i.e.*, hinting at the lack of evidence establishing mitigating factors that Petitioner never raised.  Petitioner also argues that prosecutors made improper statements during

mitigation-phase closing arguments, urging the jury to consider certain facts as non-statutory aggravating circumstances, appealing to jurors' sense of law and order, and suggesting that a finding of guilt in the culpability phase required a recommendation of death in the penalty phase.

In his amended return of writ, Respondent asserts that Petitioner's claim does not warrant habeas corpus relief because the Ohio Supreme Court's decision rejecting Petitioner's claim did not contravene or unreasonably apply clearly established federal law and because Petitioner's claim is without merit. (ECF No. 154, at 54-63.) Respondent asserts that the prosecutors' guilt-phase closing arguments challenged by Petitioner not only failed to rise to the level of being so egregious as to deny Petitioner a fundamentally unfair trial but actually were not improper at all. Respondent reasons that prosecutors enjoy considerate latitude in presenting arguments, and commenting about evidence and witnesses' credibility–especially where there is a conflict in the evidence, resolution of which will inform the jury's guilt or innocence determination. Regarding Petitioner's challenge to the prosecutors' act of tossing an exhibit at Petitioner, presumably to emphasize its importance or elicit a reaction from him, Respondent asserts that even assuming the incident, viewed in isolation, was improper, it did not singularly deny Petitioner a fundamentally fair trial.

Finally, Respondent argues that the prosecutors engaged in no misconduct during the mitigation phase. Specifically, according to Respondent, the prosecutors did nothing improper by questioning whether evidence established the mental disease or defect mitigating factor because Petitioner himself had raised the issue of his past mental health problems, albeit as a "catch-all" mitigating factor. Respondent denies that the prosecutors urged the jury to consider the facts of the offense as aggravating circumstances, reasoning that prosecutors are permitted to

67

comment on evidence and refer to the facts. Respondent also asserts that the trial court properly

instructed the jury on the aggravating circumstance, that the jury properly found that sole

aggravating circumstance, and that the Ohio Supreme Court properly identified the aggravating

circumstance during its independent reweighing of the penalty phase evidence. Finally,

Respondent asserts as reasonable the Ohio Supreme Court's determination that the prosecutors'

appeal to the jury's sense of law and order was brief and did not affect the fairness of Petitioner's

sentence.

In his traverse, Petitioner reiterates his arguments challenging the individual and

cumulative impact of the prosecutors' culpability and mitigation phase misconduct. (ECF No.

194, at 76-96.) Regarding the prosecutors' culpability-phase misconduct, Petitioner reiterates

that the prosecutors improperly expressed personal opinions about the credibility of their own

witnesses, Petitioner's witnesses, and Petitioner himself. Petitioner also takes the prosecutors to

task for intimating that defense counsel sought to mislead and confuse the jurors. With respect

to the prosecutor's act of tossing at Petitioner the shirt in which the baby's body was wrapped,

Petitioner states that "[t]his was a tremendously unprofessional act by an overzealous prosecutor

designed to incite Hill and inflame the jury against him at both phases of the trial." (ECF No.

194, at 82.) Petitioner further asserts that the culpability-phase prosecutorial misconduct at issue

had an unmistakable impact on Petitioner's death sentence as well. Specifically, Petitioner

argues that the prosecutors' denigrating defense counsel and throwing an exhibit at Petitioner all

conveyed to jurors that Petitioner was worthy of scorn and undeserving of a life sentence.

Petitioner proceeds to assert that the prosecutors engaged in misconduct during the

mitigation phase by offering improper rebuttals to arguments that Petitioner's defense counsel

68

never made. Petitioner argues that in so doing, the prosecutors influenced jurors to consider irrelevant evidence and thereby disregard evidence that Petitioner did present and inserted confusion into the sentencing deliberations. Specifically, Petitioner asserts that despite asking and learning that Petitioner's defense counsel planned to argue only Petitioner's youth and the "catch-all" mitigating factors, the prosecutors nonetheless repeatedly turned the focus to an absence of evidence that Petitioner suffered from a mental disease or defect that mitigated in favor of a sentence less than death–an argument Petitioner insists he never made at the penalty phase. Petitioner argues that the prosecutors went even further, inserting into the sentencing deliberations Petitioner's sanity and competency–issues that were wholly irrelevant to the jury's sentencing deliberations. Petitioner also argues that the prosecutors additionally made references to Petitioner's past criminal history or behavior, as well as made improper arguments concerning Petitioner's youth. Petitioner emphasizes that all of the foregoing had the effect of misleading the jury into believing that an absence of mitigation evidence tips the scales in favor of death. Petitioner proceeds to list a series of statements that the prosecution made, demonstrating that their entreaties to the jury to consider irrelevant factors were repeated and deliberate, rather than isolated and incidental. Finally, Petitioner argues that beyond improperly offering rebuttals to arguments that Petitioner never made, the prosecutors also wrongly urged the jury to consider the nature and circumstances of the offense as aggravating factors and improperly appealed to the jury's sense of law and order by suggesting that the ultimate crime deserved the ultimate punishment.

Petitioner raised his prosecutorial misconduct allegations in his first, second, and third propositions of law. The Ohio Supreme Court considered and rejected them as follows:

69

I.

*Prosecutorial Misconduct–Penalty Phase*

In his first and second propositions of law Hill contends that, at the close of the penalty phase of the trial, the prosecutor engaged in misconduct in the presentation of his closing argument. Hill claims that the prosecutor improperly attempted to focus the jury's attention upon nonstatutory aggravating circumstances in the form of evidence of the nature and circumstances of the crime, *e.g.*, that the crime was brutal, and that the victim was defenseless. Hill complains of the prosecutor's comment on the victim's age, status, helplessness and injuries, as well as the fact that Domika was kidnapped while her mother slept.

Hill's argument that the prosecutor engaged in misconduct by arguing nature-and-circumstances evidence is foreclosed by the syllabus in *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, where we held, as a matter of statutory interpretation of R.C. 2929.03(D), that a prosecutor at the penalty stage of a capital trial may introduce and comment upon, *inter alia*, evidence that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty, and evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant. While Hill acknowledges *Gumm*'s holding, he suggests that our interpretation of R.C. Chapter 2929 in *Gumm* invalidates Ohio's entire death penalty statutory framework as unconstitutional. He infers that this court is constitutionally required to impose severe restrictions upon the scope of a prosecutor's argument to the jury in the penalty phase of a capital trial, and that to do otherwise allows the imposition of an unreliable death sentence.

We reject Hill's arguments, which, in large part, are repetitious of those made in *Gumm*. As we there recognized, the United States Supreme Court has consistently relied upon the premise that both the criminal *and his crime* are properly considered in determining the propriety of imposing a death sentence. Similarly, while recognizing that a sentence of death may not be made under sentencing procedures that create a substantial risk of being inflicted in an arbitrary and capricious manner, that court nevertheless has approved of the presentation of a "wide scope of evidence and argument * * * at presentence hearings." *Gregg v. Georgia* (1976), 428 U.S. 153, 203-204, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859, 8991-892. See, *e.g.*, *California v. Ramos* (1983), 463 U.S. 992, 1008, 103 S.Ct. 3446, 3457, 77 L.Ed.2d 1171, 1185; *Gumm*, at syllabus. The court has expressly refused to "fashion general evidentiary rules, under the guise of interpreting the Eighth Amendment, which would govern the admissibility of evidence at capital sentencing proceedings." *Romano v. Oklahoma* (1994), 512 U.S. 1, 114 S.Ct. 2004, 2011, 129 L.Ed.2d 1, 12-13.

70

In the penalty phase of a capital trial, an Ohio jury is statutorily required to "consider" all of the evidentiary factors identified in the first paragraph of R.C. 2929.03(D)(1). Our syllabus in *Gumm* reflected that statutory provision. The second paragraph of R.C. 2929.03(D)(1) provides, however, that the jury's ultimate recommendation as between a life or death sentence is dependent upon the jury's balancing of whether the "aggravating circumstances the defendant was found guilty of committing" (*i.e.*, the R.C. 2929.04 specifications identified in the indictment) "are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death." In *Gumm*, we recognized it to be improper for a prosecutor to argue to a jury that individual facts surrounding an aggravated murder "are the aggravating circumstances" in a death penalty case. Such statements are improper, however, not because they seek to focus the jury's attention on the facts surrounding the crime, but rather because they misstate Ohio law. Nature-and-circumstances facts are not "aggravating circumstances" as the term is used in R.C. 2929.03 and 2929.04, or as that term is properly incorporated into jury instructions given to guide a jury in coming to its ultimate recommendation. At the same time, however, pursuant to R.C. 2929.03(D) as interpreted in *Gumm*, a prosecutor may incorporate proven facts surrounding a murder into the state's closing argument even when those proven facts could increase rather than decrease the likelihood that a sentence of death will ultimately be recommended. Cf. *Romano v. Oklahoma*, 512 U.S. at —, 114 S.Ct. at 2009-2010, 129 L.Ed.2d at 10-11.

Our holding in *Gumm* is necessary in order to harmonize the various subsections of R.C. 2929.03(D). Acceptance of Hill's argument would effectively eliminate the first paragraph of R.C. 2929.03(D)(1), as well as the first phrase of R.C. 2929.03(D)(2), both of which require a jury to "consider" a wide range of evidence during the penalty phase of the trial, as well as counsel's arguments.

We will not interpret Ohio's capital sentencing statute to require a jury to make its recommendation between life and death in a factual vacuum. Nor will we accept an interpretation of Ohio's statutes which runs the risk of resulting in the same kind of unbalanced presentation found unnecessarily unfair to the state in *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720, where " 'a parade of witnesses may praise the background, character and good deeds of Defendant * * * without limitation as to the relevance, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims.' " *Id.*, 501 U.S. at 826, 111 S.Ct. at 2609, 115 L.Ed.2d at 736. We will not sanction a procedure by which counsel for a criminal defendant is provided full opportunity to vigorously argue the full range of mitigating evidence procured on behalf of his or her client, while his adversary, the prosecutor, is precluded from vigorously arguing the entire scope of facts surrounding the act of murder of which the defendant has been convicted. We instead affirm the view of Justice

71

Cardozo, as did the majority of the United States Supreme Court in *Payne*, that " '[j]ustice, though due to the accused, is due to the accuser also.' " *Id.* at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736, citing *Snyder v. Massachusetts* (1934), 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed.2d 674, 687. In short, a capital defendant in Ohio is not statutorily or constitutionally entitled to protection during the sentencing process from the facts he himself created in committing his crime.

Our conclusions are reinforced by the recognition that there is no constitutional requirement that aggravating circumstances be "weighed against" mitigating factors, nor does the Constitution require that the sentencing process "be transformed into a rigid and mechanical parsing of statutory aggravating factors." *Barclay v. Florida* (1983), 463 U.S. 939, 950, 103 S.Ct. 3418, 3425, 77 L.Ed.2d 1134, 1144. Similarly, "[i]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Payne* at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736. The Eighth Amendment to the United States Constitution does require, however, that a defendant be found guilty of at least one valid, limiting, statutory aggravating circumstance, and that the defendant be provided full opportunity to present evidence in mitigation. *Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235. Our interpretation of Ohio's death penalty statutes preserves these constitutional requisites, and guards against arbitrary imposition of a death sentence by limiting the class of death-eligible murderers to those who are found guilty of at least one of the statutorily defined aggravating circumstances enumerated in R.C. 2929.04(A).

Hill concedes that defense counsel made no objection whatsoever to any portion of the prosecutor's argument. Because Hill failed to object at trial, his challenges to the prosecutor's argument must be analyzed according to plain-error standards, and his death sentence should be reversed only if error is found and that error is deemed to have denied him a fair trial. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244; *State v. Campbell* (1994), 69 Ohio St.3d 38, 41, 630 N.E.2d 339, 345. The United States Constitution does not require us to hold that the traditional prosecutorial role of vigorously presenting and arguing admissible evidence must or should be restrained in a capital case beyond the limits constitutionally required in other criminal cases. A death sentence need not be reversed on constitutional grounds even when prosecutorial comment is " 'undesirable or even universally condemned,' " unless the prosecutor's comments " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright* (1986), 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144, 157.

While the prosecutor did improperly characterize the facts surrounding the crime as "the aggravating circumstances," misstatements of that nature do not mandate reversal of Hill's sentence, where, as here, the trial court correctly

72

instructed the jury as to the precise aggravating circumstances, thereby negating any confusion arising from the prosecutor's imprecision. See *Gumm* at 422, 653 N.E.2d at 263. See, also, *Romano v. Oklahoma*, 512 U.S. at —, 114 S.Ct. at 2012, 129 L.Ed.2d at 13-14.

The prosecutor commented on Hill's prior criminal record (including delinquency adjudications for burglary, arson, breaking into a coin box, resisting arrest), his history as a drug dealer, and his mental condition. Hill, however, offered extensive character evidence, and Hill's own witnesses and opening statement during the sentencing proceeding discussed the topics he now complains about. The prosecutor could fairly comment on facts properly in evidence and argue the relative value of mitigation offered. *State v. Greer* (1988), 39 Ohio St.3d 236, 253, 530 N.E.2d 382, 402; *State v. Clark* (1988), 38 Ohio St.3d 252, 254-255, 527 N.E.2d 844, 848-849. Thus, the prosecutor properly argued the relative mitigating weight that should be given to [the] accused's age. See *Gumm*, at syllabus.

Hill also complains the prosecutor asked the jury to perform "a necessary function to maintain the civilized order in society" and commented that "the ultimate punishment must be inflicted to maintain a civilized law and order[ed] society." Yet this brief comment, responding to a defense argument referring to the Bible, in the context of Hill's entire trial, did not rise to the level of a denial of due process. See *State v. Murphy* (1992), 64 Ohio St.3d 554, 571, 605 N.E.2d 884, 899; *State v. Beuke* (1988), 38 Ohio St.3d 29, 33, 526 N.E.2d 274, 280.

Error arising from the prosecutor's excessive comment on the unsworn nature of Hill's statement and the fact that Hill could not be cross-examined, if any, was harmless. See *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212, 218; *State v. DePew* (1988), 38 Ohio St.3d 275, 284, 528 N.E.2542, 553. Hill's second proposition of law asserting error in the overruling of a motion *in limine* to limit the prosecution's argument lacks merit, since the denial of a motion *in limine* does not preserve a claimed error for review in the absence of a contemporaneous objection at trial. *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph three of the syllabus.

In proposition twelve, Hill argues the prosecutor improperly cross-examined a defense psychologist as to whether Hill suffered from a mental disease or defect or understood right from wrong. However, Hill introduced evidence as to his past mental problems and his psychological and mental condition in an effort to prove a mitigating "other factor." See R.C. 2929.04(B)(7). The prosecutor's cross-examination helped define the parameters of the defense claims and was not improper. See Evid.R. 611(B); *State v. Evans* (1992), 63 Ohio St.3d 231, 244, 586 N.E.2d 1042, 1054.

II.

*Prosecutorial Misconduct–Guilt Phase*

In his third proposition of law, Hill argues the prosecutor's guilt-phase argument was improper.  In final argument, the prosecutor "tossed" a shirt on defense counsel's table, and the shirt "slid on the slick surface and came to rest on the table in front of" Hill and "may have" contacted Hill's hands.  Hill responded, "Don't throw that at me," and Hill's counsel objected.  The trial court did not observe any "contact" between Hill and the shirt.

"[T]he touchstone of due-process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87; see *State v. DePew*, 38 Ohio St.3d at 283, 528 N.E.2d at 553.  The prosecutor may well have improperly handled the exhibit by tossing it on the defense table.  Yet, assuming *arguendo* that the toss of the shirt was improper, we find no prejudice to Hill in light of the overwhelming evidence of his guilt.  Compare *State v. Webb* (1994), 70 Ohio St.3d 325, 328, 638 N.E.2d 1023, 1028; *State v. Landrum* (1990), 53 Ohio St.3d 107, 110, 559 N.E.2d 710, 717.

Hill also complains the prosecutor suggested that Hill lacked remorse, that he lied in testimony, and that his counsel tried to confuse the jury.  However, Hill failed to object to these remarks and thus waived all but plain error.  *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 924-925; Crim.R. 52(B).

We find neither plain error nor prejudicial error.  Counsel could legitimately point out that Hill did not react when scenes of his dead child were shown.  An accused's face and body are physical evidence, and a prosecutor can comment on them.  *State v. Lawson* (1992), 64 Ohio St.3d 336, 347, 595 N.E.2d 902, 911; *State v. Brown*, 38 Ohio St.3d at 317, 528 N.E.2d at 538.  The prosecutor also referred to defense counsel's making "an effort really to defend the client, but also to confuse the jury, which I think goes hand in hand[.]" The comment, read in full context, represented an inartful attempt to convince the jury that defense counsel's interpretation of the evidence should be rejected.  We do not believe the comment deprived Hill of a fair trial.

The prosecutor improperly interjected his personal opinion that Hill lied. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400.  Yet, the prosecutor did not suggest that the jury should doubt Hill's credibility based simply on the fact that the prosecutor believed him to be a liar, but rather referred to evidence of Hill's inconsistent statements, which suggested falsity.  Moreover, Hill can scarcely complain, since his counsel repeatedly used variations of personal belief, "I think" or "I believe," in the preceding argument.  See, *e.g.,*

74

> *State v. Rogers* (1986), 28 Ohio St.3d 427, 28 OBR 480, 504 N.E.2d 52, paragraph two of the syllabus.

> Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431, 439. A closing argument must be viewed in its entirety to determine prejudice. *State v. Byrd* (1987), 32 Ohio St.3d 79, 82, 512 N.E.2d 611, 616. Viewed in its entirety, the prosecutor's mistakes in argument neither materially prejudiced Hill nor denied him a fair trial. See *State v. Loza* (1994), 71 Ohio St.3d 61, 78, 641 N.E.2d 1082, 1102.

(*Hill*, 75 Ohio St. 3d at 199-204.)

Petitioner offers several arguments supporting his position that the Ohio Supreme Court's decision not only unreasonably applied clearly established federal law but also involved an unreasonable determination of the facts in light of the evidence that was presented. (ECF No. 194, at 91-95.) Specifically, Petitioner argues that the Ohio Supreme Court unreasonably applied clearly established federal law when it reviewed every alleged instance of prosecutorial misconduct individually instead of for cumulative impact. Petitioner additionally argues that the Ohio Supreme Court also ran afoul of clearly established law by failing to apply the heightened standards required for capital cases. Petitioner further asserts that the Ohio Supreme Court unreasonably applied *Gregg v. Georgia*, 428 U.S. at 204 by failing to recognize that when a jury is consistently misled as to what facts they could consider in its sentencing decision, a resulting death sentence infringes on the accused's right to a fair sentencing process. Petitioner additionally argues that the Ohio Supreme Court made an unreasonable factual determination when it ruled that the penalty-phase jury instructions cured the prosecutorial misconduct. Specifically, Petitioner argues that the following jury instruction did not make it sufficiently clear that there was just one aggravating circumstance for the jury to consider: that Petitioner had committed felony murder:

> You will consider all the evidence, arguments, and all other information which is relevant to the nature and circumstances, which were that the offense of aggravated murder was committed while the defendant was committing a kidnaping and a (sic) aggravated burglary; and further you had found that the defendant was the principal offender or committed the murder by prior calculation and design while the defendant was committing a kidnaping and an aggravated burglary.

(ECF No. 194, at 94 (quoting Tr. 1770).)

Petitioner concludes his arguments asserting that the Ohio Supreme Court's decision ran

afoul of 28 U.S.C. § 2254(d) as follows:

> A review of the prosecutor's repeated misconduct in Hill's capital trial reveals that the prosecutor's flagrant and unprofessional behavior "so infected the trial with unfairness as to make the resulting conviction a denial of due process" and the Eighth Amendment's guarantees. *See DeChristoforo*, 416 U.S. at 643. The prosecutor's misconduct created a climate where the jury was hopelessly confused and unable to dispassionately deliberate on the issues of guilt, innocence or the appropriate degree of punishment. The prosecutor's arguments compelled a death verdict based upon irrelevant and prejudicial factors, and precluded the jury from giving full and meaningful consideration and effect to Hill's mitigation evidence. In denying relief, the Ohio Supreme Court ignored clearly established federal law pronounced in *Berger* and *Young* and ignored the Eighth Amendment's heightened "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

(ECF No. 194, at 95.)

In response to Petitioner's § 2254(d) arguments, Respondent begins by asserting that

Petitioner procedurally defaulted the majority of the arguments he offered. In any event,

continues Respondent, Petitioner "also fails to meet his burden under the AEDPA standard of

review." (ECF No. 213, at 17.) With respect to Petitioner's argument that the Ohio Supreme

Court unreasonably reviewed each alleged instance of misconduct individually rather than for

cumulative effect, Respondent states that "[t]here is no clearly established federal law

prohibiting a state court from individually reviewing sub-claims and concluding not a single one

constituted prosecutorial misconduct before denying the claim." (*Id.*) Respondent proceeds to

characterize as supported by case law and the record the Ohio Supreme Court's determination

that each alleged instance of misconduct either was not improper or was not prejudicial. Finally,

as to Petitioner's argument that the Ohio Supreme Court erred in not applying the stricter

standards required for capital cases, Respondent asserts that the United States Supreme Court in

*California v. Ramos*, 463 U.S. 992, 998-999 (1983), explained that:

> [T]he principal concern is "with the procedure by which the State imposes the
> death sentence than with the substantive factors the State lays before the jury as a
> basis for imposing death..." *Id.* Hill's arguments go to the scope of evidence
> before the jury, not the procedure. Nevertheless, even if it was an issue of the
> evidence, the Ohio Supreme Court correctly found there was no prejudice by the
> alleged acts of misconduct, and the state court independent reweighing would
> have been curative. *See Clemons v. Mississippi*, 494 U.S. 738, 741 (1990).

(ECF No. 213, at 18.)

This Court first identifies the law and principles governing Petitioner's claim. It is well

settled that "[t]o grant habeas relief based on prosecutorial misconduct that does not violate a

specific guarantee under the Bill of Rights, the misconduct must be so egregious as to deny the

Petitioner due process." *Lorraine v. Coyle*, 291 F.3d 416, 439 (6th Cir. 2002) (citing *Donnelly v.

DeChristoforo*, 416 U.S. 637, 643-45 (1974)). Thus, a reviewing court must first determine

whether prosecutorial misconduct occurred and, if so, whether the misconduct was prejudicial.

In so doing, the reviewing court should consider the challenged remarks within the context of the

entire trial to determine whether any improper remarks were prejudicial. *Cristini v. McKee*, 526

F.3d 888, 901 (6th Cir. 2008). In the Sixth Circuit, if a court finds that the challenged conduct

was improper, the court must determine whether the misconduct was so flagrant as to deny the

Petitioner a fundamentally fair trial. *See, e.g., Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir.

2006). A court makes that determination by considering the following four factors:

> (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.

*Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (citations omitted).

It bears reminding, with respect to prosecutorial misconduct claims, that the "[p]etitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000.) Thus, even misconduct that was improper or universally condemned does not warrant habeas corpus relief unless the misconduct was so flagrant and egregious as to deny the petitioner a fundamentally fair trial. *Donnelly*, 416 U.S. at 643-54. To that point, "[t]he relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction (or death sentence) a denial of due process." *Darden v. Wainwright* 477 U.S. 168, 181 (1986) (citation and internal quotation marks omitted). Although it is well settled that prosecutors cannot offer personal opinions as to the credibility of witnesses, the guilt of the accused, or facts not in evidence, prosecutors do enjoy wide latitude to "argue the record, highlight any inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Cristini*, 526 F.3d at 901.

Against that backdrop, the Court turns to the precise issue before it–not whether Petitioner has demonstrated a meritorious claim of prosecutorial misconduct, but whether the Ohio Supreme Court's decision rejecting Petitioner's claim of prosecutorial misconduct contravened or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts. *See, e.g., Frazier v. Huffman*, 343 F.3d 780, 793 (6th Cir. 2003) (holding that although the Court might have found meritorious a claim of prosecutorial

misconduct were it reviewing that claim in the first instance, habeas corpus relief was not warranted because the state court's decision rejecting the same claim was not unreasonable). The Court answers that inquiry in the negative.

Having reviewed each instance of the alleged misconduct–from culpability-phase closing arguments, to cross-examination of mitigation-phase witnesses, to mitigation-phase closing arguments–the Court is not persuaded that any of the instances, viewed individually or for cumulative impact, were so egregious as to deny Petitioner a fundamentally fair trial or sentencing. Viewed in the context of the trial in its entirety, most of the challenged instances did not constitute misconduct at all. Those that did consisted of isolated, innocuous incidents that did not prejudice Petitioner. Even indulging Petitioner every benefit of the doubt, the Court detected nothing that could be characterized as pervasive, overarching misconduct which might have irreparably skewed the trial in favor of the prosecution by injecting facts that were not introduced into evidence, misrepresenting evidence that was presented, or so infecting the jury's sentencing deliberations with improper facts that the resulting sentence offended due process.

Petitioner asserts that during the culpability-phase closing arguments, the prosecutor offered opinions about the credibility of witnesses–specifically criminologist William Dean, Petitioner's friend Jeff Cook, and Petitioner himself. The prosecutor implied that defense counsel sought to mislead and confuse the jury, and engaged in theatrics by tossing an exhibit– the shirt in which the baby's body was wrapped–at Petitioner. The impact of these incidents, according to Petitioner, not only impacted the jury's guilt/innocence determination but also influenced the jury's sentencing deliberations. These allegations are not borne out by the record.

Assistant Prosecutor Kunkel stated early in his culpability-phase closing argument that

"what I'm going to attempt to do for you, since we've heard a lot of evidence here, is to point out *what I feel* specifically proves the allegations here against the defendant." (Tr. Vol. XI, at 1450 (emphasis added).) If it was arguably improper for the prosecutor to argue his case in terms of what he felt, any impropriety was of no import because the prosecutor proceeded to recount the witnesses' testimony without offering any opinions about their credibility and additionally offered no personal opinions to emphasize the changing stories that Petitioner offered to police during the investigation and to the jury during his testimony. It is true that the prosecutor called William Dean "an expert" and a "straight shooter," and opined that the jury could take his testimony linking trash bags in which the baby's body was wrapped to trash bags recovered from Petitioner's residence "to the bank." (*Id.* at 1462.) To the extent those statements were improper, they were neither pervasive nor overarching. Of Petitioner's friend Jeff Cook, who testified as to Petitioner's and his whereabouts the day and hours preceding the baby's disappearance, the prosecutor stated:

> Jeff Cook, friend of the defendant. Hey, I got to give Jeff credit. He came in here and told you what he does. Spends all day long looking for some dope to smoke. I mean he came in, seemed to be honest enough about that. Said they were walking. You know, he comes in and does that and negates half of what the defendant's other witnesses have said. * * *."

(*Id.* at 1466.) The Court finds no impropriety in these remarks. It was not misconduct for the prosecutor to recount Cook's testimony that he smokes marijuana every day. That was Cook's own testimony and the prosecutor neither mischaracterized it nor offered personal opinions about it. Nor was it misconduct for the prosecutor to remark that Cook's account of Petitioner's and his whereabouts contradicted other witnesses' testimony about Petitioner's wherabouts. As noted earlier, prosecutors enjoy wide latitude to "highlight any inconsistencies or inadequacies of

the defense[.]" *Cristini*, 526 F.3d at 901.

Assistant Prosecutor Tolbert began his portion of the culpability-phase closing arguments by emphasizing that it was not important what anyone (defense counsel) believed the evidence or law to be because "what is important is what you heard from the witness stand and hear from Judge Niehaus." (Tr. Vol. XI, at 1532.) The prosecutor proceeded to point out inconsistencies in the defense case, which as noted above, is allowable. It is true, as Petitioner asserts, that the prosecutor then contrasted the demeanors of Petitioner and the baby's mother Teresa Dudley as follows:

> [Y]ou saw the way the two people acted in court. Here's a person here, the father of this child. There's autopsy slides being shown right over here. You're looking at them. And he's sitting at the table cranking his head around trying to see. No remorse. Look at him now. It's his baby killed. And he's sitting there, so what. Is that the way Teresa Dudley reacted at the pictures of the baby?"

(*Id*. at 1535-36.) To the extent that this constituted improper commentary on the demeanors–and by extension, credibility—of the accused and the state's chief witness, respectively, viewed in the context of the entirety of the proceedings, it cannot be characterized as prejudicial for habeas corpus purposes. It was neither so pervasive nor so egregious as to deny fundamental fairness or undermine confidence in the jury's verdict. It is also true, as Petitioner asserts, that the prosecutor, while arguing that the shirt in which the baby's body was wrapped belonged to Petitioner, curiously tossed that shirt at or toward Petitioner. Although arguably improper, the conduct was isolated. With respect to Petitioner's assertion that the prosecutor implied that defense counsel sought to mislead and confuse the jury, the record reflects the following remarks:

> I'm not going to sit here and read these transcripts all day, but I am going to read one thing because I believe in an effort really to defend the client, but also to

> confuse the jury, which I think goes hand in hand, the defendant's attorney said it
> wasn't a fact about the bag.

(*Id*. at 1538.) The Court finds no impropriety or material prejudice because the above

constituted an isolated, benign, and inarticulate remark–not the type of persistent, forceful, and

animated denigration of defense counsel that undermines fundamental fairness and necessitates

habeas corpus relief. The prosecutor committed no misconduct in highlighting inconsistencies in

statements that Petitioner made to police and testified to at trial, as those inconsistencies were

established in the record. That is especially so when the prosecutor immediately proceeded to

emphasize that it was the jury that had to weigh Petitioner's credibility against the credibility of

the witnesses that the state had produced. (*Id*. at 1549.) Finally, in closing, the prosecutor said

the following:

> Well, ladies and gentlemen of the jury, as I look around this courtroom now I see
> only one person here who I believe still thinks he shouldn't pay for what he did in
> this case. And I would ask your verdict to show him otherwise.

(*Id*. at 1551.) The above remark at worst constitutes an improper expression of personal belief

but plausibly amounts to a forceful arguing of the record. *See Cristini*, 526 F.3d at 901.

In short, after viewing the prosecution's culpability-phase closing arguments in their

entirety, rather than considering certain remarks piecemeal and out of context, the Court

concludes that Petitioner has failed to demonstrate any misconduct so egregious as to undermine

confidence in the jury's verdict sufficient to offend fundamental fairness and require habeas

corpus relief.

Petitioner asserts that during the mitigation phase, the prosecutors injected improper

factors into the jury's sentencing decision by rebutting arguments that Petitioner never made, by

urging the jury to consider the nature and circumstances of the offense as aggravating factors,

82

and by appealing to the jury's sense of "law and order." Petitioner states and the record confirms that at the commencement of the mitigation phase, Assistant Prosecutor Tolbert inquired and was informed that the only statutory mitigating factors upon which Petitioner's defense counsel intended to offer evidence were Petitioner's youth, O.R.C. § 2929.04(B)(4), and the "catch-all" factor, O.R.C. § 2929.04(B)(7). (Tr. Vol. XII, at 1590-91.) In opening statements, although the prosecutor referred to aggravating circumstances in the plural, the prosecutor did correctly state that the sole aggravating circumstance was that Petitioner had committed the murder of Domika Dudley while committing an aggravated burglary and a kidnapping. (*Id.* at 1593.) Petitioner's defense counsel in opening statement not only referred to Petitioner's criminal history but also mentioned that Petitioner had spent time in a mental institution, had at one time contemplated suicide, had overdosed on drugs, and had heard voices. (*Id.* at 1595-98.)

When juvenile court probation officer Linda Phillips testified, Petitioner's defense counsel on direct examination elicited testimony about Petitioner's experience with clinical depression, Petitioner's mentions of suicide, and Petitioner's time at a mental health facility. On cross examination, the prosecution asked Phillips whether the "voices" that Petitioner had reported stemmed from an organic brain defect, a mental disease or defect, or mental retardation. (*Id.* at 1684-86.) The prosecution also elicited testimony that there was no evidence that Petitioner suffered from a mental disease or defect and that Petitioner possessed the ability to know right from wrong. (*Id.* at 1687-88.) When Dr. Nancy Schmidtgoessling of the Hamilton County Court Clinic testified, Petitioner's defense counsel asked on direct examination about Petitioner's history of receiving psychological treatment. (*Id.* at 1709-10.) On cross examination, the prosecution asked whether Petitioner knew right from wrong, whether

83

Petitioner suffered from a mental disease or defect, whether Petitioner suffered any mental illness, and whether Petitioner possessed the ability to control his actions. (*Id*. at 1712, 1712-13, 1715-16, 1717, and 1719.)  On redirect examination, Petitioner's defense counsel re-emphasized the severity of Petitioner's clinical depression, (*Id*. at 1723), prompting the trial court to ask Dr. Schmidtgoessling about Petitioner's clinical depression (*Id*. at 1726).  In closing arguments, Assistant Prosecutor Kunkel stated that "the defendant, despite his problems, knew right from wrong on June the 1st, 1991; that his family, his mother and his aunts, taught him right from wrong throughout his life."  (*Id*. at 1733.)  Following defense counsel's closing argument, Assistant Prosecutor Tolbert stated in his closing argument that Petitioner was "a free-thinking human being," was "not mentally retarded," did "not suffer from a disease or defect of the mind," and was "not guided by forces outside of his own intellect and outside of his own will." (*Id*. at 1760.)

Petitioner's argument is that although defense counsel elicited testimony about Petitioner's mental deficiencies in support of the § 2929.04(B)(7) "catch-all" mitigating factor, the prosecution turned around and elicited testimony about the "mental disease or defect" factor set forth in § 2929.04(B)(3) in an effort to suggest that the absence of evidence establishing that factor should be construed against Petitioner.  That statutory mitigating factor is:

> Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law[.]

O.R.C. § 2929.03(B)(3).  The Court is not persuaded that the prosecutor's eliciting testimony about whether Petitioner suffered from a mental disease or defect, about whether Petitioner knew right from wrong, or about whether Petitioner had the ability to control his actions rose to the

level of prejudicial misconduct.  Petitioner's defense counsel opened the door by offering

testimony about Petitioner's mental health problems, albeit offering those matters only as a

"catch-all" mitigating factor.  Although the prosecution, in responding to that argument, drew

upon words and phrases from § 2929.04(B)(3), at no time did the prosecution identify or define

the § 2929.04(B)(3) mitigating factor or suggest that because Petitioner's mental health problems

did not rise to the level described in that statutory factor, the jury should construe that fact

against Petitioner.  Thus, Petitioner's assertion that the prosecution made arguments rebutting the

existence of a mitigating factor that Petitioner never raised is not supported by the record.  The

Court therefore cannot find that the prosecution committed misconduct so egregious as to deny

Petitioner a fundamentally fair sentencing decision.

Turning to the mitigation-phase closing arguments, Assistant Prosecutor Kunkel argued

first.  (Tr. Vol. XII, at 1731-37.)  In explaining to the jury the requirement that it weigh the

aggravating circumstances against mitigating factors, Kunkel stated:

> The aggravating circumstances are those that you found to exist as fact at
> the first trial, in the guilt phase; those being that the defendant Genesis Hill stole a
> helpless, sleeping baby from her mother, smashed her skull in not just one place
> but two places, took her life.  That is what you will weigh against what you heard
> yesterday from the defendant and the defendant's witnesses.

(*Id.* at 1733.)  Kunkel proceeded to recount Petitioner's criminal history, which was acceptable,

in this Court's view, due to defense counsel's extensive coverage of that issue.  Kunkel stated

toward the conclusion of his argument that:

> But I think that you have to agree with me that when you balance the aggravating
> circumstances, the brutality of this murder, the kidnapping, the taking of the baby
> while it's sleeping from its mother, it's no contest against what we heard
> yesterday.

(*Id.* at 1736.)

Following defense counsel's closing argument, Assistant Prosecutor Tolbert argued last.

Tolbert stated early in his closing argument that "the reasonable, the common sense thing to do

in this case is to impose the ultimate penalty upon one who has committed the ultimate wrong."

(*Id.* at 1757.) In describing the weighing process, Tolbert proceeded to argue as follows:

> The aggravating circumstances that we have here, the aggravating
> circumstances that were proven at trial are again, quite briefly, you've heard
> them, you know them, you decided them, that this man went into an apartment
> building in the early morning hours of June 1st, 1991; that he took a six-and-a-
> half-month-old baby, a helpless, harmless baby; and that he killed that baby by
> inflicting two massive blows to that baby's skull, one to the front, one to the rear.
> The baby was then wrapped in plastic, bound with his shirt then wrapped in
> plastic, bound with electrical tape, put in a box, and abandoned in a lot behind the
> defendant's house.
>
> Now, those are the aggravating circumstances. This poor little baby's
> death was caused in such a brutal, horrible fashion, after the offenses of
> aggravated burglary and kidnapping were done. Are you firmly convinced that
> that outweighs what you heard about Genesis Hill yesterday? That's the test.
>
> Are you firmly convinced that the horrible things that he did to a six-and-
> a-half-month-old baby outweigh his problems in life.

(*Id.* at 1757-58.) Tolbert continued by arguing essentially that Petitioner was capable of freely

making his own choices. Tolbert also raised questions about Petitioner's unsworn statement,

about whether Petitioner was lying, and about the inconsistent stories Petitioner had given to

police. (*Id.* at 1760, 1762.) Those arguments, in this Court's view, were fair comments upon the

evidence introduced at trial and fair responses to arguments made by defense counsel. Finally,

Tolbert concluded his closing argument by stating essentially that in order to maintain a civilized

law and order society, it was necessary to inflict the ultimate punishment for the ultimate crime.

(*Id.* at 1764.)

Initially, the Court notes that the prosecution's remarks appealing to the jurors' sense of

law and order, and assertion that the ultimate crime deserved the ultimate punishment, arguably crossed the line. That said, the Court is of the view that those remarks were fairly isolated and innocuous and, viewed in the context of the mitigation hearing in its entirety, not so pervasive or forceful as to run an unacceptable risk of misleading or confusing the jury. The offering by both Kunkel and then Tolbert of the facts of the offense as aggravating circumstances was without question improper. Those remarks went far beyond arguing that there was nothing mitigating in the nature and circumstances of the offense. By arguing that the facts of the offense were the aggravating circumstances, the prosecutors introduced a risk that the jury would be misled or confused in a way that tipped the scales in favor of death by taking a single aggravating circumstance–felony murder–and converting it into multiple aggravating circumstances.

The Court is not persuaded, however, that the misconduct described set forth above was so egregious as to deny Petitioner a fundamentally fair sentencing process whose resulting verdict cannot be trusted. The jury instructions correctly informed the jury that there was but one aggravating circumstance to consider–namely that Petitioner had committed the murder of Domika Dudley while committing aggravated burglary and kidnapping. (Tr. Vol. XII, at 1770.) Further, the trial court began its mitigation-phase instructions by informing the jurors that they were the sole judges of the facts, credibility of witnesses, and weight of the evidence. (*Id.* at 1767.) The trial court correctly stated Ohio law and did not reference the facts of the offense as aggravating circumstances. At no point during deliberations did the jury request clarification or express confusion about what aggravating circumstance it was to weigh. The Court is satisfied that all the factors set forth above sufficiently negated the risks posed by the prosecution's misconduct–namely the risk that the jury would construe the facts of the offense as aggravating

87

circumstances, thereby tilting the scales in favor of a death sentence.

This is not a case such as *Hodge v. Hurly*, 426 F.3d 368 (6th Cir. 2005), where the Sixth Circuit found prejudicial misconduct (and ineffective assistance of counsel for the failure to object to that misconduct) due to the prosecutor's "egregiously improper closing argument." *Id.* at 371. Specifically, the Sixth Circuit found that habeas corpus relief was necessary because the prosecutor in that child rape case repeatedly and emphatically commented on the credibility of witnesses, misrepresented the facts of the case, made derogatory remarks about the defendant, and made a general attempt to convince the jury that they should convict the defendant on the basis of his bad character. *Id.* at 371-72. The Sixth Circuit found irreparable prejudice from the pervasive misconduct because the only evidence sufficient to sustain the petitioner's conviction was the jury's determination that the complaining witness was more credible than the defendant. *Id.* at 371.

Nor is this a case such as *Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000), where the Sixth Circuit again found prejudicial misconduct (and ineffective assistance for the failure to object to the misconduct) stemming from the prosecutor's repeated and animated emphasis on the accused's bad character and unfounded argument that the child-victim's story was consistent over time, which not only misrepresented the facts of the case but also bolstered the credibility of the complaining witness. The Sixth Circuit concluded that the misconduct was prejudicial because the trial was a credibility contest in which nothing was more important than who was more believable–the defendant or the complaining witness–and the prosecutorial misconduct went to the heart of that matter by tearing down the character of the defendant while bolstering the credibility of the child-victim. *Id.* at 707-08.

In sum, the Court is not persuaded that any of the instances of alleged prosecutorial misconduct, either individually or cumulatively, were so egregious as to undermine confidence in the outcome of Petitioner's capital trial and require habeas corpus relief. *See Broom v. Mitchell*, 441 F.3d 392, 413-14 (6th Cir. 2006) (concluding that "clearly improper" behavior on the part of the prosecution during mitigation-phase closing arguments was not flagrant enough to undermine a court's confidence in the outcome of the mitigation hearing); *Stallings v. Bagley*, 561 F. Supp. 2d 821, 849-50 (N.D. Ohio 2008) (denying habeas corpus relief because considering blatant misconduct in the context of the entirety of the proceedings, "grave doubts regarding the jury's ability to base its decision on proper grounds simply do not exist.") The Ohio Supreme Court's decision rejecting the prosecutorial misconduct did not contravene or unreasonably apply clearly established federal law or rely on an unreasonable determination of the facts. Accordingly, Petitioner's tenth ground for relief is **DENIED**.

### F. Twelfth Ground for Relief: Trial counsel ineffectively assisted Mr. Hill during his trial's mitigation phase.

(Second Amended Petition, ECF No. 137-2, at ¶¶ 53-68 (argued second in the second amended petition).) According to Petitioner, his trial attorneys performed deficiently and to his prejudice during the mitigation proceedings for (1) failing to request the appointment of a mitigation specialist or otherwise conduct an adequate sentencing investigation; (2) failing to retain independent health experts to testify about Petitioner's mental illness and upbringing; (3) failing to adequately prepare lay witnesses to testify; (4) failing to object to improper jury instructions; and (5) failing to object to the prosecution's improper penalty-phase closing arguments. Petitioner asserts that his trial attorneys presented a weak mitigation case, consisting primarily of testimony by family members, "most of whom painted an apocryphal, pleasant portrait of Mr.

89

Hill's childhood; none of whom relayed the details of the abuse or illness Mr. Hill has suffered."
(*Id*. at ¶ 60.) "Had counsel or a mitigation specialist interviewed Mr. Hill's mitigation witnesses
in advance," Petitioner reasons, "counsel could have explained to the witnesses the importance
of being open and honest about unpleasant facts, and could have presented only those witnesses
who could offer useful mitigating evidence." (*Id*. at ¶ 62.) Petitioner asserts that the social
services witnesses who did testify about Petitioner's hallucinations, suicidal depression, broken
family, borderline intelligence, violence in the family, and absence of mental illness at the time
of the offense presented "only the tip of an iceberg." (*Id*. at 63-64.)

Because of counsel's failure to retain independent mental health experts, Petitioner
argues, the jury never heard that Petitioner's actual IQ was borderline retarded; that Petitioner
suffered from mental illness at the time of the offense and during trial that included auditory
hallucinations impairing his ability to respond appropriately in times of stress; that Petitioner's
mental illness and alcoholism had potential genetic components; and that drug use affected
Petitioner's behavior on the day of the offense and the impact of his mental illnesses. (*Id*. at 64.)
Petitioner continues by asserting that counsel's failure to retain a mitigation specialist or
otherwise conduct an adequate investigation prevented Petitioner's jury from learning that
Petitioner suffered weekly beatings growing up; that Petitioner was repeatedly sexually assaulted
by one of his father's friends; that Petitioner's mother was so dysfunctional that her children had
to raise themselves, including stealing their own food; that Petitioner's mother suffered such
severe depression that several times a month she could not get out of bed; that Petitioner's
mother often failed to wash clothes or keep her children clean; that Petitioner had a history of
dizziness, eye pain, blurred vision, and light-headedness; and that the voices Petitioner heard in

90

his head shouted such messages as "Die!" and "Hate you!"  (*Id.* at ¶ 66.)  "Instead of all these facts," Petitioner explains, "jurors heard a series of unprepared witnesses offering bizarre, sometimes contradictory, and often plainly counterfactual opinions on Mr. Hill and his history." (*Id.* at 67.)

In the Amended Return of Writ, Respondent begins by revisiting the fact that this Court concluded in its September 27, 2006 *Opinion and Order* that Petitioner had procedurally defaulted the first two sub-parts of his claim, set forth in paragraphs 64-66. (ECF No. 154, at 31 (citing ECF No. 151, at 89).)  With respect to the remaining three sub-parts of Petitioner's claim, Respondent asserts that they are without merit and that the Ohio Supreme Court's decision complies with 28 U.S.C. § 2254(d).  Specifically, as to Petitioner's argument that his attorneys were ineffective for failing to adequately prepare lay witnesses, Respondent asserts that Petitioner can demonstrate neither deficient performance nor prejudice because trial counsel presented a wealth of mitigation evidence that was consistent with their culpability-phase strategy and because most of the evidence that Petitioner complains was omitted was actually presented. (ECF No. 154, at 34-38.)  Respondent proceeds to argue that Petitioner's claim of trial counsel ineffectiveness for the failure to object to the trial court's use of the word "recommend" in the penalty-phase jury instructions is foreclosed by Sixth Circuit precedent repeatedly rejecting the same argument. (*Id.* at 39-40.)  Finally, with respect to Petitioner's argument that his trial counsel were ineffective for failing to object to improper remarks in the prosecution's penalty-phase closing arguments, Respondent points to the Ohio Supreme Court's extensive coverage of those remarks and concludes that because there was prosecutorial misconduct, there was no ineffective assistance for the failure to object. (*Id.* at 41-47.)

In his traverse, Petitioner begins by reiterating that counsel performed deficiently and to Petitioner's prejudice by failing to prepare their mitigation-phase lay witnesses. Specifically, according to Petitioner, "counsel failed to fully conduct a mitigation investigation, and relied on lay witnesses, whom counsel did not prepare in advance, to present to the jury a disorganized, disjointed, and at times contradictory, mitigation picture lacking any coherent or understandable theory." (ECF No. 194, at 98.) This prejudicial failure, Petitioner asserts, resulted in the jury never hearing compelling evidence about Petitioner's development and background that "differed in a substantial way" than what was presented. (*Id.*) Noting that this Court has already determined that the last state court to rule on Petitioner's claim–the state appellate court in postconviction–improperly rejected it on the basis of Ohio's procedural *res judicata* rule, Petitioner argues that this Court should review his claim *de novo*. (*Id.* at 98-99.)

Petitioner contends that his attorneys' mitigation-phase preparation of their lay witnesses fell far below prevailing professional norms as defined by evolving case law and the American Bar Association guidelines. (*Id.* at 99-103.) Petitioner asserts that counsel had a clear duty to completely investigate all available mitigation evidence, to construct a mitigation theme well in advance of trial, and to prepare their mitigation witnesses in advance and guide their testimony so as to explain to the jury the entire mitigation portrait. According to affidavits, trial counsel failed to discuss with Petitioner's relative-witnesses what constituted mitigation evidence or how they could have best helped Petitioner with their testimony, all of which prevented the jury from hearing the explicit and horrible details of Petitioner's childhood. (*Id.* at 105-106.) Petitioner asserts that instead of constructing a mitigation theme after conducting a reasonable investigation, counsel merely elicited some information from each witness, failed to put forth a

92

persuasive narrative, and offered only a catalog of seemingly unrelated mitigation facts. Further, according to Petitioner, the mitigation testimony was misleading, contradictory, and inaccurate. Petitioner offers as an example the fact that his mother, as a result of counsel's failure to adequately prepare her, did not recount that when she was just sixteen-years-old she was raped by Petitioner's father and, as a result, gave birth to Petitioner. According to Petitioner, that fact forever affected the relationship that Petitioner's mother had with Petitioner. Petitioner insists, accordingly, that as in the *Wiggins*, *Rompilla*, and *Williams* cases discussed below, his was a case where " 'the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, *cf. Wiggins*, 539 U.S., at 525, or would have been apparent from documents any reasonable attorney would have obtained, *cf. Rompilla v. Beard*, 545 U.S. 374, 389-393.' " (ECF No. 194, at 109-110 (quoting *Bobby v. Van Hook*, 130 S.Ct. 13, 19 (2009) (per curiam)).)

Petitioner next sets forth how he was prejudiced by counsel's deficient performance sufficient to support habeas corpus relief–*i.e.*, how but for counsel's deficient performance, there is a reasonable probability that the jury would have recommended a sentence less than death. Counsel's deficient mitigation presentation, according to Petitioner, left the jury not knowing what to think of Petitioner insofar as the disjointed testimony portrayed him as either someone who got everything he needed and a loving family, or someone who had some typical teenage problems and did not have a great relationship with his father. Far from that innocuous portrait, according to Petitioner, what the jury could and should have learned, had counsel better prepared their lay witnesses, was a consistent picture of an impoverished child in an impoverished single teenage parent family who suffered from birth on; was the product of rape that caused ongoing

93

problems in the relationships between Petitioner, his mother, and his father; and that Petitioner's

mother had four children from different fathers–none of whom supported their children–and had

never recovered from having lost two other children. (ECF No. 194, at 112.) Jurors would have

understood, Petitioner reasons, how Petitioner's constant exposure to all of these negative

influences affected his development, his feelings about himself, and his resulting behavior

towards his own child. Petitioner further argues that he was prejudiced by counsel's inadequate

preparation of their lay witnesses because a consistent and tragic picture would have undermined

testimony by mental health experts suggesting that Petitioner received treatment at a mental

health facility for one month and improved, did not suffer from any mental disease or defect, had

no abnormal mental conditions, and was relatively "normal" compared to other children raised in

inner-city conditions. (*Id*. at 114.) Better preparation of lay witnesses, Petitioner continues,

would have undermined that testimony by demonstrating that Petitioner actually suffered from

significant mental health issues that included auditory hallucinations and suicide attempts.

Petitioner continues in his traverse by arguing that his trial counsel performed

unreasonably and to Petitioner's prejudice when they failed to object to the trial court's

repeatedly telling Petitioner's jury that any vote to sentence Petitioner to death would be only a

recommendation to the court. (ECF No. 194, at 116-120.) According to Petitioner, this

instruction lessened the jurors' sense of responsibility in violation of Petitioner's Fourteenth

Amendment due process rights and counsel's failure to object was deficient and prejudicial.

Petitioner begins by arguing that this Court should review his claim *de novo* because the Ohio

Supreme Court rejected it without offering any reasoning or discussion. (*Id*. at 116-117.)

Petitioner argues that counsel's performance fell below prevailing professional norms which

dictate not only that counsel, when deciding whether to raise an objection, should err on the side of preserving issues for review, but also that counsel should endeavor to ensure that mitigation-phase instructions and verdict forms will enable the jury to consider and give effect to all relevant mitigation evidence. (*Id*. at 117-118.) Petitioner argues that he was prejudiced by counsel's failure to object as follows:

> In Hill's case, the jury may have wished to "send a message" in response to the death of a child, and may have been biased in favor of the death penalty by the court's indication that their decision would be a mere recommendation. As the product of a jury that did not fully understand or appreciate its serious responsibility, Hill's death sentence violates the Fourteenth Amendment. It is reasonably likely that at least one juror would have voted for something other than death had the jury's sense of responsibility not been absolved by the trial court's unconstitutional instructions. Accordingly, Hill was prejudiced by his counsel's failure to object to the trial court's errors of law.

(*Id*. at 119-120.)

Finally in his traverse, Petitioner argues that his attorneys performed deficiently and to his prejudice when they failed to object to numerous instances of misconduct during the prosecution's mitigation-phase closing arguments. (ECF No. 194, at 120-124.) Specifically, Petitioner argues that defense counsel's performance fell below prevailing professional norms when they failed to object to the prosecutors' improper reliance on non-statutory aggravating circumstances, the prosecutors' improper appeal to the jurors' sense of "law and order," and the prosecutors' improper misstatement that the ultimate crime required the ultimate punishment. Petitioner asserts that he suffered prejudice from counsel's deficient performance, contending:

> But for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different. It is reasonably likely that, but for counsel's deficient performance enabling the jury to hear and consider the prosecutor's flagrant and erroneous misconduct, at least one juror would have voted for a penalty less than death. Similarly, it is reasonably likely that but for counsel's deficient performance, the appellate court would have

95

> applied a different standard to this argument in Hill's direct appeal, leading to a
> different result of that proceeding. *See, e.g., State v. Keenan*, 66 Ohio St. 3d 402
> (1993) (death sentence reversed and remanded for new sentencing hearing based
> on prosecutor's misconduct to which defendant's counsel objected during trial).

(*Id*. at 122-23.) For similar reasons, Petitioner argues that the Ohio Supreme Court's

determination that counsel's failure to object represented a reasonable tactical choice was

unreasonable under within the meaning of 28 U.S.C. § 2254(d). (*Id*. at 123-24.)

In the response to Petitioner's traverse, Respondent reiterates that Petitioner's twelfth

ground for relief is without merit not only because he cannot overcome the AEDPA standard but

also because he cannot satisfy the *Strickland* standard. (ECF No. 213, at 20-22.) In so arguing,

Respondent insists that Petitioner's reliance on *Bobby v. Van Hook*, 130 S.Ct. 13 (2009) (per

curiam), is misplaced because, according to Respondent, "[t]he *Van Hook* Court explained that

the ABA guidelines are not the standard to judge an ineffective assistance of counsel claim."

(ECF No. 213, at 21.) Respondent reasons, therefore, that "Hill's misplaced reliance on the

ABA Guidelines over what the constitution[] requires has only muddled the analysis of his

claim." (*Id*.) Respondent also contends that Petitioner's case is distinguishable from *Wiggins v.*

*Smith*, *Rompilla v. Beard*, and *Williams v. Taylor*, both because the information that Petitioner

complains was omitted was in fact presented to his jury and because he cannot demonstrate

prejudice from the omission of information that was merely cumulative to evidence that the jury

did in fact hear. Finally, Respondent argues that *de novo* review is not warranted for sub-part

(4), in view of the fact that the Ohio Supreme Court cited two cases establishing that the jury

instruction at issue was proper and that the Sixth Circuit has repeatedly rejected challenges such

as Petitioner's to the jury instruction. Respondent also argues that sub-part (5) is without merit

for the reason that because there was no prosecutorial misconduct, there was no deficient

performance or prejudice from counsel's failure to object.

Petitioner presented some of his counsel ineffectiveness claims on direct appeal to the Ohio Supreme Court and the others in his original postconviction action. The Court turns first to the allegations that Petitioner raised in his original postconviction action–namely, those comprising sub-part (3) of his twelfth ground for relief. Petitioner raised those mitigation-phase ineffective-assistance allegations as the third claim for relief in his postconviction action. He argued:

> Third Claim for Relief: A defendant is deprived of the effective assistance of counsel guaranteed by the United States and Ohio Constitutions where defense counsel fails to conduct an adequate background search for, and preparation of, mitigation witnesses, because, as a result, insufficient and poorly prepared mitigation evidence is then presented by the defense at the penalty phase.

Although this claim represents sub-part (3) of Petitioner's twelfth ground for relief, as noted above, this Court stated unmistakably in its September 27, 2006, *Opinion and Order*, that "[o]nly petitioner's allegation that his trial attorneys were ineffective for failing to interview or prepare mitigation witnesses, *i.e.*, sub-part (3) of ground twelve, is properly before the Court–and again, only to the extent that those allegations were presented in petitioner's original postconviction action." (ECF No. 151-2, at 12.) The Court further explained:

> The following facts set forth in the second amended petition were presented to the state courts for the first time in petitioner's untimely, successor postconviction action and therefore *may not be considered by this Court*: that petitioner received weekly beatings growing up; that he was repeatedly sexually assaulted by one of his father's friends; that he had to steal food and raise himself because his mother was so dysfunctional as a parent and was so depressed that she often could not get out of bed; that he was often filthy because his mother would not wash his clothes; that he had a history of dizziness, eye pain, blurred visions, and light-headedness; that voices in petitioner's head yelled such things as "Die!" and "Hate you!"; that petitioner's actual IQ was in the borderline-retarded range; that petitioner's mental illness at the times of the offense and trial would have impaired his ability to respond appropriately during times of stress; that

> petitioner's mental illness potentially had a genetic component; that petitioner's alcoholism potentially had a genetic component; and that petitioner had organic brain damage resulting from lead poisoning during infancy which affected his behavior at the time of the offense. (Second Amended Petition, Doc. # 139, at ¶¶ 64 and 66.)

(ECF No. 151-2, at 15 (emphasis added).) Thus, to be clear, the Court cannot consider the allegations set forth above. They were not properly presented to the state courts.

As for the factual allegations set forth in sub-part (3) that are properly before the Court, it bears reminding, as Petitioner observes, that the last state courts to rule on those allegations–the trial court and court of appeals in postconviction–rejected that claim solely on the basis of Ohio's *res judicata* procedural default rule. That is, the state courts did not reject or even consider the merits of sub-part (3). Petitioner argues that this Court accordingly can review his claim not through the constrictions established by 28 U.S.C. § 2254(d), but *de novo*. Respondent disagrees but incorrectly directs that argument at this Court's consideration of sub-parts (4) and (5). The Court agrees with Petitioner that it can and must review sub-part (3) *de novo* rather than through the prism of determining whether the state courts' decision rejecting the claim was unreasonable.

The constrictive standard of review set forth in 28 U.S.C. § 2254(d) applies only to claims that the state courts adjudicated *on the merits*. *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). Thus, when a state court does not consider the merits of a claim and that claim is nonetheless properly before the federal courts for habeas corpus, the federal courts review that claim *de novo* "rather than through the deferential lens of AEDPA." *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)); *see also Clinkscale*, 375 F.3d at 436; *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003).

Against that backdrop, this Court is tasked with deciding whether Petitioner's trial

attorneys provided ineffective assistance during the mitigation-phase when they failed to

adequately investigate, interview, or prepare their lay witnesses. The right to counsel guaranteed

by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v.*

*Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard for demonstrating a claim of

ineffective assistance of counsel is composed of two parts:

> First, the defendant must show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Scrutiny of defense counsel's performance

must be "highly deferential." *Id*. at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties

inherent in making the evaluation, a court must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance." *Id*. To establish the

second prong of the *Strickland* test, prejudice, a Petitioner must demonstrate that there is a

reasonable probability that, but for counsel's errors, the result of the proceedings would have

been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id*. Because Petitioner must satisfy both prongs of the *Strickland*

test to demonstrate ineffective assistance of counsel, should the court determine that Petitioner

has failed to satisfy one prong, it need not consider the other. *Id*. at 697.

At its core, Petitioner's claim challenges the adequacy of counsel's investigation,

preparation, and presentation of available evidence during both the culpability and mitigation

phases of Petitioner's trial. It is well settled that "[c]ounsel has a duty to make reasonable

99

investigations or to make a reasonable decision that makes particular investigations

unnecessary." *Strickland*, 466 U.S. at 691; *see also Carter v. Bell*, 218 F.3d 581, 600 (6th Cir.

2000). The importance of competent representation during the penalty phase of a capital trial

cannot be understated, especially with respect to the duty to investigate, because, as a practical

matter, all that stands between a defendant who has been convicted of capital murder and a death

sentence is whatever mitigation evidence he or she can muster. *Mapes v. Coyle*, 171 F.3d 408,

426 (6th Cir. 1999).

> Under the Ohio statute, a capital defendant found guilty of a death specification
> has to present some mitigating evidence in order to avoid the death penalty. If a
> jury has nothing to weigh against the aggravating circumstance, it almost certainly
> must find that the aggravating circumstance outweighs the (nonexistent)
> mitigating circumstances, and recommend death.

*Id.*; *see also Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (incorporating the 2003 American

Bar Association ("ABA") Guidelines regarding competent representation in capital cases);

*Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (discussing the duty to investigate mitigating

evidence and incorporating the 1989 ABA Guidelines regarding competent representation in

capital cases). Thus, the Sixth Circuit has not hesitated to hold that "failure to investigate

possible mitigating factors and failure to present mitigating evidence at sentencing *can* constitute

ineffective assistance of counsel under the Sixth Amendment." *Martin v. Mitchell*, 280 F.3d

594, 612 (6th Cir. 2002) (citing *Carter v. Bell*, 218 F.3d at 600, & *Skaggs v. Parker*, 235 F.3d

261, 271 (6th Cir. 2000)).

In the Sixth Circuit, the scope of a court's review of a claim of ineffective assistance of

counsel during mitigation is shaped by the degree of counsel's alleged inadequacies. As the

Sixth Circuit has explained, "[o]ur circuit's precedent has distinguished between counsel's

*complete* failure to conduct a mitigation investigation, where we are likely to find deficient

performance, and counsel's failure to conduct an *adequate* investigation, where the presumption

of reasonable performance is more difficult to overcome." *Beuke v. Houk*, 537 F.3d 618, 643

(6th Cir. 2008) (citing *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001), & *Moore v. Parker*,

425 F.3d 250, 255 (6th Cir. 2005)). In *Beuke*, the Sixth Circuit went on to explain:

> In the present case, defense counsel did not *completely fail* to conduct an
> investigation for mitigating evidence. Counsel spoke with Beuke's parents prior
> to [the] penalty phase of trial (although there is some question as to how much
> time counsel spent preparing Beuke's parents to testify), and presented his
> parents' testimony at the sentencing hearing. Defense counsel also asked the
> probation department to conduct a presentence investigation and a psychiatric
> evaluation. While these investigative efforts fall far short of an exhaustive search,
> they do not qualify as a complete failure to investigate. *See Martin v. Mitchell*,
> 280 F.3d 594, 613 (6th Cir. 2002) (finding that defense counsel did not
> completely fail to investigate where there was "limited contact between defense
> counsel and family members," "counsel requested a presentence report," and
> counsel "elicited the testimony of [petitioner's] mother and grandmother").
> Because Beuke's attorneys did not entirely abdicate their duty to investigate for
> mitigating evidence, we must closely evaluate whether they exhibited specific
> deficiencies that were unreasonable under prevailing professional standards. *See
> Dickerson v. Bagley*, 453 F.3d 690, 701 (6th Cir. 2006).

*Beuke*, 537 F.3d at 643.

Petitioner cannot plausibly suggest that his counsel completely failed to investigate or

present evidence in mitigation, particularly concerning Petitioner's childhood, upbringing, and

family life. The record contains evidence that trial counsel more than three months before trial

requested and obtained funds to employ Dr. Nancy Schmidtgoessling of the Hamilton County

Court Clinic "to assist counsel in preparing for mitigation for sentencing purposes." (J.A. Vol. I,

at 26.) In their opening statement, defense counsel announced their intention to present

testimony from many family members who had been closest to Petitioner, evidence about

Petitioner's achievements and downfalls, evidence about Petitioner's background and run-in's

with the law as a juvenile, evidence detailing Petitioner's stays at Hillcrest school for troubled

boys and Millcreek juvenile mental health facility–the latter of which stemmed from Petitioner's

suicide attempt, drug overdose, and hearing voices–evidence about Petitioner's mother being

Petitioner's sole caretaker and about Petitioner's father being absent from Petitioner's life, and

testimony from court clinic psychologist Dr. Nancy Schmidtgoessling. Defense counsel

proceeded to present testimony by Petitioner's paternal aunt Mary Thompson, Petitioner's

maternal aunt Denise Hill, Petitioner's father Lawrence Thompson, Petitioner's mother Mary

Elizabeth Hill, Petitioner's paternal grandmother Mary Southers, Petitioner's maternal

grandmother Mary Hill, Petitioner's maternal aunt Ruby Hill, Petitioner's aunt Jennifer Clark,

Petitioner's friends Maria Byrd and Joyce Carnes, juvenile court after care social worker Angelo

Dean, juvenile court probation officer Linda Phillips, Petitioner himself, and court clinic

psychologist Dr. Nancy Schmidtgoessling. From Petitioner's relatives and friends, defense

counsel elicited evidence that Petitioner had numerous relatives from both sides of his family

with whom he was close–many of whom expressed disbelief that Petitioner had done what he

was accused of; that Petitioner had had some run-in's with the law as a juvenile and grew up in a

bad neighborhood rife with gangs and drugs; that Petitioner became involved with drugs to

survive and to obtain things he needed; that Petitioner was kind, gentle, and helpful; that

Petitioner had a good but sometimes troubled relationship with his mother, stemming from the

fact that she could not always provide for her children, that none of the fathers of her children

provided support, and that she suffered severe bouts with depression due to several lost

pregnancies; that Petitioner and his father professed to love each other even though they had

virtually no relationship and very little contact–a matter that often left Petitioner sad and

depressed; that Petitioner's mother and father never lived together or had a relationship; that

Petitioner's father had served five years in prison; that Petitioner had struggled in school,

particularly in math, despite sometimes demonstrating a desire to finish school and find a job;

that Petitioner had spent some time at Hillcrest school for troubled boys; that Petitioner had

subsequently spent time at Millcreek juvenile mental health facility due to suicidal thoughts, a

drug overdose, severe depression with psychotic features, and hearing voices that told him to

harm himself.  The record demonstrates that much of the information provided by Petitioner's

relatives was pried from them by specific, probing questions by defense counsel–demonstrating

counsel's familiarity with the information those relatives possessed but were not always prepared

to divulge.

From juvenile court social workers, defense counsel presented more detailed evidence

about Petitioner's stay at Hillcrest; the efforts (albeit failed) that Petitioner made to stop abusing

drugs and alcohol and maintain a job; Petitioner's respectful disposition; the struggles that

Petitioner's brother Marcus also experienced with the law and severe depression; the effect that

Petitioner's noisy, wild, chaotic neighborhood had on Petitioner; the manner in which Petitioner

had to align himself with gangs and/or drug dealers for protection; Petitioner's abuse or at least

use of alcohol and drugs beginning in his teens; Petitioner's receipt of treatment at the Millcreek

juvenile mental health facility due to severe depression, auditory hallucinations, and suicidal

thoughts; and Petitioner's potential for rehabilitation, to further his education, and to develop

vocational skills.  Petitioner himself testified in an unsworn statement that growing up was hard

and that he struggled to survive; that he had "done things" just to be someone, just to have

friends, and just to get clothes; that he had done these things to try to take the pressure off

"them" (his parents); that he drank and smoke because he was depressed but that he tried to stop because those things only made him hurt more; that he had wanted to end his life; that he used to hear voices telling him to "go ahead" and kill himself; that he had tried many times to end his life; that at school, he felt considerable pressure from not having the right clothes; that he had had problems especially with math; that when he went to Millcreek, he had told them all that he wanted help; that his mother's loss of the baby was bad, that she lived through bad circumstances, but that she had never left him and had always done the best she could to make sure they had what they needed; that although his father had not been around, they knew that they both loved each other; and that he was sorry the jury had to be there, sorry that the baby was gone, and sorry for the family. (Tr. Vol. XII, at 1692-1695.)

Defense counsel's final mitigation witness was Dr. Schmidtgoessling. She testified that she had met with Petitioner initially on September 4, 1991, that subsequently a social worker had met with Petitioner three times, and that Dr. Schmidtgoessling had then met with Petitioner again on October 25, 26, and 28, 1991. Dr. Schmidtgoessling testified that their collective investigation revealed very much a struggling nuclear family, an extended family that was protective but struggling itself; a heavy exposure to drug trafficking and use, as well as to violence and intimidation; and a personal (Petitioner's) and family history of psychological problems. She explained that Petitioner's mother had had a number of serious psychological and emotional losses–stemming from her loss of two pregnancies and her difficult relationships with the fathers of her children–that Petitioner's mother suffered severe depression from the time that Petitioner was fourteen-years-old; and that Petitioner had as a result many feelings of being overlooked and neglected, and of loss that his mother was not available to him. Dr.

Schmidtgoessling further testified that Petitioner's father was never active in Petitioner's family, that Petitioner had grown up very much wanting a father, and that Petitioner's self-worth was damaged by the absence of a relationship with his father.  To that point, Dr. Schmidtgoessling also testified that the man to whom Petitioner was the closest–his maternal grandfather–died when Petitioner was fourteen, at which point Petitioner began experiencing problems, struggling in school, and increasing his substance abuse.  By age seventeen, Dr. Schmidtgoessling testified, Petitioner was experiencing problems with serious depression.  He was admitted to Millcreek, where records described how painful Petitioner's family situation was for him and where another brother was also hospitalized with serious depression.  Dr. Schmidtgoessling proceeded to testify that Petitioner had a large extended family of relatives who tried to look out for each other but who had problems of their own and were protective and less than forthcoming as a result.  As Dr. Schmidtgoessling explained:

> . . . First off as a normal factor, it's not unusual that some people know [their] families better than others, so they have different perceptions of them.
>
> Our experience here is that some of the family have not been very open about sharing information.  One family member would say this was a problem, the other would say no, it wasn't.  So some of them, we believe, are simply being protective of each other, which is also typical for families.  Families don't like to see their family members subjected to what they feel might be painful or humiliating circumstances.
>
> Sometimes families don't see what's going on because they're in denial, they can't or don't want to see at a psychological level not deliberately lying, don't know how to see problems because they don't know how to solve the problems.  We believe that's also taking place in this family.

(Tr. Vol. XII, at 1704.)

Dr. Schmidtgoessling went on to testify about Petitioner's struggles in school, noting that they had not been able to pinpoint why Petitioner struggled as he did and remarking that

105

psychologically, school is an important area where kids determine their self-worth and is important for developing the skills kids need to succeed later in life. Thus, Dr. Schmidtgoessling explained, Petitioner's lack of success in school not only held him back in other areas of development but also made him more vulnerable to "street" influences as an alternative place for him to find his "niche." (*Id.* at 1706.) To that point, Dr. Schmidtgoessling testified about Petitioner's heavy exposure, from a young age, to drug trafficking and drug use. She explained that, although they ascertained that Petitioner had begun using drugs and alcohol around age fourteen, they were not able to determine with certainty from their investigation the extent of Petitioner's use of alcohol and drugs. The neighborhood where Petitioner was raised additionally exposed him to violence, to the point, Dr. Schmidtgoessling explained, that he became habituated to it. Further, according to Dr. Schmidtgoessling, Petitioner was exposed to violence in his own family, with Petitioner's father having admitted to Dr. Schmidtgoessling that he had been physically abusive toward Petitioner's mother. All this affected Petitioner as following, according to Dr. Schmidtgoessling:

> Basically it caused the defendant to become used to seeing violence. Additionally in his case he became – in an environment like that you're either a victim of violence or you become aligned with the people, like gangs, to protect himself. And in his case what he did is became more involved with people who were more violent so as to protect himself. We know he's been doing that since he's been approximately fourteen or fifteen years old, from what we've been able to put together.

(*Id.* at 1708-09.)

The last area of testimony that Dr. Schmidtgoessling covered detailed Petitioner's history of psychological treatment. Dr. Schmidtgoessling testified about Petitioner receiving treatment at Millcreek for one month during 1988. Records revealed, according to Dr. Schmidtgoessling,

106

that Petitioner was suffering from major depression with psychotic features, that Petitioner reported hearing voices that told him to harm himself, that Petitioner was treated with antidepressant medication, after which he improved after a month, was released, and was recommended for follow-up treatment at the Central Community Health Board.  Dr. Schmidtgoessling was unable to confirm whether Petitioner actually availed himself of that after-care treatment.  Dr. Schmidtgoessling reiterated that during the same time period, a brother of Petitioner's also was hospitalized at University Hospital for depression.  Dr. Schmidtgoessling proceeded to explain that Petitioner, who was twenty years of age, was diagnostically young. Because younger people are "not considered to have a fully crystallized personality or fully set personality," according to Dr. Schmidtgoessling, "it's usually – late twenties is when you usually start applying diagnoses that you feel have reliability." (*Id.* at 1711.)  That said, Dr. Schmidtgoessling emphasized that the depression from which Petitioner was suffering was not just "average" depression that everyone may experience; rather, it was much more severe, affecting Petitioner's functioning in a significant fashion.  (*Id.* at 1723.)  Dr. Schmidtgoessling also testified that notwithstanding the foregoing, as well as the offenses of which Petitioner was convicted, she was of the view that Petitioner possessed the capacity to develop job skills, to better himself academically, and to benefit from individualized attention that prisons often offer in the way of vocational and educational programs.

In closing arguments, defense counsel emphasized why Petitioner's youth was a mitigating factor; all the reasons that Petitioner's family life and violent surroundings mitigated in favor of a sentence less than death; Dr. Schmidtgoessling's observations and conclusions; the many positive programs from which Petitioner could benefit in prison; and Petitioner's sincerity

107

in his unsworn statement. (Tr. Vol. XII, at 1737-1752.) The jury began deliberating around 11:30 a.m., adjourned for the day around 6:00 p.m., resumed deliberating the following morning, and returned its sentencing verdict around 3:00 p.m. The foregoing precludes any argument that trial counsel *completely* failed to investigate or present mitigation. Accordingly, this Court will "closely evaluate" whether Petitioner's attorneys "exhibited specific deficiencies that were unreasonable under prevailing professional standards." *Beuke*, 537 F.3d at 643.

The Sixth Circuit has addressed on countless occasions claims alleging ineffective assistance for the failure to investigate and call additional family members to testify in mitigation and/or to better prepare the family members who did testify at mitigation. In *Carter v. Mitchell*, 443 F.3d 517, the only mitigation that defense counsel presented consisted of the petitioner's own statement detailing a troublesome stepfather, problems with anger, and a recent conversion to religion. *Id*. at 530. The petitioner claimed that his defense counsel should have investigated and called family members to testify about the petitioner's troubled background, abuse of drugs and alcohol, history of violent behavior, experience with racial prejudice, and influence by an alcoholic and philandering father. In support, the petitioner presented affidavits by his mother, step-father, sister, younger brother, older brother, half-sister, and paternal aunt. The Sixth Circuit found neither deficient performance nor prejudice. The Sixth Circuit could not find deficient performance because the three family members whom counsel failed to contact would have offered little personal insight into the problems described by the petitioner, because there was no allegation that counsel failed to contact the other four family members, and because the petitioner presented no evidence as to what counsel did in the way of investigation. *Id*. at 530-31. The Sixth Circuit went on to find that even assuming counsel had performed deficiently, the

petitioner could not demonstrate that he was prejudiced because the testimony that the

petitioner's family members were prepared to give was either cumulative to the petitioner's own

statement or too damaging to be of much value in mitigation. *Id*. at 531-32.

In *Clark v. Mitchell*, 425 F.3d 270 (6th Cir. 2005), the mitigation presented on behalf of

the petitioner consisted of testimony by an expert, Dr. Kisin, and the petitioner's mother.

Petitioner claimed in habeas that his attorneys were ineffective for failing to investigate and call

additional family members and offered in support affidavits by two mental health experts and

numerous family members. The Sixth Circuit rejected his claim, explaining:

> Our cases reject a requirement that any later-identified cumulative mitigating
> evidence must have been introduced in order for counsel to be effective. As this
> court recently explained, "to establish prejudice, the new evidence that a habeas
> petitioner presents must differ in a substantial way–in strength and subject
> matter–from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400
> F.3d 308, 319 (6th Cir. 2005). This court also held in *Smith v. Mitchell*, 348 F.3d
> 177, 200-02 (6th Cir. 2003), that a petitioner was not prejudiced by his counsel's
> failure to introduce additional mitigating evidence at sentencing where new
> evidence sought to be introduced was merely cumulative to that which had
> already been presented at mitigation.

*Clark*, 425 F.3d at 286. The Sixth Circuit went on to explain that, "[w]hile the opinions of Dr.

Gelbort and Dr. Kandiko, as well as the affidavits from Clark's family, provide further

mitigating details about Clark, they do not significantly expand upon the information that was

available to the jury." *Id*. at 287.

In *Martin v. Mitchell*, 280 F.3d 594 (6th Cir. 2002), trial counsel gave no opening

statement, and then presented testimony by a probation officer (for the purpose of admitting a

presentence investigation report into evidence), the petitioner's mother, and the petitioner's

grandmother. The petitioner argued that counsel were ineffective for failing to conduct an

adequate investigation into the petitioner's background, failing to contact additional family

members, and failing to collect records concerning the petitioner's medical and mental health, education, employment, and juvenile incarceration. In support, the petitioner provided affidavits by eight family members averring that they would have testified had they been contacted but otherwise failing to set forth what they would have testified to. The petitioner's mother, who stated in her affidavit that she was not prepared for what to testify to during the sentencing hearing, nonetheless provided testimony concerning the following during the sentencing hearing: the petitioner's problems with juvenile court and in school; the petitioner's juvenile institutionalization; her being on welfare during the petitioner's youth; the lack of financial support that she received from the petitioner's father; the petitioner's abnormal behavior during school; psychiatric testing that the petitioner received at school; abuse that the petitioner suffered at the hands of his mother's alcoholic husband; physical and psychological injuries that the petitioner suffered as the result of a gas explosion; the petitioner's dropping out of school in order to work for money to buy adequate clothing; and the petitioner's employment history. Following her testimony, when defense counsel stated that they had no further witnesses, the trial court asked if there were any family members or acquaintances in the courtroom, including the petitioner's father, who wished to testify on behalf of the petitioner. Subsequently, the petitioner's grandmother took the stand and testified that she had cared for the petitioner when he was an infant and again when he was five or six years old; that the petitioner wanted to go to church with her during that latter period; that she cooked for the petitioner and his siblings because they did not seem to have adequate food due to a lack of financial support from the petitioner's father; that the petitioner's mother had a difficult time raising her kids because of her asthma and inability to work steadily; and that the petitioner did not have a typical or tight

relationship with his father. In closing arguments, defense counsel argued essentially that society had cast the petitioner aside at a young age and that if he was to be institutionalized, they (society) needed to improve. The record contained evidence that the petitioner, at times, was uncooperative with his counsel.

The Sixth Circuit proceeded to address Martin's ineffective assistance of counsel claim by first examining a host of previous decisions addressing similar claims. *Martin*, 280 F.3d at 611-12. Ultimately, the Sixth Circuit found that because counsel presented something in the way of mitigation and conducted some, albeit not exhaustive, investigation, there was no constructive denial of counsel. *Id.* at 613. Following a review of omitted information about the petitioner proffered by a mental health expert, the Sixth Circuit went on to find that counsel did not perform deficiently for failing to investigate and present that information because "the testimony of Martin's mother and grandmother did discuss most, if not all, of the factors in [Dr. Schmidtgoessling's] affidavit." *Id.* at 614. The Sixth Circuit reasoned that even if that information had not been presented within the context of an expert's opinions and conclusions, it nonetheless was sufficiently presented to the jury, not only through the testimony of the petitioner's mother and grandmother but also through the presentence investigation report and psychological evaluation that went to the jury. The Sixth Circuit also held that the petitioner could not demonstrate prejudice because family members did not set forth in the affidavits that petitioner submitted what information they would have testified to and because, as noted earlier, substantial background information concerning the petitioner was presented to the jury.

Viewed against this authority, the Court concludes that the record in this case does not support a finding that Petitioner's counsel performed unreasonably and to Petitioner's prejudice

111

for failing to call additional family members to testify in mitigation and/or for failing to better

prepare those family members who did testify at mitigation. As in *Carter* and *Martin*, the record

demonstrates that counsel did investigate and present mitigating evidence, the substance of

which was akin to that which Petitioner faults counsel for failing to investigate, develop, and

present. The Court previously noted above that the record contains evidence that trial counsel

sought funds at an early stage during the pretrial proceedings for a psychologist to assist with

mitigation preparation, and obviously interviewed numerous relatives and otherwise investigated

Petitioner's background. At the mitigation hearing, trial counsel delivered an opening statement

urging the jury to consider Petitioner's difficult upbringing and family struggles, Petitioner's

exposure to neighborhood crime and violence, Petitioner's bouts with severe depression and

other mental health problems, and Petitioner's youth. Trial counsel presented numerous relatives

who testified to all of the above. Trial counsel also presented juvenile court officials and Dr.

Schmidtgoessling to provide even more detail about Petitioner's juvenile legal problems, family

struggles, and mental health problems. The foregoing precludes any argument that trial counsel

*completely* failed to investigate or present mitigation. The Court accordingly must "closely

evaluate" whether Petitioner's attorneys "exhibited specific deficiencies that were unreasonable

under prevailing professional standards." *Beuke*, 537 F.3d at 643. The Court answers that

inquiry in the negative and finds that Petitioner's attorneys did not perform deficiently in

connection with their mitigation investigation and presentation.

This is not a case such as *Williams v. Taylor*, 529 U.S. 362 (2000) or *Wiggins v. Smith*,

where counsel's initial mitigation investigation produced obvious leads that they then in turn

failed to pursue. In the instant case, the Court is not persuaded that defense counsel's mitigation

112

investigation produced evidence that a reasonable attorney would have known to probe further. Through their own investigation, as well as that of Dr. Schmidtgoessling and the social workers who assisted her, Petitioner's trial counsel uncovered all of Petitioner's juvenile run-in's with law, including his stay at Hillcrest. As for Petitioner's allegation that defense counsel's investigation into the depth of his mental health deficiencies fell short, the record demonstrates that Petitioner stayed at Millcreek only once for a month in duration, and that the records from Millcreek were not such as to alert a reasonable attorney of the need to probe further into whether Petitioner suffered from more significant mental health problems.

Petitioner's argument that defense counsel performed deficiently because "[t]he mitigation testimony presented was misleading, contradictory, and inaccurate" also falls short. (ECF No. 194, at 108.) It is true, as Petitioner asserts, that the various family members who testified often presented conflicting accounts–from Petitioner's relationships with his mother and father, to the degree of care that Petitioner's mother provided to her children, to Petitioner's involvement with drugs and alcohol. The record demonstrates, however, that that was not the result of deficient investigation and preparation on the part of defense counsel. Rather, it was the product of reality. As Dr. Schmidtgoessling explained during her testimony, it is not uncommon, when it comes to the subject of negative information, for family members to be protective, unaware, or in denial about other family members' problems. If Petitioner is suggesting that his defense counsel were constitutionally deficient for failing to guide family members into uniformly emphasizing everything negative about Petitioner's upbringing and uniformly omitting anything positive about Petitioner's upbringing, his suggestion is not well taken.

Even assuming trial counsel performed deficiently–a determination this Court is not

113

making–the Court further finds that Petitioner was not prejudiced. First, the information that Petitioner presented in postconviction, consisting of two-page affidavits by Petitioner's mother and three aunts, sets forth very little substantive information, especially in comparison to the information that defense counsel did present during Petitioner's mitigation hearing. (J.A. Vol. VIII, at 2298-2305.) Second, although not "cumulative" in the sense that it was word-for-word duplicative, there was considerable overlap between the omitted information that Petitioner's mother and aunts purportedly could have provided and the information that was presented. This Court is of the view that what purportedly was omitted was not so substantially different from what was presented that it can be said that but for counsel's failure to present the omitted information, there is a reasonable probability that the jury would have returned a life sentence. *See, e.g., Beuke v. Houk*, 537 F.3d at 645 (finding that although some of the omitted evidence in mitigation, such as the petitioner's low self-esteem and the degree of his parents' sheltering him, was not cumulative, "this non-cumulative evidence is not powerful mitigating evidence that is reasonably likely to have changed the jury's recommendation of death.")

Petitioner's case is distinguishable from those in which the Sixth Circuit found ineffective assistance of counsel for the failure to investigate and present additional mitigation evidence. The Sixth Circuit has found ineffective assistance where counsel failed to present any evidence or arguments in mitigation. *See e.g., Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997); *Hamblin v. Mitchell*, 354 F.3d 482, 490 (6th Cir. 2003); *Rickman v. Bell*, 130 F.3d 1150, 1157 (6th Cir. 1997) (prejudice inferred because deficiencies were so severe); *Groseclose v. Bell*, 130 F.3d 1161, 1166 (6th Cir. 1997). But Petitioner's is not such a case. In *Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005), the Sixth Circuit found ineffective assistance where counsel limited their

114

mitigation investigation to telephoning the petitioner's mother and brother; sending requests for information to institutions where the petitioner had been confined; interviewing the petitioner, the petitioner's co-defendant, and two state witnesses; declining to obtain a mental health expert despite indications from the petitioner's mother of mental problems; and failing to adequately investigate the petitioner's background despite indications of a troubled childhood. Even that case is distinguishable because here, Petitioner's counsel certainly did more in the way of investigation and presentation and because there is no indication in the record that there were any glaring or obvious leads that Petitioner's counsel inexplicably failed to follow up with during their investigation. The Court is not persuaded that Petitioner's defense counsel performed deficiently and to his prejudice by failing to conduct an adequate investigation or failing to better present the family member/lay witnesses who testified at the mitigation hearing.

The Court turns next to the mitigation-phase ineffectiveness claims that Petitioner raised on direct appeal to the Ohio Supreme Court–namely, those allegations comprising sub-parts (4) and (5) of his twelfth ground for relief–arguing respectively that counsel were ineffective for failing to object to the trial court's repeated use of the word "recommend" in describing the jury's sentencing verdict and for failing to object to numerous instances of misconduct during the prosecution's mitigation-phase closing argument. Petitioner included those claims of ineffective assistance of counsel in his ninth proposition of law:

> Ninth Proposition of Law: Where the acts and omissions of counsel at a criminal trial fall below an objective standard of reasonableness to the prejudice of their client, who is convicted and sentenced to death, then the client has been deprived of the effective assistance of counsel in violation of his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments, and Art. I Secs 9 and 10 of the Ohio Constitution, and his conviction and death sentence must be revoked.
>
> A.    Failure to object to the penalty phase arguments of the state.

B.    Failure to object to the prosecutors' guilt phase arguments.

C.    Failure to object to leading questions by the prosecutors.

D.    Failure to object to the prosecution adducing evidence as to the nonexistence of a statutory mitigating factor (R.C. § 2929.04(B)(3)).

E.    Failure to object to the use of the word "recommend" in the instructions and verdict forms.

F.    Failure to object to improper redirect questions.

The Ohio Supreme Court rejected Petitioner's ineffectiveness claims as follows:

> In his ninth proposition, Hill claims his counsel was ineffective during his trial. However, reversal of a conviction or sentence on ineffective assistance requires that the defendant show, first, that "counsel's performance was deficient" and, second, that "the deficient performance prejudiced the defense * * * so as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

> Hill fails to establish his counsel's performance fell "below an objective standard of reasonable representation." *State v. Bradley*, at paragraph two of the syllabus. Counsel need not raise meritless issues such as those in several propositions. Counsel's decision not to object to the prosecutor's guilt or sentencing phase arguments represented a reasonable tactical choice, as did not objecting to the form of questions. The prosecutor did not improperly lead witnesses. Nor was the scope of redirect beyond that of the cross-examination. Also, objections " 'tend to disrupt the flow of a trial' " and " 'are considered technical and bothersome' " by a jury. *State v. Campbell*, 69 Ohio St.3d at 53, 630 N.E.2d at 352. In sum, Hill has not rebutted the applicable "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland, supra*, at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

> Nor has Hill demonstrated prejudice–"a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraph three of the syllabus. The evidence of guilt was compelling; hence, his complaints about issues like question format are inconsequential.

*Hill*, 75 Ohio St. 3d at 211-12.

The issue before the Court is whether the Ohio Supreme Court's decision above contravened or unreasonably applied clearly established federal law or relied on an unreasonable determination of the facts. This Court is of the view that it did not. Initially, this Court rejects Petitioner's argument urging it to review Petitioner's "recommendation" claim *de novo*, rather than through the constrictive prism of § 2254(d). Petitioner reasons that although the Ohio Supreme Court ruled on the merits of his claim that his counsel were ineffective for failing to object to the use of the term "recommendation," *de novo* review by this Court is warranted because "[t]here was no further discussion of this claim, and no indication that Ohio courts considered the claim of ineffective assistance under federal law." (ECF No. 194, at 117.) Petitioner's argument is foreclosed by United States Supreme Court precedent, although the Court recognizes that Petitioner did not have the benefit the precedent when he raised his argument advocating for *de novo*. In *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011), the Supreme Court made clear "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.' " In so holding, the Supreme Court emphasized that § 2254(d) contains no requirement that a state court decision rejecting a claim include a statement of reasons, contains no requirement that a state court cite to or even be aware of federal decisions, and permits a presumption that an unexplained state court decision was on the merits absent a statement or suggestion to the contrary. *Id*. at 784-85. Thus, Petitioner's argument is not well taken and this Court reviews the Ohio Supreme Court's decision rejecting the instant ineffective assistance claim for unreasonableness under § 2254(d).

Notwithstanding the foregoing, Petitioner's claim fails under any standard of review. As this Court recently discussed in *Loza v. Mitchell*, 705 F. Supp. 2d 773 (S.D. Ohio 2010), the

Sixth Circuit has consistently rejected claims challenging the use of the word "recommendation"

in mitigation-phase jury instructions or verdict forms. This Court explained:

> The Sixth Circuit noted in *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001),
> that "[i]n decisions subsequent to *Caldwell*, the Supreme Court has reiterated that
> '[t]o establish a *Caldwell* violation, a defendant necessarily must show that the
> remarks to the jury improperly described the role assigned to the jury by local
> law.' " *Buell*, 274 F.3d at 353 (quoting *Dugger v. Adams*, 489 U.S. 401, 407, 109
> S.Ct. 1211, 103 L.Ed.2d 435 (1989)). *See also Mapes v. Coyle*, 171 F.3d 408,
> 414 (6th Cir. 1999) ("in order to make out a *Caldwell* violation, a defendant must
> show that the prosecutor or trial judge improperly described the jury's role under
> state law in order to 'water down' its responsibility."); *Kordenbrock v. Scroggy*,
> 919 F.2d 1091, 1101 (6th Cir. 1991) (same). Accordingly, in *Buell*, the Sixth
> Circuit found that the trial court's instruction to the jury that its sentencing verdict
> would be a recommendation and that the final decision rested with the trial court
> did not violate *Caldwell* because the instruction complied with the letter of Ohio
> law, described with accuracy the jury's role in the sentencing process, and did not
> diminish the jury's sense of responsibility, as had been done in *Caldwell*. *Buell*,
> 274 F.3d at 353.

*Loza*, 705 F. Supp. 2d at 869. Ohio law similarly forecloses challenges to the use of the word

"recommendation" in describing a capital jury's sentencing verdict. *State v. Hughbanks*, 99

Ohio St. 3d 365, 382-83 (2003) (and citations therein); *State v. LaMar*, 95 Ohio St. 3d 181, 206-

07 (2002); *State v. Mills*, 62 Ohio St. 3d 357, 375 (1992); *State v. Williams*, 23 Ohio St. 3d 16,

21-22 (1986). In short, if it was not error for the trial court to have used the word

"recommendation" in describing to the jury its sentencing verdict, then it was not ineffective

assistance for Petitioner's trial counsel to have failed to object to the statements or instructions.

Accordingly, the Ohio Supreme Court's decision finding no ineffectiveness was not

unreasonable within the meaning of 28 U.S.C. § 2254(d).

As for Petitioner's argument that his trial counsel performed deficiently and to his

prejudice by failing to object to instances of misconduct during the prosecutors' mitigation-phase

closing arguments, Petitioner's claim is without merit and the Ohio Supreme Court's decision

118

finding the same was not unreasonable. This Court considered and rejected the claimed instances of mitigation-phase prosecutorial misconduct in its discussion rejecting Petitioner's tenth ground for relief. That being so, the Court cannot find that Petitioner's trial counsel rendered ineffective assistance for failing to object to those claimed instances of mitigation-phase prosecutorial misconduct, much less that the Ohio Supreme Court's decision finding the same was unreasonable.

In sum, the Court is not persuaded that Petitioner's trial counsel provided ineffective assistance in any instance claimed by Petitioner above. The Ohio Supreme Court's decision rejecting the latter two claims of ineffective assistance did not run afoul of § 2254(d). Accordingly, Petitioner's twelfth ground for relief is **DENIED**.

G. **Seventeenth Ground for Relief: Mr. Hill was incompetent during his direct appeals.**

(Second Amended Petition, ECF No. 137-2, at ¶ 221 (argued twelfth in the second amended petition).) Petitioner asserts simply that he "remained incompetent during his appeals process, because his mental problems have, according to Dr. Smith, persisted through the present." (*Id.*)

In the Amended Return of Writ, Respondent first asserts that Petitioner presented his claim to the state courts as an appellate counsel ineffective assistance claim in an untimely App. R. 26(B) application but acknowledges that this Court previously rejected any argument that the claim was procedurally defaulted. (ECF No. 154, at 73-74.) Respondent proceeds to argue that the precise issue before the Court is determining whether the Ohio courts' decision rejecting any claim that Petitioner was incompetent on direct appeal contravened or unreasonably applied clearly established federal law, as set forth in *Drope v. Missouri*, 420 U.S. 162, 179-181 (1975); *Pate v. Robinson*, 383 U.S. 375, 385-86 (1966); and *Dusky v. United States*, 362 U.S. 402, 402

119

(1960). Finally, Respondent argues that Petitioner's claim is without merit. According to

Respondent, Petitioner must demonstrate by clear and convincing evidence a real, substantial and

legitimate doubt as to his competence. To that point, Respondent asserts that the Ohio courts'

implicit finding that Petitioner was competent at the time of his trial and direct appeal is fairly

supported by the record and accordingly entitled to a presumption of correctness in habeas

corpus. Respondent continues that although Petitioner presented evidence in the state courts

about the existence of certain mental health conditions, Petitioner did not present sufficient

evidence to support a conclusion that mental health conditions prevented him from participating

in his direct appeal. Petitioner remains unable, Respondent concludes, to overcome the

presumption that Petitioner was able to consult with his appellate counsel and that he understood

the nature of the appellate process.

In his traverse, Petitioner begins by arguing that this Court must review his claim not

through the prism of § 2254(d), but *de novo*, because the Ohio Supreme Court rejected the claim

without any reasoning. (ECF No. 194, at 125.) Petitioner explains that he raised this claim not

only in a successor postconviction action but also in his Ohio R. App. 26(B) application for

delayed reopening–the procedure in Ohio for raising claims of ineffective assistance of appellate

counsel. According to Petitioner, "[t]he Supreme Court of Ohio rejected his application without

specifically addressing this claim." (*Id.*) "Because the Ohio courts did not address the merits of

Hill's federal claim," Petitioner concludes, "AEDPA's limitations [set forth in] 28 U.S.C. §

2254(d) are not warranted, and Hill is entitled to *de novo* review of his claim." (*Id.*)

Relying on *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003); and *Carter v.
Bradshaw*, 583 F. Supp. 2d 872 (N.D. Ohio 2005), Petitioner asserts that there exists a

constitutional right to be competent on direct appeal that is rooted in common law and the United States Supreme Court's recognition of a due process right to be competent during trial. According to Petitioner, the right further stems from the principle that the rights to direct appeal and to effective assistance of counsel on direct appeal presuppose a right to be competent during that direct appeal.

According to an evaluation that Dr. Robert L. Smith, Ph.D. conducted on Petitioner during his postconviction appeals, "Dr. Smith diagnosed Hill as suffering from Major Depressive Disorder with mood congruent psychotic features, Paranoid Personality Disorder, and Substance Dependence at the time of the offense." (*Id.* at 132.) Further, "[b]ecause Hill did not receive any psychotropic medications or any other form of psychological treatment while awaiting trial or during trial," Petitioner continues, "Dr. Smith concluded that the symptoms of his Major Depressive Disorder with psychotic features and Paranoid Personality Disorder would have persisted through trial." Petitioner's symptomatic belief that people around him, including his attorneys, were conspiring against him, in Dr. Smith's opinion, were likely to have impaired Petitioner's ability to trust his attorneys, to work with them cooperatively, or to understand and contribute to his defense adequately.

In his Response, Respondent first urges the Court to reconsider its decision that Petitioner's claim is not barred by procedural default and next argues in the alternative that Petitioner's claim is without merit. (ECF No. 213, at 23-27.) Citing *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008), Respondent argues that Petitioner's claim that he was incompetent on direct appeal is barred by procedural default because having been raised in a Rule 26(B) application for reopening is the equivalent of not having been raised at all. Respondent reasons

121

that all Petitioner or any other defendant could preserve in a Rule 26(B) application for

reopening are claims of appellate counsel ineffectiveness–nothing else. (ECF No. 213, at 23-25.)

Respondent further asserts that Petitioner "also could not have fairly presented his claim in an

application to reopen his direct appeal, which is limited to the record, when he grounded the

factual bases in evidence outside the record." (*Id*. at 24.)

Turning to the merits of Petitioner's claim, Respondent argues that Petitioner is not

entitled to habeas corpus relief because his claim is without merit. (*Id*. at 25-27.) First,

according to Respondent, Petitioner bases his claim on an unrecognized right that is unsupported

by clearly established federal law as determined by the Supreme Court. To that point,

Respondent asserts that even assuming reliance on lower court decisions could satisfy the burden

that 28 U.S.C. § 2254(d) establishes, Petitioner's reliance on *Rohan* and *Carter* is misplaced. In

any event, Respondent argues, Petitioner has not demonstrated that he was incompetent on direct

appeal. Respondent explains that Dr. Smith's affidavit should not be considered in habeas

corpus because it was never fairly presented to the state courts. Respondent argues in any event

that the affidavit does not establish that Petitioner was incompetent during his direct appeal.

Respondent reasons that Dr. Smith's affidavit post-dated Petitioner's direct appeal by three years

and did not address at all Petitioner's competency on direct appeal or even what would constitute

incompetency on direct appeal.

In response, Petitioner argues that Respondent's motion for reconsideration of this

Court's prior procedural default ruling is not warranted. (ECF No. 214.) First, Petitioner argues

that, "[e]ven assuming that the Warden is correct that Hill did not fairly present Ground 17 to the

state courts, the ineffectiveness of Hill's appellate counsel constitutes cause and prejudice,

thereby excusing any default which may have occurred." (*Id*. at 2.) To that point, Petitioner argues that his appellate counsel clearly performed deficiently and to Petitioner's prejudice by failing to raise Petitioner's competency on direct appeal "as there was overwhelming evidence in the record demonstrating that Hill was suffering from severe mental illness." (*Id*. at 2-3.)

Next, Petitioner argues that it was not improper for him to support his claim with evidence outside the trial record, asserting that "[a]n application for reopening under Rule 26(B) is a collateral proceeding which permits the consideration of evidence outside the record." (*Id*. at 3 (citing *Morgan v. Eads*, 818 N.E.2d 1157, 1159 (Ohio 2004)).) Another reason that it was not improper to offer evidence outside the record, according to Petitioner, is that "when a defendant claims a lack of competence to proceed on appeal, he or she is not asking the court to 'decide the appeal.'" (ECF No. 214, at 4.)

Petitioner's third argument is that this Court correctly determined in its original procedural default ruling that the elements of the *Maupin* test had not been satisfied. Specifically, as Petitioner points out, this Court noted that because the Ohio Supreme Court rejected Petitioner's Rule 26(B) application on the merits, rather than on untimeliness as the appellate court below had, it cannot be said either that Petitioner violated a state procedural rule (the first part of the four-part *Maupin* test) or that the state courts actually enforced the procedural default (the second part of the *Maupin* test). (ECF No. 214, at 4-5.)

Finally, Petitioner reiterates that he was in fact incompetent during his direct appeal of right "[f]or the reasons already stated in Hill's petition and his traverse...." (*Id*. at 5 n.5.)

Even assuming that this Court's determination that Petitioner fairly presented his incompetency-on-direct-appeal claim in his Rule 26(B) application lacked detailed reasoning and

123

even assuming the Court's application of the *Maupin* test amounted to an improper conflation of procedural default and fair presentment, it is immaterial because for the reasons that follow, Petitioner's claim, whether styled as an free-standing claim or as an instance of appellate counsel ineffectiveness, is without merit. Even assuming there exists a right to be competent on appeal– an assumption that is supported at best by persuasive reasoning but not firmly established federal law–Petitioner's claim lacks evidentiary support. That is, the evidence simply does not demonstrate what Petitioner claims it so clearly demonstrates–namely that he was incompetent during his direct appeal proceedings.

As a preliminary matter, the Court must address the issue of whether a criminal defendant enjoys a constitutional right to be competent during direct appeal. It is well settled that a criminally accused has a due process right to be competent for his or her trial. *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Dusky v. United States*, 362 U.S. 402 (1960); *see also Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *Medina v. California*, 505 U.S. 437, 453 (1992). When a defendant's competency is in question, the relevant inquiry is whether that defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. In *Drope v. Missouri*, 420 U.S. 162, 171 (1975), the Supreme Court further stated that competency to stand trial involves "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." It was in *Riggins v. Nevada* that Justice Kennedy explained that, "[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to

124

summon, to confront, and to cross-examine witnesses, and the right to testify on one's own

behalf or to remain silent without penalty for doing so." 504 U.S. 127, 139-140 (1992)

(Kennedy, J., concurring) (citing *Drope*, 420 U.S. at 171-72).

The above demonstrates why a defendant's right to be competent for trial is as obvious as

it is fundamental. A fair trial is impossible if a defendant does not possess sufficient mental

capacity and rational understanding to consult with and assist counsel in preparing his or her

defense. The Ninth Circuit observed that, "[t]he right to competence *after* trial, now addressed

almost exclusively in the context of competence to be executed, has taken a different course" and

largely "remains unsettled." *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 809 (9th Cir.

2003.) Beyond trial but before execution, a case can (and has been) made for the logic of

recognizing at least a statutory right to be competent during collateral proceedings, for

competency is necessary to give effect to any statutory right to counsel during collateral

proceedings. Capital habeas corpus petitioners enjoy a statutory right to counsel, first set forth in

21 U.S.C. § 848(q)(4)(b), which has since been replaced by a virtually identical statute–18

U.S.C. § 3599(a)(2). Thus, as Petitioner points out, in *Rohan*, the Ninth Circuit recognized a

"statutory right to competence in [] federal habeas proceedings." *Id*. at 817. Recognizing a

capital habeas petitioner's statutory right to counsel, the Ninth Circuit reasoned that:

> Counsel's assistance, however, depends in substantial measure on the petitioner's
> ability to communicate with him. And if meaningful assistance of counsel is
> essential to the fair administration of the death penalty and capacity for rational
> communication is essential to meaningful assistance of counsel, it follows that
> Congress's mandate cannot be faithfully enforced unless courts ensure that a
> petitioner is competent."

*Rohan*, 334 F.3d at 813. The Ninth Circuit went on to state that "[i]mplying a right to

competence from a right to counsel breaks no new ground." *Id*.

The Ninth Circuit took it one step further in *Nash v. Ryan*, 581 F.3d 1048, 1055 (9th Cir. 2009), holding there "that the statutory right to competence in capital cases that we recognized in *Rohan* applies to appeals." In so holding, the Ninth Circuit reiterated its observation in *Rohan* that a right to competence is implied from a right to counsel. *Id*. And in *Holmes v. Buss*, 506 F.3d 576, 579 (7th Cir. 2007), the Seventh Circuit held that, *assuming* there exists a right to be competent during habeas corpus, the standard "to govern the issue of competence to litigate or assist in litigation" should be the same as the standard to govern competence to be convicted of a crime or be executed.

The same reasoning that implies a right to competence from a right to counsel during trial and even on collateral attack does not support a right to competence during direct appeal. What distinguishes a trial and collateral attack from a direct appeal, with respect to a need for the accused to be competent, is the nature and extent of participation by the accused that is required. To be clear, at the heart of the right to competency is the need for an accused to be able to communicate with his or her counsel and assist with his or her defense. Because information vital to an accused's defense often resides exclusively in his or her mind, it is essential to his fundamental right to a fair trial that he or she be able to communicate and interact with his or her counsel. A direct appeal, by contrast, is confined to the record and as such, would logically not require any information unknown to anyone but the defendant.

Courts that have considered the level of competency required at various stages of a criminal proceedings have recognized a difference between claims or challenges that require an accused's participation and assistance and claims or challenges that do not. In *Carter v. Bradshaw*, the Sixth Circuit was faced with a habeas corpus petitioner whom several experts had

found could not, due to suffering from schizophrenia, a personality disorder, and hallucinations, fully and articulately communicate with his counsel. In considering whether it was appropriate to appoint a "next friend" to litigate Petitioner's habeas corpus action for him, the Sixth Circuit observed that although a next friend would be of little help "[w]here the factual basis for Carter's claims is locked away exclusively in his memory," a next friend could be of considerable help in litigating other claims that would not require the petitioner's assistance. *Carter*, 644 F.3d 329, 336 (6th Cir. 2011). Similarly, in *Holmes v. Buss*, where the Seventh Circuit assumed without deciding the existence of a right to competency during direct appeal, the Seventh Circuit also concluded that, "[w]hatever the nature of the proceeding, the test should be whether the defendant (petitioner, appellant, etc.) is competent to play whatever role in relation to his case is necessary to enable it to be adequately presented." *Holmes*, 506 F.3d at 579. In sum, the foregoing militates against a finding that criminal defendants enjoy a right to competency during direct appeal and significantly undermines Petitioner's claim.

In any event, even assuming that such a right exists, Petitioner's claim still fails because the evidence fails to demonstrate that he was incompetent during his direct appeal. Petitioner relies on a 1998 affidavit by psychologist Dr. Robert L. Smith. Dr. Smith's affidavit is a part of the instant record (ECF No. 146-2) and the Court will not recount its contents verbatim. Without giving short shrift to Dr. Smith's affidavit–the Court does not question the exhaustiveness of Dr. Smith's document review and evaluation of Petitioner–the Court will highlight portions that demonstrate why Dr. Smith's conclusions fall far short of establishing that Petitioner, during his direct appeal, lacked sufficient ability to consult with his attorneys with a reasonable degree of rational understanding or lacked a rational and factual understanding of the proceedings against

him. *Dusky*, 362 U.S. at 402.  Initially, the Court notes that Dr. Smith evaluated Petitioner in

1998–three years after Petitioner's direct appeal–and courts have discounted collateral evidence

of incompetency produced long after the relevant time period.  *See Black v. Bell*, 664 F.3d 81,

102 (6th Cir. 2011); *Eley v. Bagley*, 604 F.3d 958, 967 (6th Cir. 2010); *Harries v. Bell*, 417 F.3d

631, 636 (6th Cir. 2005).

More to the point, Dr. Smith's evaluation and affidavit did not address squarely the issue

of Petitioner's competency during direct appeal; rather, the central theme of his affidavit appears

to be what efforts and tasks are essential to an adequate mitigation investigation and preparation.

(ECF No. 146-2, at ¶¶ 9-15.)  Dr. Smith described at length Petitioner's various mental disorders

and deficiencies but never drew a definitive nexus between those mental disorders and

Petitioner's alleged incompetency.  Courts have held that neither a diagnosis of mental illness,

*see, e.g., Fitzpatrick v. Bradshaw*, No. 1:06-cv-356, 2009 WL 3734143, at *15 (S.D. Ohio Nov.

5, 2009) (citing *United States v. Miller*, 531 F.3d 340, 349-50 (6th Cir. 2008)),  nor a finding of a

low IQ, *see, Fitzpatrick*, 2009 WL 3734143, at *16 (citing *United States v. Carpenter*, 25 F.

App'x 337, 345 (6th Cir. 2001)), is alone determinative of competency.

Dr. Smith provided an exhaustive description of Petitioner's deprived background,

troubled upbringing, and exposure to and experience with substance abuse, noting that all "were

significant to my psychological and chemical dependency evaluation."  (ECF No. 146-2, at ¶ 19.)

Of particular note is Dr. Smith's description of "[t]he only formal psychiatric treatment that Mr.

Hill received [which] was at approximately age 17."  (*Id.* at p. 6, sub-¶ D.)  Dr. Smith continued:

> At that time, Mr. Hill informed his mother that he was experiencing auditory
> hallucinations and was uncertain whether he could resist the commands to kill
> himself.  Mr. Hill was then taken to Millcreek Psychiatric Center for Children in
> Cincinnati, Ohio.  He was hospitalized for approximately 35 days and was

diagnosed as suffering from Major Depression with Mood Congruent Psychotic Features and Substance Abuse. In an effort at self-treatment, Mr. Hill had started drinking alcohol and smoking marijuana. He acknowledged hearing voices that commanded him to kill himself. It was noted that there were previous suicide attempts.

(*Id.* at sub-¶ E.) Dr. Smith proceeded to describe his initial contact with Petitioner as follows:

During my interview of Mr. Hill, he admitted that the voices continue up to the present time. He had been prescribed several medications since his incarceration including: antipsychotics (i.e. Resperdal, Stelazine); antidepressants (i.e. Desyrel, Prozac, Serzone) and a mood stabilizer, Depakote. Throughout the interview, Mr. Hill was extremely suspicious of anyone in the hallway outside of the exam room and expressed concern that someone was listening to the evaluation. In hushed tones he disclosed that in 1996 or 1997 the voices told him to pour blue paint on his head and place a large plastic bag over his head to asphyxiate himself. In addition, the voices told him to place newspapers around his feet and start a fire. A guard intervened. A short time later, the voices again instructed him to set a fire. He found several materials in a wastebasket and started a fire in compliance with the voices. Mr. Hill explained that if he does not follow the directives of the voices, the voices become louder and more persistent.

(*Id.* at ¶ 21.)

The conclusions that Dr. Smith drew from administrations of several tests fall short of demonstrating that Petitioner was incompetent. For instance, Dr. Smith's observations following administration of the MMPI-2 personality test include that Petitioner's "profile suggests that he is extremely angry and suspicious of those around him"; that Petitioner "is concerned that others will be critical of him and try to take advantage of him"; that "[i]t is likely that he is overtly paranoid with delusions"; that he "is generally depressed and views life as no longer worthwhile"; and that he acknowledged bizarre thoughts "that suggest the presence of delusions and hallucinations." (*Id.* at ¶ 22.) Similarly, in noting that Petitioner's results from the WAIS-R IQ test "indicate[d] that his intellectual functioning falls within the range classified as borderline mental retardation," Dr. Smith cautioned that "[i]t is possible that this score is depressed as Mr.

129

Hill was distracted by the guards in the doorway and was suspicious of their intentions." (*Id.* at ¶ 23.)  From the substance abuse measures that Dr. Smith administered to Petitioner, Dr. Smith conclusions included that Petitioner's use of alcohol was "problematic," that his use of other drugs was a "significant problem," and that he was "chemically dependent." (*Id.* at ¶ 24.)  Dr. Smith continued:

> In assessing Mr. Hill's mental status, it must be noted that there was evidence of a thought disorder, including hallucinations and delusions.  Mr. Hill demonstrates symptoms of paranoia.  He believes that those around him are conspiring against him, including his attorneys.  He described frequent auditory hallucinations commanding him to hurt or kill himself.  He presented below average intellectual functioning and displayed limited insight regarding his actions and resulting consequences.

(*Id.* at ¶ 25.)

Dr. Smith described a connection between Petitioner's mental disorders and his involvement in the offenses, as well as between Petitioner's mental disorders and his qualification for a statutory mitigating factor–but not between Petitioner's mental disorders and his competency. Specifically, Dr. Smith stated that in his professional opinion, to a reasonable degree of psychological certainty, Petitioner's psychological disorders played a significant role in his involvement in the offenses and that he "evidenced symptoms of a Major Depressive Disorder, including mood congruent psychotic features." (*Id.* at ¶ 26.)  Dr. Smith also concluded that the psychotic features included delusions and hallucinations.  Dr. Smith diagnosed Petitioner with three psychological disorders:  Major Depressive Disorder with mood congruent psychotic features, Paranoid Personality Disorder, and Substance Dependence at the time of the offense. (*Id.* at ¶¶ 27-31.)  Dr. Smith proceeded to express his opinion that Petitioner's psychological disorders significantly impaired his ability to appreciate the wrongfulness of his actions and that

130

as a result of his disorders, Petitioner "lacked substantial capacity to appreciate the criminality of his conduct," that he attributed Petitioner's problems to a mental disease or defect within the meaning of the mitigating factor set forth in Ohio Rev. Code § 2929.04(B)(3), and that he would have testified as much at Petitioner's trial. (*Id*. at ¶ 33.)

Further, the only conclusions that Dr. Smith drew about the connection between Petitioner's mental disorders and his ability to interact with his trial attorneys stopped short of opining that Petitioner was incompetent. Specifically, Dr. Smith stated that because Petitioner received no medications or treatment leading up to or during his trial, he would have experienced depression, paranoia, hallucinations, and delusions that "would have impaired Mr. Hill's ability to perceive what was 'real' and identify who in his environment was untrustworthy." (*Id*. at ¶ 34.) Dr. Smith continued that in his opinion, "Mr. Hill's depression, paranoia, hallucinations, and delusions were likely to have impaired his ability to trust his defense counsel, to work cooperatively with them, and to adequately understand and contribute to his own defense." (*Id*. at ¶ 36.) This is not the standard for incompetency. Dr. Smith concluded that in his opinion, Petitioner's psychological disorders continue to present, meaning that "his ability to act in his own defense and to work cooperatively with his attorneys is very limited." (*Id*. at ¶ 37.) This does not satisfy the criteria for a finding of incompetency. Dr. Smith reiterated that Petitioner believed his attorneys were conspiring against him, spoke in hushed tones, and darted his eyes from side to side as he expressed his belief that his attorneys were working with the prosecution. Noting that Petitioner also "evidenced" difficulty concentrating and following instructions, "it is unlikely that Mr. Hill is able to work with his attorneys in formulating his defense." (*Id*. at ¶ 37.) Once again, this is not the standard for incompetency. In sum, Dr. Smith's observations do not

131

establish, incompetency.

Beyond what Dr. Smith observed, which falls short of establishing incompetency, the record contains no actual evidence calling Petitioner's competency into question. In determining whether an accused's competency is in doubt, the Supreme Court stated that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but ... even one of these factors standing alone may, in some circumstances, be sufficient." *Drope*, 420 U.S. at 172. In the instant case, the record reflects none of the above. That is, the record contains no evidence or suggestion that Petitioner's attorneys, the trial court, or the deputies who maintained custody of Petitioner had any question about Petitioner's competency. Nor does the record contain any evidence or suggestion that Petitioner "acted out" or engaged in any irrational behavior, either in the courtroom or while in custody, that would cause a reasonable person to question his competency. Petitioner's unsworn statement, however unpersuasive, demonstrates that he had a rational and factual understanding of the charges and penalty he faced, as well as the criminal proceedings against him. (Tr. Vol. XII, at 1692-1695.) In fact, Dr. Smith in his 1998 affidavit remarked that at the time of his trial, it was likely that the symptoms he was experiencing from his psychological disorders were exacerbated by the stress of being incarcerated and awareness that he was "facing the death penalty." (ECF No. 146-2, at ¶ 35.) Dr. Schmidtgoessling, who evaluated Petitioner to testify at the mitigation hearing, discussed his mental disorders at length but not once expressed a single concern about whether he was competent. (Tr. Vol. XII, at 1695-1727.) Finally, the record contains no medical opinion on Petitioner's competence prior to his trial.

132

This Court is in no position to question Dr. Smith's 1998 diagnosis, or that of the

Millcreek facility that treated Petitioner around age 17, that Petitioner suffered, and may

continue to suffer, from certain psychological disorders. But that is not determinative of the

issue. Courts have consistently stressed that an accused's suffering from one or more mental

disorders does not automatically render him or her incompetent. *Hernandez v. Martel*, 824 F.

Supp. 2d 1025 (C.D. Cal. 2001), was a capital habeas corpus case in which the petitioner's

competence to stand was at issue. The district court ultimately rejected the petitioner's claim of

incompetency as follows:

> Petitioner has submitted a great deal of evidence concerning his mental
> state as part of the evidentiary hearing. This evidence includes testimony that
> petitioner suffers from bipolar mood disorder and organic brain damage. (Record
> citations omitted). Brain damage impairs petitioner's ability to organize and
> recall information, causes petitioner to misperceive emotions and makes it
> difficult for petitioner to modulate his emotional response appropriately. (Record
> citations omitted). This evidence does not suggest, however, that petitioner
> lacked the capacity to understand that he was being tried for capital murder and
> faced the death penalty. While many of petitioner's experts have testified that he
> lacked the capacity to form the requisite intents at the time of the crime, none has
> testified that he was incompetent to stand trial. (Record citations omitted).
> Moreover, none of the experts who evaluated petitioner at the time of trial found
> him incompetent. Petitioner has not met his burden of establishing by a
> preponderance of the evidence that he was incompetent to stand trial.

*Id.* at 1090. *See also Doughty v. Grayson*, 397 F. Supp. 2d 867, 878 (E.D. Mich. 2005) ("That

the petitioner's mental illness cause him some diminished ability to concentrate in general does

not mean that he was not competent."); *Tuttle v. Romanowski*, Case No. 10-cv-11238, 2011 WL

227579, at * 3 (E.D. Mich. Jan. 24, 2011) (holding that because not every mental illness

demonstrates incompetence to stand trial, the evidence must demonstrate an inability to assist

counsel or understand the criminal charges); *Franklin v. Bradshaw*, Case No. 3:04-cv-187, 2009

WL 649581, at *18 (S.D. Ohio Mar. 9, 2009) (Reiterating that "[o]ne may suffer from mental

illness yet still be competent to stand trial[]" and stating "[t]hat Franklin was diagnosed as a paranoid schizophrenic with a borderline personality disorder by Dr. Cherry (record citation omitted) is therefore something to be considered, but not determinative of the question of Franklin's competence during his trial."). Viewed against this landscape, Petitioner's claim that he was incompetent during direct appeal is plainly without merit.

To conclude, Petitioner's claim, whether viewed as a free-standing claim or an instance of appellate counsel ineffectiveness, and whether viewed *de novo* or through the proscriptive lens imposed by 28 U.S.C. § 2254(d), is without merit legally and factually. First, as explained in detail above, Petitioner has not demonstrated that there is statutory or constitutional right to be competent during direct appeal. Even assuming such a right exists, the evidence in this case does not establish that Petitioner was incompetent during his direct appeal. That is, the evidence does not establish that Petitioner, during his direct appeal, lacked sufficient ability to consult with his attorneys with a reasonable degree of rational understanding or lacked a rational and factual understanding of the proceedings against him. *Dusky*, 362 U.S. at 402. For the foregoing reasons, the Court **DENIES** Petitioner's seventeenth ground for relief.

> **H.** **Eighteenth and Nineteenth Grounds for Relief: Mr. Hill lacked effective assistance of counsel during his direct appeals to the Hamilton County Court of Appeals and the Ohio Supreme Court.**

(Second Amended Petition, ECF No. 137-2, at ¶¶ 69-76 (argued third in the second amended petition).) Petitioner argues in his eighteenth and nineteenth grounds for relief that he was denied his right to effective assistance of appellate counsel on his direct appeals to the intermediate appellate court and the Ohio Supreme Court. Specifically, Petitioner asserts that that during both levels of his direct appeals, his attorneys failed, to his prejudice, to preserve

several meritorious arguments. Petitioner highlights trial counsel's failures to investigate and prepare witnesses, Petitioner's alleged incompetency, and prosecutorial misconduct as significant and obvious issues that appellate counsel failed to argue on appeal. Petitioner further argues that he was prejudiced by deficient appellate performance because one of the members of his defense team admitted to being clinically depressed at the time of Petitioner's appeal and eventually (years after Petitioner's appeal) resigned from the practice of law after the Ohio Supreme Court Board of Commissioners on Grievances and Discipline determined that he had mishandled client funds and deliberately misled the Board during its investigation.

In the Amended Return of Writ, Respondent begins by recounting this Court's conclusion in its 2006 procedural default decision that Petitioner's claims of ineffective assistance of appellate counsel are properly before the Court only to the extent that Petitioner presented them to the Ohio Supreme Court in his Ohio R. App. P. 26(B) application for delayed reconsideration–the procedure in Ohio for raising claims of ineffective assistance of appellate counsel. (ECF No. 154, at 47-48.) Respondent proceeds to argue that Petitioner's claims are without merit. (*Id.* at 48-53.) Relying on *Jones v. Barnes*, 463 U.S. 745, 752-53 (1983); and *Smith v. Murray*, 477 U.S. 527, 535-36 (1986), Respondent asserts that competent counsel has no duty to raise every conceivable non-frivolous issue. Against that backdrop, Respondent asserts that the adequacy of appellate counsel's conduct is apparent from a review of the issues that appellate counsel did raise on direct appeal–issues including prosecutorial misconduct, admission of prejudicial photographs, ineffective assistance of trial counsel, suppression of favorable evidence, weight and sufficiency of the evidence, erroneous jury instructions, the adequacy of Ohio's appellate process, disproportionate sentencing, flaws in the sentencing entry, and the constitutionality of

135

Ohio's death penalty. Respondent argues that Petitioner is unable to demonstrate that appellate

counsel's choice of which issues to raise and which to omit was anything but a strategic decision

to focus on the strongest issues. Respondent further argues that, as demonstrated in connection

with Petitioner's twelfth ground for relief, the omitted issues that Petitioner champions now as

more significant and obvious were meritless. With respect to Petitioner's assertion that he was

prejudiced by the presence of clinically depressed member of his appellate team, Respondent

asserts that Petitioner points to no actual instances where attorney Chuck Stidham's appellate

performance was compromised by his *subsequent* problems. This is especially so, Respondent

continues, because Petitioner was represented on direct appeal by Stidham and another attorney,

H. Fred Hoefle.

Petitioner begins his reply by disputing Respondent's argument that counsel has no duty

to raise every non-frivolous issue. According to Petitioner, "[t]he need for winnowing issues is

almost non-existent in capital litigation due to the continuing evolution of law." (ECF No. 194,

at 136 (citing *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999).) Petitioner reasons that "[t]he

Supreme Court has long recognized that the direct appeal is the primary vehicle for challenging a

criminal (especially capital) defendant's claims that he was denied due process and a fair trial or

any other deficiency with his trial, including the denial of the effective assistance of trial

counsel." (ECF No. 194, at 137.) Petitioner proceeds to highlight certain issues that, in his

view, counsel omitted in favor of issues that were weaker and less obvious. Those issues

included claims alleging racial discrimination in the county's grand jury selection process,

improper "unanimity" penalty-phase jury instructions, racial discrimination in the prosecution's

use of its peremptory challenges, culpability-phase and penalty-phase ineffective assistance of

counsel, other non-specific improprieties in the culpability-phase and penalty-phase jury

instructions jury instructions, suppression by the prosecutors of exculpatory evidence; and

Petitioner's incompetence during his trial and direct appeals. (*Id.* at 139-140.) In a footnote,

Petitioner mentions that he "did not specifically challenge the sentencing instructions at the end

of the guilt-innocence phase in his *Murnahan* petition, independent of his claim of ineffective

assistance of trial counsel and his challenge to the mitigation-phase instructions[]" due to "the

page limitation imposed by App. R. 26(B)." (ECF No. 194, at 140 n. 10.)

In a response to Petitioner's traverse, Respondent argues that Petitioner cannot meet the

burden imposed by 28 U.S.C. § 2254(d) because he cannot demonstrate that the Ohio Supreme

Court misapplied *Strickland* in rejecting his claims of appellate counsel ineffectiveness. (ECF

No. 213, at 27-28.) Asserting that the claims Petitioner now champions are not stronger than

those that appellate counsel did raise, Respondent insists that Petitioner can show neither

deficient performance on the part of his appellate attorneys nor prejudice from their performance.

The Court begins by making explicitly clear what claims of ineffective assistance of

appellate counsel are properly before the Court and which are not. That determination begins

and ends with the App. R. 26(B) applications for delayed reopening that Petitioner filed in the

state courts. Only those claims of appellate counsel ineffectiveness that Petitioner presented in

those applications to both the court of appeals and the Ohio Supreme Court may be considered

here. As the Court proceeds to consider each of the appellate counsel ineffectiveness claims that

Petitioner advances in the instant petition, the Court will constrict its consideration of each claim

to the precise claim that Petitioner presented to the state courts.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987).

Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986)(quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). Of course, not every decision made by appellate counsel can be insulated from review merely by categorizing it as strategic. The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

A.    Were the omitted issues "significant and obvious?"

B.    Was there arguably contrary authority on the omitted issues?

C.    Were the omitted issues clearly stronger than those presented?

D.    Were the omitted issues objected to at trial?

E.    Were the trial court's rulings subject to deference on appeal?

F.    Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

G.    What was appellate counsel's level of experience and expertise?

H.    Did the petitioner and appellate counsel meet and go over possible issues?

I.    Is there evidence that counsel reviewed all the facts?

J.    Were the omitted issues dealt with in other assignments of error?

K.    Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d at 427-28. The Sixth Circuit cautioned, however, that this list is not exhaustive and need not produce a certain "score." *Id.* at 428.

138

In sum, to establish a claim of ineffective assistance of counsel, Petitioner must show

both deficient performance on the part of his appellate attorneys and prejudice from the deficient

performance:

> First, the defendant must show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. at 687. With respect to the first prong of the *Strickland* test,

the Court notes that, "[b]ecause of the difficulties inherent in making the evaluation, a court must

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." *Id.* at 689. To establish the second prong of the *Strickland* test, *i.e.*,

prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for

counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Court has already considered and rejected several instances of appellate counsel

ineffectiveness alleged by Petitioner in the instant claims. The Court will not revisit those

appellate counsel ineffectiveness claims. In its September 27, 2006 *Opinion and Order*, this

Court concluded in several instances that Petitioner had not demonstrated ineffective assistance

of appellate counsel for the failure to raise certain issues. First, the Court concluded that

appellate counsel had not performed deficiently or to Petitioner's prejudice for failing to raise

culpability-phase trial counsel ineffectiveness for counsel's failure to find, interview, and prepare

witnesses; counsel's failure to request a pathologist and criminalist; counsel's failure to request a

lesser included instruction; counsel's making inappropriate remarks during *voir dire*; counsel's

decision to call Petitioner to testify; and counsel's failure to assert *Batson* challenges. (ECF No. 151-1, at 26-36; ECF No. 151-2, at 1-4.) In that decision, the Court also concluded that appellate counsel had not been ineffective for failing to allege *Brady* violations concerning information recounted by probation officer Linda Phillips indicating that the baby's death was an accident and the fact that the police administered polygraph tests to both Petitioner and Teresa Dudley– the mother of the victim. (ECF No. 151-2, at 26-31.) Further, the Court concluded that appellate counsel had not been ineffective for failing to argue that the prosecutors had used three of their peremptory challenges to strike African-American jurors. (ECF No. 151-2, at 35-36.) Finally, the Court also concluded that appellate counsel had not been ineffective for failing to argue on appeal that the grand jury and grand jury foreperson selection process was tainted by racism. (ECF No. 151-3, at 27-29.)

In the instant decision, the Court also concluded, in denying Petitioner's twelfth ground for relief, that Petitioner's trial counsel did not provide ineffective assistance during the mitigation phase for the failure to investigate and prepare witnesses, for the failure to object to jury instructions, or for the failure to object to the prosecution's closing arguments. If those trial counsel ineffectiveness claims are without merit, then it stands to reason that there was neither deficient performance, nor prejudice, stemming from appellate counsel's failure to raise those trial counsel ineffectiveness claims on direct appeal. That is especially so if those trial counsel ineffectiveness claims relied on non-record evidence, in which case appellate counsel could not logically have raised those claims on direct appeal based solely on the trial record. Also in the instant decision, this Court rejected Petitioner's claims that he was incompetent to validly execute either a *Miranda* waiver or a consent to search and that he was incompetent during his

140

direct appeals. In so ruling, this Court considered evidence concerning Petitioner's competency not only during his direct appeals but also before and during trial. For the reasons the Court discussed more fully in rejecting Petitioner's first and seventeenth grounds for relief, this Court concludes that appellate counsel did not perform deficiently or to Petitioner's prejudice for failing to raise a claim that Petitioner was incompetent during both phases of his trial. That is especially so to the extent such a claim relied on non-record evidence, in which case appellate counsel could not logically have raised that claim on direct appeal based solely on the trial record. Finally, as explained more fully below in connection with Petitioner's twentieth ground for relief, the Court rejects Petitioner's claim challenging the constitutionality of Ohio's proportionality review. For those reasons, the Court concludes herein that appellate counsel did not perform deficiently or to Petitioner's prejudice in failing to raise a claim challenging the manner in which Ohio conducts proportionality review.

The Court turns now to the remainder of the claims of ineffective assistance of appellate counsel that are properly before the Court.

### 1. Penalty-Phase Unanimity Instruction.

Petitioner argues that his appellate counsel performed unreasonably and to Petitioner's prejudice in failing to raise a claim challenging the trial court's penalty-phase unanimity instruction. Petitioner argued as follows before the Court of Appeals for the First Appellate District:

> During the penalty phase of Mr. Hill's case, the trial court incorrectly stated that the jury's recommendation – of either death or life imprisonment – must be unanimous. This defective instruction violated Mr. Hill's Eighth and Fourteenth Amendment rights under the United States Constitution to be free from deprivation of life without due process of law.

141

Under R.C. §2929.03(D)(2) only a recommendation for the death penalty must be unanimous. A recommendation for any life sentence opinion need not be unanimous. *State v. Brooks* (1996), 75 Ohio St.3d 148; *State v. Springer* (1992), 63 Ohio St.3d 167.

The trial court erred when it informed Mr. Hill's jury that it would take all 12 signatures on the life sentence verdict form. (T.p. 1772.) The jury should have been instructed that if it was unable to reach a unanimous verdict as to death, then the jury was required to return a recommendation of life. This fatal error in Mr. Hill's case must be remedied. *Mapes v. Coyle* (C.A. 6, 1999), 171 F.3d 408; *Scott v. Anderson* (N.D. Ohio Sept. 30, 1998), 1998 WL 1086056; *Henderson v. Collins* (S.D. Ohio August 4, 1999), No. C-1-94-106 (See Exhibits A, B).

(J.A. Vol. XVII, at 9-10.)

Petitioner argued as follows before the Ohio Supreme Court:

During the penalty phase of Mr. Hill's case, the trial court stated that the jury's recommendation of *either* death or life imprisonment must be unanimous. This defective instruction violated Mr. Hill's Eighth and Fourteenth Amendment rights under the United States Constitution to be free from deprivation of life without due process of law. Mapes v. Coyle, 171 F.3d 408 (6th Cir. 1999); Henderson v. Collins, No. C-1-94-106 (S.D. Ohio, 1999). The instruction did not inform the jury of what action it should take if it did not agree upon a verdict and violated Ohio Rev. Code § 2929.03(D)(2), which states that only a recommendation for death must be unanimous.

Indeed, in the State of Ohio a "solitary juror" may prevent the imposition of the death penalty by finding that the aggravating circumstances do not outweigh the mitigating factors beyond a reasonable doubt. State v. Brooks, 75 Ohio st. 3d 148, 661 N.E.2d 1030 (1996); State v. Springer, 63 Ohio St.3d 167, 586 N.E.2d (1992). The trial court erred when it misinformed Mr. Hill's jury that it would take all twelve juror signatures on the life verdict form. (T.p. 1772).

(J.A. Vol. XX, at 32.) The jury instruction at issue, as Petitioner set forth in a footnote in his

brief to the Ohio Supreme Court, was as follows:

You shall recommend the sentence of death if you unanimously, upon the agreement of all twelve, find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

If you do not so find, you shall unanimously, all twelve, recommend either a sentence of life in prison with parole eligibility after serving twenty full years of

imprisonment, or life in prison after serving thirty full years of imprisonment. A
verdict form will be furnished to you so that you may render any verdict that you
find to have been justified.

(*Id.* at n.2 (quoting Tr. Vol. XII, at 1772).) Although the appellate court rejected Petitioner's

claim without addressing the merits, concluding that it was untimely, the Ohio Supreme Court

rejected the claim on the merits, albeit without any detailed reasoning.

An examination of the *Mapes* factors raises only faint questions about appellate counsel's

failure to challenge the unanimity instruction above. Initially, determining whether the issue was

significant and obvious presents a close question–one that does not yield a resounding "yes" or

"no." First, under case law now and at the time of Petitioner's direct appeal, the jury instruction

at issue was not glaringly problematic, if problematic at all. Under current case law, albeit

stemming from the Supreme Court's 1988 decision of *Mills v. Maryland*, although unanimity is

required for the existence of any aggravating circumstance, a state cannot, consistent with the

Eighth Amendment, require unanimity on the existence of a mitigating factor. *See, e.g., Henley

v. Bell*, 487 379, 390 (6th Cir. 2007). Thus, if instructions give rise to a substantial possibility

that jurors believed they had to be unanimous on the existence of a mitigating factor in order to

consider that factor, then resentencing is required. Notwithstanding the foregoing, it is not a

violation to require unanimity in the results of the weighing process–or unanimity in the final

verdict. *Id.* at 391; *see also Coe v. Bell*, 161 F.3d 320, 338 (6th Cir. 1998); *Bowling v. Parker*,

Civil No. 03-28-ART, 2012 WL 2415167, at *19-20 (E.D. Ky. Jun. 26, 2012); *Moore v.

Mitchell*, No. 1:00-cv-023, 2007 WL 4754340, at *51 (S.D. Ohio Feb. 15, 2007). As early as

1988, however, it was unconstitutional to require–through jury instructions or statutory

language–a jury to be unanimous on the existence of a mitigating factor in order to consider that

143

factor. *Mills v. Maryland*, 486 U.S. 367, 374-76 (1988) (jury instructions and verdict forms);

*McKoy v. North Carolina*, 494 U.S. 433 (1990) (state capital sentencing scheme). In

*Kordenbrock v. Scroggy*, 919 F.2d 1091, 1121 (6th Cir. 1990), the Sixth Circuit found no

constitutional error in jury instructions that explicitly required any aggravating circumstance to

be found unanimously but were totally silent on whether unanimity was required as to the

existence of any mitigating factor. Neither the jury instructions nor verdict forms that Petitioner

challenges herein stated or would have lead reasonable jurors to believe that mitigating factors

had to be found unanimously. That being so, although the same or similar jury instructions were

routinely challenged in capital cases at the time of Petitioner's direct appeal, it is difficult to

characterize this particular jury instruction as significant and obvious.

For the same reasons, it is difficult to characterize this issue as clearly stronger than the

issues that were raised on Petitioner's direct appeal. Petitioner's appellate counsel raised twenty-

nine issues before the court of appeals and twenty-six issues before the Ohio Supreme Court.

Those issues included claims alleging prosecutorial misconduct, irregularities in the trial court's

journalization of the judgment and sentencing opinion, improper denial of a motion for a

mistrial, erroneous evidentiary rulings, improper jury instructions and verdict forms (lessening

jurors' sense of responsibility), ineffective assistance of counsel at both phases of the trial, errors

in the jury selection process, erroneous denial of motions to suppress statements and evidence,

insufficiency of the evidence, unconstitutionality of Ohio's capital statutory scheme,

inadequacies in appellate review, insufficiency of evidence supporting underlying felonies, and

other improprieties in jury instructions. Although it would be difficult to say that a challenge to

the alleged unanimity instruction was stronger than the claims alleging prosecutorial misconduct,

ineffective assistance of counsel, and insufficiency of the evidence–in view of the fact that it was only circumstantial evidence that linked Petitioner to the disappearance and killing of the victim– it is quite easy to say that a challenge to the alleged unanimity instruction was stronger than the "boilerplate" challenges to the constitutionality of Ohio's death penalty statutes, standard jury instructions, and standards of appellate review that are prescribed by statute. This *Mapes* factor does not bode for or against Petitioner on his claim challenging appellate counsel's failure to challenge the sentencing-phase unanimity instruction.

Turning to the other *Mapes* factors, trial counsel did not object to the jury instruction at issue or otherwise preserve the issue for appeal. In fact, Petitioner attempted to challenge that omission on the part of trial counsel in a second untimely postconviction action. That the issue was not preserved for appeal militates in favor of a finding that appellate counsel's decision to omit the issue was reasonable. Several *Mapes* factors either are not reflected by the record or do not speak one way or the other about appellate counsel's performance. Appellate counsel has never testified in a collateral proceeding about their strategy on appeal. The record simply does not reflect whether or to what extent appellate counsel met with Petitioner to discuss possible issues to raise on appeal. Nor does the record reflect the level of counsel's experience and expertise. As for whether there is evidence demonstrating that appellate counsel reviewed all of the facts, although there is no direct evidence demonstrating as much, a review of the briefs and other pleadings filed by Petitioner's appellate attorneys strongly indicate that they thoroughly reviewed the transcript and trial record and were well versed on the facts of Petitioner's case.

The final *Mapes* factor directs the Court to consider whether the decision to omit the issue was an unreasonable decision that only an incompetent attorney would make. After careful

145

review, the Court answers that inquiry in the negative. The Court can not characterize the issue as significant, obvious, or clearly stronger than most of the issues that were presented. The issue was not objected to at trial or otherwise preserved for review. Further, arguably there was contrary authority on the omitted issue. In sum, it would be difficult to characterize appellate counsel's performance as deficient under the first prong of *Strickland*.

Even assuming that counsel's decision was unreasonable, or that counsel omitted the issue out of pure oversight, the Court cannot conclude under the prejudice prong of *Strickland* that there is a reasonable probability that the outcome of petitioner's appeal would have been different had appellate counsel raised this issue. Ohio case law at the time was not yet very favorable to penalty phase "unanimity" instructions. *See, e.g., State v. Jenkins*, 15 Ohio St. 3d 164, 213-14 (1984); *see also State v. Williams*, 23 Ohio St. 3d 16, 22 (1986); *but see State v. Springer*, 63 Ohio St. 3d 167 (1992) (holding that when a jury becomes irreconcilably deadlocked on a sentencing verdict, the trial court must sentence the accused to life imprisonment). Moreover, the Court has already determined that the particular instruction given at Petitioner's trial did not appear to cross the line into improperly requiring unanimity on the existence of a mitigating factor. That being so, even if appellate counsel had raised the issue on appeal, there is no reasonable probability that the outcome of petitioner's appeal would have been different.

For the foregoing reasons, the Court concludes that Petitioner's appellate counsel did not perform deficiently or to his prejudice in failing to raise a claim challenging the alleged penalty phase "unanimity" instruction.

    **2.**    **Discriminatory Use of Peremptory Challenges.**

Petitioner argues that his appellate counsel were ineffective for failing to raise a claim

challenging the prosecution's allegedly discriminatory use of peremptory challenges. As noted

earlier in this section addressing ineffective assistance of appellate counsel, this Court has

already considered and rejected the essence of these allegations.

### 3.   Culpability Phase Ineffective Assistance of Counsel.

Petitioner argues that his appellate counsel were ineffective for failing to raise a claim

challenging numerous incidences of ineffective assistance of trial counsel during the culpability

phase of Petitioner's trial. Of these numerous incidences, the only one that this Court has not yet

addressed, and will accordingly address below, is Petitioner's claim that his trial attorneys

performed deficiently and to Petitioner's prejudice in failing to object to several culpability

phase jury instructions.

To determine the precise claim at issue, the Court looks to how Petitioner framed the

claim in the state courts. Petitioner argued in relevant part to the intermediate court of appeals as

follows:

> Trial counsel was ineffective for failing to object to several improper jury
> instructions: 1] the trial court's definition of reasonable doubt – it diluted the
> State's burden of proof; and 2] the trial court's charge regarding the capital
> specifications – the jury should have been told to make two separate findings on
> these "either/or" statutory elements and that Mr. Hill could be found guilty only if
> the jury was unanimous as to one or both alternatives.

(J.A. Vol. XVII, at 11.)

Petitioner expanded his claim when he presented it to the Ohio Supreme Court. Because

the Ohio Supreme Court rejected the claim on the merits, it is this expanded version of the claim

that this Court will consider:

> Trial counsel was ineffective for failing to object to several improper jury

147

instructions, namely the following: (i) the trial court incorrectly added an uncharged theft offense as an element of aggravated burglary which created a material variance on the charge as indicted; (ii) the court's incorrect definition of "reasonable doubt" – it diluted the State's burden of proof; (iii) the court's incorrect definition of "purpose" – it shifted the burden of proof to Mr. Hill and incorrectly instructed the jury that purpose to kill may be inferred so that it was presumed from the homicide itself; (iv) the court gave a misleading definition of causation by foreseeable result, which made Mr. Hill culpable by the mere performance of an illegal act; (v) the court did not accurately instruct on the element of "principal offender" – it allowed the jury to convict Mr. Hill <u>absent</u> a finding that he was the principal offender; (vi) the court failed to instruct the jury that it has to be unanimous in finding Mr. Hill was the principal offender or acted with prior calculation and design; and (vii) the court's instruction on kidnapping that included the element of "serious physical harm" – there was no harm apart from the homicide itself and, thus, the instruction violated Mr. Hill's right to be free from double jeopardy.

(J.A. Vol. XX, at 33-34.)  As alluded to above, although the appellate court rejected Petitioner's claim without addressing the merits, concluding that it was untimely, the Ohio Supreme Court rejected it on the merits–including implicitly the additional claims that Petitioner included without having first presented them to the appellate court below, albeit without any detailed reasoning.

     **a.**   **Instruction on uncharged theft offense as element of aggravated burglary.**

Petitioner is presumably referring to the following instructions.  First, the trial court stated as follows:

> As it applies in the first count of the indictment, aggravated burglary means that the defendant allegedly, by deception, force, stealth, trespassed in the occupied structure of another without their consent, and to deprive them of that property.

(Tr. Vol. XI, at 1559.)  Shortly thereafter, the trial court stated the following:

> Purpose to deprive another of his property is an essential element of aggravated burglary.  It is also the definition of theft.  A person acts purposely when it is his or her specific intention to cause a certain result.

148

(Tr. Vol. XI, at 1561.)

A detailed consideration of the *Mapes* factors is unnecessary. Petitioner's claim of

appellate counsel ineffectiveness is without merit because there was no error in the instructions

set forth above, no risk that jurors might have been misled or confused, and no prejudice to

Petitioner.

Under Ohio law at the time Petitioner was indicted, aggravated burglary was defined in

Section 2911.11 of the Revised Code as follows:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied
> structure, as defined in section 2909.01 of the Revised Code, or in a separately
> occupied portion thereof, with purpose to commit therein any theft offense, as
> defined in section 2913.01 of the Revised Code, or any felony, when any of the
> following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on
> another;
>
> (2) The offender has a deadly weapon or dangerous ordnance, as defined in
> section 2923.11 of the Revised Code, on or about his person or under his control;
>
> (3) The occupied structure involved is the permanent or temporary habitation of
> any person, in which at the time any person is present or likely to be present.

Ohio Rev. Code § 2911.11. Petitioner was indicted on two counts of aggravated murder, each

with two capital specifications alleging aggravated burglary and kidnapping respectively.

Petitioner was also indicted on separate counts of aggravated burglary and kidnapping. The

aggravated burglary was set forth in count three as follows:

> The Grand Jurors of the County of Hamilton, in the name and by the
> authority of the State of Ohio, upon their oaths do find and present that Genesis
> Hill, on or about the 1st day of June in the year Nineteen Hundred and Ninety-One
> at the County of Hamilton and State of Ohio aforesaid, by force, stealth, or
> deception, trespassed in an occupied structure, or in a separately secured or
> separately occupied portion thereof, to wit: the apartment of Theresa Dudley, with
> purpose to commit a theft offense or felony therein, and at the time, the said

occupied structure was the permanent or temporary habitation of Theresa Dudley, and at which time any person was present or likely to be present, in violation of Section 2911.11 of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

(J.A. Vol. I, at 16.)

Thus, a person commits aggravated burglary when he or she trespasses in an occupied structure with the intent to commit theft or any other felony. Although arguably it was not necessary for the trial court to have defined a theft offense, in view of the fact that the felony that Petitioner committed when he trespassed in Teresa Dudley's apartment was kidnapping, the fact remains that the offense of theft is included in the text of the offense of aggravated burglary. Thus, the trial court's instruction was entirely consistent with the statutory definition of aggravated burglary and the count indicting Petitioner for aggravated burglary. Moreover, a reasonable reading of the culpability phase instructions in their entirety leaves no doubt that the underlying felony that Petitioner committed when he trespassed in Teresa Dudley's apartment was kidnapping. The instructions were not erroneous or prejudicial. Trial counsel did not perform deficiently or to Petitioner's prejudice in failing to object to a sound jury instruction. And appellate counsel did not perform deficiently or to Petitioner's prejudice in failing to challenge trial counsel's omission.

### b. Reasonable doubt instruction.

Petitioner argues that the trial court's "reasonable doubt" instruction diluted the State's burden of proof and that trial counsel were ineffective for failing to object to the instruction. Petitioner argues that his appellate attorneys should have raised this failing on the part of trial counsel. During preliminary instructions at the beginning of Petitioner's trial, the trial court defined reasonable doubt as follows:

150

> Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge or the specifications of aggravated circumstance. Reasonable doubt is doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything in human affairs or depending upon moral evidence is open to some possible or imaginary doubt.

> Proof beyond a reasonable doubt is proof of such a character that an ordinary person would be willing to rely and act upon it in the conduct of his or her most important affairs.

(Tr. Vol. VII, at 940-41.) At the conclusion of the culpability phase of Petitioner's trial, the trial

court instructed the jury as follows:

> We discussed early on the burden of proof, which is beyond a reasonable doubt. And I told you that the State must firmly convince you of the truth of a charge or a specification before you can find the defendant guilty. If the State has failed to firmly convince you of the truth of the charge or specification, you must find the defendant not guilty.

(Tr. Vol. XI, at 1552.)

Under Ohio law at the time Petitioner was tried, "reasonable doubt" was defined by

statute. Section 2901.05(D) provided:

> "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

Ohio Rev. Code § 2901.05(D).

The "reasonable doubt" instruction that the trial court gave was consistent with that

prescribed by state law and the challenge raised by Petitioner that the instruction dilutes the

State's burden of proof is and was foreclosed by Ohio and federal law. *See State v. Van Gundy*,

151

64 Ohio St. 3d 230, 232-35 (1992); *State v. Cooey*, 46 Ohio St. 3d 20, 37 (1989); *State v. Jenkins*, 15 Ohio St. 3d 164, 211 (1984); *State v. Nabozny*, 54 Ohio St. 2d 195, paragraph two of the syllabus (1978); *see also Thomas v. Arn*, 704 F.2d 865, 869 (6th Cir. 1983). It stands to reason, therefore, that trial counsel did not perform deficiently or to Petitioner's prejudice in failing to object to a sound jury instruction. That being so, appellate counsel did not perform deficiently or to Petitioner's prejudice in failing to challenge trial counsel's omission.

    **c.   Definition of "purpose."**

    Petitioner contends that the trial court incorrectly defined "purpose" in its culpability phase jury instructions. According to Petitioner, the court's definition shifted the burden of proof to Petitioner and incorrectly told jurors that purpose to kill may be inferred such that it could be presumed from the homicide itself. Petitioner argues that trial counsel were ineffective for failing to object and that appellate counsel were ineffective for failing to raise on appeal this instance of trial counsel ineffectiveness. At the conclusion of the culpability phase, the trial court instructed the jury as follows with respect to the definition of purpose:

> Purpose to kill is an essential element of the crime of aggravated murder. A person acts purposely when it is his or her specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to kill Domika Dudley while the defendant was committing or attempting to commit aggravated burglary.
>
> Purpose is a decision of the mind to do an act with the conscious objective of producing a specific result. To do an act purposely is to do it intentionally, and not accidentally. Purpose and intent mean the same thing.
>
> The purpose with which a person does an act is known only to himself or herself, unless he or she expresses it to others or indicates it by his or her conduct. The purpose with which a person brings about a result is determined from the manner in which the act is done, the weapon used, and all the facts and circumstances that you heard in the evidence.

<div align="center">152</div>

None of these factors in and of themselves are conclusive as to the defendant's intent, but they may be considered together with all the other evidence in determining whether there existed in the mind of the defendant a specific intention to cause the death of Domika Dudley.

No person shall be convicted of aggravated murder unless he or she is specifically found to have intended to cause the death of another. If a wound is inflicted upon a person in a manner calculated to destroy life, the purpose to kill may be inferred from the manner in which the wound is inflicted. Such inference is not conclusive, but it may be accepted or rejected by you in your deliberations. If you accept such inference, then you must consider it together with the sum totality of all the evidence as to facts and circumstances bearing upon the issue of intent.

(Tr. Vol. XI, at 1556-57.)

The "purpose" instructions that the trial court gave in connection with the aggravated murder charge were consistent with Ohio Rev. Code § 2903.01(D)–the statute defining aggravated murder and requiring specific intent to cause death. In *State v. Campbell*, 69 Ohio St. 3d 38, 48-49 (1994), the Ohio Supreme Court found no plain error from similar jury instructions. The Ohio Supreme so found because the trial court had also clearly instructed the jury that "*[n]o* person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another" and that "[i]t must be established *** that at the time in question there was present in the mind of the defendant a specific intention to kill [the victim]." The jury in Petitioner's case was so instructed. Further, the trial court in Petitioner's case also instructed the jury that any inference set forth above was not conclusive, may be rejected, and if not, must be considered with the totality of all of the evidence.

The challenge raised by Petitioner that the instruction allowed the jury to infer specific intent is and was foreclosed by Ohio and federal law. *See State v. Maurer*, 15 Ohio St. 239, 248 (1984); *see also Stallings v. Bagley*, 561 F. Supp. 2d 821, 856-57 (N.D. Ohio 2008); *Bonnell v.*

*Mitchell*, 301 F. Supp. 2d 698, 751-54 (N.D. Ohio 2004); *Franklin v. Anderson*, 267 F. Supp. 2d 768, 791-92 (S.D. Ohio 2003).[3] In view of the foregoing, it is difficult to conclude that trial counsel performed deficiently or to Petitioner's prejudice in failing to object to the jury instructions defining "purpose" or that appellate counsel were ineffective for failing to challenge trial counsel's omission.

### d.    Instruction on causation and foreseeability.

Petitioner argues that the trial court provided the jury with a misleading definition of causation by foreseeable result, making Petitioner culpable by his mere performance of an illegal act. Petitioner argues that trial counsel were ineffective for failing to object and that appellate counsel were ineffective for failing to raise this trial counsel ineffectiveness on appeal.

The trial court's culpability-phase jury charge included the following instructions:

> Causation is also an essential element of aggravated murder. The State charges that the acts of the defendant cause the death of Domika Dudley. Cause is an act which in a natural and logical and continuous sequence directly produces the death of a person, and without which it would not have occurred. Cause occurs when the death is a natural and foreseeable result of the acts of the defendant.

> The test for foreseeability is not whether the defendant should have foreseen the death in its precise form, the test is whether in light of all the circumstances a reasonably prudent person would have anticipated that death was likely to result to anyone from the performance of the acts or act.

(Tr. Vo. XI, at 1558.)

---

[3]    Although these federal decisions are subsequent to Petitioner's conviction and direct appeal, they involve the same or similar time periods with respect to when the respective aggravated murders were committed and when the judgments were challenged on direct appeal. *Stallings* involved a crime that was committed in 1996 and adjudicated on direct appeal in 2000. *Bonnell* involved a crime that was committed in 1987 and adjudicated on direct appeal in 1991. And *Franklin* involved a crime that was committed in 1988 and adjudicated on direct appeal in 1991.

It is true that, at the time of and following Petitioner's appeal, appellate courts in Ohio were questioning the propriety of the foreseeability instruction set forth above. *See State v. Burchfield*, 66 Ohio St. 3d 261, 263 (1993) ("The usefulness in murder cases of the foreseeability instruction is questionable, especially given its potential to mislead jurors."); *see also State v. Williams*, 99 Ohio St. 3d 493, 507-08 (2003) (questioning the usefulness of the foreseeability instruction in an aggravated murder case); *State v. Jacks*, 63 Ohio App. 3d 200, 204-05 (Ohio App. 8 Dist. 1989) (reversing murder conviction because of risk that foreseeability instruction misled jurors). That said, Ohio and federal courts alike consistently held that where the overall jury charge makes clear that the jury was required to find specific intent to cause death, the inclusion of the foreseeability instruction in the charge does not constitute error. *Williams*, 99 Ohio St. 3d at 508; *State v. Goodwin*, 84 Ohio St. 3d 331, 346 (1999); *State v. Phillips*, 74 Ohio St. 3d 72, 100 (1995); *Burchfield*, 66 Ohio St. 3d at 262; *State v. Thompson*, 33 Ohio St. 3d 1, 12-13 (1987). *See also Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000); *Bonnell*, 301 F. Supp. 2d at 752; *Jackson v. Anderson*, 141 F. Supp. 2d 811, 845 (N.D. Ohio 2001). The Court has already concluded that the culpability-phase jury instructions made clear that the jury was required to find that Petitioner specifically intended to cause the death of Domika Dudley. Trial counsel did not perform deficiently or to Petitioner's prejudice in failing to object to a sound jury instruction. And appellate counsel did not perform deficiently or to Petitioner's prejudice in failing to challenge trial counsel's omission.

### e. Instruction on "Principal Offender."

Petitioner claims that trial counsel should have objected to the trial court's jury instruction on "principal offender" because the instruction allowed the jury to convict Petitioner

absent a finding that he was the principal offender. According to Petitioner, the trial court should have instructed the jury to make two separate findings on the "either/or" statutory elements and that the jury could find Petitioner guilty only if the jury was unanimous on one or both of the alternatives.

Petitioner was charged with two counts of aggravated murder, counts one and two. Attached to both aggravated murder counts were two capital specifications, one for committing the aggravated murder during an aggravated burglary and one for committing the aggravated murder during a kidnapping. At the conclusion of the culpability phase, the trial court in several instances defined the capital specifications to the two aggravated murder charges as follows:

> Specification one is that the defendant committed the aggravated murder while he was committing or attempting to commit or fleeing immediately after committing or attempting to commit the offense of aggravated burglary, and the offender was the principal offender in the commission of the aggravated murder. Or if he was not the principal offender, that he committed the aggravated murder with prior calculation and design. Specification two to count one charges that the defendant committed the aggravated murder while he was committing or attempting to commit or fleeing immediately after committing or attempting to commit the offense of kidnapping, and the offender then was the principal offender in the commission of the aggravated murder; or if he was not the principal offender, he committed the aggravated murder with prior calculation and design.

(Tr. Vol. XI, at 1553-54.) The trial court gave the same or similar instruction on several different occasions during the culpability-phase jury charge. The trial court also gave an instruction defining the term "principal offender" as follows:

> The term principal offender means the one who personally performs every act constituting the offense; in this case aggravated murder, purposely causing the death of Domika Dudley.

(*Id.* at 1563.)

In *State v. Penix*, 32 Ohio St. 3d 369, 371 (1987), the Ohio Supreme Court made clear

156

that in a capital trial, the jury may not be instructed or otherwise allowed to consider the "principal offender / prior calculation and design" alternatives in the conjunctive–such that the jury could cumulate aggravating circumstances. *See also State v. Holloway*, 38 Ohio St. 3d 239, 244 n.2 (1988) ("We caution the bench and bar, however, against using a defendant's status as principal offender in the conjunctive with aggravating circumstances listed in R.C. 2929.04([A])(7) in any manner that might infer that status as principal offender is a separate aggravating circumstance.") At the time of and following Petitioner's direct appeals, however, Ohio and federal courts were holding that so long as a trial court's instruction on the principal offender / prior calculation and design alternatives set forth in capital specifications is clearly phrased in the disjunctive–such that the jury could find one, the other, or neither but not both–the trial court commits no prejudicial error in failing to require the jury to make separate findings as to which alternative it unanimously chose. *See State v. Chinn*, 85 Ohio St. 3d 548, 558 (1999); *State v. Williams*, 74 Ohio St. 3d 569, 573 (1996); *State v. Cook*, 65 Ohio St. 3d 516, 527 (1992). *See also O'Neal v. Bagley*, No. 1:02-cv-357, 2010 WL 6423295, at *37 (S.D. Ohio Oct. 14, 2010); *LaMar v. Ishee*, No. 1:04-cv-541, 2010 WL 5574467, at *73-74 (S.D. Ohio Jul. 30, 2010); *Jalowiec v. Bradshaw*, No. 1:03 CV 654, 2008 WL 312655, at *112 (N.D. Ohio Jan. 31, 2008). No *Penix* error occurred in Petitioner's case because both the culpability-phase jury instructions and verdict forms involving the principal offender / prior calculation and design alternatives phrased those alternatives in an either / or disjunctive. That being so, trial counsel did not perform deficiently or to Petitioner's prejudice in failing to object to the instructions and appellate counsel did not perform deficiently or to Petitioner's prejudice in failing to challenge trial counsel's omission.

157

**f. Failure to require unanimity as to principal offender/prior calculation.**

Petitioner argues that the trial court erred in failing to instruct the jury that it had to be unanimous in the finding of the alternative elements either that Petitioner was the principal offender or that the murder was committed with prior calculation and design. The discussion of sub-part (e) immediately above essentially forecloses this allegation.

**g. Inclusion of "serious physical harm" in kidnapping instruction.**

Petitioner argues that the trial court erred in including in its kidnapping instruction the element of "serious physical harm." Petitioner reasons that because there was no harm inflicted on Domika Dudley apart from the homicide itself, the inclusion of an element of "serious physical harm" in the kidnapping instruction violated his right to be free from double jeopardy and trial counsel should have objected.

The indictment against Petitioner included the following kidnapping charge:

> The Grand Jurors of the County of Hamilton, in the name and by authority of the State of Ohio, upon their oaths do find and present that <u>Genesis Hill</u>, on or about the 1st day of June in the year Nineteen Hundred and Ninety-One at the County of Hamilton and State of Ohio aforesaid, by any means, knowingly removed Domika Dudley, a person under the age of thirteen or mentally incompetent, from the place where she was found, under circumstances which created a substantial risk of serious physical harm to the said Domika Dudley, in violation of Section 2905.01 of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

(J.A. Vol. II, at 16.)

At the conclusion of the culpability phase, the trial court instructed Petitioner's jury as follows:

> In count four of the indictment the defendant is charged with kidnapping. Before you can find the defendant guilty you must find beyond a reasonable doubt that on or about the first day of June, 1991, in Hamilton County, Ohio, the defendant, by force, threat, or deception, under circumstances which created a

158

substantial risk of physical harm to Domika Dudley, removed Domika Dudley
from the place where she was found.

(Tr. Vol. XI, at 1567.) Shortly thereafter, the trial court gave the following instruction:

Substantial risk of harm means a strong possibility, as contrasted with a
remote or significant possibility, that a certain result may occur or that certain
circumstances exist.

(*Id.* at 1568.) Finally, to this point, the trial court instructed the jury as follows:

Serious physical harm to person means any of the following: Any mental
illness or condition of such gravity as would normally require hospitalization or
prolonged psychiatric treatment. Any physical harm which carries a substantial
risk of death. Any physical harm which involves some permanent incapacity,
whether partial or total, or which involves some temporary, substantial incapacity.
Any physical harm which involves some permanent disfigurement, or which
involves some temporary, serious disfigurement. Any physical harm which
involves acute pain of such duration as to result in substantial suffering or which
involves any degree of prolonged or intractable pain.

(*Id.*)

Trial counsel were not ineffective for failing to object to the instruction on the element of

serious physical harm in the kidnapping charge and appellate counsel were not ineffective for

failing to challenge trial counsel's omission. To be clear, the kidnapping charge and the jury

instructions did not include an element that Petitioner did commit serious physical harm while

removing Domika Dudley from her mother's room. The kidnapping charge and the jury

instructions included an element that Petitioner created a substantial risk of serious physical

harm while removing Domika Dudley from her mother's room. Petitioner's removal of the

sleeping six-month-old from her custodial parent's room for the purpose of harming her more

than satisfies the element that Petitioner's actions as charged in the kidnapping count created a

substantial risk of serious physical harm. *Cf. State v. Morales*, 32 Ohio St. 3d 252, 257 (1987)

(finding sufficient evidence to support element of creating a risk of serious physical harm where

"the jury could reasonably conclude beyond a reasonable doubt that appellant removed [the child victim] from the place where he was found for the purpose of committing a felony or of inflicting serious physical harm.") It further bears mentioning that nowhere in his pretrial motion to dismiss the indictment did Petitioner include a challenge that there was no substantial risk of serious physical harm, apart from the murder itself, during the removal of Domika Dudley from her mother's room. (J.A. Vol. II, at 32.) And nowhere in his Rule 29 motion for acquittal at the conclusion of the prosecution's case in chief did Petitioner argue that there was no substantial risk of serious physical harm, apart from the murder itself, during the removal of Domika Dudley from her mother's room. (Tr. Vol. IX, at 1219-1230.) Thus, an objection to the instant jury instruction does not strike this Court as significant, obvious, or strong issue. There was no factual or legal basis for trial counsel to object to the jury instruction. Appellate counsel cannot be characterized as ineffective for failing to challenge trial counsel's omission.

For the foregoing reasons, the Court rejects Petitioner's claim that his appellate attorneys performed unreasonably and to his prejudice for failing to challenge on appeal trial counsel's failure to object to the culpability-phase instructions discussed above.

### 4. Mitigation Phase Ineffective Assistance of Trial Counsel.

Petitioner next argues that his appellate attorneys performed unreasonably and to his prejudice for failing to challenge on appeal several instances of trial counsel ineffectiveness that occurred during the mitigation phase of Petitioner's capital trial. In his application for reconsideration challenging appellate counsel's effectiveness, Petitioner argued to the intermediate court of appeals as follows:

> Mr. Hill was entitled to the effective assistance of counsel at the mitigation phase. *Strickland*, 466 U.S. at 668. For the following reasons, Mr.

160

Hill's sentencing procedure can hardly have been relied upon as having produced a just result.

A]    Trial counsel failed to request the services of an independent and competent expert pursuant to R.C. § 2929.024. *See Glenn v. Tate* (C.A. 6, 1995), 71 F.3d 1204. The State was permitted to collect family interview notes taken by Court Clinic personnel, which were used to cross examine the family members who testified at mitigation. The State also improperly elicited opinions from the Court Clinic Psychologist at mitigation as to the family's "motivations" in testifying on Mr. Hill's behalf and the content of their testimony.

B]    Trial counsel failed to provide necessary records, essential social history information or properly to brief the court psychologist. *Wallace v. Stewart* (C.A. 9, 1999), 1999 WL 511348.

C]    Trial counsel failed to object to: 1] the court's erroneous directive that a recommendation of life imprisonment must be unanimous; 2] improper identification of aggravating circumstances; 3] the court's mandatory death penalty instruction (must recommend death if aggravating circumstances outweigh mitigating circumstances); 4] the court's instruction that it must determine if death is appropriate before considering life; 5] the court's erroneous definition of "outweigh"; 6] the court's erroneous definition of "reasonable doubt"; 7] the court's improper instruction that Mr. Hill had the burden of proof for the life sentence; 8] the court's improper definition of §2929.04(B)(7) mitigating factors; 9] State's use of the clinic's interview notes with family members for cross examination at mitigation. (T.p. 1581-85; 1618-19; 1770-74; 1798).

D]    Trial counsel failed to request essential instructions at mitigation that: 1] Genesis enjoyed the presumption of life; 2] the trial court merged both counts of aggravated murder and the aggravating circumstances; 3] the jury need not be unanimous to consider a factor as mitigation; and 4] Mr. Hill faced additional prison time for Kidnapping and Aggravated Burglary and the impact of consecutive sentences – this instruction would have given accurate information about Mr. Hill's actual date of parole eligibility if the jury returned a life verdict.

(J.A. Vol. XVII, at 12.)

Following the appellate court's decision rejecting Petitioner's application as untimely,

Petitioner proceeded to argue on appeal to the Ohio Supreme Court as follows:

Mr. Hill was denied his right to the effective assistance of counsel at the mitigation phase of his case in violation of the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution. Mr. Hill was entitled to the effective assistance of counsel at the mitigation phase of his case. Strickland, 466 U.S. 668. For the following reasons, Mr. Hill's sentencing procedure cannot be relied upon as having produced a just or reliable result:

(a)     Trial counsel failed to request the services of an independent and competent mental health expert pursuant to O.R.C. § 2929.024. See Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995). An expert appointed under this provision is treated as a defense expert who works with the defense and his or her findings are protected by the doctrine of work product. By contrast, when counsel fails to make such a request, as is the situation here, the expert is appointed under O.R.C. § 2929.03(D)(1) and the expert actually works for the court. When the expert is the "court's expert," information that is collected is accessible and disseminated. In this case, the State was permitted to collect interview notes taken by Court Clinic personnel. Family members were later cross-examined at mitigation with notes from interviews they thought were private. The State also improperly elicited opinions from the Court Clinic Psychologist regarding the family's "motivations" in testifying on Mr. Hill's behalf and commentary on the actual content of their testimony.

(b)     Trial counsel failed to provide the necessary records, essential social history information, or even properly brief the court psychologist regarding their client. Wallace v. Stewart, 1999 WL 511348 (9th Cir. 1999).

(c)     Trial counsel failed to object to several erroneous instructions issued by the trial court at sentencing. Namely, trial counsel failed to object to: (i) the court's erroneous directive that a jury must be unanimous before it could find that aggravating circumstances did not outweigh the mitigating factors (Brooks, 75 Ohio St. 3d at 148); (ii) the court's improper identification of aggravating circumstances – the jury was instructed to consider any evidence relevant to the nature of the aggravating circumstances; (iii) the court's mandatory death penalty instruction that the jury must recommend death if aggravating circumstances outweigh mitigating circumstances; (iv) the court's instruction that the jury must determine if death is appropriate before considering life; (v) the court's improper instruction that Mr. Hill had the burden of proof for the life sentence; and (vi) the court's improper definition of 2929.04(B)(7) factors. (T.p. 1581-85; 1618-19; 1770-74; 1798).

(d)     Trial counsel failed to object to the State's use of Court Clinic interview notes with family members during cross-examination in the mitigation phase. Trial counsel also sat silent while the State solicited Court Clinic

"opinions" regarding the family member's reasons for testifying and the actual content of their testimony.

(e)     Trial counsel failed to request essential instructions at mitigation that Genesis enjoyed the presumption of life, that he faced additional prison time for Kidnapping and Aggravated Burglary, and the impact of consecutive sentences. This information would have provided the jury with an accurate picture of the lengthy sentence Mr. Hill faced if a life verdict was returned.

(f)     Trial counsel failed to request essential instructions that would have clarified the confusing jury charge provided by the trial court. Specifically, the jury should have been instructed that the trial court merged both counts of aggravated murder as well as the aggravating circumstances and that the jury did not have to be unanimous to consider a factor as mitigation – an individual juror can decide a particular mitigating factor deserves weight. Mills v. Maryland, 466 U.S. 367 (1988).

(J.A. Vol. XX, at 35-36.) Although the appellate court rejected Petitioner's claim without addressing the merits, concluding that it was untimely, the Ohio Supreme Court rejected it on the merits–including implicitly the additional claims that Petitioner included without having first presented them to the appellate court below, albeit without any detailed reasoning.

### a.     Failure to request independent defense mental health expert.

Petitioner argues that his trial counsel were ineffective for requesting a mental health evaluation pursuant to R.C. § 2929.03(D)(1) instead of requesting an independent and competent mental health expert pursuant to R.C. § 2929.024. The former works as a defense expert whose findings enjoy protection under the work product doctrine, while the latter works as a court expert whose findings are shared with the court and the prosecution. In the instant case, Petitioner continues, the prosecution collected and utilized court clinic notes in their cross-examination of Petitioner's family members. Thus, according to Petitioner, appellate counsel performed unreasonably and to Petitioner's prejudice in failing to raise this alleged instance of

163

trial counsel ineffectiveness on direct appeal. The Court disagrees.

In comparison to the issues that appellate counsel did raise, such as those alleging prosecutorial misconduct, flawed jury instructions, and insufficient evidence, it is difficult to characterize trial counsel's failure to request an independent mental health expert for mitigation as a stronger, more significant, more obvious issue than those that were raised. The issue was not preserved at trial and arguably relied in part on evidence outside the record–such as an affidavit by an independent mental health expert or mitigation specialist–thereby rendering it an issue unsuitable for direct appeal. Moreover, there was controlling authority unfavorable to the claim. *Cf. State v. Esparaza*, 39 Ohio St. 3d 8, 11 (1988) (holding that trial courts are not required by R.C. 2929.024 to provide experts of an indigent defendant's choosing); *see State v. McNeil*, 83 Ohio St. 3d 438, 450-51 (1998) (finding no prejudice from trial counsel's request of R.C. 2929.03(D)(1) mental health evaluation rather than R.C. 2929.024 independent mental health expert).

Thus, although the better practice might be for counsel representing an indigent capital defendant to request a defense expert pursuant to R.C. § 2929.024 rather than a mental health evaluation pursuant to R.C. § 2929.03(D)(1), it is not constitutionally required such that trial counsel can be characterized as having violated an essential duty owed to Petitioner by failing to do so. Further, in the instant case, Petitioner fails to demonstrate that he was prejudiced by his trial counsel's opting for a § 2929.03(D)(1) mental health evaluation instead of a § 2929.024. Dr. Schmidtgoessling provided helpful testimony and little that strikes this Court as overly harmful. (Tr. Vol. XII, at 1695-1727.) As for the prosecution's utilization of court clinic notes in the cross-examination of Petitioner's relatives, Petitioner fails to demonstrate and the Court

164

cannot otherwise discern any prejudice that ensued from the prosecution's actions. *See Keith v. Mitchell*, 455 F.3d 662, 671-72 (6th Cir. 2006); *see also Sowell v. Collins*, 557 F. Supp. 2d 843, 879 (S.D. Ohio 2008); *Esparza v. Anderson*, No. 3:96 CV 7434, 2012 WL 2872149, at *48-51 (N.D. Ohio Jul. 12, 2012). If the prosecution gained some sort of unfair advantage from having been privy to the interview notes, it is not readily apparent from the record. The prosecution's cross-examination of Petitioner's relatives strikes this Court as run-of-the-mill and almost benign.

    **b.**     **Failure to provide necessary records and information to court psychologist.**

Petitioner argues that his trial counsel were ineffective for failing to provide to the court psychologist necessary records or essential social history. Thus, the claim before this Court is that Petitioner's appellate attorneys were ineffective for failing to raise this instance of ineffective assistance of trial counsel. The record does not support Petitioner's claim.

Appellate counsel does not render ineffective assistance for failing to raise a claim on direct appeal that relies on evidence outside the trial record. And this particular claim of ineffective assistance of appellate counsel necessarily relies on evidence outside the trial record. Had appellate counsel raised a claim of ineffective assistance of trial counsel for trial counsel's failure to find and provide necessary records and other essential background information, appellate counsel could not possibly have established either deficient performance or, more importantly, prejudice, without the aid of evidence not contained in the trial record—namely, documents and other materials reflecting the necessary records and other essential background information that trial counsel were allegedly ineffective for failing to find and provide. In fact, it was only in his untimely and successive postconviction action that Petitioner first raised this

claim of trial counsel ineffectiveness and first attempted to offer evidence—outside the trial record— supporting his claim. (App. Vol. XIV, at 153, 206-214.) Petitioner's attempt to raise the claim in postconviction and to support it with non-record evidence is all but a concession that the claim could *not* have been raised on direct appeal. That being so, Petitioner has failed in this instance to demonstrate either deficient performance or prejudice on the part of appellate counsel for failing to raise a claim of ineffective assistance of trial counsel stemming from trial counsel's failure to provide necessary records and other essential background information.

### c.   Failure to object to mitigation-phase errors.

As noted earlier in this section addressing ineffective assistance of appellate counsel, the Court has already addressed and rejected these allegations.

### d.   Failure to request essential jury instructions at mitigation.

Petitioner next argues that his appellate counsel were ineffective for failing to raise a claim alleging that trial counsel were ineffective for failing to request essential jury instructions during mitigation. Specifically, Petitioner asserts that trial counsel should have requested: (1) an instruction that Petitioner enjoyed the presumption of life; (2) an instruction concerning the trial court's merger of both counts of aggravated murder and the aggravating circumstances; (3) an instruction that the jury need not be unanimous on the existence of a mitigating factor; and (4) an instruction explaining the additional prison time that Petitioner faced for his Kidnapping and Aggravated Burglary convictions.

### (1).   Instruction that Petitioner enjoyed a presumption of life.

Petitioner argues that his trial counsel were ineffective for failing to request a jury instruction that Petitioner enjoyed a presumption of life and accordingly that appellate counsel

166

were ineffective for failing to raise this instance of trial counsel ineffectiveness. The Court is not persuaded, however, that trial counsel performed deficiently or to Petitioner's prejudice in this regard because there was no basis for requesting such an instruction. *See, e.g., State v. Hooks*, Nos. CA 16978, CA 17007, 1998 WL 754574, at *35 (Ohio App. 2 Dist. Oct. 30, 1998). In Ohio, the decision of whether to recommend a death sentence or a life sentence is strictly governed by a statutory standard: namely, a juror *shall* recommend the death penalty if he or she finds beyond a reasonable doubt that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors. Ohio Rev. Code § 2929.03(D)(2). That being so, any instruction that the offender enjoys a presumption of life is not only unwarranted but arguably improper. Even if trial attorneys in capital cases routinely request such an instruction—almost always without success—Petitioner cannot show that trial counsel have a duty to request the instruction. The Court accordingly concludes that trial counsel were not ineffective for failing to request an instruction that Petitioner enjoyed a presumption of life and that appellate counsel were not ineffective for failing to raise this alleged instance of trial counsel ineffectiveness on direct appeal.

      **(2).**    **Instruction concerning trial court's merger of aggravating circumstances.**

      **(3).**    **Instruction concerning unanimity on the existence of mitigating factors.**

In his application for reopening to the Ohio Supreme Court, Petitioner combined these two alleged instances of ineffective assistance of trial counsel. The essence of the argument is that Petitioner's trial counsel performed deficiently and to Petitioner's prejudice when they failed to ask for an instruction explaining that the trial court had merged both counts of aggravated murder as well as the aggravating circumstances and clarifying that the jurors were not required

167

to be unanimous on the existence of any mitigating factor in order to consider that mitigating factor. Citing *Mills v. Maryland*, 466 U.S. 367 (1988), Petitioner asserts that an individual juror can decide that a particular mitigating factor deserves weight. The precise issue here is whether Petitioner's appellate counsel were ineffective for failing to argue this instance of trial counsel ineffectiveness on direct appeal.

For reasons this Court touched upon in rejecting Petitioner's first allegation of ineffective assistance of appellate counsel—appellate counsel's failure to raise a claim challenging the trial court's "unanimity" instruction—the Court also concludes that the instant, related allegations of ineffective assistance of appellate counsel are also without merit. To be clear, the better practice would be for trial counsel to request the instructions set forth above. They had and continue to have a basis in controlling case law and they would serve to clarify the jury's weighing process. That said, the jury instructions in Petitioner's case did not pose the risks that the instructions in *Mills* did—namely, expressly stating that the jury's finding on any mitigating factor had to be unanimous. The jury instructions sufficiently conveyed the proper statutory standard for weighing the aggravating circumstances and mitigating factors. The Sixth Circuit has upheld penalty-phase jury instructions that are silent on whether the jury needs to be unanimous on the finding of any mitigating factor. *See Kordenbrock v. Scroggy*, 919 F.2d 1091, 1121 (6th Cir. 1990); *see also Thompson v. Parker*, Civil Action No. 5:11CV-31-R, 2012 WL 6201203, at *31-32 (W.D. Ky. Dec. 10, 2012). Upon consideration of all of the *Mapes* factors, the Court cannot find that appellate counsel performed deficiently or to Petitioner's prejudice in failing to raise a claim challenging trial counsel's failure to request the instructions set forth above.

**(4).    Instruction explaining the additional sentences Petitioner would receive.**

168

Trial counsel failed to request an instruction explaining the additional prison sentences that Petitioner faced for his kidnapping and aggravated burglary convictions, as well as the impact of consecutive sentences. Such information, Petitioner reasons, would have provided the jury with a more accurate picture of the lengthy prison time Petitioner faced in the event the jury returned a life sentence verdict. Petitioner argues here that appellate counsel were ineffective for failing to raise this instance of trial counsel ineffectiveness. The *Mapes* factors do not favor this claim of appellate counsel ineffectiveness because the alleged instance of ineffective assistance of trial counsel falls short. In Ohio, consideration of parole and the impact of consecutive or concurrent sentences is not for the capital jury's consideration. *See State v. Mitts*, 81 Ohio St. 3d 223, 229-230 (1998); *State v. Mills*, 62 Ohio St. 3d 357, 374 (1992). Thus, there existed case law disfavoring trial counsel's requesting an instruction about the additional prison time that Petitioner faced. Moreover, such instructions are also disfavored because they invite jurors to speculate as to additional sentences that a trial court might impose. *Cf. Sutton v. Bell*, 683 F. Supp. 2d 640, 718 (E.D. Tenn. 2010). In Ohio, capital juries are tasked with weighing against any aggravating circumstances the nature and circumstances of the offense; the history, character, and background of the offender; and seven enumerated mitigating factors. Evidence of additional prison time that the offender faces for other felony convictions is not relevant to the nature and circumstances of the offense or the offender's character. For these reasons, the Court cannot conclude that appellate counsel were ineffective for failing to challenge on appeal trial counsel's failure to request a jury instruction explaining the additional prison time that Petitioner faced for his kidnapping and aggravated burglary convictions.

  5.    **Trial Court's Improper Sentencing Phase Jury Instructions.**

The fifth assignment of error that, according to Petitioner, appellate counsel were

ineffective for failing to raise was a challenge to improper sentencing phase instructions that the

trial court gave to the jury.  Petitioner argued as follows to the intermediate appellate court:

> Fifth Assignment of Error:  The trial court denied Mr. Hill's constitutional rights
> under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States
> Constitution by failing to give proper sentencing instructions at the mitigation
> phase.
>
> Rather than discuss each instructional issue again individual, reference is
> made to the Fourth Assignment of Error, subsections C and D.

(J.A. Vol. XVII, at 12-13.)

Petitioner argued similarly to the Ohio Supreme Court as follows:

> The trial court violated Mr. Hill's constitutional rights under the Fifth,
> Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by
> failing to give proper sentencing instructions at the mitigation phase.
>
> Rather than discuss each instructional error again separately, reference is
> made to the instructional errors listed above in errors #4 and #5.

(J.A. Vol. XX, at 36.)

The Court follows suit and incorporates by reference its discussion rejecting the allegedly

improper jury instructions that the trial court gave at the conclusion of the penalty phase.

### 6. Prosecutorial Misconduct—Abuse of Subpoena Power.

Petitioner argues here that his appellate counsel performed deficiently and to Petitioner's

prejudice in failing to raise prosecutorial misconduct for the brazen abuse of the subpoena

power.  According to Petitioner, the prosecution improperly compelled witnesses to meet with

prosecutors by issuing *ex parte* subpoenas.  Petitioner presented the claim to the intermediate

appellate court as follows:

> Sixth Assignment of Error:  Mr. Hill's substantial right to due process under the

170

Fifth and Fourteenth Amendments to the United States Constitution is violated when prosecutorial misconduct denies him a fair trial.

The State improperly compelled witnesses to meet with the prosecution after the State issued *ex parte* subpoenas. The State's brazen abuse of the subpoena power to compel out-of-court "pre-trial conferences" with witnesses violated Mr. Hill's right to due process. *See United States v. LaFuenta* (C.A. 8, 1993); *United States v. Keen* (C.A. 9, 1975), 509 F.2d 1273.

(J.A. Vol. XVII, at 13.) Before the Ohio Supreme Court, Petitioner argued as follows:

(7) Mr. Hill's substantial right to due process under the Fifth and Fourteenth Amendments to the United States Constitution is violated when prosecutorial misconduct denies him a fair trial.

Hamilton County Prosecutors improperly compelled Mr. Hill's family members to meet with them through the use of *ex parte* subpoenas. Family members were informed that they were to meet with Judge Niehaus for a "pretrial conference." However, upon arrival family members were interrogated by prosecutors and uniformed officers about the case. Neither Mr. Hill's counsel nor counsel for the family members were present. The information gathered at this conference was later used against the family members at trial.

The State's brazen abuse of the subpoena power violated Mr. Hill's right to due process. Such practices have been condemned. See United States v. LaFuenta, 991 F.2d 1406 (8th Cir. 1993); United States v. Keen, 509 F.2d 1273 (9th Cir. 1975).

(J.A. Vol. XX, at 36-37.)

The Court concludes that appellate counsel were not ineffective for failing to raise this claim. First and foremost, it appears that the claim relied on evidence outside the trial record, thereby making it unsuitable for direct appeal. When Petitioner raised this instance of appellate counsel ineffectiveness in his application for reopening, he supported it with two family member affidavits. The issue was not preserved at trial and therefore would have been reviewed on appeal only for plain error. And it does not appear that any on-point authority existed supporting such a claim. *Cf. State of Ohio v. Shannon L. Grove*, No. 01-CA-41, 2002 WL 1528028, at *4

(Ohio App. 5 Dist. Jul. 09, 2002) ("appellant cites no authority that alleged misuse of subpoena powers is cognizable on appeal as a form of prosecutorial misconduct.") In sum, although appellate counsel could have raised this alleged instance of prosecutorial misconduct on direct appeal, the Court cannot conclude that appellate counsel were constitutionally deficient for not raising it.

> 7.      **Prosecutorial Misconduct for Failing to Disclose Probation Officer Report.**

Petitioner argues here that his appellate attorneys were ineffective for failing to raise a claim on appeal challenging the prosecution's failure to disclose material and exculpatory evidence—namely a report by juvenile probation officer Lynda Phillips indicating that Ms. Phillips had learned that the infant-victim's death was an accident as opposed to homicide. As noted earlier above, the Court has already considered and rejected the essence of this claim in its procedural default decision. (ECF No. 151-2, at 26-31.)

> 8.      **Trial Court's Failure to Consider Mitigation Evidence—Phillips Statement.**

The eighth assignment of error that appellate counsel were ineffective for failing to raise, according to Petitioner, was a claim challenging the trial court's refusal to consider valid mitigation evidence—namely, juvenile probation officer Lynda Phillips' statement at sentencing that Petitioner had told her the victim's death was an accident. In his application for reopening before the court of appeals, Petitioner presented the claim as follows:

> Eighth Assignment of Error: The trial court erred when it refused to consider and weigh valid mitigation evidence in sentencing Mr. Hill to death, violating his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.
>
> At sentencing, juvenile court probation officer, Lynda Phillips, informed the court that Domika Dudley's death was an accident. The trial court refused to consider this evidence – that the death was accidental – despite the fact that the

172

final sentencing authority clearly rests with the judge.  R.C. §2929.03(D)(3).
(T.p. 1791-94).

Ms. Phillips' statements regarding the accidental nature of the victim's death should certainly have been considered by the judge before he imposed Mr. Hill's death sentence.  In Ohio, the trial court is required to conduct an independent review of all trial evidence including testimony, other evidence, statements of the offender, arguments of counsel and any statutorily prepared mitigation reports.  R.C. §2929.03(D)(3).

(J.A. Vol. XVII, at 14.)  On appeal to the Ohio Supreme Court, Petitioner argued as follows:

(9)  The trial court erred when it refused to consider and weigh valid mitigation evidence in sentencing Mr. Hill to death, violating his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

At sentencing, juvenile probation officer, Lynda Phillips, interrupted the trial judge and informed him that the victim's death was accidental.  The trial court refused to consider this evidence – that the death was accidental – because it was no longer in the "mitigation phase."  (T.p. 1791-94).  However, the judge clearly could and should have considered this critical information before imposing death because the final sentencing authority rested with him.  O.R.C. § 2929.03(D)(3).  Indeed, in Ohio, the trial court is required to conduct an independent review of all trial evidence including testimony, *other evidence*, statements of the offender, arguments of counsel, and any statutorily prepared mitigation reports.  O.R.C. § 2929.03(D)(3).

(J.A. Vol. XX, at 37-38.)

Although this Court did find in its procedural default decision that the issue was somewhat significant and one that appellate counsel might have wanted to highlight (ECF No. 151-2, at 27), the Court ultimately is not persuaded that Petitioner's appellate attorneys were ineffective for failing to argue this issue on appeal.  In short, the issue is not as strong as it appears at first glance.

Following the jury's verdict recommending the death penalty, Petitioner returned to court on December 6, 1991 for formal sentencing.  After the trial court stated that it had "reviewed the evidence in this case," the trial court invited additional arguments.  (Tr. Vol. XII, at 1784-85.)

173

At the conclusion of arguments by both sides, defense counsel asked if juvenile probation officer Linda Phillips could make a statement. (*Id.* at 1791.) The trial court agreed. At that point, Ms. Phillips not only reiterated the reasons she thought Petitioner's life should be spared, but then added, "[f]rom his own words, Genesis did not brutally nor intentionally kill that baby. He told me it was an accident." (*Id.*) The prosecution objected to the defense's making such an allegation for the first time at sentencing, at which point Ms. Phillips interjected that she was making these revelations against Petitioner's wishes and defense counsel clarified that they had just learned of revelations, too. (*Id.* at 1791-93.) The trial court then stated, "[w]ell, the nature of this proceeding is what it is. And if there were facts to be presented in mitigation of sentence, they should have been presented at the mitigation hearing." (*Id.* at 173.)

Although information that infant-victim's death was the result of an accident rather than a premeditated course of action would arguably militate in a sentence less than death, the fact remains that the information in this case is second hand. Petitioner was present in the courtroom when Ms. Phillips made the revelation but refused to corroborate it. Defense counsel added that they, too, had been unable to persuade Petitioner to tell the trial court that the victim's death had been an accident. Petitioner is reasonable in his argument that the statutory provision governing the trial court's consideration of a recommendation of death includes the phrase "other evidence." Ultimately, however, the Court is not persuaded that this was a strong issue for appeal.

The issue was clearly preserved at trial. Although there does not appear to be any contrary authority undermining the issue and neither is there any authority that this Court could find supporting the issue. In sum, the Court is not persuaded that omitting this issue is a decision

174

only an incompetent attorney would make.

### 9. Improper Consideration of Race in Selection of Grand Jury Forepersons.

Petitioner argues that his appellate attorneys were ineffective for failing to argue on appeal that the process in Ohio and Hamilton County for selecting grand jury forepersons, as well as grand and petit jurors, is unconstitutionally tainted by consideration of race. As the Court noted preceding its substantive discussion of Petitioner's appellate counsel ineffectiveness claims, the Court already considered and rejected the essence of these grand jury and petit jury selection process allegations in its September 27, 2006 *Opinion and Order* (ECF No. 151-3, at 27-29).

### 10. Denial of Fair Proportionality Review.

The tenth assignment of error that appellate counsel were ineffective for omitting, according to Petitioner, was a claim arguing that Petitioner's sentence is void or voidable because the State did not afford him fair proportionality review as required by statute. Petitioner reasons that because he has a liberty interest in a fair proportionality review, the failure of the appellate courts to afford Petitioner that review in violation of a state statute amounts to a violation of Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment rights. In his application to reopen his direct appeal before the court of appeals, Petitioner framed this claim as follows:

> Tenth Assignment of Error: Mr. Hill's sentence is void or voidable because the state denied him a fair proportionality review as required by statute in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Ohio's proportionality statutes create a *liberty interest* that mandates that the appellate courts perform proportionality review to determine appropriateness and excessiveness in the sentence.
>
> Because a *liberty interest* is protected by the due process clause of the

175

> Fourteenth Amendment, the Ohio Supreme Court cannot use *State v. Steffen* (1987), 31 Ohio St.3d 111, to arbitrarily confine proportionality review to a "pool of cases decided by the appellate court where the death penalty was actually imposed." By making no meaningful review of "similar" cases and ignoring cases with similar facts where the death penalty was not imposed, Ohio courts have made proportionality review meaningless. *Parker v. Dugger* (1991), 498 U.S. 308, 321.

(J.A. Vol. XVII, at 15.)  On appeal to the Ohio Supreme Court, Petitioner argued as follows:

> (10)  Mr. Hill's sentence is void or voidable because the state denied him a fair proportionality review as required by the statute in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Ohio's proportionality statutes create a liberty interest that mandates that the appellate courts perform proportionality reviews to determine appropriateness and excessiveness in the sentence.
>
> Because a liberty interest is protected by the due process clause of the Fourteenth Amendment, the state appellate courts and the Ohio Supreme Court cannot use State v. Steffen, 31 Ohio St. 3d 111, 509 N.E.2d 383 (1987), to arbitrarily confine proportionality review to a "pool of cases decided by the appellate court where the death penalty was actually imposed." By conducting no meaningful review of "similar cases" – refusing to consider cases with similar facts and death was not imposed – Ohio courts have rendered the proportionality review meaningless. See Parker v. Dugger, 498 U.S. 308 (1991).

(J.A. Vol. XX, at 38.)

The issue before the Court is whether Petitioner's appellate attorneys performed deficiently and to Petitioner's prejudice in failing to argue on appeal that the intermediate appellate courts denied him his right to fair proportionality review. The answer is no. As noted earlier in this section addressing ineffective assistance of appellate counsel, this Court below considers and rejects Petitioner's asserted right to proportionality review. That is and has always been the state of the law in Ohio and federal courts alike. For that reason, Petitioner cannot demonstrate that his appellate attorneys performed deficiently and to his prejudice for failing to raise this issue on appeal.

176

**11.    Petitioner's Incompetency During Trial and Direct Appeal.**

Petitioner argues here that his appellate attorneys were ineffective for failing to argue on

appeal that Petitioner had been incompetent during the guilt and penalty phases and was still

incompetent at the time of his direct appeal.  In his application to reopen his direct appeal before

the court of appeals, Petitioner presented the claim as follows:

> Eleventh Assignment of Error:  Mr. Hill was incompetent at both the guilt and
> sentencing phases of his trial and at the time of his direct appeal in violation of his
> rights under the Fifth, Eighth, and Fourteenth Amendments to the United States
> Constitution.
>
>      For an individual's due process rights to be protected at trial, it is
> necessary that the individual has the capacity to comprehend the nature and
> consequences of the proceedings and is able to assist in their effective
> representation. *Pate v. Smith* (C.A. 6, 1981), 637 1068, 1071.  At the time of Mr.
> Hill's trial and direct appeal he was suffering from Major Depressive Disorder
> with Psychotic Features, Paranoid Personality Disorder and Substance Abuse
> Dependence.  Mr. Hill's mental illnesses significantly impaired his ability to trust
> his defense counsel, to work cooperatively with them, and adequately understand
> and contribute to his own defense.  His mental illnesses also precluded him from
> effectively assisting his appellate counsel on his direct appeals to this Court and
> the Supreme Court of Ohio.  Indeed, the Sixth Circuit recognizes that
> communication with appellate counsel is crucial, especially when the client is
> incarcerated. *Boyd v. Cowan* (C.A. 6, 1975, 519 F.2d 182.

(J.A. Vol. XVII, at 15-16.)  Before the Ohio Supreme Court in his effort to reopen his direct

appeal, Petitioner argued as follows:

> (11)  Mr. Hill was incompetent at both the guilt and sentencing phases of his trial
> and at the time of his direct appeal in violation of his rights under the Fifth,
> Eighth, and Fourteenth Amendments to the United States Constitution.
>
> For an individual's due process rights to be protected at trial, it is necessary that
> the individual has the capacity to comprehend the nature and consequences of the
> proceedings and assist in their effective representation. Pate v. Smith, 637 F.2d
> 1068 (6th Cir. 1981).  At the time of Mr. Hill's trial and direct appeal, he was
> suffering from Major Depressive Disorder with Psychotic Features, Paranoid
> Personality Disorder, Substance Abuse Dependence, frontal lobe brain damage,
> and mental retardation.  These serious mental deficits impaired his ability to

understand and contribute to his own defense and assist his appellate attorneys.

(J.A. Vol. XX, at 38.)

As the Court noted above, for reasons discussed more fully in rejecting Petitioner's first and seventeenth grounds for relief, the Court also concludes that Petitioner's appellate counsel were not ineffective for failing to raise on appeal Petitioner's alleged incompetency at trial and on direct appeal.

### 12. Ohio's Violation of the Supremacy Clause.

Finally, Petitioner argues that Ohio violates the Supremacy Clause and numerous treaties and conventions through its continued use of capital punishment. The Court has already determined that this claim is not properly before it for review on the merits. As the Court explained, Petitioner presented this claim to the court of appeals but subsequently failed to present it to the Ohio Supreme Court.

### 13. Clinical Depression and Subsequent Discipline of Appellate Team Member

The Court turns last to Petitioner's claim that his appellate counsel performed deficiently and to Petitioner's prejudice because a member of that appellate counsel team, attorney Stidham, was clinically depressed and, several years following the completion of Petitioner's direct appeals, left the practice of law in the face of disciplinary action for the misuse of client funds and misleading of investigators. The Court rejects Petitioner's claim because Petitioner offers no evidence directly or even inferentially linking Mr. Stidham's alleged depression to acts or omissions during Petitioner's direct appeals that were either objectively unreasonable or prejudicial. And it tests the limits of credulity to suggest that disciplinary action that Mr. Stidham faced years after Petitioner's direct appeals had concluded somehow rendered Mr.

178

Stidham's performance during Petitioner's direct appeals objectively unreasonable or prejudicial. Petitioner essentially is asking the Court to assume that because Mr. Stidham faced discipline for misusing client funds and then making misleading statements during the disciplinary investigation, Mr. Stidham was engaging in misconduct during Petitioner's direct appeals, which caused Mr. Stidham to perform deficiently and to Petitioner's prejudice. The Court declines to do so.

For the foregoing reasons, the Court finds nothing unreasonable or contrary to federal law in the Ohio Supreme Court's rejection of Petitioner's application for reopening asserting the claims of ineffective assistance of appellate counsel considered and rejected above. Accordingly, the Court **DENIES** Petitioner's eighteenth and nineteenth grounds for relief.

**I.     Twentieth Ground for Relief: The Ohio courts offered no meaningful review of Mr. Hill's death sentence.**

(Second Amended Petition, ECF No. 137-2, at ¶¶ 248-257 (argued sixteenth in the second amended petition).) Petitioner states that, "[w]here a state has determined that death should be an available penalty for certain crimes, as Ohio has, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is appropriate and those for whom it is not." (ECF No. 137-2, at ¶ 248.) The essence of Petitioner's argument herein is that the manner in which Ohio conducts appellate proportionality review is constitutionally flawed. Specifically, Petitioner complains that, "Ohio appellate courts' proportionality review does not satisfy the Due Process and Equal Protection Clauses of the Fourteenth Amendment because the appellate courts only determine whether a death sentence is appropriate compared to other cases in which a death sentence was imposed, rather than compared to all similar cases regardless of the penalty imposed." (*Id.* at ¶ 251.) In so arguing, Petitioner concedes that

179

appellate proportionality review is not constitutionally required. Petitioner relies on the

argument, however, that "if a state chooses to include proportionality in its review of capital

cases as an additional safeguard against arbitrary and capricious imposition of the death penalty,

then the state must conduct that review in a constitutional manner – i.e., it must comport with the

demands of due process and equal protection by evaluating, balancing, comparing, and

contrasting a death sentence with *all* similar cases to determine if it is disproportionate." (*Id.* at ¶

249 (emphasis in original).) Petitioner proceeds to argue that he was prejudiced by this

inadequate proportionality review, offering examples of similar or "worse" offenses than those

with which Petitioner was charged for which the offenders did not receive the death penalty. (*Id.*

at ¶¶ 253-255.)

  In the Amended Return of Writ, Respondent asserts simply that Ohio's proportionality

review is not contrary to clearly established federal law. (ECF No. 154, at 79-81.) According to

Respondent, "[t]his claim is non-cognizable because the federal constitution does not require

proportionality review in the first place." (*Id.* at 79-80.) Respondent proceeds to argue that even

assuming Petitioner's claim were cognizable, "he is still at bottom asking this Court to overrule

the Ohio Supreme Court's interpretation of an Ohio statute." (*Id.* at 80.) Respondent notes that

the Ohio Supreme Court has stated in unmistakable terms how the statutory proportionality

requirement is to be conducted and contends that to the extent Petitioner might prefer a different

kind of proportionality review, he has no constitutional right to one. In short, Respondent

argues, Petitioner is not entitled to relief on this claim.

  Petitioner responds by pointing out that he presented his claim to the state courts not

only in postconviction, (which Respondent acknowledged), but also on direct appeal, (which

Respondent did not acknowledge). (ECF No. 194, at 143-171.)  Petitioner proceeds to argue

that because the specific challenges that he raised were not addressed by either the intermediate

appellate court in postconviction or the Ohio Supreme Court on direct appeal, the limitations

imposed by § 2254(d) do not apply, leaving this Court free to review his claim *de novo*.

Petitioner insists that he has the right to receive a sentence that is not arbitrary, capricious,

discriminatory, or disproportionate and a sentence not in violation of his rights to equal

protection and due process. Petitioner emphasizes that his claim consists of both a facial

challenge to Ohio's proportionality statute and the manner in which Ohio appellate courts

implement that statute and an as-applied challenge to how proportionality review was

implemented in Petitioner's case.

Of the intermediate appellate court's consideration of Petitioner's claim in

postconviction, Petitioner complains that "the appeals court rejected Hill's federal constitutional

claims by relying on the Supreme Court of Ohio's continued use of a facially and as-applied

unconstitutional proportionality review scheme." (ECF No. 194, at 147-48.)  The Ohio Supreme

Court, in turn, ignored Petitioner's particular arguments and merely recited that its

proportionality review does not infringe upon any Constitutional rights. "Thus," according to

Petitioner, "there is no decision on the merits by the state courts that might implicate the §

2254(d)(1) limitations on relief this Court may grant." (*Id.* at 149.)  Petitioner proceeds to

criticize the citations upon which the Ohio Supreme Court relied, insisting that none of them

support the Ohio Supreme Court's position on proportionality review.  Beyond that, Petitioner

argues, the Ohio Supreme Court's review was perfunctory, devoid of any factual comparisons or

discussion.  Petitioner concludes that regardless of which decision this Court regards as the "final

decision" adjudicating the merits of Petitioner's claim, § 2254(d) applies to neither of them.

Petitioner argues in the alternative that his claim prevails even under the "intermediate deference" crafted by the Sixth Circuit for situations in which a state court's adjudication of a claim is murky. Petitioner's argument is two-pronged. First, according to Petitioner, his sentence violates the Eighth Amendment because statutory proportionality review did not properly narrow the sentence. Arguing that appellate review plays a crucial role in preventing arbitrary death sentences forbidden by the Eighth Amendment, Petitioner asserts that Ohio's proportionality review falls short–amounting to little more than cursory, perfunctory, and meaningless lip service. That review, according to Petitioner, also fails to narrow the class of offenders deserving of the death penalty. Second, Petitioner argues that his sentence violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment because Ohio is not fairly or equally applying the proportionality review that it elected to provide for capitally sentenced individuals. To this point, Petitioner emphasizes that he is not challenging the state courts' interpretation of a state statute. Rather, "it is the fact that Ohio has explicitly granted him the right to a robust proportionality review, and then failed to uphold that right in violation of his rights under the due process and equal protection clauses, that support his habeas relief." (ECF No. 194, at 160-61.)

Petitioner concludes the arguments in his Traverse by asserting that even if the constrictions of § 2254(d) apply, his claim still prevails. Petitioner begins this argument by clarifying what he believes is the issue before the Court. He asserts that:

> The issue, properly defined, is whether the Ohio Courts decisions that 1) Hill's sentence was not disproportionate in violation of the Eighth Amendment, and 2) Hill's sentence was not in violation of the Fourteenth Amendment's due process and equal protection guarantees, were contrary to, or involved an unreasonable

182

application of, clearly established Federal law, as determined by the Supreme Court of the United States. The correct answer is yes.

(ECF No. 194, at 166.) As the clearly established federal law, Petitioner points to a line of cases that, according to Petitioner, "stand[] for the proposition that a state procedural system that fails to properly individualize and narrow the category of death-sentenced offenders to those who commit a 'narrow category of the most serious crimes,' and whose 'extreme culpability' makes them 'the most deserving of execution' is unconstitutional because such a system fails to prevent arbitrarily, capriciously, and/or disproportionately imposed death sentences." (*Id.* at 166-67.) Petitioner further argues that the Sixth Circuit's precedent holding that proportionality review is not constitutionally required is based on an erroneous interpretation of *Pulley v. Harris*, 465 U.S. 37 (1984), and its predecessors. Petitioner then proceeds to lay out the manner in which the Ohio courts contravened or unreasonably applied the clearly established Federal law that he identified. He argues:

> The state court's refusal to conduct a thorough, comprehensive, and appropriate proportionality review in Hill's case–i.e. the court's perfunctory review of his sentence, comparing his case only to those cases in which a death penalty was imposed, and ignoring similar cases in which death was not imposed or even sought at all–therefore constitutes a situation in which the state court applied a rule that, because it allows for arbitrary, capricious, or discriminatory death sentences that are not individualized and narrowly confined to the extremely culpable, contradicts the governing law set forth by the Supreme Court.

(ECF No. 194, at 169.)

Petitioner continues:

> Moreover, the Ohio courts *may* identify the correct governing legal rule–certainly a disputed proposition–but the courts nevertheless unreasonably applied it by engaging in cursory, perfunctory, and essentially non-existent proportionality review in Hill's case.

(*Id*. at 170.)

183

Petitioner concludes:

> Similarly, the Ohio state courts' treatment of Hill's Fourteenth
> Amendment due process and equal protection claims resulted in a decision that
> was contrary to, or involved an unreasonable application of, clearly established
> federal law.

(*Id.*)

In his Response to the Traverse, Respondent asserts that Petitioner is not entitled to *de novo* review of his claim and that, in any event, "[t]he claim is as plainly meritless in habeas as it was in state court." (ECF No. 213, at 28.) Reiterating that there is no constitutional right to proportionality review, Respondent notes that "[t]he fact that Hill points to a statement by Justice Stevens in a cert. denial is indicative of his claim wholly lacking legal support." (*Id.* at 29.) Respondent also points out that "claims of constitutional violations based on proportionality review have already been rejected by the Sixth Circuit Court of Appeals." (*Id.*)

On direct appeal, the Ohio Supreme Court held not only that Ohio's "system of proportionality review does not infringe the Constitution," but also that "[i]mposing the death penalty in this case is appropriate and not excessive or disproportionate when compared with the penalty in similar felony-murder cases of kidnapping." *Hill*, 75 Ohio St. 3d at 212-213, 214. During Petitioner's postconviction proceedings, the last state court to issue a reasoned decision addressing Petitioner's claims–the intermediate court of appeals–held that "[t]he Ohio Supreme Court continues to rely on the proportionality review required by R.C. 2929.05(A)." (App. Vol. 9, at 2799.)

This Court finds that neither of these decisions of the state courts are unreasonable. The Court reaches this conclusion because the Constitution does not require proportionality review

and because Sixth Circuit case law forecloses relief on Petitioner's claim.  This Court recognizes

that Petitioner has endeavored to distinguish his claim from one relying on a constitutional right

to proportionality review.  That said, the case law foreclosing relief on proportionality review

challenges is no less dispositive of Petitioner's instant claim.  *See Smith v. Mitchell*, 567 F.3d

246, 261 (6th Cir. 2009) (relying on prior decisions in rejecting claim that Ohio's system of

proportionality and appropriateness review is inadequate because limiting review to only cases

where the death penalty was imposed prevents fair proportionality review); *Wickline v. Mitchell*,

319 F.3d 813, 824-25 (6th Cir. 2003) (rejecting claim asserting that Ohio Supreme Court did not

conduct meaningful proportionality review on grounds that proportionality review is not

constitutionally required, states have latitude in defining pool of cases for comparison, and Ohio

acted within that wide latitude); *Cooey v. Coyle*, 289 F.3d 882, 928 (6th Cir. 2002) ("The

Constitution simply has not been held to require proportionality review of the sort that Mr.

Cooey desires."); *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001) ("Buell's contentions

regarding inadequate appellate review of the proportionality of death sentences under the Ohio

statute fail because no proportionality review is constitutionally required."  (citing *Pulley v.

Harris*, 465 U.S. 37, 44-51 (1984)); *Jamison v. Collins*, 100 F. Supp. 2d 647, 765 (S.D. Ohio

2000) (holding that there is no federal constitutional requirement that a state appellate court

conduct a comparative proportionality review); *Treesh v. Bagley*, No. 1:02 CV 462, 2007 WL

1039081, at *62 (N.D. Ohio Mar. 31, 2007) ("The Sixth Circuit has held that by limiting

proportionality review to previous cases wherein the death penalty has been imposed, the Ohio

Supreme Court has complied with the latitude allowed.").

     This Court has carefully considered Petitioner's arguments for why he is entitled, under

the Eighth and Fourteenth Amendments, to a more meaningful proportionality review than that

afforded by Ohio appellate courts. None of Petitioner's arguments, nor the cases cited in

support, are sufficient to overcome the inescapable fact that there are countless Supreme Court

and Sixth Circuit decisions stating unequivocally that there is no constitutional right to

proportionality review. This Court is obligated to follow the letter and spirit of those decisions.

For the foregoing reasons, this Court does not find unreasonable the Ohio courts'

decisions finding that Petitioner's death sentence was neither inappropriate, nor disproportionate,

nor excessive. The Court **DENIES** Petitioner's twentieth ground for relief.

> **J.      Twenty-First Ground for Relief: The prosecutors sought the
> death penalty against Mr. Hill arbitrarily, in violation of his
> due process rights.**

(Second Amended Petition, ECF No. 137-2, at ¶¶ 135-138 (argued seventh in the second

amended petition).) According to Petitioner, "[a] prosecutor who pursues the death penalty with

discriminatory intent violates a defendant's rights under the Equal Protection Clause of the

Fourteenth Amendment." (*Id.* at ¶ 135 (citing *McClesky v. Kemp*, 481 U.S. 279, 292 (1987)).)

Asserting that prosecutors in Ohio and specifically Hamilton County have virtually unlimited

discretion in their indictment decisions, Petitioner proceeds to argue that "various facts give rise

to an inference that Hamilton County prosecutors relied on inappropriate factors in pursuing a

death sentence for Mr. Hill." (*Id.* at ¶ 137.) Petitioner continues:

> Of the one hundred and ninety-three death sentences imposed in Ohio since the
> death penalty's reinstitution, forty-eight have been imposed upon individuals from
> Hamilton County. And of those forty-eight death sentences, sixty percent have
> been imposed against African-Americans. Yet African-Americans comprise only
> about twenty-one percent of the Hamilton County population, according to the
> 1990 United States census.

(*Id.*)

186

Respondent argues in the Amended Return of Writ that Petitioner's claim is meritless. (ECF No. 154, at 64-65.) Citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996), as clearly established Federal law, Respondent asserts that prosecutorial decisions enjoy a presumption of regularity absent clear evidence to the contrary. Respondent notes that Petitioner does not even allege that the prosecution in his case based the decision to charge him capitally on an unjustifiable basis. Respondent concludes that it is simply not unconstitutional for prosecutors to have discretion in charging capital felonies.

In his traverse, Petitioner insists that "inappropriate considerations of race infected Hill's prosecution when prosecutors sought the death penalty based, at least in part, on arbitrary and impermissible factors including Hill's race." (ECF No. 194, at 171.) Petitioner proceeds to assert, however, that he is unable to fully brief this claim, due to Respondent's failure to provide court-ordered discovery. The Court turns to that issue now.

On September 30, 2010, this Court issued an *Opinion and Order* granting Petitioner's motion to compel discovery. (ECF No. 212, at 9-14.) Specifically, the Court gave Respondent fourteen (14) days to provide Petitioner with certain documents (ECF No. 202-5) because Petitioner demonstrated good cause to believe those documents might contain information supporting Petitioner's claim that the prosecution's decision to indict him capitally was race-based. (*Id.*) Assuming Respondent complied and provided those documents to Petitioner, the absence of any subsequent filing from Petitioner, such as a motion to expand the record or a motion to supplement his Traverse, suggests to this Court that those documents contained nothing supporting Petitioner's claim of discriminatory prosecution and that Petitioner stands by his claim as briefed. His claim as briefed does not establish that any improper basis, such as

187

race, drove the prosecution's decision to capitally indict Petitioner.

To the extent that Petitioner raised this claim on direct appeal by including it in the myriad of facial challenges he made to the constitutionality of Ohio's capital statutes, the Ohio Supreme Court summarily denied it on the merits without addressing it in any detail. *Hill*, 75 Ohio St. 3d at 212. The issue for the Court to decide, accordingly, is whether the Ohio Supreme Court's denial contravened clearly established Supreme Court law. That said, even if the Court were to review the claim *de novo*, the claim would fail.

This Court considered and rejected a similar claim in *Loza v. Mitchell*, 705 F. Supp. 2d 773, 875 (S.D. Ohio 2010). There, this Court explained that:

> A presumption of regularity supports prosecutorial decisions and unless there is clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties. *United States v. Armstrong* (1996), 517 U.S. 456, 116 S.Ct. 1480, 1486 [134 L.Ed.2d 687]. If a prosecutor has probable cause to believe that an accused committed an offense, the decision whether to prosecute, and what charges to file or bring before a grand jury, generally rests entirely within the prosecutor's discretion. *Id*. However, pursuant to the equal protection component of the Due Process Clause of the Fifth Amendment, a prosecutor's decision whether to prosecute may not be based upon "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id*. In order to establish a claim of selective prosecution, a defendant must show that a prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id*. at 1487, quoting *Oyler v. Boles* (1962), 368 U.S. 448, 456, 82 S.Ct. 501 [7 L.Ed.2d 446].

*Loza*, 705 F. Supp. 2d at 875. In *Smith v. Mitchell*, 348 F.3d 177, 211-12 (6th Cir. 2003), the Sixth Circuit rejected a similar race-based challenge, finding an absence of any evidence or suggestion of discriminatory intent driving the State's decision to prosecute Smith.

As in *Loza*, Petitioner herein offers nothing of substance to call into question, much less overcome, the presumption of regularity that the prosecution's decision to capitally indict him enjoys. In fact, the record amply supports the offenses and aggravating circumstances with

which the prosecution charged Petitioner.

For the foregoing reasons, the Court concludes that the Ohio Supreme Court's summary decision denying this claim did not contravene clearly established Supreme Court precedent. The Court therefore **DENIES** Petitioner's twenty-first ground for relief.

### K. <u>Twenty-Third Ground for Relief</u>: Ohio's death penalty violates the Eighth Amendment.

(Second Amended Petition, ECF No. 137-2, at ¶ 258 (argued seventeenth in the second amended petition).) In his Second Amended Petitioner, Petitioner states simply that he "acknowledges that the United States Supreme Court has not yet abolished the death penalty as cruel and unusual punishment but nonetheless argues that it is unconstitutional, to preserve the issue." (*Id*.) In the Amended Return of Writ, Respondent states just as simply in response that Petitioner is not entitled to relief on this claim, as Petitioner himself recognizes. (ECF No. 154, at 81-82.)

In his Traverse, Petitioner expands upon his argument, asserting that "lethal injection as administered in Ohio violates [Petitioner's] Eighth Amendment rights against cruel and unusual punishment." (ECF No. 194, at 174.) "Accordingly," Petitioner reasons, "the fact of Hill's death sentence must be deemed unconstitutional." (*Id*.) Petitioner begins by arguing that he is entitled to *de novo* review of his claim, both because the Ohio Supreme Court's cursory consideration did not address or resolve Petitioner's claim on the basis of federal law and because the Ohio Supreme Court's decision related to death by electrocution—not death by lethal injection. (*Id*. at 175-76.)

Petitioner proceeds to make a case for why his claim is cognizable in federal habeas corpus. (*Id*. at 177-180.) To that point, Petitioner asserts that the precise nature of his claim as "challeng[ing] the constitutionality of his death sentence based on the proposition that Ohio's

189

method of execution violates the Eighth Amendment." (*Id.* at 177.)  Petitioner continues that,

following the Supreme Court's fractured plurality decision in *Baze v. Kentucky*, 553 U.S. 35

(2008), addressing the constitutionality of Kentucky's execution procedures in the context of a §

1983 challenge, two Sixth Circuit panels have held that constitutional challenges to Ohio's

method-of-execution are cognizable in habeas corpus.  Petitioner further argues that the Supreme

Court's decision in *Hill v. McDonough*, 547 U.S. 573 (2006), held that method-of-execution

challenges may–but not necessarily must–be raised in § 1983.  According to Petitioner, "if a state

provides that only lethal injection may be used as an execution method, but that state's lethal

injection protocol, policies, procedures, and processes are found to violate the Eighth

Amendment, then the fact of an inmate's death sentence in that state would also violate the

Eighth Amendment because the state would be prevented from executing the capitally sentenced

inmate." (*Id.* at 179-80.)

Next, pointing to Ohio's multiple changes to its execution protocol and the failed attempt

to execute Romell Broom, Petitioner continues to insist that discovery is needed in order for him

to fully brief this claim. (*Id.* at 181-184.)  Petitioner requests to expand the record with filings

from the § 1983 *Cooey* litigation, alleging that that information remains unavailable to him

without court-ordered discovery.

In the Response to Petitioner's Traverse, Respondent raises multiple arguments against

Petitioner's claim.  First, according to Respondent, "[t]his Court has already properly found that

this claim is not cognizable in federal habeas when denying discovery." (ECF No. 213, at 30

(citing ECF No. 158, at 29-30.)  Respondent mischaracterizes this Court's September 27, 2007

*Opinion and Order*.  To be clear, it was the nature of Petitioner's requested discovery, as well as

the cases and anecdotal evidence that supported it, that this Court rejected.  In so doing, the

Court explicitly refrained "from expressing any opinion as to the merits of petitioner's claim[.]"

(ECF No. 158, at 30.)  Respondent next lays out arguments for why Petitioner's claim sounds

exclusively in § 1983 and never in habeas corpus.  (ECF No. 213, at 30-31.)  This Court recently

expressly rejected those arguments when it granted Petitioner's motion for leave to amend his

petition to add Eighth Amendment and Fourteenth Amendment method-of-execution challenges.

(ECF No. 230, at 5-6.)  Respondent proceeds to argue that even assuming Petitioner's claim is

cognizable in habeas corpus, Petitioner's claim fails because it is procedurally defaulted by

virtue of never having been presented to the state courts.  Finally, Respondent argues that

Petitioner's claim fails on the merits because no court has ever ruled lethal injection *per se*

unconstitutional.  (ECF No. 213, at 31 (citing *Baze v. Rees*, 553 U.S. 35, 61 (2008); and *Gregg v.*

*Georgia*, 428 U.S. 153, 179 (1976)).)

Pursuant to this Court's July 5, 2012 *Opinion and Order*, Petitioner filed his Third

Amended Petition on August 3, 2012, abandoning his twenty-third ground for relief and adding

the following grounds for relief:

> **Twenty-Fifth Ground for Relief:** Hill's execution will violate the Eighth
> Amendment because Ohio's lethal injection protocol will result in cruel and
> unusual punishment.

> **Twenty-Sixth Ground for Relief:** Hill's execution will violate the Fourteenth
> Amendment because Ohio's lethal injection protocol will deprive him of equal
> protection of the law.

(ECF No. 231, at ¶¶ 299-341.)  In his Eighth Amendment claim:

> Hill's challenge includes, but is not limited to, matters related to the drugs
> employed, the delivery mechanisms used, the physical structures employed in
> Ohio's protocol, the personnel and training involved, Ohio's substantial and
> documented pattern of repeated deviation and/or variation from the written

> execution policy and execution protocols and procedures in administering
> executions regardless of the particular policy in effect at the time, the functional
> nonexistence of the written policy's safeguards as administered, the repeated
> inability to carry out an execution without encountering serious problems, and the
> unfettered discretion granted in the policy to several of the actors involved.

(ECF No. 231, at ¶ 311.)  The essence of Petitioner's Fourteenth Amendment challenge is that:

> The State of Ohio's deviations and/or variations from their policy,
> protocols and procedures, regardless of the policy, protocols and procedures in
> effect at any given time, are arbitrary, they are irrational, they further no
> legitimate state interest, nor is there any relationship between the deviations
> and/or variations and the condemned inmate.

(*Id.* at ¶ 337.)  Petitioner argues as to both claims that because the State of Ohio provides no

forum for litigating method-of-execution challenges, there can be no state court adjudication on

the merits, thereby entitling his claim to *de novo* review in habeas corpus.

In her September 26, 2012 Supplemental Return of Writ, Respondent raises several

arguments against Petitioner's new claims.  Specifically, Respondent asserts that Petitioner's

claims are barred by the statute of limitations, and/or barred by procedural default, and/or

without legal support.  (ECF No. 238, at 7-8.)

### 1.    Statute of Limitations.

With respect to her statute of limitations argument, Respondent reasons that "construed

as a general challenge to the State's use of lethal injection as a method of execution, Hill's

claims accrued at the earliest when Ohio mandated lethal injection as its exclusive method of

execution, and, at the latest, when Ohio adopted a 'single drug' method in 2009."  (*Id.* at 7.)

Respondent argues that the claims are accordingly barred by the one-year statute of limitations

set forth in 28 U.S.C. § 2244(d).  Petitioner disputes this argument, asserting that his claims

began to accrue only after the State adopted the most recent version of its written execution

protocol on September 18, 2011.  (ECF No. 239, at 15-17.)

Prolonged discussion of this argument is unnecessary.  In its July 5, 2012 *Opinion and Order* granting Petitioner leave to add his twenty-fifth and twenty-sixth grounds for relief, the Court concluded that the claims were *not* time-barred under 28 U.S.C. § 2244(d).  (ECF No. 230, at 4-5.)  The Court incorporates that discussion herein and rejects Respondent's argument that grounds twenty-five and twenty-six are barred by the statute of limitations.

### 2.    **Procedural Default.**

Respondent also argues that Petitioner's claims are barred by procedural default because he has never presented them to any state court.  (ECF No. 238, at 12-20.)  Respondent additionally argues that Petitioner cannot establish cause and prejudice to excuse the default.  Recognizing that Petitioner could not have challenged Ohio's current execution protocol at the time that he filed his original postconviction action in 1996, as that protocol did not exist until September 18, 2011, Respondent argues that "ample evidence existed to apprise Hill of a potential challenge to lethal injection under the Eighth Amendment, akin to the challenge to electrocution that he actually presented in state post-conviction."  (*Id.* at 17.)  "That is all the more true,"Respondent continues, "of Hill's equal protection claim."  (Id.)  Respondent also stresses that " '[t]he evolving nature of method-of-execution challenges does not relieve an inmate who chooses to litigate that claim via federal habeas corpus of the obligations to present the essence of the claim to the state courts and to plead the essential facts and legal arguments in his petition.' "  (*Id.* at 14-15 (quoting *Lynch v. Hudson*, 2011 U.S. Dist. LEXIS 110652, Slip opinion at *390).)

To that point, Respondent disputes Petitioner's argument that in *State v. Houk*, 127 Ohio

193

St. 3d 317 (2010), the Ohio Supreme Court held that the State of Ohio provides no forum for the litigation of method-of-execution challenges. According to Respondent, all that *Houk* held was "that state law provided no civil cause of action parallel to a suit under Title 42 Section 1983 to litigate the issue of '*whether a specific lethal-injection protocol* is constitutional.' " (*Id.* at 18 (quoting *State v. Houk*, 127 Ohio St. 3d at 318-19.) Respondent includes a string-cite of cases in which Ohio courts considered method-of-execution challenges raised by Ohio inmates in various state court forums. (ECF No. 238, at 19.)

Petitioner denies that his claims are procedurally defaulted. (ECF No. 239, at 17-24.) As alluded to by Respondent, the gravamen of Petitioner's argument is that "[t]he exhaustion/procedural default defenses are unavailable to the Warden because there is no corrective state process by which Hill could have presented his claims to the state court." (*Id.* at 17.) In that regard, Petitioner asserts that the Ohio Supreme Court in *Scott v. Houk* did conclude that challenges to Ohio's method of execution cannot be raised in Ohio courts and that Respondent's interpretation otherwise is too narrow. As Petitioner reasons:

> In *Scott*, the Supreme Court of Ohio considered a certified question from the Northern District of Ohio: "Is there a post-conviction or other forum to litigate the issue of whether Ohio's lethal injection protocol is constitutional under *Baze v. Rees*, 553 U.S. 35 [] (2008), or under Ohio law?" *Scott*, 939 N.E.2d at 836. The Supreme Court of Ohio clearly and concisely held that no such forum is available: "[t]he Ohio General Assembly has not yet provided an Ohio-law cause of action for Ohio courts to process challenges to a lethal-injection protocol. . . ." *Id.* The *Scott* court concluded that "until the General Assembly explicitly expands state review of death-penalty cases by creating a methodology for reviewing Ohio's lethal injection protocol, we must answer the certified question as follows: There is no state post-conviction relief or other state-law mode of action to litigate the issue of whether a specific lethal-injection protocol is constitutional under *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420, or under Ohio law." *Id.*

(ECF No. 239, at 18-19.) Another reason why the Ohio Supreme Court's *Scott v. Houk* decision

194

is not confined to a civil cause of action, according to Petitioner, is that the Ohio Supreme Court expressly offered as a rationale for why it saw no need to craft a state remedy given the fact that litigants could obtain such review in federal courts through 42 U.S.C. § 1983 *or* federal habeas corpus. (*Id*. at 19-20.)

Petitioner argues that Respondent's reliance on certain cases is misplaced. *State v. Powell*, No. 2007-2027, 971 N.E.2d 865 (Ohio 2012), according to Petitioner, does not support Respondent's interpretation of *Scott v. Houk* because "Powell did not raise any of the claims and arguments that Hill has raised here in his Amended Petition." (*Id*. at 20.) Petitioner further argues that Respondent's reliance on *Lynch v. Hudson*, No. 2:07-cv-948, 2011 U.S. Dist. LEXIS 110652 (S.D. Ohio Sept. 28, 2011), is also of little help because "[t]he habeas claim asserted in *Lynch* was not the same as Hill's." (ECF No. 239, at 22.)

Finally, Petitioner argues that even assuming *arguendo* that Respondent is correct in her assertion that method-of-execution challenges must be litigated in the state courts before they can be raised in federal habeas corpus, the appropriate course of action for this Court to take is to "simply stay and hold Hill's petition in abeyance, so that Hill may return to state court to litigate his claims." (*Id*. at 24.)

The Court finds Petitioner's arguments to be unpersuasive and is of the view that his newly added claims are procedurally defaulted. No one disputes that Petitioner has never presented the allegations framed in his twenty-fifth and twenty-sixth grounds for relief to the state courts. A state prisoner must exhaust available state court remedies before he or she can secure federal habeas corpus relief. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Picard v. Connor*, 404 U.S.

195

270, 275 (1971). A petitioner satisfies the exhaustion requirement when he or she raises the claim in a manner and procedural forum that affords the state courts a fair opportunity to address the federal constitutional issue. *See, e.g., Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Picard v. Connor*, 404 U.S. at 275-76. If the petitioner has not fairly presented his claims, and no remedy exists for him or her to do so, then his or her claim is exhausted but also procedurally defaulted, absent a showing of cause and prejudice to excuse the waiver. *See, e.g., Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

The exhaustion requirement may be excused if it appears that there is an absence of available state court corrective process. 28 U.S.C. § 2254(b)(1)(B)(i). The Court is not persuaded, however, by Petitioner's arguments that there is no state court remedy in Ohio for raising method-of-execution challenges such as those he raises in his twenty-fifth and twenty-sixth grounds for relief. That is, the Court is not persuaded that *Scott v. Houk* stands for the proposition "that challenges to Ohio's method of execution cannot be raised under Ohio law." (ECF No. 239, at 18.) The Ohio Supreme Court issued *Scott v. Houk*, 127 Ohio St. 3d 317 (2010), to answer a question certified to the court by Judge John Adams of the United States District Court for the Northern District of Ohio. Specifically, Judge Adams certified the following question: "Is there a post-conviction or other forum to litigate the issue of whether Ohio's lethal injection protocol is constitutional under *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), or under Ohio law?" *Scott*, 127 Ohio St. 3d at 318. In answering that question, the Ohio Supreme Court began by noting the various established methods that the Ohio legislature had established for Ohio death-sentenced inmates to receive state review of his or her case: direct appeal, postconviction, state habeas corpus, and application to reopen the direct

196

appeal.  The Ohio Supreme Court then stated as follows:

> The Ohio General Assembly has not yet provided an Ohio-law cause of action for Ohio courts to process challenges to a lethal-injection protocol, and given the review available on this issue through Section 1983, Title 42, U.S. Code, for injunctive relief against appropriate officers or federal habeas corpus petitions, we need not judicially craft a separate method of review under Ohio law.  Accordingly, until the General Assembly explicitly expands state review of death-penalty cases by creating a methodology for reviewing Ohio's lethal-injection protocol, we must answer the certified question as follows:  There is no state postconviction relief or other state-law mode of action to litigate the issue of whether a specific lethal-injection protocol is constitutional under *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), or under Ohio law.

*Scott v. Houk*, 127 Ohio State 3d at 318.  Several factors militate against giving *Scott* the meaning Petitioner ascribes to it.  The Court begins with examining the plain language of the decision.  The Ohio Supreme Court stated that the Ohio General Assembly had yet to provide a state *cause of action* for Ohio courts to process challenges to Ohio's lethal injection protocol.  The Ohio Supreme Court's use of the phrase "cause of action," rather than "claim," suggests to this Court that the Ohio Supreme Court was contemplating a separate civil action raising various challenges and seeking various forms of relief, rather than a constitutional claim included in a direct appeal, in postconviction, or in state habeas corpus.  Moreover, Section 1983 claims may be brought and adjudicated in the courts of Ohio.

Finally, it is telling to look at what *Scott v. Houk* does not say.  In *Gapen v. Bobby*, No. 3:08-cv-280, 2012 WL 3686303 (S.D. Ohio Aug. 27, 2012), Magistrate Judge Michael R. Merz recently rejected the very interpretation of *Scott v. Houk* that Petitioner herein urges this Court to accept in determining whether the very method-of-execution claims that Petitioner herein raises were properly raised in habeas corpus.  Magistrate Judge Merz stated in relevant part:

> Judge Adams' question was limited to challenges to a specific lethal injection protocol and not addressed to general claims that lethal injection

197

> execution is unconstitutional. Thus the Ohio Supreme Court's response should not be read as holding that such a general claim could not be raised in a criminal death penalty trial, on direct appeal, or in post-conviction proceedings under Ohio Revised Code § 2953.21, which specifically allows for consideration of constitutional claims, both Ohio and federal. In other words, *Scott* should not be read as narrowing the scope of any pre-existing Ohio procedures for raising a claim that all lethal injection executions are unconstitutional.

*Gapen*, 2012 WL 3686303, at \*4. Magistrate Judge Merz also observed that "[t]here is no suggestion anywhere in *Scott* that prior occasions of raising a lethal injection claim on direct appeal or in a post-conviction were or should have been dismissed for want of jurisdiction." *Id.* at \*5. The Court agrees with this reasoning.

For the reasons set forth above, the Court concludes that Petitioner could have raised his twenty-fifth and twenty-sixth ground for relief in the state court but did not and now no longer can. He has waived his claims, accordingly, absent a showing of cause and prejudice to excuse the waiver and permit federal review. He has offered no cause and prejudice arguments. Accordingly, the Court concludes that Petitioner has waived his twenty-fifth and twenty-sixth grounds for relief.

Petitioner also argues that assuming the Court concludes that a remedy exists in Ohio for him to raise his claims, the proper course of action for this Court to take is not to dismiss the claims as waived but to stay these proceedings and hold them in abeyance while Petitioner returns to the state courts to litigate his claims. The Court disagrees. One prerequisite for the stay and abeyance procedure that Petitioner seeks is a determination by this Court that his claims are not "plainly meritless." *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005). For the reasons that follow in sub-section (3) below, Petitioner cannot satisfy that prerequisite because this Court concludes that his claims are plainly meritless.

### 3. Merits.

Although the foregoing is dispositive of Petitioner's claims, the Court, out of an abundance of caution and in the interests of judicial economy, will also address the merits.

Respondent argues that Petitioner's claim is without legal and factual support. As to the Eighth Amendment challenge framed in Petitioner's twenty-fifth ground for relief, Respondent states that "[n]o court to the Warden's knowledge has ever upheld a 'general challenge' to lethal injection as a method of execution." (ECF No. 238, at 20.) With respect to the Fourteenth Amendment challenge set forth in Petitioner's twenty-sixth ground for relief, Respondent asserts that "[t]he Warden's research has failed to disclose any decision of the Supreme Court of a federal circuit court invalidating a condemned prisoner's sentence on the ground that the state's use of lethal injection violated the Equal Protection Clause." (*Id.*) With respect to both claims, Respondent relies on *Lynch v. Hudson*, in which another judge within this district, the Honorable Gregory L. Frost, rejected similar if not nearly identical Eighth and Fourteenth Amendment challenges raised in habeas corpus. Case No. 2:07-cv-948, 2011 WL 4537890, at *132 (S.D. Ohio Sep. 28, 2011).

Petitioner disagrees. As a preliminary matter, Petitioner asserts that the strictures of § 2254(d) are "inapplicable here, and consequently so is *Lynch*." (ECF No. 239, at 25.) The Court agrees with the former but not with the latter. Petitioner's Eighth Amendment claim is all but foreclosed by Sixth Circuit precedent and Petitioner's Fourteenth Amendment claim finds no support in law. To that point, Respondent is correct that *Lynch* offers persuasive factual and legal reasoning for why both of Petitioner's new claims are without merit.

In *Lynch*, the Honorable Gregory L. Frost addressed a claim challenging Ohio's lethal

199

injection protocol, procedures, and practices.  In addition to concluding that Petitioner's claim

was largely barred by procedural default, Judge Frost additionally found that the claim was

without merit.  Judge Frost explained:

> Petitioner has not (and cannot) cite to any clearly established federal law as
> determined by the United States Supreme Court holding that lethal injection
> constitutes cruel and unusual punishment, or violates the rights to due process or
> equal protection.  In *Fitzpatrick v. Bradshaw*, where the petitioner asserted a
> claim asserting that lethal injection violated the petitioner's rights to protection
> from cruel and unusual punishment and to due process of law, a sister court
> within the Sixth Circuit rejected it as follows:
>
> > Fitzpatrick does not provide this Court with any citation to
> > case law in which lethal injection was found to be cruel and
> > unusual punishment.  No court has found this method of execution
> > to be constitutionally impermissible.  The Sixth Circuit has even
> > commented that at this time, lethal injection "is the law of the
> > republic." *Alley v. Little*, 2006 WL 1313365, * 2 (6th Cir. 2006);
> > *Adams v. Bradshaw*, 484 U.S. F.Supp2d 753, 796 (2007).  This
> > Court also notes, that recently the U.S. Supreme Court upheld the
> > constitutionality of a lethal injection protocol similar to that used in
> > Ohio. *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420
> > (2008).  This claim is without merit.
>
> No. 1:06-cv-356, 2008 WL 7055605, at *62 (S.D. Ohio Oct. 14, 2008); *see also
> Hand v. Houk*, No. 2:07-cv-846, 2011 WL 2446383, at *113 (S.D. Ohio Apr. 25,
> 2011); *Hanna v. Ishee*, No. C-1_03-cv-801, 2009 WL 485487, at *52-53 (S.D.
> Ohio Feb. 26, 2009).  Not even this Court's recent decision in *Cooey v. Kasich*
> granting Smith's motion for a temporary restraining order and preliminary
> injunction staying his execution bolsters Petitioner's claim.  Nos. 2:04-cv-1156,
> 2:09-cv-242; 2:09-cv-823, 2:10-cv-27, 2011 WL 2681193 (S.D. Ohio Jul. 8,
> 2011).  The decision does not constitute clearly established federal law as
> determined by the Supreme Court.  And in granting the Plaintiff-Intervener's
> motion for a temporary restraining order and preliminary injunction staying his
> execution, this Court did not hold that Ohio's execution procedure was
> unconstitutional, 2011 WL 2681193, at *34.  Rather, the Court concluded only
> that the Plaintiff-Intervener had a substantial likelihood of succeeding on the
> merits of his claim that Ohio's execution procedure violates the Equal Protection
> Clause.

*Lynch*, 2011 WL 4537890, at *132.

The Court agrees with this reasoning and adds that nothing in its own review of Petitioner's claims and relevant case law persuades it that there is any merit to Petitioner's claims. As alluded to above, the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), approved a lethal-injection protocol that was nearly identical to the protocol that Ohio had in place at that time. Assuming that *Baze* establishes the controlling standard—*Baze* was a fractured decision and was not issued in the context of habeas corpus—a method of execution violates the Eighth Amendment only if it creates a substantial risk of severe pain or harm. *Baze*, 553 U.S. at 61-62. In the wake of *Baze*, courts within the Sixth Circuit have consistently rejected habeas claims raising Eighth Amendment and Fourteenth Amendment challenges against Ohio's execution protocol, procedures, and practices. In *Cooey (Biros) v. Strickland*, 589 F.3d 210, 223-24 (6th Cir. 2009), the Sixth Circuit held—albeit in the context of denying a stay of execution brought in a § 1983 action—that Ohio's then protocol did not violate the Eighth Amendment. In *Treesh v. Bagley*, 612 F.3d 424, 439 (6th Cir. 2010), the Sixth Circuit denied a certificate of appealability on a claim raising an Eighth Amendment challenge against Ohio's execution protocol, concluding that the petitioner had failed to make a substantial showing that he was denied a constitutional right. District courts have followed suit. *See Brinkley v. Houk*, 866 F. Supp. 2d 747, 842-43 (N.D. Ohio 2011) (rejecting Eighth and Fourteenth Amendment challenges to Ohio's execution protocol); *Scott v. Houk*, No. 4:07-CV-0753, 2011 WL 5838195, at *46-47 (N.D. Ohio Nov. 18, 2011) (same); *Frazier v. Bobby*, No. 3:09-CV-1208, 2011 WL 5086443, at *57-58 (N.D. Ohio Oct. 25, 2011) (same). This Court has given careful consideration to the facts and arguments offered by Petitioner not only in his Amended Petition (ECF No. 231, at ¶¶ 299-341) but also in his Supplemental Reply/Traverse (ECF No. 239, at 4-15) and is not

201

persuaded that they warrant habeas corpus relief under controlling precedent—even persuasive precedent.

This conclusion similarly forecloses any request by Petitioner for factual development. Finding that Petitioner can demonstrate good cause to conduct discovery requires a finding that the claims have some chance of succeeding. And that this Court cannot find.

For the foregoing reasons, the Court **DENIES** Petitioner's twenty-fifth and twenty-sixth grounds for relief. Petitioner withdrew his twenty-third ground for relief.

L. <u>**Twenty-Fourth Ground for Relief**</u>: **Cumulative error in the state court proceedings denied Mr. Hill due process.**

(Second Amended Petition, ECF No. 137-2, at ¶ 298 (argued twenty-first in the second amended petition).) In his Second Amended Petitioner, Petitioner argues that all of the errors he alleges, considered together, deprived him of his right to a fair trial and sentencing, entitling him to habeas corpus relief. Acknowledging that the Sixth Circuit has rejected cumulative-error analysis in post-AEDPA cases, however, Petitioner explains that he presents the issue to preserve the issue. (*Id*. at 93 n.14.)

Respondent argues in the Amended Return of Writ that "'[c]umulative error' is not a cognizable habeas claim because the United States Supreme Court has never held that errors can cumulate to permit relief." (ECF No. 154, at 89.) Another reason that Petitioner's claim fails, according to Respondent, is that no errors occurred and a string of zeros adds up to zero. (*Id*. at 90.)

In the Traverse, Petitioner asserts that "[t]he cumulative effect of constitutional errors may render a trial fundamentally unfair." (ECF No. 194, at 184 (citing *Lundy v. Campbell*, 888 F.2d 467, 472-73 (6th Cir. 1989)).) Arguing that his prosecution was rife with constitutional

202

error from beginning to end, Petitioner concludes by asserting that "[t]ogether, the errors establish a trial atmosphere that was fundamentally unfair as a matter of constitutional significance, as opposed to being merely 'procedurally unfair.' " (*Id.* at 187-88 (quoting *Lundy*, 888 F.2d at 481).)

In the Response, Respondent reiterates that cumulative error claims are plainly without merit as a matter of law and that Petitioner's cumulative error claim is additionally without merit as a matter of fact, given that there were no established errors to cumulate. (ECF No. 213, at 32.)

Petitioner's claim is foreclosed by Sixth Circuit precedent that clearly establishes as to cases governed by the AEDPA that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003); *see also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006) (holding that the Supreme Court has never held that distinct claims can accumulate to grant habeas relief); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (same). In light of the foregoing, this Court cannot find that the Ohio courts' decisions rejecting Petitioner's cumulative-effect-of-the-errors claims were contrary to or involved an unreasonable application of clearly established federal law.[4]

Accordingly, the Court **DENIES** Petitioner's twenty-fourth ground for relief.

### VI. Motion to Revive Procedurally Defaulted Claims

On April 23, 2021, Petitioner filed a motion to revive ineffective assistance of trial counsel claims that Petitioner procedurally defaulted by failing to include them in his original postconviction action. (ECF No. 229.) Petitioner bases his motion on the decision of *Martinez*

---

[4] This Court is mindful that the Sixth Circuit granted relief on a cumulative-error claim in *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2003), but that case was not governed by the AEDPA.

*v. Ryan*, 132 S. Ct. 1309, 1315 (2012), where the Supreme Court held that "[i]nadequate

assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's

procedural default of a claim of ineffective assistance at trial." Respondent filed no response.

Petitioner qualifies his motion, however. Specifically, Petitioner states the following:

> This Court held that Hill had established cause and prejudice for a claim
> under *Brady v. Maryland*, 373 U.S. 83 (1963). (Opinion and Order, Doc. No.
> 226, PageID 2385 et seq.) Because a showing of cause and prejudice on a *Brady*
> claim is coextensive with the claim's merits, the Court's ruling will likely render
> Hill's ineffective assistance of counsel claims moot. Hill is submitting the instant
> motion to ensure that his arguments under *Martinez* are preserved in the event that
> Hill's *Brady* claim does not ultimately result in habeas corpus relief.

(ECF No. 229, at 3 n.1.) Because the Court has in fact granted conditional habeas corpus relief

on the *Brady* claim set forth in sub-part (c) of Petitioner's fourth ground for relief, the Court

**DENIES** as moot the Petitioner's motion to revive procedurally defaulted claims. (ECF No.

229.)

## VII. Conclusion

For the foregoing reasons, the Court **GRANTS** sub-part (c) of Petitioner's Fourth Ground

for Relief and **DENIES** Petitioner's remaining habeas corpus claims. The Court further

**DENIES** as moot Petitioner's motion to revive procedurally defaulted claims of ineffective

assistance of counsel. (ECF No. 229.) The Court also **GRANTS** Petitioner's September 18,

2012 motion to expand the record. (ECF No. 237.)

The Court concludes that the Writ of Habeas Corpus should be granted as to the *Brady*

violation set forth in sub-part (c) of Petitioner's Fourth Ground for Relief. The Court **ISSUES** a

conditional Writ of Habeas Corpus directing the State of Ohio, within one-hundred, eighty (180)

days from the date of this judgment, to either release Petitioner or grant Petitioner a new trial.

The Court **DIRECTS** the Clerk to enter judgment in favor of Petitioner.

      **IT IS SO ORDERED.**

                                  3-29-2013

                              **EDMUND A. SARGUS, JR.**
                              **United States District Judge**

08·01·91    06:38    ☎513 352 4076    DISTRICT 4    +++ CIS    ☑001·001

## CINCINNATI POLICE PRELIMINARY INVESTIGATION REPORT

NAME OF COMPLAINANT __Teresa Dudley_____ DISTRICT/BEAT __4/403__

TYPE OF OFFENSE __Missing Person_____ REPORT DATE __6-1-91__ OFFENSE # _____
_____*Column use*

1. DESCRIBE CRIME SCENE SEARCH CONDUCTED (immediate area, adjoining rooms, hallways or floors, other buildings, yards, parking lots,
   etc.) __We searched the whole house which includes__
   __the attic, The alley behind the House. The suspects House.__ *(Father)*

2. PHYSICAL EVIDENCE LOCATED (what was found, where, by whom, and where it is being held). __The suspects change__ *(Fathers)*
   __of clothing which consisted of a Biegh miskey Mouse Tshirt and yellow__
   __shorts, which had nothing unusual about them__

3. FINGERPRINTS LIFTED FROM _____ BY WHOM? __NONE__

4. SHOULD AN INVESTIGATOR RETURN TO THE CRIME SCENE? (yes-no) IF YES, WHY? __Search The outside premises__
   __In daylight__

5. PERSONS INTERVIEWED (neighbors, witnesses, friends/associates, possible suspects-list name, address, home and work phone, and
   information received from each). __Pamela Lewis was The last one to see him near the__  *(2285 Loth St 2nd Fl.)*
   __baby's house at 0001 hrs. Barbera Janson of 2285 Loth St 1st Fl. 721-3688__
   __also saw the Father around the house approx. 2350 hrs.__
   __Both neighbors stated he entered the house but never came out.__ *(walkway of)*

6. DOES AN INVESTIGATOR NEED TO RE-CONTACT ANY OF THE ABOVE? (yes-no) IF YES, WHY? __Follow up on__
   __Question How much time the mother Spends with the child__
   __and how many diffent people does she let watch her.__

7. ADDITIONAL SUSPECT/VEHICLE INFORMATION (unusual marks, scars or other identifying features).
   __Father Genesis Hill MB 19 of 18 Mulberry 3rd Fl. -381-2775 he is__
   __Unemployed and denies that the child is his.__

8. CAN SUSPECT BE IDENTIFIED? (yes-no) IF YES, HOW? __No one saw the Father with the baby.__

9. OTHER UNITS/AGENCIES CONTACTED (C.P.D. units, outside law enforcement/civilian agencies). __None__

10. DO YOU BELIEVE THAT THIS CASE COULD BE SOLVED WITH SOME ADDITIONAL INVESTIGATIVE TIME?
    (yes-no) IF YES WHY? __Investigate why the mother ran from police and asked__
    __for the police to check the alley behind the house. (several Times)__

REPORTING OFFICER __James Givens__ SUPERVISOR _____ APPROVING

Reverse Side for Additional Information  ☒ Yes  ☐ No    FORM 311 A

APPENDIX A

08/01/81   06:40   ☎513 352 4078   DISTRICT 4   →→→ CIS   ☒001/001

ADDITIONAL COMMENTS:

Recieved radio run regarding family trouble. When we arrived Mother and Grandmother were lying on ground crying. The mother then told us she thinks the father took the baby. We searched The house and surrounding area, Notified Lieutenant; we then went to fathers house. Gave consent to search. During Search found nothing. Notified CIS they responded and had the Mother, Grandmother, and father come down for Question CIs interveiwed the above.

The Fathers Sister - Angela Hill - 651-2057 30 Mulberry 2nd Fl. 45210 States the mother is very irresponsible and was with her family most of the day without the baby.

November 6, 1991
Givens - direct                                                    1037

1                        NOVEMBER 6, 1991

2                        Afternoon Session

3                        (The jury entered the courtroom at

4              1:40 p.m.)

5                   THE COURT:  Good afternoon, ladies and

6              gentlemen of the jury.  We'll continue with the

7              prosecution's presentation of their case.

8                        Next witness.

9                   MR. KUNKEL:  Officer Givens.

10                      OFFICER JAMES GIVENS

11      being first duly sworn, was examined and testified as

12      follows:

13                   THE COURT:  Proceed.

14                      DIRECT EXAMINATION

15      BY MR. KUNKEL:

16              Q.    Officer Givens, please state your name

17      and spell your last name.

18              A.    James Givens, G-I-V-E-N-S.

19              Q.    And you work for the Cincinnati Police

20      Department?

21              A.    That's correct, District Four.

22              Q.    Were you so employed on May the 31st

23      1991?

24              A.    That's correct.

25              Q.    And what hours were you on duty that


                          State vs. Hill          APPENDIX B

        Barbara Moss

November 6, 1991
Givens - direct                                        1038

1    day?

2           A.      From eleven to seven, 11 p.m., 7 a.m.

3           Q.      Were you dispatched to 2287 Loth Street?

4           A.      Yes, I was.

5           Q.      And what time did you arrive at that

6    location, do you remember?

7           A.      About 12:15 a.m.

8           Q.      So it would have been actually June the

9    1st then when you got there?

10          A.      Yes.

11          Q.      What did you see when you arrived at

12   that location?

13          A.      I saw a Teresa Dudley and her mother.

14   They were laying on the ground crying.  It was

15   dispatched as family trouble.  I got there and asked

16   them what the problem was.  And they said -- Teresa

17   said her baby was missing.  So we just --

18          Q.      What did you do then?

19          A.      Went in the house, asked her when was

20   the last time she saw it.  And she told me --

21                  MR. KRUMBEIN:  Objection, Your Honor, to

22          statements made by other individuals.

23                  THE COURT:  Sustained.

24          Q.      Did you search around the house?

25          A.      Yes.

                        State vs. Hill
Barbara Moss

November 6, 1991
Givens - direct                                                    1039

1          Q.     How long did you look?

2          A.     You mean total or --

3          Q.     Around her house.

4          A.     About an hour, two hours, at the time.

5          Q.     Did you talk to any witnesses?

6          A.     Yes.

7          Q.     Did you then look in the alley behind

8     the house?

9          A.     Yes.

10         Q.     Did you find anything back there?

11         A.     No.

12         Q.     Did you search that whole house?

13         A.     Yes.  I called for a sergeant -- I

14    called for a sergeant to come, and he also helped me

15    search the house.  You know, we searched top to bottom,

16    front yard, backyard, everywhere.

17         Q.     And it would have been dark out?

18         A.     Yeah, it was dark out there.

19         Q.     How were you able to search?

20         A.     What, the inside?

21         Q.     The outside.

22         A.     Flashlight.

23         Q.     Did you then go down to 18 Mulberry

24    Street?

25         A.     Yes.


                              State vs. Hill
      Barbara Moss

November 6, 1991
Givens - direct                                              1040

1      Q.    Why did you go down there?

2      A.    She said that -- she said that the

3  father of the baby had --

4            MR. KRUMBEIN:  Objection, Your Honor, to

5            anything anyone else said.

6            THE COURT:  Sustained.

7      Q.    And when you got down to 18 Mulberry

8  Street what did you find?

9      A.    Well, we went to ask the father of the

10  child, you know, had he seen it, 'cause she --

11  witnesses said they saw him go in there, but never saw

12  him come out.

13           MR. DAVIS:  Objection.

14           MR. KRUMBEIN:  Objection, Your Honor.  I

15           would ask the Court to instruct the witness not

16           to repeat the statements of the others.  This

17           is hearsay.

18           THE COURT:  It's already in evidence.

19           I'm not sure what we're protecting.

20           MR. KRUMBEIN:  Ask it be stricken.

21           THE COURT:  Overruled.  Go ahead.  It's

22           already in evidence.  Go ahead.

23     Q.    Who did you go down to 18 Mulberry

24  Street with?

25     A.    Sergeant Eggers.


                          State vs. Hill
Barbara Moss

November 6, 1991
Givens - direct                                                1041

1          Q.     Anybody else?

2          A.     Teresa Dudley and her mother.

3          Q.     Who was there when you got there?  Was

4    anybody outside?

5          A.     Yes, his family.

6          Q.     How many people?

7          A.     I say about six of them.

8          Q.     Was Genesis Hill there?

9          A.     Not at the moment.

10         Q.     Did you ask for him?

11         A.     Yes.

12         Q.     And how long was it until he came out

13   after you asked?

14         A.     About twenty minutes.

15         Q.     Do you know why it took so long?

16         A.     No.  I was -- was distracted, talking to

17   the family.  So you know, then he finally came out.

18         Q.     When he came out -- let me ask you this:

19   Do you see Genesis Hill here in the courtroom today?

20         A.     Yes.

21         Q.     Point him out for me, please.  Tell me

22   what he's wearing.

23         A.     He's sitting there with the -- at the

24   defendant's table, in the middle, wearing a pink shirt

25   and burgundy pants.


                         State vs. Hill
     Barbara Moss

November 6, 1991
Givens - direct                                          1042

1               MR. KUNKEL:  Let the record reflect

2          identification of the defendant.

3               THE COURT:  So reflect.

4       Q.    Did you speak with the defendant after

5  he came out of the house?

6       A.    Yes.

7       Q.    What did you ask him?

8       A.    Asked him had he saw the baby.

9       Q.    What did he say?

10      A.    No.

11      Q.    What was his attitude, you know, what

12  was his demeanor at the time?

13      A.    Nonchalant, like.

14      Q.    Did he appear to you to be concerned?

15      A.    Nope.

16      Q.    Did you go inside 18 Mulberry Street?

17      A.    Yes.

18      Q.    And why did you go inside?

19      A.    Wanted to search around, and just to

20  check out the clothes the witnesses said he changed

21  from.

22               MR. DAVIS:  Objection.

23               MR. KRUMBEIN:  Your Honor, objection.

24          We'd ask that that be stricken from the record.

25               THE COURT:  It's already in evidence.


                              State vs. Hill
Barbara Moss

November 6, 1991
Givens - direct                                          1043

1          Overruled.

2          Q.      So you went in the house to look for

3    clothing?

4          A.      Yes.

5          Q.      Did you find it?

6          A.      Yes.

7          Q.      Well, what was the defendant wearing

8    when you got there?

9          A.      A royal blue T-shirt and black pants.

10         Q.      Long or short pants?

11         A.      Long.

12         Q.      What was the -- if you remember back

13   then, do you remember approximately what the

14   temperature would have been?  Was it cold or was it

15   warm?

16         A.      It was pretty warm.

17         Q.      Did -- where did you find the clothes?

18         A.      They were up in his room.  His room was

19   like up in the attic.  And they were like buried under

20   a pile of clothes, a big pile of clothes.

21         Q.      Did you find them or did the defendant

22   tell you where they were?

23         A.      We searched till we found them 'cause he

24   couldn't remember where they were.

25         Q.      You didn't take the clothes at that


                         State vs. Hill
Barbara Moss

1    time?

2         A.    No.

3         Q.    Do you remember what the clothes looked

4    like that you found up there?

5         A.    It was a beige Mickey Mouse T-shirt and

6    a pair of yellow shorts.

7         Q.    Did you ever look in the garage?

8         A.    No, didn't know he had a garage.

9         Q.    Did you search the yard?   .

10        A.    No, not to his house.  No, we didn't

11   really search the outside at all.

12        Q.    Did you ever directly ask the defendant

13   if he had the baby?

14        A.    Yes.

15        Q.    What was his response?

16        A.    No.

17        Q.    Teresa Dudley was present when this was

18   going on?

19        A.    Yes.

20        Q.    Was he having a -- saying anything to

21   her?

22        A.    No.  They weren't saying anything.  He

23   was just snickering at her, I guess.  I thought it was

24   just boyfriend-girlfriend trouble.  That's how it

25   normally is, you know.

State vs. Hill

Barbara Moss

November 6, 1991
Givens - cross                                                    1045

1        Q.    Snickering at her, what do you mean?

2        A.    Grinning, smiling at her.

3        Q.    Grinning at her?

4        A.    Yeah, like he was picking on her or

5   whatever.  But he didn't touch her or really say

6   anything to her.

7        Q.    Did you ask him if he'd been up to

8   Teresa Dudley's house?

9        A.    Yes.

10       Q.    What did he tell you?

11       A.    He said he hadn't been up there.  He

12   said he hadn't been up there.

13       Q.    He said no?

14       A.    Right.

15             MR. KUNKEL:  One moment, Your Honor.

16             THE COURT:  Okay.

17             MR. KUNKEL:  No further questions at

18         this time, Your Honor.

19             THE COURT:  Okay.  Cross.

20             MR. KRUMBEIN:  One moment, please, Your

21         Honor.

22                      CROSS-EXAMINATION

23   BY MR. DAVIS:

24       Q.    What time did you say you got to the

25   2387 Loth?


                          State vs. Hill
         Barbara Moss

November 6, 1991
Givens - cross                                          1046

1          A.      About 12:15 a.m.

2          Q.      And who was with you?

3          A.      Sergeant Eggers.

4          Q.      Okay.  And pursuant to whatever --

5   whoever you talked to, you searched the area; is that

6   correct?

7          A.      That's correct.

8          Q.      And you indicated -- did you search that

9   area for about two hours; is that right?

10         A.      Right.

11         Q.      So you're saying around 2:15, 2:30 you

12  went down to Mulberry, I mean; is that correct?

13         A.      No.  I went down to Mulberry about --

14  about thirty-five minutes later.  But when you say

15  searched the area, it was about two hours total.

16         Q.      So you searched the area around Loth

17  Street for about half an hour, thirty-five minutes?

18         A.      Right.

19         Q.      And you went back around, and looked at

20  the area around there; is that right?

21         A.      No.  We didn't look around Mulberry.  We

22  talked to the defendant, he gave us permission to

23  search his room and all that.  But we really didn't

24  search the outside or anything.

25         Q.      I'm talking about up on Loth Street.


                        State vs. Hill
Barbara Moss

1    You searched around that area?

2              A.    Right.

3              Q.    You went around the walkway up around

4    2287; is that right?

5              A.    We did that later, the outside and

6    walkway later.  As far as the alley, the rear alley, we

7    did all that after we talked to the -- after we talked

8    to the defendant.

9              Q.    Originally when you went to Loth Street

10   did you search the apartment on Loth Street?

11             A.    Right.

12             A.    Well, it's a house, it's a big house.

13             Q.    You searched the entire house?

14             A.    Right.

15             Q.    Okay.  Then did you also search behind

16   the house when you originally went to Loth Street?

17             A.    No, not the first time we didn't.

18             Q.    Then you went down to Mulberry; is that

19   right?

20             A.    Right.

21             Q.    And you went down there with who?

22             A.    Sergeant Eggers.  I had him come down

23   also.

24             Q.    Do you know their names?

25             A.    Officers' names?


                              State vs. Hill
     Barbara Moss

November 6, 1991
Givens - cross                                                    1048

1           Q.      Yes.

2           A.      Yeah, Sergeant Eggers.

3           Q.      Did Teresa Dudley go down there with

4    you, also?

5           A.      Originally yes, and her mother.

6           Q.      And her mother.  And did you ask for

7    Genesis; is that correct?

8           A.      Yes.

9           Q.      And he came outside in about twenty

10   minutes?

11          A.      Right.

12          Q.      Did you go upstairs to where he was

13   living?

14          A.      Yes.

15          Q.      Did Teresa go up with you?

16          A.      No.

17          Q.      Who went up with you?

18          A.      Sergeant and a lieutenant.

19          Q.      Okay.  And you indicated while you were

20   down there he was talking with Teresa; is that right?

21          A.      No, he wasn't -- he wasn't really left

22   alone with her or anything.

23          Q.      Okay.  But they were --

24          A.      This was down, you know, this was down

25   to -- on the way to CIS, when they wanted to question

                              State vs. Hill
Barbara Moss

1    them.

2              Q.    That night?

3              A.    Well, that's when they were, you know,

4    close together or whatever, near each other.

5              Q.    Okay.  No conversation between the two?

6              A.    No.

7              Q.    At any time when you were up on Mulberry

8    did you see Teresa go inside of the building?

9              A.    Inside of what building?

10             Q.    Hill house on Mulberry.

11             A.    No, I didn't.

12             Q.    Did she go into the garage?

13             A.    I didn't know there was a garage.  I

14    don't know.  I didn't see her go back --

15             Q.    You talked to Genesis, did he appear to

16    be somewhat glassy eyed or --

17             A.    No.

18             Q.    Was he coherent?

19             A.    No, he was pretty cooperative, you know,

20    he didn't --

21             Q.    Polite, cooperative?

22             A.    Right.

23                   MR. DAVIS:  That's all

24                   MR. KUNKEL:  No redirect, Your Honor.

25                   THE COURT:  Okay.  Step down, Officer.


                              State vs. Hill
     Barbara Moss