# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**GENESIS HILL,**

    **Petitioner,**

**v.**

**BETTY MITCHELL, Warden,**

    **Respondent.**

**Case No. 1:98-cv-452**
**Chief Judge Edmund A. Sargus, Jr.**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, brings this habeas corpus action pursuant to 28 U.S.C. § 2254. Through his original Petition for Writ of Habeas Corpus and various subsequent amendments, Petitioner brought twenty-six claims for habeas corpus relief. On March 29, 2013, this Court granted Petitioner's writ as to his Fourth Ground for Relief, sub-part (C), finding that the State had violated his constitutional rights by withholding exculpatory evidence, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). *See Hill v. Mitchell*, No. 1:98-cv-452, 2013 WL 1345831 (S.D. Ohio Mar. 29, 2013) (ECF No. 240). On December 1, 2016, the United States Court of Appeals for the Sixth Circuit reversed this Court's decision, ruling that Petitioner's *Brady* claim was barred by the statute of limitations. *See Hill v. Mitchell*, 842 F.3d 910 (6th Cir. 2016) (ECF No. 269). The Supreme Court of the United States subsequently denied certiorari on October 2, 2017, notice of which was filed in this Court on October 5, 2017. (ECF No. 275.) The Sixth Circuit's mandate issued the same day. (ECF No. 276.) This matter is now before the Court for consideration of Petitioner's Motion for Relief from Judgment Under Federal Rule of Civil Procedure 60(b) (ECF No. 273), Respondent's

Motion to Transfer to the Sixth Circuit (ECF No. 280), Petitioner's Opposition to Respondent's

Motion to Transfer to the Sixth Circuit (ECF No. 281), and Respondent's Reply in Support of

Motion to Transfer (ECF No. 282). For the reasons that follow, the Court **ENTERS**

**JUDGMENT** denying Petitioner's habeas corpus claims and dismissing his habeas corpus

petition pursuant to the Sixth Circuit's October 5, 2017 Mandate. Respondent's Motion to

Transfer (ECF No. 280) is **DENIED.** Petitioner's Motion for Relief from Judgment (ECF No.

273) is **GRANTED**. The Court further **ISSUES** a conditional Writ of Habeas Corpus as to the

Fourth Ground for Relief, sub-part (C), in Petitioner's Second Amended Petition (ECF No. 137-

1).

## I.    INTRODUCTION

The undersigned is keenly aware of the mandate rule, which serves a number of critically

essential functions, including the application of the rule of law. When the Court of Appeals

decides a case, as in this matter, the district court is required "to adhere to the commands of a

superior court." *Allard Enterprises, Inc. v. Adv. Programming Resources, Inc.*, 249 F.3d 564,

569 (6th Cir. 2001) (citing *United States v. Moored,* 38 F.3d 1419, 1421 (6th Cir. 1994)).

Nonetheless, "the trial court 'may consider those issues not decided expressly or impliedly by the

appellate court or a previous trial court.'" *Id.* at 570 (citing *Jones v. Lewis,* 957 F.2d 260, 262

(6th Cir. 1992)).

In this case, the Court of Appeals has held that the Petitioner's claim that the State of

Ohio violated *Brady v. Maryland*, 373 U.S. 83 (1963) was time barred.[1]  In its decision, the

---

[1] Judge McKeague found the *Brady* claim to be time barred and without merit. Judge Batchelder
determined the *Brady* claim had merit, but was nonetheless time barred. Judge Cole found the
*Brady* claim timely and meritorious.

Court of Appeals stated that the issue of equitable tolling of the statute of limitations was not raised by the Petitioner and was not addressed in the appellate court's opinion. On remand, the Petitioner has raised the issue in a Rule 60(b) motion, which is now before this Court. The motion raises issues not considered by this Court in its original, merits decision and not reviewed by the Court of Appeals. The Court begins consideration of the motion with the understanding that the *Brady* claim has been conclusively found to be time barred.

## II. BACKGROUND

This case arises out of Petitioner's conviction for capital murder of his infant daughter, Domika, and his subsequent death sentence. The extensive factual and procedural background of this case has been well documented in prior opinions, *see Hill v. Mitchell*, No. 1:98-cv-452, 2013 WL 1345831 (S.D. Ohio Mar. 29, 2013), and *Hill v. Mitchell*, 842 F.3d 910 (6th Cir. 2016), and will not be repeated here. Instead, the Court references only those facts and procedural points that pertain to the Motions before it.

### A. Petitioner's Original *Brady* Claim

Petitioner was convicted in Ohio state court of the May 31, 1991 murder of his six-month-old daughter and was subsequently sentenced to death. As this Court previously recognized, the prosecution's case was based almost exclusively upon the testimony of the victim's mother, Teresa Dudley. *See Hill*, 2013 WL 1345831, at *3. Consequently, "this case turned in large part on the jury's assessment of Dudley's credibility." *Id.* at *4.

After his conviction, Petitioner began the long process of seeking post-conviction relief through the state courts and eventually, on June 26, 1998, filed a petition for habeas corpus relief in this Court. (ECF No. 6.) Among his many claims, Petitioner asserted in his Fourth Ground for Relief, sub-part (C), a generic *Brady* claim, alleging that the "[p]rosecutors' failure to provide

3

exculpatory evidence during pretrial discovery denied [Petitioner] a fair trial," in part because "[t]he files of the prosecutor and investigating officer contain *Brady* materials." (*See* Sept. 27, 2006 Op. 55, ECF No. 151-1.) Petitioner based his claim exclusively on the allegation that the Hamilton County Prosecutor's office had a history of committing *Brady* violations. Upon motion by Respondent, in September 2006, this Court dismissed Petitioner's *Brady* claim due to the "the utter lack of substance to the claim." *Id.* at 96, ECF No. 151-2.

### B. Petitioner Seeks to Revive his *Brady* Claim

Petitioner's claim of withheld evidence proved to be prophetic. After requests for complete copies of the prosecutor's file allegedly went unmet, in 2007, Petitioner's counsel hired a private investigator to obtain a "Homicide Book" prepared by the Cincinnati Police Department related to the investigation and indictment of Petitioner. (*See* Feb. 15, 2011 Mot. to Reconsider Ex. C, ECF No. 215-3.) Upon acquiring the Homicide Book, Petitioner discovered that it contained a Cincinnati Police Preliminary Investigation Report (the "Preliminary Report") that severely undermined the credibility of Dudley, the State's key witness. The first officer to respond to the report of a missing child, James Givens, documented in the report that Dudley had run from police, causing Givens to question her motive for doing so, a fact not known to the jury at Petitioner's trial. Givens also reported that Dudley asked police to check the alley behind the house a day before the victim's body was found in that location, another fact not known to the jury. The Preliminary Report had not previously been provided to Petitioner.

On February 15, 2011, Petitioner filed a motion for reconsideration requesting, among other things, that the Court reconsider its dismissal of his *Brady* claim presented in his Fourth Ground for Relief, sub-part (C), in light of the discovery of the withheld Preliminary Report. (ECF No. 215.) Respondent opposed Petitioner's request, arguing that Petitioner was attempting

4

to amend his petition to present a completely new claim for habeas corpus relief. Because Petitioner obtained the withheld Preliminary Report more than one year before filing his motion for reconsideration, Respondent argued, his new *Brady* claim was barred by the statute of limitations.

### C. After Ruling that Petitioner's *Brady* Claim was Timely, this Court Grants Habeas Relief on the Claim

On March 23, 2012, this Court granted Petitioner's motion for reconsideration finding that his *Brady* claim premised upon the withheld Preliminary Report was not time barred for two reasons: (1) Petitioner presented new evidence, namely the Preliminary Report, in support of his previously-asserted *Brady* claim, warranting relief under Federal Rule of Civil Procedure 60(b)(2); and (2) even if Petitioner's motion were construed as a motion to amend to assert a new *Brady* claim, the new claim related back to the original *Brady* claim under Rule 15(c)(1). (*See* March 23, 2012 Op. 15-16, ECF No. 226.)

After concluding that Petitioner's *Brady* claim was properly before it, on March 29, 2013, this Court granted Petitioner's request for habeas relief on his Fourth Ground for Relief, sub-part (C). The Court reasoned that "[t]he report cast far more suspicion on Teresa Dudley than any evidence at trial had, which was defense counsel's sole strategy." *Hill*, 2013 WL 1345831, at *30. Noting how critical Dudley's credibility was to the prosecution's case, the Court continued:

> The fact that Dudley had voiced a concrete idea about where her baby's body might be, which was close to where the body was eventually discovered, critically undermined Dudley's credibility. And Petitioner's jury never heard it. The fact that Dudley fled when first approached by police, even though it was Dudley and her mother who had summoned the police when Dudley's baby went missing, also critically undermined Dudley's credibility. And Petitioner's jury never heard it.

*Id*. at *30-31. Because the prosecution's case turned almost exclusively on Dudley's testimony—and therefore her credibility—this Court held that this "evidence compiled by the

police, but not turned over to the defense, was material and calls into question whether the same jury would have convicted the Defendant, had this evidence been considered." *Id.* at \*4. Consequently, this Court granted relief on Petitioner's claim alleging that "[t]he files of the prosecutor and investigating officer contain *Brady* material." *Id.* at \*29.

## D. The Sixth Circuit Agrees that a *Brady* Violation Occurred, but Reverses Upon Finding the Claim is Time Barred

The United States Court of Appeals for the Sixth Circuit reversed, finding that Petitioner's *Brady* claim was procedurally barred as untimely. *Hill*, 842 F.3d at 916. Specifically, the Sixth Circuit held that Rule 60(b)(2) requires that new evidence offered to justify reconsideration of a prior dismissal order must be brought within one year. In addition, the Court determined that Petitioner's *Brady* claim premised upon the withheld Preliminary Report did not relate back to the "catch-all" *Brady* claim he originally asserted. *Id.* at 925. As a result, the Sixth Circuit concluded that the new *Brady* claim, which was brought three years after Petitioner obtained the Preliminary Report, was barred by the one-year statute of limitations set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The Court acknowledged that "AEDPA's statute of limitations is subject to equitable tolling," but declined to consider whether equitable tolling might apply because "the district court did not invoke equitable tolling and [Petitioner] does not argue that would apply to this case." *Id.* at 925 n.4.

Although it found Petitioner's *Brady* claim to be time barred, two of the three panel members went on to consider the merits of the claim and a majority of the Court agreed that a *Brady* violation had indeed occurred. Specifically, though she found the claim time barred, Judge Alice M. Batchelder emphasized in her concurring opinion that, "[c]onsidering the totality of the evidence, I believe the withheld police report satisfies the standard for materiality of

6

impeachment evidence under *Brady v. Maryland*." *Id.* at 948. Judge R. Guy Cole, Jr. similarly found that a *Brady* violation occurred, underscoring in his dissent that "[i]t is beyond debate that Officer Givens's preliminary investigation report and Teresa Dudley's grand jury testimony were suppressed by the state, and that those documents were favorable to [Petitioner]. I would also conclude that this evidence qualifies as 'material' for *Brady* purposes." *Id.* at 952.

Petitioner subsequently sought review in the United States Supreme Court, however that court denied certiorari on October 2, 2017. The Sixth Circuit mandate issued three days later, on October 5, 2017.

### E. Petitioner's Instant Rule 60(b) Motion and Respondent's Motion to Transfer

The day after the Sixth Circuit mandate issued, on October 6, 2017, Petitioner filed the instant motion seeking relief under Rule 60(b)(6), arguing that the actual-innocence exception to the statute of limitations applies to overcome AEDPA's one-year limitations period. As he must to obtain application of the actual-innocence exception, Petitioner presents new evidence consisting of three affidavits in support of his motion. Specifically, Petitioner presents a September 1, 2011 affidavit of a fact witness, Mesha Daniels, in which Ms. Daniels avers that "[a]round the time the baby was missing" she witnessed Dudley and Dudley's neighbor and best friend, Barbara Janson, "carrying a brown Similac box down the street" with "[e]ach of them h[olding] one side of the box." (Pet. Mot. Ex. B at ¶ 3, ECF No. 273-2.) Evidence presented at Petitioner's trial established that the victim's body was ultimately discovered hidden in a brown Similac box. Ms. Daniels further avers that "[a]fter Teresa and Barbara walked down the road, Teresa's mother, Debra Dudley, came outside her house and was screaming and sobbing very loud," saying "'I can't believe she did that to my baby.'" *Id.* at ¶ 4. Ms. Daniels goes on to state that she was never interviewed by police, the prosecution, or Petitioner's trial counsel, and she

7

did not testify at the trial. According to her affidavit, Ms. Daniels "do[es] not personally know [Petitioner] or any member of his family." *Id.* at ¶ 9.

Petitioner also presents a September 1, 2011 affidavit of Alexis Davenport, another fact witness who did not testify at trial. (Pet. Mot. Ex. C, ECF No. 273-3.) Ms. Davenport avers that she, too, witnessed Ms. Dudley and Ms. Janson carrying a brown Similac box down the street toward the location where the victim's body was ultimately discovered. She states that later that day Ms. Dudley told her that the victim was dead, although the victim's body was not found by police until the following day.

Petitioner also presents an affidavit of Dr. Amy Martin, dated March 4, 2016. (Pet. Mot. Ex. A, ECF No. 273-1.) Dr. Martin, a deputy coroner and forensic pathologist employed by the Hamilton County Coroner's office in 1991, performed the original autopsy on the victim. She avers that the "original cause of death was certified as blunt trauma to the head and the manner of death was determined as a homicide." *Id.* at ¶ 3. Dr. Martin states that she testified at trial and was asked by defense counsel "if an adult falling on a child from nine to ten feet might crush a baby skull," to which she responded that she "was not sure, and would need additional information." *Id.* at ¶ 5. In light of her extensive subsequent experience and newly-published literature in the decades following Petitioner's conviction, Dr. Martin now avers as follows:

> [B]ased in part of my experience as a forensic pathologist over the past 25 years, as well as the scientific literature now available that discusses more clearly the characteristics of crushing injuries to the head in children, I believe [the victim's] head injury is much more consistent with a crush injury then with inflicted impacts, and certainly more consistent with a crush injury than with injuries seen in shaking or shaking/impact.

*Id.* at ¶ 10. Dr. Martin bases her analysis in significant part on literature that did not exist at the time of Petitioner's trial. Ultimately, she avers that the victim's head injury is "very consistent"

8

with statements suggesting Petitioner "fell off the retaining wall . . . while holding the infant, and fell in such a way that his knee crushed [the victim's] head." *Id.* at ¶ 11. According to Dr. Martin, she now believes "[t]he pattern of skull fractures is very consistent with this type of crush injury, and much less consistent with direct blows to the head usually seen in abusive head trauma." *Id.* In addition, Dr. Martin avers that she was "dismayed to review the closing argument of the Hamilton County prosecuting attorney" in Petitioner's trial because his assertions that the victim was "shaken very violently" were "not an accurate summary of [her] testimony." *Id.* at ¶ 6.

Petitioner contends that these three affidavits, particularly when considered along with the withheld *Brady* evidence, demonstrate actual innocence at a level sufficient to overcome AEDPA's statute of limitations. Specifically, Petitioner insists that "this evidence is consistent with the defense theory that [Petitioner] accidentally fell with [the victim], that Teresa subsequently failed to provide [the victim] with adequate medical attention, and that Teresa then tried to pin the death on [Petitioner]." (Pet. Op. to Mot. to Transfer 12, ECF No. 281.) Especially because the prosecution's case rested almost exclusively on Dudley's testimony, according to Petitioner, the affidavits and *Brady* evidence warrant application of the actual-innocence exception to the statute of limitations, and therefore relief under Rule 60(b)(6).

Respondent counters that Petitioner's Rule 60(b) motion actually constitutes a second or successive habeas petition that cannot be considered without prior authorization from the Sixth Circuit under 28 U.S.C. § 2244(b)(3)(A). Specifically, Respondent insists that Petitioner "for a second time seeks habeas relief against the very same state court conviction and death sentence that he attacked in his first habeas action." (Mot. to Transfer 2, ECF No. 280.) As such,

9

Respondent requests that this Court transfer Petitioner's motion to the Sixth Circuit pursuant to 28 U.S.C. § 1631. The Court considers the parties' arguments below.

## III. LEGAL STANDARDS

### A. Second or Successive Habeas Petition

A second or successive application for habeas relief is governed by 28 U.S.C. § 2244(b), which provides that authorization from the court of appeals is required before the application may be considered by the district court: "Before a second successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). Failure to obtain authorization for the filing deprives the district court of jurisdiction to adjudicate the claims raised therein. *Post v. Bradshaw*, 422 F.3d 419, 421 (6th Cir. 2005). Thus, before considering a Rule 60(b) motion in a habeas case, a district court must first assess whether the motion amounts to a successive habeas petition for which circuit court authorization is required. *See Moreland v. Robinson*, 813 F.3d 315, 322 (6th Cir. 2016) ("[W]hen faced with what purports to be a Rule 60(b) motion or a motion to amend, federal courts must determine . . . if it is instead a second or successive application for habeas relief in disguise.").

"A Rule 60(b) motion is a second or successive habeas petition when it 'seeks vindication of' or 'advances' one or more 'claims.'" *Post*, 422 F.3d at 424 (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005)). As the United States Supreme Court has recognized, a motion presents a "claim," and therefore amounts to a second or successive petition, under the following circumstances:

A motion that seeks to add a new ground for relief . . . will of course qualify. A

10

motion can also be said to bring a 'claim' if it attacks the federal court's previous resolution of a claim *on the merits*, since alleging that the court erred in denying habeas relief on the merits is effectively indistinguishable from alleging that the movant is, under the substantive provisions of the statutes, entitled to habeas relief. That is not the case, however, when a Rule 60(b) motion attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings.

*Gonzalez*, 545 U.S. at 532 (emphasis in original). Put another way, a Rule 60(b) motion

constitutes a second or successive petition when it challenges "a determination that there exist or

do not exist grounds entitling a petition to habeas corpus relief under 28 U.S.C. §§ 2254(a) and

(d)." *Id.* at n.4. "When a movant asserts one of those grounds (or asserts that a previous ruling

regarding one of those grounds was in error) he is making a habeas corpus claim." *Id.*

Conversely, a Rule 60(b) motion *does not* bring a claim for relief rendering it a second or

successive petition when the petitioner "merely asserts that a previous ruling which precluded a

merits determination was in error—for example, a denial for such reasons as failure to exhaust,

procedural default, or statute-of-limitations bar." *Id.* at 532 n.4.

     Applying Supreme Court precedent, the Sixth Circuit Court of Appeals has repeatedly

recognized that a challenge to the application of the statute of limitations is not a claim, but

rather an issue properly raised in a Rule 60(b) motion. *See Mitchell v. Rees*, 261 F. App'x 825,

829 (6th Cir. 2008) ("[N]o claim is presented if a Rule 60(b) motion attacks some defect in the

integrity of the federal habeas proceedings," including improper application of a "statute-of-

limitations bar") (internal citations and modifications omitted); *Willis v. Jones*, 329 F. App'x 7,

14 (6th Cir. 2009) ("[I]nsofar as Willis's motion can be construed to argue that the district court

made a mistake in calculating the statute of limitations . . ., his claim goes to the procedural

handling of his first habeas petition, and need not be dismissed [as a second or successive

petition]."). The Sixth Circuit has further explained that a Rule 60(b) motion does not necessarily bring a claim even if the district court previously decided the habeas petition on the merits:

> [The petitioner's] Rule 60(b) motion argues that [our prior decision] erroneously denied him an evidentiary hearing and requests that the district court reopen the case and grant the hearing. This is not a 'claim' because it does not assert an error in the state conviction and would not constitute a federal basis for relief. Respondent argues that this case is distinguishable from cases in which a limitations bar applies because here the court actually decided [the petitioner's] original claim on the merits. While this may be true, the focus of the inquiry is not on whether the court reached the merits of the original petition but on whether the Rule 60(b) motion contains a claim.

*Mitchell*, 261 F. App'x at 829. In short, regardless of whether the court previously reached the merits of a petitioner's claim, "a motion is not a successive habeas petition 'if it does not assert, or reassert, claims of error in the movant's state conviction.'" *Tyler v. Anderson*, 749 F.3d 499, 507 (6th Cir. 2014) (quoting *Gonzalez*, 545 U.S. at 538).

**B. Rule 60(b) Standard**

Once a district court determines that a Rule 60(b) motion does not present a claim that renders the motion a second or successive petition under 28 U.S.C. § 2244(b), it must next consider whether the motion meets the standards of Rule 60(b). That Rule, along with the time limits of Rule 60(c), provides as follows:

> **(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> **(1)** mistake, inadvertence, surprise, or excusable neglect;
>
> **(2)** newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> **(3)** fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

12

> **(4)** the judgment is void;
>
> **(5)** the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> **(6)** any other reason that justifies relief.
>
> **(c) Timing and Effect of the Motion.**
>
>> **(1)** *Timing.* A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.
>>
>> **(2)** *Effect on Finality.* The motion does not affect the judgment's finality or suspend its operation.

Fed. R. Civ. P. 60(b)-(c).

Petitioner in this case seeks relief under Rule 60(b)(6), which is "interpreted narrowly, permitting relief only in 'extraordinary circumstances.'" *Mitchell*, 261 F. App'x at 829 (quoting *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 86-64 (1988)). Relief is proper under Rule 60(b)(6) only when the more specific circumstances of Rules 60(b)(1)-(5) do not apply. *Id.* "The general purpose of a Rule 60(b)(6) is to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice must be done." *Charter Twp. Of Muskegon v. City of Muskegon*, 303 F.3d 755, 760 (6th Cir. 2002).

One potential basis for relief under Rule 60(b)(6) is to apply equitable tolling to reach the merits of an otherwise time-barred habeas claim. *See Satterfield v. Dist. Attorney of Phila.*, 872 F.3d 152, 163 (3d Cir. 2017). AEDPA imposes a one-year statute of limitations on the filing of habeas corpus petitions. 28 U.S.C. § 2244(d). At least two mechanisms exist by which a petitioner could overcome this limitations period and bring an otherwise time-barred habeas

13

petition: (1) traditional equitable tolling; and (2) application of the actual innocence exception to the statute of limitations. *See Montgomery v. Turner*, No. 1:15-cv-00330, 2016 WL 11371451, at *39-41 (N.D. Ohio Oct. 26, 2016). Traditional equitable tolling applies when a habeas petitioner establishes "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Fla*, 560 U.S. 631, 649 (2010) (internal quotation marks and citations omitted). Alternatively, the actual-innocence exception applies if the petitioner "demonstrates actual innocence, so that by refusing to consider his petition due to timeliness the court would cause a fundamental miscarriage of justice." *Patterson v. Lafler*, 455 F. App'x 606, 609 (6th Cir. 2012). The Supreme Court has described the actual-innocence exception as being "'grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons.'" *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). Petitioner invokes only the actual-innocence exception here.

Federal courts have recognized that Rule 60(b)(6) provides an appropriate vehicle for relief based on the actual-innocence exception to AEDPA's statute of limitations. *See Satterfield*, 872 F.3d at 163 ("[A] proper demonstration of actual innocence [] should permit Rule 60(b)(6) relief unless the totality of equitable circumstances ultimately weigh heavily in the other direction."); *Willis*, 329 F. App'x at 14 (entertaining an actual-innocence argument on review of a denial of a Rule 60(b)(6) motion); *cf. Thomas v. Romanowski*, 362 F. App'x 452, 453 (6th Cir. 2010) (considering equitable tolling to overcome AEDPA's statute of limitations in the context of a Rule 60(b)(6) motion).

## C. Standard for the Actual Innocence Exception

To overcome a limitations bar based on actual innocence, a habeas petitioner must show

14

that "'it is more likely than not that no reasonable jury would have convicted [him].'" *Eberle v. Warden, Mansfield Corr. Inst.*, 532 F. App'x 605, 612-13 (6th Cir. 2013) (quoting *McQuiggin*, 569 U.S. at 395 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995))). A petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. In assessing a request for application of the actual-innocence exception, "a court must survey 'all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.'" *Eberle*, 532 F. App'x at 612-613 (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). With "'all the evidence' thus in mind, the court's final task is 'to assess the likely impact of the evidence on reasonable jurors'; it is not to work through an 'independent factual determination' to divine 'what likely occurred.'" *Id.* (quoting *House*, 547 U.S. at 538); *see also Souter v. Jones*, 395 F.3d 577, 590, 590 n.5 (6th Cir. 2005) (finding a credible claim of actual innocence based upon newly discovered evidence is sufficient to excuse the limitations period in § 2244(d)(1)). Moreover, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

As the Sixth Circuit has recognized, "a showing of actual innocence works to 'overcome' AEDPA's statute of limitations," rather than simply excuse late filings, which means "a petitioner who asserts a convincing actual-innocence claim does not have to 'prove diligence to cross a federal court's threshold.'" *Eberle*, 532 F. App'x at 612-13 (quoting *McQuiggin*, 569 U.S. at 399). Unexplained delay in advancing new evidence of actual innocence remains "'a factor relevant in evaluating the reliability of a petitioner's proof of innocence.'" *Id.* at 612-13

15

(quoting *McQuiggin*, 569 U.S. at 399 ("Unexplained delay in presenting new evidence bears on

the determination whether the petitioner has made the requisite showing.").

In addition, the Supreme Court has explained that the threshold for demonstrating actual

innocence to overcome a limitations bar is *lower* than that required to warrant habeas relief based

on a claim of actual innocence:

> If there were no question about the fairness of the criminal trial, a *Herrera*-type claim [for habeas relief based on actual innocence] would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish [the petitioner's] innocence. On the other hand, if the habeas court were merely convinced that those new facts raised sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that trial was untainted by constitutional error, [the petitioner's] threshold showing of innocence would justify a review of the merits of the constitutional claims.

*Schlup*, 513 U.S. at 314-15. The Sixth Circuit has similarly recognized that a lower threshold

applies to claims of actual innocence made to overcome a limitations bar:

> In *Schlup*, the Court distinguished habeas petitions asserting claims of actual innocence in cases where no constitutional error is alleged . . . from petitions in cases where a constitutional error allegedly occurred. The petitioner in the latter scenario does not argue that his innocence entitles him to habeas relief, but rather that his innocence entitles him to have a federal court consider the merits of his constitutional claims despite a procedural bar that would ordinarily preclude such review. In that case, a credible claim of actual innocence only operates as a 'gateway' through which a petitioner may pass and obtain federal review of his claims. Accordingly, where a petitioner's claim of actual innocence is for the purpose of having the court determine whether the constitutional errors alleged in the habeas petition warrant relief, the petitioner is required to meet a less stringent standard than in cases where the petitioner seeks habeas relief solely on the basis of his claimed innocence.

*Cleveland v. Bradshaw*, 693 F.3d 626, 631-32 (6th Cir. 2012) (internal citations and quotation

marks omitted). That said, however, actual innocence is an exception that is rarely granted, and

only in the most extraordinary circumstances. *See Schlup*, 513 U.S. at 324 (reasoning that,

16

because new reliable evidence will be unavailable "in the vast majority of cases, claims of actual innocence are rarely successful"); *see also McQuiggin*, 569 U.S. at 386 ("We caution, however, that tenable actual-innocence gateway pleas are rare.").

## IV. ANALYSIS

Applying the foregoing standards here, the Court concludes that Petitioner's Rule 60(b) motion does not constitute a second or successive habeas petition under 28 U.S.C. § 2244(b). In addition, Petitioner meets the standards for relief under Rule 60(b)(6) and has made the requisite showing of actual innocence to overcome AEDPA's one-year statute of limitations.

### A. Petitioner's Motion is not a Successive Petition

First, Petitioner's Rule 60(b) is not a second or successive habeas petition under 28 U.S.C. § 2244(b). Petitioner claims entitlement to relief from judgment in light of new evidence that demonstrates his actual innocence at a level sufficient to overcome the one-year statute of limitations that the Sixth Circuit held bars his *Brady* claim. Significantly, Petitioner does not challenge a merits determination of his *Brady* claim. In other words, he "does not assert an error in the state conviction" that could "constitute a federal basis for relief." *Mitchell*, 261 F. App'x at 829. Nor does he attack "a determination that there exist or do not exist grounds entitling [his] petition" to relief on his *Brady* claim. *Gonzalez*, 545 U.S. at 532 n.4. Rather, Petitioner seeks equitable tolling of the limitations period, which would allow the Court to reach the merits of his otherwise time-barred *Brady* claim. As the Sixth Circuit has recognized, such motions are not successive habeas petitions under 28 U.S.C. § 2244(b). *See, e.g., Willis*, 329 F. App'x at 14 (emphasizing that a motion arguing "that the district court made a mistake in calculating the statute of limitations . . . goes to the procedural handling of his first habeas petition, and need not be dismissed [as a second or successive petition].").

17

Respondent disagrees, arguing that the motion must be transferred to the Sixth Circuit as a second or successive habeas petition because Petitioner "has already had one complete round of habeas litigation that attacked the same conviction and death sentence that [Petitioner] again challenges by new claims supported by supposed new evidence." (Resp.'s Reply 2, ECF No. 282.) The question, however, is whether the instant 60(b) motion presents a "claim" for habeas corpus relief that attacks the state-court conviction, or whether it "attacks some defect in the integrity of the federal habeas proceedings," including improper application of the statute of limitations. *Mitchell*, 261 F. App'x at 829. Petitioner's motion falls into the latter category, and therefore does not constitute a second or successive petition.

Respondent also suggests that Petitioner's motion is a second or successive petition because the evidence supporting his actual-innocence argument could also be used to attack Petitioner's conviction. That may be; however, Petitioner does not seek habeas relief based on actual innocence or otherwise attack the state-court conviction based on the newly-presented evidence. Rather, Petitioner presents the evidence to support a well-recognized exception to AEDPA's statute of limitations. Petitioner's motion is thus not a second or successive habeas petition. Respondent's Motion to Transfer is therefore **DENIED**.

## B. Rule 60(b)(6) and the Actual-Innocence Exception

The Court concludes that Petitioner has made the requisite showing of actual innocence to overcome the limitations bar and obtain relief under Rule 60(b)(6).

### 1. Petitioner's Failure to Raise Actual Innocence Earlier Does Not Preclude Consideration of his Rule 60(b) Motion

As an initial matter, although Respondent does not argue that Petitioner waived his request for application of the actual-innocence exception by failing to raise it earlier in the

18

proceedings, the Court finds it appropriate to consider whether he has. The Court concludes that it may appropriately consider Petitioner's actual-innocence argument because (1) it was unavailable for Petitioner to raise earlier in the proceedings; and (2) consideration is warranted to avoid a plain miscarriage of justice.

Although courts typically decline to consider arguments made for the first time in a Rule 60(b) motion, this principle generally applies only when the arguments were available at the time the petition was filed. *See, e.g., United States v. Irvin*, No. 94-CR-81259-1, 2008 WL 2915336, at \*7-8 (E.D. Mich. July 25, 2008) (rejecting equitable tolling arguments raised for the first time in a 60(b) motion because they "were available at the time of [the petitioner's] first habeas petition"); *Landrau-Romero v. Banco-Popular de P.R.*, 212 F.3d 607, 612 (1st Cir. 2000) (declining to consider tolling argument that "was available to [the movant] before judgment was entered"); *cf. Dolphin v. Garraghty*, 27 F. App'x 496, 498-99 (6th Cir. 2001) (declining to address for the first time on appeal an equitable tolling argument based on "evidence that had been available and well-known to Petitioner" when he filed his motion in the district court).

Here, Petitioner has not argued that the actual-innocence exception applies to overcome AEDPA's limitations bar until now. Indeed, the Sixth Circuit recognized that equitable tolling often applies to AEDPA's statute of limitations, but emphasized that "the district court did not invoke equitable tolling and [Petitioner] does not argue that it would apply to his case." *Hill*, 842 F.3d at 925 n.4. This Court agrees with the Sixth Circuit, and further notes that the actual-innocence argument was unavailable to Petitioner at the time he sought to revive his *Brady* claim in this Court. In fact, Petitioner did not acquire a significant portion of the evidence in support of his argument until long after briefing closed and oral argument was held in the Sixth Circuit.

More specifically, Petitioner seeks to overcome the limitations bar based on three new affidavits that he claims help establish his actual innocence: Affidavits from Mesha Daniels and Alexis Davenport dated September 1, 2011, and an affidavit from Dr. Amy Martin dated March 4, 2016. (Pet. Mot. Exs. A-C, ECF No. 273.) None of these affidavits existed when Petitioner moved this Court to revive his *Brady* claim in February 2011. Nor did they exist when briefing closed on his motion in March of that year. This Court ultimately ruled that Petitioner's *Brady* claim was timely in March 2012. After that, Petitioner had no reason to raise equitable tolling based on actual innocence given the Court's ruling that the claim was timely. Although the affidavits of Daniels and Davenport are dated several months prior to this Court's March 2012 ruling that the *Brady* claim was timely, Dr. Martin's affidavit is dated March 4, 2016—nearly four years after this Court's determination that Petitioner's *Brady* claim was timely—and thus was not available prior to this Court's ruling. Nor did Dr. Martin's affidavit exist until three years after Respondent appealed that ruling to the Sixth Circuit in 2013. Indeed, Dr. Martin's affidavit did not exist until well after briefing closed and oral argument was held on the appeal in the Sixth Circuit.[2] Because the actual-innocence argument was unavailable to Petitioner at the time he sought to revive his *Brady* claim, and because he did not acquire a significant portion of the evidence used to support his argument until after briefing and oral argument concluded in the Sixth Circuit, this Court finds that Petitioner's failure to raise the argument earlier does not bar its consideration now.

Even if the evidence supporting his actual-innocence argument had been available to

---

[2] Briefing concluded in the Sixth Circuit in March 2015, and oral argument was held in January 2016.

Petitioner earlier, the Court would nevertheless find consideration of Petitioner's motion appropriate to avoid a plain miscarriage of justice. *See, e.g., Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 614-15 (6th Cir. 2014) (noting the propriety of considering otherwise waived arguments when the failure to do so "would produce a plain miscarriage of justice or when there are exceptional circumstances that militate against finding waiver"). Here, both this Court and a majority of the Sixth Circuit panel that reviewed Petitioner's habeas claim found that the State deprived Petitioner of a fair trial in violation of his Constitutional rights. In addition, Petitioner advances evidence that, particularly when coupled with the *Brady* material prosecutors withheld during his trial, suggests that Petitioner is actually innocent of the crime for which he now sits on death row. Because "[t]he quintessential miscarriage of justice is the execution of a person who is entirely innocent," *Schlup*, 513 U.S. at 324-25, the Court finds it appropriate to consider Petitioner's actual-innocence argument to avoid such grave miscarriage of justice here.[3]

### 2. Petitioner has Made the Requisite Showing of Actual Innocence to Overcome the Statute of Limitations

Having determined it is proper to consider Petitioner's actual-innocence argument raised in his Rule 60(b) motion, the Court next considers whether Petitioner is entitled to relief under Rule 60(b)(6). The Court concludes that he is.

As a threshold matter, because none of the more specific provisions of Rule 60(b) apply, relief from judgment due to equitable tolling based on actual innocence is appropriately brought

---

[3] In addition, the Supreme Court has emphasized that "a petitioner who asserts a convincing actual-innocence claim does not have to prove diligence to cross a federal court's threshold." *McQuiggin*, 569 U.S. at 399. That principal would be undermined if the Court declined to consider Petitioner's actual-innocence argument simply because he arguably might have been able to present the argument earlier in the proceedings.

under Rule 60(b)(6). *See, e.g., Satterfield*, 872 F.3d at 163.[4]  A Rule 60(b)(6) motion must be

brought within a "reasonable amount of time." Fed. R. Civ. P. 60(c)(1).  Here, Petitioner

brought his Rule 60(b)(6) motion the day after the Sixth Circuit issued its mandate, which was

before this Court even entered judgement pursuant to the mandate.  The Court finds that

Petitioner's one-day turnaround was reasonable, and that his motion is therefore timely.[5]  In

substantively reviewing Petitioner's submissions in support of the actual innocence exception,

the Court considers not just the newly-presented evidence, but "all the evidence, old and new,

incriminating and exculpatory, without regard to whether it would necessarily be admitted" at

trial. *Eberle*, 532 F. App'x at 612-13.  Specifically, the Court has considered evidence presented

at trial, the *Brady* evidence suppressed at trial, and the three new affidavits obtained by Petitioner

---

[4] The Court notes that although Petitioner advances new evidence in support of his actual-innocence argument, as he must to warrant application of the exception, Rule 60(b)(2), which allows relief from judgment based on newly discovered evidence, does not apply.  First, Petitioner advances new evidence not to bolster the merits of his *Brady* claim (and indeed the newly-presented evidence has no bearing on his *Brady* claim at all), but rather in support of his request for application of the actual-innocence exception to the statute of limitations.  Moreover, to justify relief under Rule 60(b)(2), a movant must demonstrate that the newly-presented evidence would be admissible at trial. *See Wilson v. Upjohn Co.*, 808 F. Supp. 1321, 1323 (S.D. Ohio 1992).  When considering whether Petitioner has made a sufficient showing of actual innocence to overcome a limitations bar, however, this Court must consider all available evidence without respect to admissibility, *see Schlup*, 513 U.S. at 327-28, which further demonstrates that Rule 60(b)(2) fails to afford a proper basis for relief.

[5] Although Respondent does not contend that Petitioner's Rule 60(b)(6) motion is untimely, he does argue that Petitioner's delay in presenting the affidavits upon which he bases his actual-innocence argument calls into question the strength of his actual-innocence claim. (Resp. Mot. 6-8, ECF No. 280.)  Though delay is relevant to weighing the actual-innocence evidence, as Respondent suggests, the Supreme Court has emphasized that "a petitioner who asserts a convincing actual-innocence claim does not have to prove diligence to cross a federal court's threshold." *McQuiggin*, 569 U.S. at 399.  Accordingly, although the Court will consider any delay by Petitioner in the context of assessing his actual-innocence claim, Respondent's argument of undue delay does not render Petitioner's motion untimely under Rule 60(b)(6).

since his trial.

### a. Evidence Presented at Trial

The evidence against Petitioner presented at trial comprises the following as recounted by

the Sixth Circuit:

> Teresa Dudley, Domika's mother, testified that [Petitioner] told her "I bet I don't pay" child support. Trial Tr. Vol. VIII, Dudley Testimony at 1012–14. Barbara Sue Janson testified that she heard [Petitioner] tell Dudley he would "kill that little bitch before he paid anything." *Id.*, Janson Testimony at 981–82. Two witnesses testified that they saw [Petitioner] enter Dudley's house the night Domika disappeared, but did not see him leave. Trial Tr. Vol. VIII, Janson Testimony at 980, Lewis Testimony at 994–95. [Petitioner] admitted at trial that he entered Dudley's home the night Domika disappeared and unscrewed the lightbulb in the hallway outside her room. Trial Tr. Vol. X, Genesis Hill Testimony at 1405–06. The next morning, Dudley searched [Petitioner]'s garage with [Petitioner]'s aunt and cousin and found one of the barrettes she placed in Domika's hair the night before. Trial Tr. Vol. VIII, Dudley Testimony at 1012–14. Officers Robert Steinher and Charles Beaver testified that they found Domika's body in a vacant lot behind [Petitioner]'s house. Trial Tr. Volume VIII, Steinher Testimony at 1084, Beaver Testimony at 1097–98. Officer Robert Hennekes testified that the police found Domika's body in a formula box that was traced back to [Petitioner]'s house. *Id.*, Hennekes Testimony at 1065–67. A forensic expert testified that the trash bags wrapped around Domika's body matched trash bags from [Petitioner]'s home. Trial Tr. Vol. IX, William Dean Testimony at 1170–71. Officer Steinher testified that those trash bags were secured with electrical tape, and that [Petitioner]'s uncle (who he lived with) was unable to find the electrical tape he normally kept in his tool box. Trial Tr. Vol. VIII, Steinher Testimony at 1088. Dudley and Janson testified that Domika's body was wrapped in a shirt that "look[ed] just like" one [Petitioner] owned. Trial Tr. Vol. VIII, Dudley Testimony at 1005, Janson Testimony at 980–81, 987–88. Finally, a bus driver picked [Petitioner] out of a photo array, though at trial the driver clarified he identified [Petitioner] based on size and height and "could not really honestly say that it would be him or not." Trial Tr. Vol. IX, Patrick Ormond Testimony at 1138–41. The driver testified that he saw a passenger matching [Petitioner]'s physical description say he "could not believe what he had done to a little baby" and feared he would "get the chair for it." *Id.*

842 F. 3d at 934. In dissent, Judge Cole provided additional discussion of evidence in

Petitioner's favor:

Barbara Sue Janson, a neighbor, testified that she saw [Petitioner] enter Dudley's home about 10 minutes before Domika's disappearance. But that is all she saw. Janson knew nothing of what happened inside the Dudley residence, nor did she see [Petitioner] depart. Janson further claimed that she could "positive[ly]" identify [Petitioner]'s shirt, and that she once overheard him say "he'd kill that little bitch before" paying child support. (Trial Tr., Vol. 8, p. 981–82.) But it later came out that Janson had "bad blood" with [Petitioner's] family, that she only believed the shirt wrapped around Domika's body "look[ed] like" one [Petitioner] owned, and that [Petitioner] never "threaten[ed] little Domika or ever [said] he would hurt her." (*Id.* at 988, 989, 1004.) The state also marshalled the testimony of a local bus driver named Patrick Ormond, who apparently overheard a young man on his bus say that "he thought he might get the chair" for "what he had done to a little baby." (*Id.*, Vol. IX, p. 1138.) But despite that vivid recollection, Ormond could not identify [Petitioner] in the courtroom.

The prosecution also called several police officers and forensic experts to introduce circumstantial physical evidence. For instance, the prosecution established that [Petitioner]'s latent fingerprint was on a lightbulb at Dudley's home, and that [Petitioner]'s uncle was missing some electrical tape. The state also matched serial numbers from the formula box in which Domika's body was found, with formula cans found inside the [Petitioner's] family home. And a forensic expert for the state opined, based on an unusual "wood grain" and "jigsaw" pattern analysis, that one of the trash bags in which Domika's body was wrapped came from a roll inside [Petitioner's] household. (*Id.*, Vol. IX, p. 1160, 1165.) But that evidence was not unassailable. For example, [Petitioner] admitted that he went to Dudley's house that night, but explained that he only "turned out the [light] bulb" as a "signal" he was "call[ing]" on her, then simply left when she did not respond. (*Id.*, Vol. X, p. 1413.) And the electrical tape, formula box, and trash bags were readily accessible to others, which "suggests, at most, that someone in [[Petitioner]'s family or] group of friends may have committed the crime, and that [Petitioner] may have been involved in events related to the murder *after* it occurred." *See Wearry*, 136 S. Ct. at 1006.

842 F.3d at 955–56 (Cole, J., dissenting).

### b. *Brady* Evidence

As described in this Court's previous orders, Petitioner obtained two pieces of exculpatory evidence following his conviction that had been suppressed at trial. The first was a police report:

The one-and-a-half page report at issue, dated June 1, 1991 and authored by Cincinnati Police Officer James Givens, provides in relevant part the following. On

a line following the question, "Do you believe that this case could be solved with some additional investigative time[,]" Officer Givens circled "yes" and handwrote the following: "Investigate why the mother ran from police and asked for the police to check the alley behind the house. (several times)" (ECF No. 219-4, at 1.)

(ECF No. 269 at 9). The second was Dudley's grand jury testimony:

> According to Petitioner, portions of Dudley's testimony before the grand jury were inconsistent with the testimony that Dudley gave at trial. Critical to the prosecution's case linking Petitioner to the kidnapping and killing of the child-victim was the discovery of the victim's barrette in Petitioner's garage the morning after the victim went missing. Petitioner asserts that although Dudley testified before the grand jury that she was accompanied by her cousins Denise and Ranisha when Dudley discovered the victim's barrette in Petitioner's garage, Dudley testified at trial that she was accompanied by Barbie and Pam. (ECF No. 237, at 9.) Moreover, Petitioner continues, although Dudley testified before the grand jury that she had found the victim's barrette *outside* the garage of Petitioner's home, Dudley testified at trial that she had found the barrette *inside* the garage. Concerning the importance of the discovery of the barrette to the State's case, Petitioner points out that the prosecution repeatedly emphasized that evidence in its rebuttal closing arguments. (*Id.* at 11.)

(ECF No. 240 at 19).

### c. New Witness Affidavits

Finally, the Court considers the three affidavits submitted by Petitioner as described in detail in Section I.E, *supra*: Ms. Daniels and Ms. Davenport both averred that they observed Dudley and Janson carrying a Similac box, consistent with the one in which Domika was later found, on the day Domika went missing. Ms. Davenport also averred that Dudley told her Domika was dead on June 1, 1991, even though Domika's body was not found until June 2. (ECF Nos. 273-2, 273-3).

Additionally, Petitioner submitted the affidavit of Dr. Martin, the coroner who conducted Domika's autopsy. Based on scientific literature generated over the 25 years since she conducted the autopsy, Dr. Martin now opines that Domika's head injury is "much more

consistent with a crush injury then with inflicted impacts, and certainly more consistent with a crush injury than with injuries seen in shaking or shaking/impact." (ECF No. 273-1).[6]

### d. The Evidence is Sufficient to Satisfy the Actual Innocence Exception

The Court finds that the evidence collectively establishes a threshold showing of Petitioner's actual innocence sufficient to overcome AEDPA's statute of limitations. The Court discussed the significance of the suppressed *Brady* material in its earlier orders, finding that it cast significant doubt as to the credibility of the prosecution's key witness, Teresa Dudley:

> [Officer Givens' police] report casts far more suspicion on Teresa Dudley than any evidence at trial did. If it was defense counsel's strategy to shift blame for the baby's death to Dudley or otherwise call her credibility into question, the trial transcript contains very little evidence to that end. The most that defense counsel established was that Dudley's friend Barbara Janson did not get along with Petitioner (Tr. Vol. VIII, at 982-83); that Dudley was at her home when she handed to police a barrette similar to one her daughter was wearing at the time of her disappearance that Dudley claimed to have found on the floor of Petitioner's garage (Tr. Vol. VIII, at 1105-06); that several neighbors were of the view that Dudley did not properly care for her baby daughter (Tr. Vol. X, at 1298-99; 1385-95); and that when Dudley discovered that her baby was missing and told her mother, her mother was crying and shouting but Dudley was not (Tr. Vol. X, at 1394-95).
>
> At a minimum, the suppressed report gives rise to a reasonable suspicion that Dudley had knowledge not only that her missing baby was dead but also where the baby's body was—before the body was found and at a time when Dudley was purporting to search for her missing daughter. The suppressed report also gives rise to a reasonable suspicion that Dudley actively undertook to place the blame for the baby's death on Petitioner. Finally, the suppressed report gives rise to at least an inference that Dudley was responsible for the baby's death.
>
> According to the suppressed report, Teresa Dudley fled from police when they first approached her, despite the fact that it was Dudley and her mother who called police

_____

[6] Respondent argues that Dr. Martin's revised opinion does not constitute "newly discovered evidence" and therefore may not be considered by the Court. (ECF No. 280 at 9–11). However, Petitioner correctly identifies Sixth Circuit precedent holding that revised expert opinions are properly considered in the actual innocence context. *Souter*, 395 F.3d at 592 ("[I]f Dr. Cohle has changed his expert opinion, the evidence itself has changed, and can most certainly be characterized as new.").

when Teresa could not find her baby. (Tr. Vol. VIII, at 1005.) The credibility of Teresa Dudley's testimony was essential to the prosecution's case against Petitioner. In the instant case, information that a young mother who frantically called police when her baby went missing actually fled from police when they first approached her constitutes vital, powerful evidence as to her credibility. Petitioner's jury never heard any of these matters.

(ECF No. 226 at 9–10).

Dudley's grand jury testimony, which was also suppressed at trial, created similar problems for Dudley's credibility:

The fact that Dudley had testified differently before the grand jury than she had at trial about whom she was accompanied by when the victim's barrette was discovered in Petitioner's garage and about whether that barrette was discovered inside or outside Petitioner's garage calls her credibility into question. Petitioner's jury never heard any cross-examination by defense counsel exposing those inconsistencies. As the Court also noted, although there was evidence produced at trial implicating Petitioner in the kidnapping and murder of the baby, Teresa Dudley by far provided the most damning evidence, leaving the Court with grave doubts whether the prosecution could have made a case without Teresa Dudley. The grand jury testimony . . . serves to bolster the Court's conclusion that the prosecution failed to disclose favorable, material evidence-evidence undermining the credibility of the prosecution's key witness, undercutting the prosecution's case, and potentially bolstering defense counsel's trial strategy of innocence.

(ECF No. 240 at 22).

Two of Petitioner's affidavits, those of Ms. Daniels and Ms. Davenport, further undermine the strength of Dudley's testimony. Both witnesses observed Dudley and her close friend Janson carrying a brown Similac box, consistent with the one in which Domika was later found, on the day Domika went missing. Ms. Davenport also averred that Dudley told her Domika was dead on June 1, 1991, even though Domika's body was not found until June 2. (ECF Nos. 273-2, 273-3). This evidence lends further plausibility to the inference that Dudley was involved in Domika's death and therefore weakens her testimony against Petitioner.

Finally, Dr. Martin's affidavit revising her opinion as to the manner of Domika's death significantly decreases the likelihood that the prosecution could have convinced a jury that anyone, including Petitioner, intentionally killed Domika, which was required to obtain a capital murder conviction. As recounted by the Ohio Supreme Court, the only evidence of purposeful killing presented at trial was (1) Dr. Martin's expert testimony and (2) Janson's testimony that Petitioner stated to Dudley that he would "kill that little bitch" before he would pay child support. *State v. Hill*, 75 Ohio St. 3d 195, 206, 661 N.E.2d 1068, 1079 (1996). However, the latter evidence was countered by Dudley's testimony that Petitioner never threatened Domika. Accordingly, Dr. Martin's testimony was the only unrebutted trial evidence that Domika was purposefully killed.

Dr. Martin has made significant revisions to the expert opinion she offered at trial. Her original testimony, as summarized by the Ohio Supreme Court, was that "Domika died as a result of multiple blunt force or blunt impacts to her head. Her three skull fractures could not have been caused by a simple fall. Violent shaking, in addition to blunt trauma, may have contributed to her death, but the coroner concluded Domika died as a result of homicide, not accident." *Hill*, 75 Ohio St. 3d at 206, 661 N.E.2d at 1079. In contrast, her current affidavit states:

> [B]ased in part on my experience as a forensic pathologist over the past 25 years, as well as the scientific literature now available that discusses more clearly the characteristics of crushing injuries to the head in children, I believe that Domika's head injury is much more consistent with a crush injury then [*sic*] with inflicted impacts, and certainly more consistent with a crush injury than with injuries seen in shaking or shaking/impact.
>
> In my opinion, Domika's head injury is very consistent with the statements provided to me by [Petitioner]'s counsel . . . which suggest that [Petitioner] fell off the retaining wall seen in the photographs while holding the infant, and fell in such a way that his knee crushed Domika's head. The pattern of skull fractures is very

consistent with this type of crush injury, and much less consistent with direct blows to the head usually seen in abusive head trauma.

(ECF No. 273-1 at 3–4). Thus, the possibility that Domika's death was accidental, rather than purposeful, is much greater based on Dr. Martin's revised testimony.

The Court notes that the Petitioner's new evidence, namely the statements of the three affiants discussed above, was not presented at trial. These statements combined with the withheld *Brady* evidence demonstrate that "it is more likely than not that no reasonable jury would have convicted [Petitioner]." *Eberle*, 532 F. App'x at 612-13. This is particularly the case given that the evidence need only "raise[] sufficient doubt about [Petitioner's] guilt" to overcome the statute of limitations, rather than "unquestionably establish [Petitioner's] innocence," as would be required to grant habeas relief based on an actual-innocence claim. *Schlup*, 513 U.S. at 314-15. Accordingly, the Court concludes that Petitioner has satisfied the actual innocence exception to AEDPA's statute of limitations. Therefore, having previously found for Petitioner on the substance of his *Brady* claims, the Court further concludes that habeas relief is warranted.

## V.    CONCLUSION

Pursuant to the October 5, 2017 Mandate, the Court hereby **ENTERS JUDGMENT** denying Petitioner's habeas corpus claims and dismissing his habeas corpus petition. Respondent's Motion to Transfer (ECF No. 280) is **DENIED**. Petitioner's Motion for Relief from Judgment (ECF No. 273) is **GRANTED**.

The Court concludes that the Writ of Habeas Corpus should be granted as to the *Brady* violation set forth in sub-part (C) of Petitioner's Fourth Ground for Relief in his Second Amended Petition (ECF No. 137-1, ¶¶ 93–97). The Court **ISSUES** a conditional Writ of Habeas

29

Corpus directing the State of Ohio, within one-hundred eighty (180) days from the date of this judgment, to either release Petitioner or grant Petitioner a new trial. The Court **DIRECTS** the Clerk to enter judgment in favor of Petitioner.

     *IT IS SO ORDERED.*

_____
4-24-2019
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**